1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  SCOTT C. MATHER, State Bar No. 190912
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5709
     Fax:  (415) 703-5843
8    Email:  Scott.Mather@doj.ca.gov

9  Attorneys for Respondent Ben Curry

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15  **BRICE GLASGOW,**                              C 07-1851 MJJ

16                             Petitioner,          **ANSWER TO THE ORDER
                                                    TO SHOW CAUSE;**
17            v.                                     **MEMORANDUM OF POINTS
                                                    AND AUTHORITIES**
18  **BEN CURRY, Warden,**

19                             Respondent.          Judge:     The Honorable
                                                               Martin Jenkins
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION                                                                     1

ANSWER TO THE ORDER TO SHOW CAUSE                                                2

MEMORANDUM OF POINTS AND AUTHORITIES                                             7

    ARGUMENT                                                                    7

        THE STATE COURT'S DENIAL OF PETITIONER'S HABEAS CLAIM WAS
NOT CONTRARY TO OR AN UNREASONABLE APPLICATION OF
CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN
UNREASONABLE DETERMINATIONOF THE FACTS.                                          7

        A.   Petitioner Received All Process Due Under the Only United States
Supreme Court Law Addressing Due Process in the Parole Context.                  8

        B.   The Ninth Circuit's Some-Evidence Test Is Not Clearly Established
Supreme Court Law, and thus Not Applicable to Petitioner's Federal
Habeas Corpus Claims under AEDPA.                                                9

        C.   Even if the Some-Evidence Standard Was Clearly Established
Federal Law,the Standard Was Correctly Applied by the State Court.              12

        D.   The Board May Rely on Static Factors to Deny Parole.                      15

        E.   Petitioner's Erroneously Argues that He Is Entitled to Parole Based
on the Language of California Penal Code section 3041(a).                       17

CONCLUSION                                                                      18

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.

*Glasgow v. Curry*
C 07-1851 MJJ

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Benny v. U.S. Parole Comm'n*
295 F.3d 977 (9th Cir. 2002)                                           6

*Biggs v. Terhume*, 334 F.3d 910 (9th Cir. 2003)                      16, 17

*Carey v. Musladin*
__ U.S. __, 127 S. Ct. 649 (2006)                                   6, 9-12

*Crater v. Galaza*
491 F.3d 1119 (9th Cir. 2007)                                         10

*Foote v. Del Papa*
492 F.3d 1026 (9th Cir. 2007)                                         10

*Greenholtz v. Inmates of Neb. Pen. & Corr. Complex*
442 U.S. 1 (1979)                                                   5, *passim*

*Gutierrez v. Griggs*
695 F.2d 1195 (9th Cir. 1983)                                         17

*Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002)                                         13

*In re Dannenberg*
(2005) 34 Cal.4th 1061                                              4, *passim*

*In re Rosenkrantz*
29 Cal.4th 616 (2002)                                               6, 12

*Irons v. Carey*
__ F.3d __, 2007 WL 2027359 (9th Cir. July 13, 2007)                16, 18

*Jancsek v. Oregon Board of Parole*
833 F.2d 1289 (9th Cir. 1987)                                         9

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005)                                         12

*Lockyer v. Andrade*
583 U.S. 63 (2003)                                                    7

*Middleton v. Cupp*
768 F.2d 1083 (9th Cir. 1985)                                         17

*Nguyen v. Garcia*
477 F.3d 716 (9th Cir. 2007)                                          10

*Pedro v. Or. Parole Bd.*
825 F.2d 1396 (9th Cir. 1987)                                         8

**TABLE OF AUTHORITIES (continued)**

|  | Page |
|---|---|
| *Pulley v. Harris*<br>465 U.S. 37 (1984) | 17 |
| *Rompilla v. Beard*<br>545 U.S. 374 (2005) | 10 |
| *Rose v. Hodges*<br>423 U.S. 19 (1975) | 17 |
| *Sandin v. Conner*<br>515 U.S. 472 (1995) | 5 |
| *Sass v. Cal. Bd. of Prison Terms*<br>461 F.3d 1123 (9th Cir. 2006) | 5, 12, 16 |
| *Schriro v. Landrigan*<br>___U.S.___, 127 S. Ct. 1933 (2007) | 10, 11 |
| *Superintent v. Hill*<br>472 U.S. 445, 455 (1985) | 9, 12, 13, 15 |
| *Wainwright v. Greenfield*<br>474 U.S. 284 (1986) | 10 |
| *Wiggins v. Smith*<br>539 U.S. 510 (2003) | 10 |
| *Wilkinson v. Austin*<br>545 U.S. 2384 (2005) | 8, 11 |
| *Williams v. Taylor*<br>529 U.S. 362 (2000) | 7 |
| *Wolff v. McDonnell*<br>418 U.S. 539 (1974) | 11 |
| *Ylst v. Nunnemaker*<br>501 U.S. 797 (1991) | 8 |

**Statutes**

| California Code of Regulations, Title 15 |  |
|---|---|
| § 2402(a) | 15 |
| § 2402(b) | 14 |
| § 2402(c)(1)(A) | 4, 13 |

| Penal Code |  |
|---|---|
| § 3041 | 5, 6, 15, 17 |
| § 3041(a) | 18 |
| § 3041(b) | 15, 17 |

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.

*Glasgow v. Curry*
C 07-1851 MJJ

iii

**TABLE OF AUTHORITIES  (continued)**

Page

United States Code, Title 28
 § 2254(a)              5
 § 2254(d)             9, 12
 § 2254(d)(1)            10
 § 2254(d)(1)-(2)           7
 § 2254(e)(1)            12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.     *Glasgow v. Curry*
C 07-1851 MJJ

iv

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  SCOTT C. MATHER, State Bar No. 190912
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone: (415) 703-5709
    Fax: (415) 703-5843
8   Email:  Scott.Mather@doj.ca.gov

9  Attorneys for Respondent Ben Curry

10

11           IN THE UNITED STATES DISTRICT COURT

12        FOR THE NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **BRICE GLASGOW,** | C 07-1851 MJJ |
| Petitioner, | **ANSWER TO THE ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| **BEN CURRY, Warden,** | |
| Respondent. | Judge:    The Honorable Martin Jenkins |

**INTRODUCTION**

Petitioner Brice Glasgow is a California state inmate incarcerated at the Correctional

Training Facility in Soledad, California, proceeding pro se in this habeas corpus action.

Petitioner alleges in his petition that the Board of Parole Hearings unconstitutionally denied him

parole at his November 2005 parole consideration hearing.  This Court found cognizable

Petitioner's claims that this parole denial was "not based on at least 'some' evidence bearing any

indicia of reliability."  (Order to Show Cause, filed July 25, 2007, at 2.)  Respondent Warden

Ben Curry answers as follows:

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                 C 07-1851 MJJ

1        **ANSWER TO THE ORDER TO SHOW CAUSE**

2        In response to the Petition for Writ of Habeas Corpus and this Court's July 25, 2007 Order

3    to Show Cause, Respondent admits, denies, and alleges the following:

4        1.    Petitioner is lawfully in the custody of the California Department of Corrections and

5    Rehabilitation following his 1981 convictions of first-degree murder, assault with a deadly

6    weapon, and use of a firearm in the commission of a felony. (Ex. 1, Abstracts of Judgment; Ex.

7    2, Nov. 2, 2005 Subsequent Parole Consideration Hr'g Tr., at 1.) He is currently serving an

8    indeterminate sentence of twenty-five years to life. (*Id.*) Petitioner does not challenge his

9    underlying conviction in the current proceeding.

10        2.    Petitioner's murder offense occurred on March 4, 1980, when he shot Ralph Collins

11    several times inside the apartment of his niece, Patricia Watts, killing Collins and wounding his

12    niece in the back as she attempted to protect Collins. According to Watts' testimony at

13    Petitioner's criminal trial, the incident began at approximately 5:00 a.m., when Petitioner

14    knocked at her apartment door. Watts told Petitioner that she would not open the door at that

15    time and returned to bed until the morning. When Petitioner returned, she allowed him to enter

16    her apartment, after which he sat in the living room for approximately ten minutes playing with

17    Watts' daughter. While Watts was in another room, she heard a knock at the back door and,

18    when she approached, saw Petitioner letting another man, Edmond Duhart, in through the door.

19    When Watts observed that Petitioner had a gun in his hand, she ran to the bedroom and

20    attempted to wake up Collins as Petitioner pushed his way into the bedroom. As Petitioner

21    attempted to shoot Collins, Watts struggled with Petitioner and was also shot. During this

22    struggle, Petitioner called for Duhart to come into the room and remove Watts. Duhart then

23    attempted to pull Watts away from Collins, while Petitioner continued to shoot at Collins, firing

24    several more shots. Duhart subsequently left the apartment and Petitioner also fled the scene.

25        When police officers arrived, they observed that Collins was lying on the bedroom floor and

26    had been shot several times—three times in the back and twice in the back of the head. The

27    police could not detect any of Collins' vital signs. The police also observed that Watts had

28    suffered a gunshot wound to her back. (Ex. 2 at 11-13, 17; Ex. 3, Probation Officer's Report, at

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                  C 07-1851 MJJ

1  2-3; Ex. 4, July 2004 Life Prisoner Evaluation Report [Board Report], at 1; Ex. 5, Feb. 2003

2  Board Report, at 1-2.)

3      3.    Petitioner has admitted to shooting Collins, but claimed that Collins had approached

4  him with something in his hand that Petitioner believed was "maybe" a gun.  Petitioner also

5  stated that he had not known Collins was in his niece's apartment when he arrived and that

6  Collins only "occasionally stayed together" with Watts in her apartment.  When asked how many

7  times he had shot Collins, Petitioner replied, "I don't know nothin about nothin," and also stated

8  that he did not remember how his niece Watts had been shot.  (Ex. 2 at 14-16; Ex. 5 at 1-2.)

9      4.    On November 2, 2005, Petitioner attended a subsequent parole hearing, at which time

10  the Board found he was unsuitable for parole and would "pose an unreasonable risk of danger to

11  society or a threat to public safety is released from prison." (Ex. 2 at 65.) The Board's decision

12  was based on several grounds. (*Id.* at 65-69.)  First, the Board considered the circumstances of

13  Petitioner's commitment offense, finding that while it could not determine whether or not

14  Petitioner was telling the truth in his version of the offense, the Board was also unable to

15  "reconcile the facts of the crime with [Petitioner's] accounts."  The Board found that the murder

16  had been carried out in a manner that was "especially cruel and callous" given that Petitioner had

17  shot Collins three times in the back and twice in the back of the head, and had also shot his niece

18  Watts once in the back.  Based on these facts, the Board found that Petitioner had attacked

19  multiple victims in the same incident.  The Board also found that the motive for the murder could

20  either be "explicable or very trivial" depending on whether Petitioner's decision to shoot Collins

21  had "intentional motives" or if it was the result of an altercation as Petitioner indicated in his

22  statement.  Finally, the Board considered the fact that Petitioner had fled the scene and that there

23  was no indication that he knew whether Collins was dead at that time. (Ex. 2 at 65-66.)

24      Second, the Board also considered Petitioner's vast criminal history, which the Board found

25  reflected an "escalated pattern of criminal conduct and violence" as well as "a history of unstable

26  relationships with others."  These findings were based on Petitioner having been arrested eighty-

27  two times for various crimes, including battery, illegal weapon, burglary, conspiracy, and forgery.

28  In addition, the Board found that Petitioner had "failed to profit" from society's previous

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.              *Glasgow v. Curry*
C 07-1851 MJJ

1  attempts to correct his criminality, which included a juvenile commitment, parole, and probation.

2  Further, during the hearing Petitioner stated that his twenty-three-year heroine addiction and a

3  "rebellious" nature toward authority contributed toward his criminal conduct. (Ex. 2 at 18-22,

4  66-67; Ex. 3 at 5; Ex. 5 at 3-7; Ex. 6, Cal. Bureau of Identification records re criminal history.)

5       Third, although the Board found the 2004 psychological report was favorable, the Board

6  also determined it did not "delve into [Petitioner's] prior criminal history and the heroine use as

7  it relates to the crime." The Board stated that Petitioner might be able to further reconcile some

8  of the issues the Board was concerned about if he had discussions with a therapist or

9  psychologist. Thus, the Board found that Petitioner needed further therapy and that until

10  progress was made, Petitioner "may be unpredictable and a threat to others." (Ex. 2 at 67-68; Ex.

11  7, Dec. 1, 2004 Mental Health Evaluation.)

12       Fourth, the Board considered the opposition to parole from the Palo Alto Police Department

13  and the Santa Clara County District Attorney's Office. (Ex. 2 at 29-32, 54-58, 68.)

14       5.    The Board also considered the circumstances tending to support Petitioner's parole at

15  the November 2005 hearing, commending Petitioner on his programming while in prison, his

16  lack of a recent disciplinary history, adequate parole plans, and that the December 2004

17  psychological report was favorable. The Board determined, however, that the "positive aspects

18  of [Petitioner's] behavior [did] not outweigh the factors of unsuitability." (Ex. 2 at 67-69.)

19       6.    On September 13, 2006, the Santa Clara County Superior Court denied Petitioner's

20  habeas corpus petition in which Petitioner appears to have alleged the same causes of action as

21  found cognizable in his federal Petition. The superior court found that "[p]ursuant to *In re*

22  *Dannenberg* (2005) 34 Cal.4th 1061[,] parole can be denied if any one of several broadly

23  interpreted and extremely deferentially reviewed, unsuitability factors are present. In this case

24  'multiple victims were attacked, injured or killed.'"[1/] (Exs. 8-9.)

25       7.    On January 25, 2007, the California Court of Appeal summarily denied Petitioner's

26  

27      1.    The quoted language is taken directly from the illustrative criteria in the Board's

28  regulations regarding one circumstance of a commitment offense that indicates the crime was
especially heinous, atrocious, or cruel. Cal. Code Regs. tit. 15, § 2402(c)(1)(A).

1 | habeas corpus petition, in which he alleged the same causes of action as found cognizable in his

2 | federal Petition. (Exs. 10-11.)

3 |     8.   On April 25, 2007, the California Supreme Court summarily denied Petitioner's

4 | petition for review, in which he alleged the same causes of action as found cognizable in his

5 | federal Petition. (Exs. 12-13.) Hence, Respondent admits that Petitioner has exhausted his state

6 | court remedies in regard to the issues currently before this Court. However, Respondent does not

7 | admit that Petitioner has exhausted his claims to the extent that they are more broadly interpreted

8 | to encompass any systematic issues beyond this particular review of the November 2005 parole

9 | denial.

10 |     9.   Respondent denies that Petitioner has shown that the state court's denial of

11 | habeas corpus was contrary to, or involved an unreasonable application of, clearly established

12 | Supreme Court law, or that the denial was based on an unreasonable determination of facts in

13 | light of the evidence presented. Petitioner therefore fails to make a case for relief under the

14 | Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

15 |     10.   Respondent denies that Petitioner has a federally protected liberty interest in parole.

16 | *Greenholtz v. Inmates of Neb. Pen. & Corr. Complex*, 442 U.S. 1 (1979); *Dannenberg*, 34 Cal.

17 | 4th at 1087-88 (clarifying that under California Penal Code section 3041, the setting of a parole

18 | release date is neither mandatory nor presumed); *Sandin v. Conner*, 515 U.S. 472, 484 (1995);

19 | *contra Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006). Accordingly,

20 | because Petitioner is not in custody in violation of federal law, he has not alleged a federal

21 | question and this Court does not have subject matter jurisdiction to decide his petition. 28

22 | U.S.C. § 2254(a).

23 |     11.   Respondent affirmatively alleges that even if Petitioner has a federally protected liberty

24 | interest in parole, Petitioner had an opportunity to present his case before the Board at his 2005

25 | parole hearing, and that the Board provided him with a detailed explanation as to why he was

26 | denied parole. Hence, Petitioner received all the process due under *Greenholtz*, the only clearly

27 | established Supreme Court law regarding the due process rights of inmates at parole

28 | consideration hearings.

1    12.   Respondent affirmatively alleges that there is no United States Supreme Court decision

2    requiring a state parole decision to be supported by some evidence.  *See Carey v. Musladin*, __

3    U.S. __, 127 S. Ct. 649, 654  (2006) (holding that the absence of Supreme Court law on a

4    particular issue precludes habeas relief under AEDPA).  Thus, Petitioner has not shown that the

5    state court's denial of habeas corpus was contrary to, or involved an unreasonable application of,

6    clearly established Supreme Court law, or that the denial was based on an unreasonable

7    determination of facts in light of the evidence presented.  Hence, Petitioner fails to make a prima

8    facie case for relief under AEDPA.

9    13.   Respondent affirmatively alleges that the Board considered all reliable and relevant

10   evidence before it at Petitioner's 2005 parole hearing, and that its decision finding that

11   Petitioner's release would "pose an unreasonable risk of danger to society or a threat to public

12   safety if released from prison" (Ex. 2 at 65) is supported by some evidence.

13   14.   Respondent denies that the Board's decision denying parole violated Petitioner's

14   federal due process rights.

15   15.   Respondent denies that the Board unlawfully relied on static factors in denying

16   Petitioner parole at his 2005 hearing.

17   16.   Respondent denies that the Board was required to find Petitioner suitable for parole at

18   his 2005 hearing based on the evidence regarding his rehabilitation in prison or pursuant to the

19   statutory language of Penal Code section 3041.

20   17.   Respondent affirmatively alleges that Petitioner fails to state or establish any grounds

21   for federal habeas corpus relief.

22   18.   Respondent affirmatively alleges that if the petition is granted, Petitioner's remedy is

23   limited to a new parole consideration hearing before the Board that comports with due process.

24   *Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 984-85 (9th Cir. 2002) (finding that the Board must

25   exercise discretion in determining whether or not an inmate is suitable for parole); *In re

26   Rosenkrantz,* 29 Cal.4th 616, 658 (2002) (finding that the proper remedy if a Board decision

27   lacks some evidence is a new hearing that comports with due process).

28   19.   Respondent does not allege that there is any procedural bar to this action, including

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                 C 07-1851 MJJ

1    statute of limitations or non-retroactivity.

2         20.   Respondent denies that an evidentiary hearing is necessary in this matter.

3         21.   Except as expressly admitted above, Respondent denies, generally and

4    specifically, each and every allegation of the petition, and specifically denies that Petitioner's

5    administrative, statutory, or constitutional rights have been violated in any way.

6         For the reasons stated in this Answer and in the following Memorandum of Points and

7    Authorities, this Court should deny the Petition.

8                        **MEMORANDUM OF POINTS AND AUTHORITIES**

9                                        **ARGUMENT**

10        **THE STATE COURT'S DENIAL OF PETITIONER'S HABEAS**
          **CLAIM WAS NOT CONTRARY TO OR AN UNREASONABLE**
11        **APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW,**
          **NOR BASED ON AN UNREASONABLE DETERMINATION**
12        **OF THE FACTS.**

13        Under AEDPA, when a state inmate's claim has been adjudicated on the merits in state

14   court, a federal court may grant a writ of habeas corpus on the same claim only if the state court's

15   adjudication was either (1) "contrary to, or involved an unreasonable application of, clearly

16   established Federal law, as determined by the Supreme Court of the United States;" or (2) "based

17   on an unreasonable determination of the facts in light of the evidence presented at the State Court

18   proceeding." 28 U.S.C. § 2254(d)(1)-(2).

19        "Clearly established federal law, as determined by the Supreme Court of the United States,"

20   refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time

21   of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court

22   decision is contrary to established federal law if "the state court applies a rule that contradicts the

23   governing law set forth in [United States Supreme Court] cases," or "the state court confronts a

24   set of facts that are materially indistinguishable from a decision of [the United States Supreme]

25   Court and nevertheless arrives at a result different from [the Court's] precedent." *Lockyer v.*

26   *Andrade*, 583 U.S. 63, 73 (2003) (citations and internal quotation marks omitted). A state court

27   decision is an unreasonable application of clearly established law "if the state court identifies the

28   correct governing legal principle from [the United States Supreme Court's] decision but

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                 C 07-1851 MJJ

1    unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75. It is not enough

2    that the state court applies the law erroneously or incorrectly; rather, the application must be

3    objectively unreasonable. *Id.* at 75-76.

4         When, as here, the California Supreme Court denies a petition for review without

5    comment, the federal court will look to the last reasoned decision as the basis for the state court's

6    judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). In this case, the last reasoned

7    decision is the Santa Clara County Superior Court's order denying Petitioner's habeas claims.

8    (Ex. 9.) As this decision is neither contrary to or an unreasonable application of federal law, nor

9    based on an unreasonable determination of the facts in light of the evidence presented, Petitioner

10   fails to establish a violation of AEDPA standards. Therefore, his petition for writ of habeas

11   corpus must be denied.

12   **A.    Petitioner Received All Process Due Under the Only United States Supreme
          Court Law Addressing Due Process in the Parole Context.**

13

14        The setting of a parole date is not part of the criminal prosecution so the full panoply of

15   rights afforded a defendant in a criminal proceeding are not constitutionally mandated in a parole

16   proceeding. *Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The only

17   Supreme Court decision to address the requirements of due process at a parole consideration

18   hearing has held that a parole board's procedures are constitutionally adequate if the inmate is

19   given an opportunity to be heard and a decision informing him of the reasons he did not qualify

20   for parole. *Greenholtz*, 442 U.S. at 16.[2/]

21        Here, Petitioner does not contend that he failed to receive an opportunity to be heard and

22   a statement of the grounds for which the Board found him unsuitable for parole. (*See generally*

23   Pet.) Similarly, the Board's hearing transcript reflects that Petitioner appeared at the hearing and

24

---

25        2. The Supreme Court has continued to cite *Greenholtz* approvingly for the proposition that
26   the "level of process due for inmates being considered for release on parole includes an opportunity
     to be heard and notice of any adverse decision" and noted that *Greenholtz* remains "instructive for
27   [its] discussion of the appropriate level of procedural safeguards." *Wilkinson v. Austin*, 545 U.S.
     2384, 2397 (2005).
28

1  received an opportunity to be heard, and that the Board issued a decision informing him of the

2  grounds upon which he was denied parole. (Ex. 2.)  Accordingly, because Petitioner received all

3  the process due under the United States Supreme Court precedent finding a federal liberty

4  interest in discretionary parole release, the state court decision was not contrary to or an

5  unreasonable application of clearly established federal law as determined by the United States

6  Supreme Court.  *See* 28 U.S.C. § 2254(d).

7  **B.    The Ninth Circuit's Some-Evidence Test Is Not Clearly Established Supreme Court
          Law, and thus Not Applicable to Petitioner's Federal Habeas Corpus Claims under**

8  **AEDPA.**

9          Petitioner alleges that the Board's decision must be overturned because it is not

10  supported by some evidence.  This argument stems from the holding in *Superintent v. Hill*, 472

11  U.S. 445, 455 (1985), in which the United States Supreme Court determined that some evidence

12  must support the decision of a prison disciplinary board to revoke good time credits.  In *Jancsek*

13  *v. Oregon Board of Parole*, 833 F.2d 1289, 1290 (9th Cir. 1987), the Ninth Circuit held that this

14  standard applies not only in the disciplinary context, but the parole context as well, and that some

15  evidence must support the Board's denials of parole.  Because the holding in *Jancsek* is not

16  clearly established federal law under AEDPA standards, the some-evidence standard may not be

17  applied in federal habeas proceedings challenging parole denials.

18          As the Supreme Court clarified in *Musladin*, 127 S. Ct. at 654, where the Court has not

19  applied a test or standard to a certain type of case it cannot be said that the failure of a state court

20  to do so was an unreasonable application of clearly established federal law.  In *Musladin*, the

21  petitioner challenged a state court decision finding that the fact the victim's family wore buttons

22  displaying the victim's image at the defendant's trial was not inherently prejudicial.  *Id.* at 650.

23  The Ninth Circuit held that the state court decision was contrary to or an unreasonable

24  application of federal law regarding state-sponsored courtroom practices.  *Id.*  In reversing the

25  Ninth Circuit, the Supreme Court noted that although it had articulated a test to determine

26  whether state-sponsored courtroom practices were inherently prejudicial, it had never addressed

27  the issue of whether conduct by a private party was so prejudicial that it deprived the defendant

28  of his right to a fair trial.  *Id.* at 654.  "Given the lack of holdings" on the specific issue, the Court

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                  C 07-1851 MJJ

1  reversed the Ninth Circuit and held that the state court's decision was not an unreasonable

2  application of federal law. *Id.*

3      The Supreme Court has since reiterated its holding in *Musladin*, confirming that a state

4  court decision cannot be contrary to or an unreasonable application of federal law where the

5  Court has not addressed what protection or test is required in a specific factual or legal scenario.

6  In *Schriro v. Landrigan*, ___U.S.___, 127 S. Ct. 1933 (2007), the Ninth Circuit found that the

7  state court unreasonably applied *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*,

8  545 U.S. 374, 381 (2005) when it denied federal habeas relief to a defendant asserting ineffective

9  assistance of counsel, despite the fact that he had refused to allow the presentation of any

10  mitigating evidence. *Landrigan*, 127 S. Ct. at 1942. The Supreme Court reversed that part of the

11  decision after distinguishing the facts of the case from those in *Wiggins* and *Rompilla*. *Wiggins*

12  did not address a situation in which the client had interfered with counsel's efforts to present

13  mitigating evidence. *Id.* And in *Rompilla*, the defendant had not informed the court that he did

14  not want mitigating evidence presented. *Id.* Because the high court had never addressed a

15  situation like the one raised in *Landrigan*, it held that the state court's decision was not

16  objectively unreasonable. *Id.*

17      Several recent Ninth Circuit decisions also emphasize that there can be no clearly

18  established federal law where the Supreme Court has never addressed a particular issue or

19  applied a certain test to a specific type of proceeding. *Crater v. Galaza*, 491 F.3d 1119, 1122-23,

20  1126-27, n.8 (9th Cir. 2007) (citing *Musladin*, the Ninth Circuit acknowledged that decisions by

21  courts other than the Supreme Court as "non-dispositive" under § 2254(d)(1)); *Foote v. Del*

22  *Papa*, 492 F.3d 1026, 1029-30 (9th Cir. 2007) (affirming district court's denial of petition

23  alleging ineffective assistance of appellate counsel based on an alleged conflict of interest

24  because no Supreme Court case has held that such an irreconcilable conflict violates the Sixth

25  Amendment); *Nguyen v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007) (holding that state

26  court's decision finding *Wainwright v. Greenfield*, 474 U.S. 284 (1986) did not apply to a state

27  court competency hearing was not contrary to clearly established federal law because Supreme

28  Court had not held that *Wainwright* applied to competency hearings).

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                 C 07-1851 MJJ

1    Because the Supreme Court developed the some-evidence standard in the context of a

2    prison disciplinary hearing, which is fundamentally different from a parole proceeding, applying

3    this standard to a parole decision cannot be clearly established federal law. *Musladin*, 127 S. Ct.

4    at 654; *Landrigan*, 127 S. Ct. at 1942. The level of due process protections to which an inmate is

5    entitled is directly related to the level of his liberty interest and the nature of the decision being

6    made. *Greenholtz*, 442 U.S. at 13-14. At a disciplinary hearing, the inquiry is retrospective and

7    factual in nature, and the prisoner faces a potential loss of credits. *Greenholtz*, 442 U.S. at 14.

8    But a decision to parole an inmate is fundamentally different. First, the level of liberty interest

9    an inmate has in the possibility of parole is markedly different from that of an inmate who is

10    facing a loss of credits. *Wolff v. McDonnell*, 418 U.S. 539, 560-61 (1974) (contrasting the

11    different interests that a parolee and a prisoner may have in their deprivation of liberty);

12    *Greenholtz*, 442 U.S. at 13-14 (distinguishing the parole suitability decision from the parole

13    revocation and disciplinary decisions). Second, a parole decision is not factual in nature. Rather,

14    it is a predictive and subjective decision requiring discretionary analysis of the inmate's

15    suitability for release. *Greenholtz*, 442 U.S. at 9-10; *Wilkinson*, 545 U.S. at 229. In fact, due to

16    the discretionary nature of parole decisions, the Supreme Court has held that, in contrast to prison

17    disciplinary hearings, due process does not require the decision-maker to specify the evidence

18    showing that a prisoner is unsuitable for parole. *Greenholtz*, 442 U.S. at 15.

19    In summary, applying the some-evidence standard to a parole proceeding is not clearly

20    established federal law. Instead, the *only* clearly established Supreme Court authority describing

21    the process due when there is a federal liberty interest in parole simply requires that the inmate be

22    given an opportunity to be heard and advised of the reasons he was not found suitable for parole.

23    *Greenholtz*, 442 U.S. at 16. Indeed, in *Greenholtz* the Supreme Court rejected the argument that

24    due process requires an evidentiary standard of review in parole cases, holding that there is

25    "nothing in the due process concepts as they have thus far evolved that requires the Parole Board

26    to specify the particular 'evidence' . . . on which it rests the discretionary determination that an

27    inmate is not ready for conditional release." *Id.* at 15-16. The Supreme Court has thus explicitly

28    rejected the notion that a parole decision must be supported by any particular quantum of

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.          *Glasgow v. Curry*
                                                                        C 07-1851 MJJ

11

1  evidence. *Id.*

2        Accordingly, because application of the some-evidence standard to parole denial

3  challenges is not clearly established Supreme Court law regarding federal due process, AEDPA

4  precludes this standard from being applied to Petitioner's claims in this case. *See* 28 U.S.C. §

5  2254(d); *Musladin*, 127 S. Ct. at 654.

6  **C.    Even if the Some-Evidence Standard Was Clearly Established Federal Law, the**
   **Standard Was Correctly Applied by the State Court.**

7

8        Even if the some-evidence standard was clearly established federal law for AEDPA

9  purposes, Petitioner's claim would nonetheless fail because he cannot show that the state court

10  unreasonably applied this standard or made an unreasonable determination of the facts.  Under

11  California law, the proper level of judicial review is whether "some evidence in the record before

12  the Board supports the decision to deny parole, based upon the factors specified by statute and

13  regulation." *Rosenkrantz*, 29 Cal. 4th at 658.  The some-evidence standard "does not require

14  examination of the entire record, independent assessment of the credibility of witnesses, or

15  weighing of the evidence;" rather, it is satisfied if there is "any evidence in the record that could

16  support the conclusion reached by the [B]oard." *Hill*, 472 U.S. at 455-57; *see also Sass*, 461

17  F.3d at 1129 (stating that "*Hill's* some evidence standard is minimal.")

18        Although Petitioner invites the Court to re-examine the facts of his case and re-weigh the

19  evidence presented to the Board, AEDPA does not permit this degree of judicial intrusion.

20  Petitioner bears the burden of proving that the state court's factual determinations were

21  objectively unreasonable.  28 U.S.C. § 2254(e)(1); *Juan H. v. Allen*, 408 F.3d 1262, 1270 (9th

22  Cir. 2005).   So long as the state court's reasoned decision was a reasonable determination of the

23  facts presented, Petitioner's claim must fail.

24        Moreover, in assessing the state court's review of Petitioner's claims, not only should the

25  appropriate deference be afforded under AEDPA to the state court's review, but deference is also

26  due to the underlying Board decision.  The Supreme Court has recognized the difficult and

27  sensitive task faced by the Board members in evaluating the advisability of parole release.

28  *Greenholtz*, 442 U.S. at 9-10.  Thus, contrary to Petitioner's belief that he should be paroled

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                 C 07-1851 MJJ

1   based on the evidence in support of parole presented at the hearing (Pet. at 6), the Supreme Court

2   has stated that in parole release, there is no set of facts which, if shown, mandate a decision

3   favorable to the inmate. *Greenholtz*, 442 U.S. at 9-10. Instead, under the some-evidence

4   standard, the court's inquiry is limited solely to determining whether the state court properly

5   found that the Board's decision to deny parole is supported by some evidence in the record, i.e.,

6   any evidence. *Hill*, 472 U.S. at 455.

7        Here, the state court reasonably upheld the Board's decision, finding that "[p]ursuant to

8   [*Dannenberg*,] parole can be denied if any one of several broadly interpreted and extremely

9   deferentially reviewed, unsuitability factors are present. In this case 'multiple victims were

10  attacked, injured or killed.'" (Ex. 9.) The language quoted by the court is taken directly from the

11  illustrative criteria in the Board's regulations regarding one circumstance of a commitment

12  offense that indicates the crime was especially heinous, atrocious, or cruel. Cal. Code Regs. tit.

13  15, § 2402(c)(1)(A). Thus, because the state court relied on evidence that was undisputed—that

14  Petitioner's crime involved multiple victims—Petitioner cannot show that the state court

15  unreasonably determined the facts or unreasonably applied the some-evidence standard in

16  denying his claims.

17       Moreover, the state court's decision should also be upheld given that the Board's decision

18  was supported by some evidence regarding other aspects of the murder offense and other parole

19  criteria. Although these other factors were not explicitly discussed by the state court, this Court

20  can also consider them because under AEDPA, this Court is only concerned with whether the

21  superior court's decision granting or denying relief, as opposed to its reasoning, is contrary to or

22  an unreasonable application of Supreme Court law. *Hernandez v. Small*, 282 F.3d 1132, 1140

23  (9th Cir. 2002) (determining in habeas proceedings that "the intricacies of the state court's

24  analysis need not concern us; what matters is whether the *decision* the court reached was contrary

25  to controlling federal law").

26       Here, in addition to the presence of multiple victims, the Board found that the murder had

27  been carried out in a manner that was "especially cruel and callous" given that Petitioner had shot

28  Collins three times in the back and twice in the back of the head, and had also shot his niece

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                C 07-1851 MJJ

13

1  Watts once in the back. (Ex. 2 at 65-66.)  The Board also found that the motive for the murder

2  could either be "explicable or very trivial" depending on whether Petitioner's decision to shoot

3  Collins had "intentional motives" or if it was the result of an altercation as Petitioner indicated in

4  his statement. (*Id.* at 66.)  And the Board considered the fact that Petitioner had fled the scene

5  and that there was no indication that he knew whether Collins was dead at the time. (*Id.*)

6        Furthermore, in addition to the murder offense, the Board considered Petitioner's

7  extensive criminal history, including eighty-two arrests for such crimes as battery, illegal

8  weapon, burglary, conspiracy, and forgery, which the Board found reflected an "escalated pattern

9  of criminal conduct and violence" as well as "a history of unstable relationships with others."

10  (*Id.* at 66-67; Ex. 5 at 3-7; Ex. 6.)  Similarly, the Board found that Petitioner had "failed to

11  profit" from society's previous attempts to correct his criminality (ex. 2 at 66-67), which

12  included a juvenile commitment, parole, and probation. (*Id.*; Ex. 5 at 3-7; Ex. 6.)  Additionally,

13  during the hearing Petitioner also stated that his twenty-three-year heroine addiction and a

14  "rebellious" nature toward authority contributed toward his criminal conduct. (Ex. 2 at 18-22.)

15        Next, the Board considered that the 2004 psychological report was favorable, the Board

16  also determined it did not "delve into [Petitioner's] prior criminal history and the heroine use as

17  it relates to the crime." (*Id.* at 67; *see also* Ex. 7.)  The Board stated that Petitioner might be able

18  to further reconcile some of the issues the Board was concerned about if he had discussions with

19  a therapist or psychologist. (Ex. 2 at 67-68.)  Thus, the Board found that Petitioner needed

20  further therapy and that until progress was made, Petitioner "may be unpredictable and a threat to

21  others." (*Id.* at 68.)  And while this consideration may not independently support a denial of

22  parole, the Board still properly considered this circumstance within the context of the other

23  parole criteria. Cal. Code Regs. tit. 15, § 2402(b) (providing that "[c]ircumstances which taken

24  alone may not firmly establish unsuitability for parole may contribute toward a pattern which

25  results in a finding of unsuitability").

26        Finally, the Board considered the opposition to parole from the Palo Alto Police

27  Department and the Santa Clara County District Attorney's Office. (Ex. 2 at 29-32, 54-58, 68.)

28  The Board  appropriately considered this opposition to parole, as required by California Penal

1    Code section 3042. *Dannenberg*, 34 Cal. 4th at 1084-85 (finding that public opposition to parole

2    must not only be considered, but "may be influential, and even decisive in appropriate cases").

3          In summary, Petitioner cannot show that the state court unreasonably applied the some-

4    evidence standard in upholding the Board's parole denial given that it was supported by some

5    evidence. Also, as previously indicated, Petitioner cannot establish a denial of due process based

6    on the weight that he or this Court believes should have been assigned to the evidence in favor of

7    his parole because the some-evidence standard does not permit a re-weighing of evidence, but

8    rather limits the court's inquiry solely to determining whether the state court properly found that

9    the Board's decision to deny parole is supported by some evidence. *See Hill*, 472 U.S. at 455.

10   Here, the Board's findings were reasonably based on Petitioner's testimony at the hearing, the

11   public opposition to parole, and the relevant documents from Petitioner's central prison file. (Ex.

12   2 at 6-9 [stating information Board would consider at the hearing]; *see also* Exs. 4-7.) Therefore,

13   if the some-evidence test in *Hill* applies, Petitioner's claims must be denied because he cannot

14   show that this standard was unreasonably applied by the state court.

15   **D.    The Board May Rely on Static Factors to Deny Parole.**

16         Petitioner also argues that due process precludes the Board from relying on static factors,

17   such as the circumstances of the commitment offense and his significant criminal record, to deny

18   parole. Petitioner cannot show, however, that the state court unreasonably upheld the Board's

19   consideration of these factors given that there is no clearly established Supreme Court precedent

20   precluding the Board from relying on such factors when determining an inmate's suitability for

21   parole.

22         Moreover, California Penal Code section 3041 requires that the parole authority examine

23   the commitment offense, providing that the Board "shall set a release date unless it determines

24   that the gravity of the current convicted offense or offenses, or the timing and gravity of current

25   or past convicted offense or offenses, is such that consideration of the public safety requires a

26   more lengthy period of incarceration." Cal. Penal Code § 3041(b); *Dannenberg*, 34 Cal. 4th at

27   1080. The applicable regulations also provide that a prisoner shall be denied parole if he "will

28   pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, §

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.          *Glasgow v. Curry*
                                                                       C 07-1851 MJJ

1   2402(a). Similarly, the California Supreme Court held in *Dannenberg* that the Board may rely

2   *solely* on the circumstances of the commitment offense. 34 Cal. 4th at 1094. Hence, "an inmate

3   whose offense was so serious as to warrant, at the outset, a maximum term of life in prison, may

4   be denied parole during whatever time the Board deems required for 'this individual' by

5   'consideration of the *public safety*.'" *Id.* at 1084.

6       The Board's consideration of public safety is also not limited to the inmate's potential for

7   violence as suggested by Petitioner. Rather, the United States Supreme Court has indicated that

8   the parole authority's consideration of the commitment offense also must account for "whether,

9   in light of the nature of the crime, the inmate's release will minimize the gravity of the offense,

10  weaken the deterrent impact on others, and undermine respect for the administration of justice."

11  *Greenholtz*, 442 U.S. at 8.

12      The Ninth Circuit's holding in *Biggs v. Terhume*, 334 F.3d 910 (9th Cir. 2003) does not

13  compel a different result. In *Biggs*, the Ninth Circuit stated that the Board's continuing reliance

14  on an unchanging factor to deny parole "could result in a due process violation." *Id.* at 917.

15  However, the *Biggs* court did not definitively indicate that reliance on an unchanging factor

16  necessarily violates due process, only that it possibly could. Indeed, the court praised Biggs for

17  being "a model inmate," and found that the record was "replete with the gains Biggs has made,"

18  including a master's degree in business administration. *Id.* at 912. Nonetheless, the court denied

19  habeas relief because the Board's decision to deny parole–which relied solely on the commitment

20  offense–was supported by some evidence. *Id.* at 917.

21      Most importantly, the statement in *Biggs* is merely circuit court dicta, and not clearly

22  established federal law sufficient to overturn a state court decision under AEDPA standards. In

23  *Sass*, the Ninth Circuit emphasized that *Biggs* does not contain mandatory language, and that

24  "[u]nder AEDPA, it is not our function to speculate about how future parole hearings could

25  proceed." *Sass*, 461 F.3d at 1129. The *Sass* court then rejected the argument that the Board's

26  reliance on "immutable behavioral evidence" to deny parole violated federal due process. *Id.*

27  The Ninth Circuit most recently addressed this issue in *Irons v. Carey*, __ F.3d __, 2007 WL

28  2027359 (9th Cir. July 13, 2007). In overturning a district court grant of habeas corpus, the

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                 C 07-1851 MJJ

16

1    Ninth Circuit held that despite substantial evidence of the inmate-petitioner's rehabilitation, the

2    Board acted properly and did not abuse its discretion by relying on the circumstances of the

3    commitment offense to deny parole. *Id.* at *5-6. Thus, the dicta from *Biggs* and its progeny do

4    not prelude the Board from using circumstances of the commitment offense to deny parole, nor

5    may this dicta be used to overturn a valid state court decision.

6              Accordingly, because Petitioner fails to prove that the state court decision denying parole

7    and rejecting his claims regarding the Board's continued reliance on his crime and criminal

8    history is contrary to or an unreasonable application of clearly established Supreme Court law,

9    his federal petition must be denied.

10   **E.    Petitioner's Erroneously Argues that He Is Entitled to Parole Based on the**
         **Language of California Penal Code section 3041(a).**

11

12             In addition to challenging the sufficiency of the evidence, Petitioner also contends that he

13   was unlawfully denied parole based on his allegation that California Penal Code section 3041(b)

14   creates an "affirmative obligation" for the Board to grant parole. (Pet. at 6.) Petitioner's

15   allegation is both without merit and fails to state a federal claim. Petitioner thus fails to

16   demonstrate that the state courts unreasonably denied his petition as to this claim.

17             As an initial matter, Petitioner's claim regarding the proper interpretation of California's

18   parole statute is solely a state law claim, and thus not cognizable in federal habeas corpus. *See,*

19   *e.g., Rose v. Hodges*, 423 U.S. 19, 21 (1975); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197-98 (9th

20   Cir. 1983). Moreover, even if Petitioner is alleging that the state court erroneously interpreted or

21   applied the applicable California law when it denied his petition, a federal court may not

22   challenge a state court's interpretation or application of state law, *Middleton v. Cupp*, 768 F.2d

23   1083, 1085 (9th Cir. 1985), or grant relief "on the basis of a perceived error of state law." *Pulley*

24   *v. Harris*, 465 U.S. 37, 41 (1984). Thus, the Petition should be denied as to Petitioner's claim

25   challenging the proper application of California Penal Code section 3041.

26             Alternatively, to the extent Petitioner's allegations state a federal claim, they are without

27   merit. As to Petitioner's construction of the language in Penal Code section 3041(b) establishing

28   an "affirmative obligation" to grant parole, the California Supreme Court has determined, in

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.                    *Glasgow v. Curry*
                                                                                C 07-1851 MJJ

1   construing the *entire* statute, that "the statutory language belies the notion of a *mandatory duty*"

2   to parole any prisoner, nor does it notably restrict the Board's discretion in determining parole

3   suitability. *Dannenberg*, 34 Cal. 4th at 1084-88 (emphasis in original). Rather, Petitioner is only

4   entitled to parole after having been found suitable for parole release. *Irons*, 2007 WL 2027359 at

5   4, n.3 (citing *Dannenberg*, 34 Cal. 4th at 1078). Petitioner thus cannot show that he was entitled

6   to parole based solely on the language of California Penal Code section 3041(a). As a result,

7   Petitioner cannot meet his burden of demonstrating that the state court unreasonably denied him

8   relief as to this claim.

9                                        **CONCLUSION**

10          Under AEDPA, the Court may grant a writ of habeas corpus only if it determines that the

11   state court findings denying relief were contrary to, or an unreasonable application of, clearly

12   established federal law, or involved an unreasonable interpretation of the facts. Petitioner fails to

13   prove that this is the case. First, he received all process due under *Greenholtz*, the only clearly

14   established federal law specifically addressing the process due at parole consideration hearings.

15   Second, even if the some-evidence standard applies, Petitioner cannot show that the state court

16   decision denying him relief was based on either an unreasonable application of this standard

17   under clearly established Supreme Court law or that it was based an unreasonable determination

18

19

20

21

22

23

24

25

26

27

28

1 | of the facts.  For these reasons, Respondent respectfully requests that the petition for writ of

2 | habeas corpus be denied.

3 | Dated:  October 18, 2007

4 | Respectfully submitted,

5 | EDMUND G. BROWN JR.
Attorney General of the State of California

6 | DANE R. GILLETTE
7 | Chief Assistant Attorney General

JULIE L. GARLAND
8 | Senior Assistant Attorney General

9 | ANYA M. BINSACCA
Supervising Deputy Attorney General

10 |

11 |

12 |

13 | SCOTT C. MATHER
Deputy Attorney General
Attorneys for Respondent

14 |

15 | 20104225.wpd
16 | SF2007200663

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

Answer to Am. Pet. for Writ of Habeas Corpus; Mem. of P. & A.

*Glasgow v. Curry*
C 07-1851 MJJ

19

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Glasgow v. Curry**

No.:    **C 07-1851 MJJ**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **October 23, 2007**, I served the attached

### ANSWER TO THE ORDER TO SHOW CAUSE;
### MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Brice Glasgow**
**C-26529**
**Correctional Training Facility**
**P.O. Box 689**
**Soledad, CA 93960-0689**
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **October 23, 2007**, at San Francisco, California.

| | |
|---|---|
| J. Palomino | _J. Palomino_ |
| Declarant | Signature |

20110499.wpd

# EXHIBIT 1

DEPT. No. _1_____ CASE NO. _75071_

In the Superior Court of the State of California

IN AND FOR THE_____ COUNTY OF__SANTA CLARA___

ABSTRACT OF JUDGMENT
(Commitment to State Prison as provided by Penal Code Section 1213.5)

The People of the State of California,

vs

_BRICE GLASGOW_ Defendant.

Hon. _FRANK CLIFF_
(Judge of Superior Court)

_J. NEDDE_
(District Attorney)

_B. SHECHMEISTER_
(Counsel for Defendant)

This certifies that on the __11__ day of __Feb.__, 19_91_ judgment of conviction of the above-named defendant was entered as follows:

In Case No. __75071__ Count No.__1__ he was convicted by _JURY_; on his plea of_____
(Court or Jury)

_GUILTY_ _____ (guilty, not guilty, former conviction or acquittal, once in jeopardy,

not guilty by reason of insanity); of the crime of __MURDER IN THE 1ST DEGREE__

(designation of crime and degree, if any, including fact that it constitutes a second or subsequent conviction of same offense if that affects the sentence and if under Section 209 of the Penal Code whether victim suffered bodily harm):

in violation of __PC 187__
(reference to Code or Statute, including Section and Sub-section);

with prior convictions charged and proved or admitted as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
| Jan, 1973 | Santa Clara, CA | 475a PC | Admitted |
| Jan, 1966 | Santa Clara, CA | 459 PC ** | Admitted |
| Jan, 1966 | Santa Clara, CA | 182 PC | Admitted |
| Sept, 1972 | Merced, CA | 459 PC | Admitted |

Defendant _Was   Not_ adjudged a habitual criminal within the meaning of Sub-division _(a) or (b)_ of

(was) or (was not)                                                                        (a) or (b)

Section 644 of the Penal Code; and the defendant _is not_ a habitual criminal in accordance with Sub-division (c)

(is) or (is not)

of that Section.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprison-
ment in the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff
of the.............................. County of _Santa   Clara_ ......and by him delivered to the Director of Corrections of the
State of California at the place hereinafter designated.

It is ordered that sentences shall be served in respect to one another as follows. _Count 1 Sentence_

(Note whether concurrent or consecutive as to each count):

_is to be served consecutive) to sentence for Count 2,
Section 245(A) Penal Code, Assault with Deadly Weapon,
Middle Term, 3 yrs + 2 yrs PC12022.5, gun enhancement
for total of 5 years._

and in respect to any prior incomplete sentence (s) as follows:...... —

(NOTE whether concurrent or consecutive as to all incomplete sentences from other jurisdictions);

_Credit for times served on Count 1 set at 0 days._

To the Sheriff of the .............................. County of _Santa Clara_ ...... and to the Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at...... _Vacaville_ ......
at your earliest convenience.

Witness my hand and seal of said court

this..........11th.......... day of ......_February_......., 1981

......_John Kazubowski_......................................................... Clerk

by......_K. Sanguinetti_........................................................... Deputy

K. Sanguinetti

SEAL

State of California,

.............................. County of _Santa Clara_ } ss.

I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made
and entered on the minutes of the Superior Court in the above entitled action as provided by Penal
Code Section 1213.

Attest my hand and seal of the said Superior Court this 11th day of _Feb_ 19 81

County Clerk and Ex-officio Clerk of the Superior Court of the State of California in and for the

............................County of....._Santa Clara_

The Honorable: ...........................................................................

FRANK CLIFF

Judge of the Superior Court of the State of California, in and for the....................County of

....._Santa Clara_...............................

Note: If probation was granted in any sentence of which abstract of judgment is certified, attach a
minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

7956 REV 8/76

FORM CR 290

...OR COURT OF CALIFORNIA, COUNTY = SANTA CLARA
BRAN... PALO ALTO                                    ...R COURT USE ONLY

...E OF THE STATE OF CALIFORNIA          versus
...NDANT:  BRICE GLASGOW
    AKA:                              ☑ Present    ☐ Not Present
...MMITMENT TO STATE PRISON P.C. § 1170
...STRACT OF JUDGMENT              CASE NUMBER: 75071

Hearing 02-11-81  Dept. No. 1  Judge FRANK LIEB  Clerk K. SANGUINETH
         MO. DAY YR
Reporter JUNE                                  Counsel for People J. NEDDE
Counsel for Defendant B. SHECHMEISTER  Probation Number or Probation Officer D. GARISH

Defendant was convicted of the commission of the following crimes:
☐ Additional counts are listed on attachment 1.a.

| Count | Code | Section No. | Crime | Year Crime Committed | Date of Conviction Mo. Day Yr. | Conviction by: Jury Trial | Court Trial | Plea | Count Stayed PC § 654 | ENHANCEMENTS Charged and Found PC §12022.5(b) | PC §12022.5 | PC §12022 (blank) | PC §12022.6 | PC §12022 | PC §12022.6 | PC §12022.7 | Additional term stricken due to circumstances in mitigation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 245 A | ASSAULT WITH DEADLY WEAPON | 1980 | 12-19-80 | X | | | | | X | | | | | | |

A. Number of prior prison terms charged and found: 0 667.5(c) felonies; 0 other than 667.5(c) felonies.
Punishment for prior prison terms stricken: 0 667.5(c) felonies; 0 other than 667.5(c) felonies.
...he crime with the greatest "principal" term of imprisonment (including § 12022-series enhancements) is.

A. ☑ In the present proceeding, Count 2.      B. ☐ In a prior uncompleted sentence identified on next line.

Defendant is sentenced on the crime with the greatest "principal" term to state prison for the ☐ lower ☑ middle ☐ upper base term of ___ years.

Unstayed and unstricken enhancements imposed:
A. ☐ Penal Code § 12022(a)    ☐ Penal Code § 12022(b)    ☑ Penal Code § 12022.5    ☐ Penal Code § 12022.7 ___ years.
B. ☐ Penal Code § 12022.6(a)  ☐ Penal Code § 12022.6(b) ... ___ years.
☐ Penal Code § 667.5(a) ... ___ years.
☐ Penal Code § 667.5(b) ... ___ years.

Terms for consecutive sentences:
1) ☐ Other convictions in the present case for felonies not listed in § 667.5(c) on counts ___ years.
2) ☐ Other convictions in prior uncompleted sentences for felonies not listed in § 667.5(c) ___ years.
3) ☑ Other convictions in the present case for felonies listed in § 667.5(c) on counts 1. INDETERMINATE SENTENCE. ___ years.
4) ☐ Other convictions in prior uncompleted sentences for felonies listed in § 667.5(c) ___ years.

Concurrent Sentences (to be served with sentence on count identified on line 3):
☐ For convictions of the present case, counts ___, ___, ___.    B. ☐ For convictions of prior uncompleted sentence.

...ears imposed above on lines 4 through 5.E.(4), number of years stayed pursuant to California Rules of Court, Rule 447, to comply
... Penal Code §§ 1170.1(a) [5-year limit] and 1170.1(f) [double-base-term limit] ... [ ___ years]
... total unstayed prison term imposed by this judgment is ... 5 ___ years.

...cution of sentence imposed    A. ☑ at initial sentencing hearing    B. ☐ at resentencing pursuant to decision on appeal
                                C. ☐ after revocation of probation    D. ☐ at resentencing pursuant to recall of commitment (P.C. § 1170(d))
...court pronounced sentence on 0 2 1 1 8 1 . Defendant is credited for time spent in custody, 522 total days, including:
                              MO. DAY YEAR
...al Local Time 348 P.C. § 40 9(b) credit 174 State Institutions Time 0 (specify dates of admission and release in oral proceedings and minutes).

...dant is remanded to the custody of the Sheriff to be delivered: ☑ forthwith  ☐ after 48 hours, excluding Saturdays, Sundays and Holidays
... e custody of the Director of Corrections at the Reception-Guidance Center located at  ☐ Calif. Institution for Women — Frontera
☐ Calif. Medical Facility — Vacaville  ☐ Calif. Institution for Men — Chino  ☐ Other: (specify) ___

I hereby certify the foregoing to be a correct              CLERK OF SUPERIOR COURT
abstract of the judgment made in this action.    By K. Sanguinetti
                                                              DEPUTY
                                                 Date 2-11-81

...prescribed pursuant to Penal Code § 1213.5 to satisfy the requirements of Penal Code § 1213 (Abstract of Judgment and Commitment) for determinate
...der Penal Code § 1170.1. A copy of the probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code § 1203c.
...he sentencing proceedings and any supplementary probation report shall be transmitted to the Department of Corrections pursuant to Penal Code
...tachments may be used but must be incorporated by reference.

...opted by the
...ncil of California
... January 16, 1979                    ABSTRACT OF JUDGMENT-COMMITMENT           Pen C. 667.5, 1170, 1170.1, 1213.5,
                                              FORM CR 290                         12022, 12022.5, 12022.6, 12022.7.

# EXHIBIT 2
# Part 1 of 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )     CDC Number C-26529
                          )
BRICE GLASGOW             )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 2, 2005

8:45 A.M.

PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Chuck Wolk, Deputy Commissioner


OTHERS PRESENT:

Mr. Brice Glasgow, Inmate
Mr. Anthony Hall, Attorney for Inmate
Mr. Ronald Rico, Deputy District Attorney
Ms. Joyce Nedde, Observer
Correctional Officers Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

          _____    No      See Review of Hearing
          _____    Yes     Transcript Memorandum


**Sue Gerdes, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 11 |
| Pre-Commitment Factors | 18 |
| Parole Plans | 22 |
| Post-Commitment Factors | 32 |
| Closing Statements | 54 |
| Recess | 64 |
| Decision | 65 |
| Adjournment | 69 |
| Transcriber Certification | 70 |

--oOo--

1

| 1 | <u>P R O C E E D I N G S</u> |
|---|---|

2       **DEPUTY COMMISSIONER WOLK:**  We're on

3  record.

4       **PRESIDING COMMISSIONER ST. JULIEN:**  It's

5  8:45 A.M. and this is a Subsequent Parole

6  Hearing for Brice Glasgow CDC number C-26529.

7  Today is November 2nd, 2005 and we are at the

8  Correctional Training Facility in Soledad.  The

9  inmate was received on February 19th, 1981 for a

10  life term starting date (indiscernible) 17th,

11  1983 from the County of Santa Clara case number

12  75071 count one Penal Code section violation 187

13  murder first, count two assault with a deadly

14  weapon Penal Code section 245A, count two as

15  well, use of a firearm, Penal Code section

16  violation 12022.5 and inmates are all from the

17  County of Santa Clara case number 75079.  The

18  inmate received a term of 25 years to life plus

19  five years.  First eligible parole date March

20  18th, 1998.  Is that correct?

21       **INMATE GLASGOW:**  (indiscernible)

22       **PRESIDING COMMISSIONER ST. JULIEN:**  We

23  might need to have (indiscernible).  We are tape

24  recording the hearing so we are going to go

25  around the room and introduce our selves.  We

26  will say our first and last name, spell our last

27  name and if you could also state your CDC number

2

1    after you spell your last name.  My name is

2    Tracey St. Julien S-T capital J-U-L-I-E-N

3    Commissioner.

4         **DEPUTY COMMISSIONER WOLK:**  Chuck Wolk W-

5    O-L-K Deputy Commissioner.

6         **ATTORNEY HALL:**  Anthony Hall H-A-L-L

7    attorney for Mr. Glasgow.

8         **INMATE GLASGOW:**  Glasgow  C-26529 G-L-A-

9    S-G-O-W.

10        **PRESIDING COMMISSIONER ST. JULIEN:**  Your

11   first name.

12        **INMATE GLASGOW:**  Brice B-R-I-C-E.

13        **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

14   Rico.

15        **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you

16   Commissioner.  Ronald Rico R-I-C-O Deputy

17   District Attorney for Santa Clara County.  And I

18   have a second individual in the room.  The

19   former trial prosecutor in the case who is here

20   as an observer only.  I will let the identify

21   herself.

22        **MS. NEDDE:** My name is Joyce Nedde N-E-D-

23   D-E.

24        **PRESIDING COMMISSIONER ST. JULIEN:**  And

25   we also have two correctional officers in the

26   room who are here for security purposes.  And

27   Mr. Glasgow, that form in front of you that

3

1    addresses your ADA rights I need you to please

2    read that aloud and then I am going to ask you

3    some questions about what you have read.

4         **INMATE GLASGOW:**  The Americans with

5    Disabilities Act, AFA, is a law to help people

6    with disabilities.  Disabilities are problems

7    that make it harder for some people to see,

8    hear, breathe, talk, walk, learn, think, work or

9    take care of them selves than it is for others.

10   No one can be kept out of pubic places or

11   activities because of a disability.  If you have

12   a disability you have the right to ask for help

13   to get ready for your court or parole hearing

14   and BPT hearing.  To get to the hearing, talk,

15   read forms and papers and understand the hearing

16   process.  The BPT will look at what you ask for

17   to make sure that you have a disability that is

18   covered by the ADA and that you have asked for

19   the right kind of help.  If you do not get help

20   or if you don't think you got the kind of help

21   you need, ask for a BPT 1074 grievance form.

22   You can also get help to fill it out.

23        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

24   I note that on May 3rd, 2004 you signed a BPT

25   form 1073 indicating that you do not have

26   disabilities, is that still correct?

27        **INMATE GLASGOW:**  What it is I have a

4

1  bladder infection and I was concerned

2  (indiscernible) an enlargement in my lower

3  (indiscernible) just an infection.

4  (indiscernible).

5        **PRESIDING COMMISSIONER ST. JULIEN:**  Are

6  you taking antibiotics?

7        **INMATE GLASGOW:**  Yes I did.

8        **PRESIDING COMMISSIONER ST. JULIEN:**  You

9  said that you are currently taking medication.

10  What are you currently taking?

11        **INMATE GLASGOW:**  (indiscernible)

12        **PRESIDING COMMISSIONER ST. JULIEN:**

13  Probably and antibiotic.  And is that medication

14  giving you any side affects?

15        **INMATE GLASGOW:**  Dries me up.

16        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

17  makes you thirsty.  Is that uncomfortable enough

18  that you can't participate in the hearing today?

19        **INMATE GLASGOW:**  No.

20        **PRESIDING COMMISSIONER ST. JULIEN:**  Now I

21  noticed that you are wearing glasses, with those

22  glasses on, eyeglasses, can you see around the

23  room clearly?

24        **INMATE GLASGOW:**  Yes.

25        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

26  and you can read?

27        **INMATE GLASGOW:**  Yes.

5

1          **PRESIDING COMMISSIONER ST. JULIEN:** And

2    you can see the (indiscernible).

3          **INMATE GLASGOW:** Yes Ma'am.

4          **PRESIDING COMMISSIONER ST. JULIEN:** Do

5    you have any hearing impairments?

6          **INMATE GLASGOW:** No.

7          **PRESIDING COMMISSIONER ST. JULIEN:**

8    (indiscernible).

9          **ATTORNEY HALL:** It has to do with his

10   medical condition.  In the 1073 he mentioned he

11   has frequent (indiscernible).

12         **PRESIDING COMMISSIONER ST. JULIEN:** And

13   that's (indiscernible).  If you feel the need

14   that you need to be excused for a few minutes or

15   whatever while we are at the hearing today you

16   can just ask and we can take a recess.  Okay?

17         **INMATE GLASGOW:** Yes Ma'am.

18         **PRESIDING COMMISSIONER ST. JULIEN:** And

19   do you know what the Triple CMS and the EOP

20   programs are?

21         **INMATE GLASGOW:** I think it has something

22   to do with mental health.

23         **PRESIDING COMMISSIONER ST. JULIEN:** Yes

24   exactly.  They are the mental health services

25   programs that the department offers.  Have you

26   ever been a part of those programs?

27         **INMATE GLASGOW:** No Ma'am.

6

1          **PRESIDING COMMISSIONER ST. JULIEN:**    And

2    have you ever taken any psychotropic

3    medications?

4          **INMATE GLASGOW:**    No.

5          **PRESIDING COMMISSIONER ST. JULIEN:**    And

6    you did mention that you are on medicines now

7    for bladder issues.    Are you taking any other

8    medications?

9          **INMATE GLASGOW:**    Hyper tension

10   (indiscernible).

11         **PRESIDING COMMISSIONER ST. JULIEN:**    And

12   again, do the medications that you are taking

13   for that condition will they cause you not to be

14   able to participate in the hearing today?

15         **INMATE GLASGOW:**    No.

16         **PRESIDING COMMISSIONER ST. JULIEN:**    And

17   Mr. Hall, are you satisfied that your client's

18   ADA rights have met?

19         **ATTORNEY HALL:**    Yes I do.

20         **PRESIDING COMMISSIONER ST. JULIEN:**    I am

21   going to go ahead then and give you an outline

22   of the hearing procedure today.    And I will note

23   that you (indiscernible) ADA issues that you do

24   have your GED.

25         **INMATE GLASGOW:**    Yes.

26         **PRESIDING COMMISSIONER ST. JULIEN:**    You

27   didn't have any problem (indiscernible).    We are

7

```
 1   conducting the hearing pursuant to Penal Code
 2   sections 3041 and 3042 of the rules and
 3   regulations of the Board of Parole Hearings
 4   governing parole consideration hearings for life
 5   inmates.  The purpose of the hearing today is to
 6   consider your suitability for parole.  We will
 7   reach a decision today and inform you whether or
 8   not we find you suitable or the reasons for that
 9   decision.  If you are found suitable for parole
10   the length of your confinement will be explained
11   to you.  The hearing will be conducted in two
12   parts.  First I am going to discuss the number
13   and the nature of crimes you were committed for,
14   your prior criminal and social history and your
15   parole plans and letters of support or
16   opposition that you may have.  Then Commission
17   Wolk will discuss with you your behavior and
18   programming history as well as your
19   psychological evaluations and counselors
20   reports.  When that is done the District
21   Attorney and your attorney will be able to ask
22   you questions and then the District Attorney
23   actually asks the questions to the panel and you
24   answer in turn to us.  And then the District
25   Attorney, your attorney and you will be given an
26   opportunity to make a final statement as to your
27   suitability.  We will recess to deliberate and
```

8

1   when we reach a decision we will reconvene the

2   hearing and announce our decision.  The

3   California Code of Regulations state that

4   regardless of time served, a life inmate shall

5   be found unsuitable for and denied parole if in

6   the judgment of the panel the inmate still pose

7   an unreasonable risk of danger to society if

8   released from prison.  You also have certain

9   rights.  Those rights include the right to a

10  timely notice of this hearing, the right to

11  review your Central File, and the right to

12  present relevant documents.  Mr. Hall, have you

13  client's rights been met?

14          **ATTORNEY HALL:**  Yes they have.

15          **PRESIDING COMMISSIONER ST. JULIEN:**  You

16  also have the right to be heard by an impartial

17  panel.  Do you have any objections to today's

18  panel?

19          **INMATE GLASGOW:**  No Ma'am.

20          **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

21  Hall?

22          **ATTORNEY HALL:**  No objections.

23          **PRESIDING COMMISSIONER ST. JULIEN:**  You

24  will receive a copy of our written tentative

25  decision today and that decision is subject to

26  review by the decision review unit and the

27  entire board meeting as a whole. That decision

9

1    becomes effective within 120 days.  In the

2    future you will receive a copy of that decision

3    and a copy of the transcripts once they are

4    transcribed.  The board no longer has an appeals

5    process.  So if you have any objections or

6    complaints about anything that happens here

7    today you need to file those directly to the

8    court.  You can find information on how going

9    about doing that in the prison law library.

10   (indiscernible) Administrative Appeals

11   Correspondence and Grievances Concerning BPT

12   Hearings.  You are not required to admit your

13   offense or discuss your offense if you do not

14   wish to do so.  However, we accept as truth the

15   findings of the court.  We invite you to discuss

16   the facts and circumstances of the crime if you

17   wish.  We will consider and review any prior

18   statements you've made regarding your offense in

19   determining your suitability for parole.

20   Commissioner Wolk, is there confidential

21   information?

22          **DEPUTY COMMISSIONER WOLK:**  Not that we

23   will be using today.

24          **PRESIDING COMMISSIONER ST. JULIEN:**

25   Earlier I passed a checklist marked exhibit one

26   to your attorney and I note that I received it

27   back.  Are all of those documents in order?

10

1          **ATTORNEY HALL:**  Yes we have those.

2          **PRESIDING COMMISSIONER ST. JULIEN:**  And

3     Mr. Rico I am looking at a hearing checklist

4     that has gone by, it looks like the name on here

5     is Villego V-I-L-L-E-G-O and it's dated maybe

6     9/27/05.

7          **DEPUTY DISTRICT ATTORNEY RICO:**  I have

8     that same checklist and those documents and I am

9     prepared to --

10          **PRESIDING COMMISSIONER ST. JULIEN:** Okay

11     thank you.  Do you have any additional

12     documents?

13          **ATTORNEY HALL:**  Yes Commissioner we have

14     a chrono and a checklist and a couple other

15     documents.

16          **PRESIDING COMMISSIONER ST. JULIEN:**  One

17     of the officers will -- And do you have any

18     preliminary objections?

19          **DEPUTY DISTRICT ATTORNEY RICO:**  There

20     isn't any.

21          **PRESIDING COMMISSIONER ST. JULIEN:**  Thank

22     you.  And will Mr. Glasgow be speaking with us

23     today?

24          **ATTORNEY HALL:**  Yes he will.

25          **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

26     Glasgow I need you to get an oath.  Do you

27     solemnly swear or affirm that the testimony you

11

1   give at this hearing will be the truth, the

2   whole truth and nothing but the truth?

3        **INMATE GLASGOW:**  Yes Ma'am.

4        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

5   I am going to go ahead then and read the summary

6   of the crime as it appears in the February 2003

7   board report.  And that report was prepared by

8   Correction Counselor (indiscernible) last name

9   Minor M-I-N-E-R and approved by the

10  classification (indiscernible).  It states that

11  on March 4th, 1980 the Palo Alto police

12  department officers responded to the report of a

13  shooting.  On arrival at the scene, the officers

14  observed the victim (indiscernible) Collins on

15  the floor of the bedroom.  Victim Collins had

16  been shot several times (indiscernible).  No

17  vital signs were detected and the Palo Alto

18  paramedics were (indiscernible).  At this time

19  the investigating officers made contact with the

20  victim Patricia Watts (indiscernible) who was

21  sitting on a fold out bed (indiscernible)

22  apartment.  Watts had suffered a gunshot wound

23  to her back.  Watts explained that at

24  approximately five A.M. she heard a knock on the

25  door and observed the defendant (indiscernible)

26  inmate in front of the apartment.  She indicated

27  that she would not open the door at that time

12

1    and returning to bed she remained that way until

2    morning.  The defendant returned and she allowed

3    him to enter the apartment.  She indicated that

4    he sat in the living room for approximately ten

5    minutes and played with her daughter.

6    (indiscernible) bathroom in the hallway of the

7    apartment and during this time she heard a knock

8    at the back door.  The defendant then allowed

9    Edmond Duhart D-U-H-A-R-T to enter the

10   apartment.  Watts explained the defendant then

11   began walking toward the hallway and she

12   observed that he had a gun in his hand.  She

13   indicated that she ran to the bedroom and

14   attempted to arouse Collins however the

15   defendant was at the door to the bedroom and

16   attempted to get in.  She related that the

17   defendant pushed his way into the bedroom and

18   during the ensuing struggle the defendant was

19   firing (indiscernible) at Collins and as she

20   attempted to protect the victim she was also

21   wounded.  Victim Watts relayed that during this

22   time that she was in bedroom, the defendant call

23   for Duhart to come into the room and remove

24   victim Watts indicating that he tried to pull

25   her off victim Collins while the defendant was

26   still shooting at the victim.  She indicated

27   that the defendant fired several shots from the

13

1    weapon (indiscernible).  She then related that

2    defendant Duhart then left the apartment.  So

3    apparently your (indiscernible) so we will have

4    to (indiscernible).

5         **DEPUTY COMMISSIONER WOLK:**  We are back on

6    record.

7         **PRESIDING COMMISSIONER ST. JULIEN:**  There

8    seems to be some discrepancies between your

9    version of what happened that day and what's on

10   the record here in terms of Ms. Watts and her

11   testimony.  Do you recall that?

12        **INMATE GLASGOW:**  Ya, I am not sure what

13   the Commissioner is mentioning.

14        **PRESIDING COMMISSIONER ST. JULIEN:**  Well

15   the prior transcripts you mentioned that Ms.

16   Watts was subsequently convicted of perjury for

17   giving false testimony in your case.

18        **INMATE GLASGOW:**  Yes.

19        **PRESIDING COMMISSIONER ST. JULIEN:**  So

20   did you shoot Mr. Collins?

21        **INMATE GLASGOW:**  Yes, yes I did.

22        **PRESIDING COMMISSIONER ST. JULIEN:**  And

23   did you shoot him when he was unarmed?

24        **INMATE GLASGOW:**  I believe he was armed.

25   This is what the discrepancy is.

26        **PRESIDING COMMISSIONER ST. JULIEN:**  So

27   why don't you tell us what happened.

14

1          **INMATE GLASGOW:**  He came to the door and
2    he had somethin in his hand (indiscernible)bein
3    fired (indiscernible) and we was fighten and she
4    was pulling on it.

5          **PRESIDING COMMISSIONER ST. JULIEN:**  So it
6    was the three of you correct?

7          **INMATE GLASGOW:**  Ya.

8          **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.
9    Collins, Ms. Watts, and yourself?

10         **INMATE GLASGOW:**  Yes Ma'am.

11         **PRESIDING COMMISSIONER ST. JULIEN:**  And
12   whose gun was it?

13         **INMATE GLASGOW:**  It was my gun.

14         **PRESIDING COMMISSIONER ST. JULIEN:**  And
15   did you bring it to the house with you?

16         **INMATE GLASGOW:**  Yes Ma'am.

17         **PRESIDING COMMISSIONER ST. JULIEN:**  And
18   how did they know that you had a gun?

19         **INMATE GLASGOW:**  They didn't know, until
20   after was bein fired.

21         **PRESIDING COMMISSIONER ST. JULIEN:**  So
22   you all just kind of got in a fight?

23         **INMATE GLASGOW:**  No, when I went to open
24   the door for Mr. Dunhart evidentially she woke
25   Mr. Collins up.  I was in the bathroom and
26   that's when we started fighten.

27         **PRESIDING COMMISSIONER ST. JULIEN:**  So

15

1    you came out of the bathroom then did Mr.

2    Collins approach you at start physically

3    fighting with you?

4         INMATE GLASGOW:  He had somethin in his

5    had.

6         PRESIDING COMMISSIONER ST. JULIEN:  Do

7    you know what that was?

8         INMATE GLASGOW:  I thought it was a gun,

9    maybe it was a gun.  But I was afraid of it and

10   the fear might a took over.  But I did shoot

11   him.

12        PRESIDING COMMISSIONER ST. JULIEN:  How

13   many times did you shoot him?

14        INMATE GLASGOW:  I don't know nothin

15   about nothin.

16        PRESIDING COMMISSIONER ST. JULIEN:  Do

17   you remember how Ms. Watts got shot?

18        INMATE GLASGOW:  No I don't.  I didn't

19   know she been shot.

20        PRESIDING COMMISSIONER ST. JULIEN:  So

21   were there just bullets going off?

22        INMATE GLASGOW:  She was jerking on his

23   arm and all three of us was fighten.  It's hard

24   for me to describe but I was afraid and I don't

25   think she intentionally lied.  I think she was

26   hollering and screaming.  I know I was afraid of

27   I had contact with this man before.

16

1        **PRESIDING COMMISSIONER ST. JULIEN:**  So

2   you were afraid of him, did he live there?  Did

3   he live with Ms. Watts?

4        **INMATE GLASGOW:**  No, they just

5   occasionally stayed together.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  Did

7   you know that he was there?

8        **INMATE GLASGOW:**  No.

9        **PRESIDING COMMISSIONER ST. JULIEN:**  So

10  when you went to Ms. Watts' apartment and you

11  spent some time with her child and all that you

12  didn't know that Collins' was there?

13       **INMATE GLASGOW:**  No.

14       **DEPUTY COMMISSIONER WOLK:**  What were you

15  doing there?

16       **INMATE GLASGOW:**  I just stopped there to

17  see my niece.  I heard she was havin trouble.

18       **DEPUTY COMMISSIONER WOLK:**  The girl that

19  you were talking with in the living room was

20  your niece?

21       **INMATE GLASGOW:**  Yes, it my gran --

22       **PRESIDING COMMISSIONER ST. JULIEN:**  So do

23  remember pulling the trigger?

24       **INMATE GLASGOW:**  I had my hand on the

25  trigger and she was pulling the gun.

26       **PRESIDING COMMISSIONER ST. JULIEN:**  The

27  gun was fired several times.

17

1    **INMATE GLASGOW:**  Ya but I never did stand

2    back and fire all them in his body or anything

3    that the crime say.  She was hollering and

4    screaming and pulling on the gun.

5    **PRESIDING COMMISSIONER ST. JULIEN:**  So

6    how do you feel about this crime now?

7    **INMATE GLASGOW:**  I feel like I am

8    responsible for it and I sorry it had to happen.

9    It affected me and it affected my family and it

10   affected his family.  And I know that they

11   suffer from it and so have I.  If I could redo

12   it again I would do it much different.

13   **PRESIDING COMMISSIONER ST. JULIEN:**  And

14   how would you redo it?

15   **INMATE GLASGOW:**  I would take the chance

16   in turning myself over to the care of God and I

17   wouldn't leave the scene like I did.

18   **PRESIDING COMMISSIONER ST. JULIEN:**  And

19   why do you think that you left?

20   **INMATE GLASGOW:**  I was afraid.  Fear took

21   over and I was afraid.  I did shoot the man and

22   I proves I was (indiscernible).

23   **PRESIDING COMMISSIONER ST. JULIEN:**  In

24   some of letters from law enforcement following

25   your arrest it said that you didn't show any

26   remorse about shooting Mr. Collins and Ms.

27   Watts.  Do you remember that?  That you didn't

18

1  show that you were sorry for killing Mr.

2  Collins?

3       INMATE GLASGOW:  It was murder, I killed

4  a man I am sorry. That's my family.  I love my

5  niece.  I (indiscernible) that's why I stopped.

6       DEPUTY COMMISSIONER WOLK:  Why were you

7  carrying a gun?

8       INMATE GLASGOW:  Palo Alto is a very bad

9  place.  When I go there, I been jumped before I

10  been a couple of times.  It's a bad place and

11  they have a lot of after hours (indiscernible).

12       PRESIDING COMMISSIONER ST. JULIEN:  Up

13  until that shooting you were in trouble a lot.

14       INMATE GLASGOW:  Yes.

15       PRESIDING COMMISSIONER ST. JULIEN:  I

16  have over 82 arrests.  That is a huge, huge

17  extensive arrest record.  Can you explain that?

18       INMATE GLASGOW:  I (indiscernible).

19       PRESIDING COMMISSIONER ST. JULIEN:  A lot

20  of burglaries, forgery, carrying concealed

21  weapons, battery.  So what kind of life were you

22  leading?

23       INMATE GLASGOW:  Terrible life Ma'am.

24       PRESIDING COMMISSIONER ST. JULIEN:  And

25  then that we have that you had a heroine

26  addiction for over 23 years?

27       INMATE GLASGOW:  Yes, that's part of the

19

1   reason.

2        **PRESIDING COMMISSIONER ST. JULIEN:** So

3   did you become addicted to heroine?

4        **INMATE GLASGOW:** Living (indiscernible).

5        **PRESIDING COMMISSIONER ST. JULIEN:** But

6   there are -- how many other people did you know

7   from the same environment and the same

8   conditions that became addicted to heroine?

9        **INMATE GLASGOW:** All my associates.

10       **PRESIDING COMMISSIONER ST. JULIEN:** What

11  about member's or your family?

12       **INMATE GLASGOW:** No.

13       **PRESIDING COMMISSIONER ST. JULIEN:** So

14  what made you different from them?

15       **INMATE GLASGOW:** I guess the time and

16  era.

17       **PRESIDING COMMISSIONER ST. JULIEN:** What

18  do you think was in your character or your

19  personality or your life that led you to become

20  addicted to heroine and do all these crimes

21  other than the conditions that you were living

22  in?

23       **INMATE GLASGOW:** Well my association in a

24  count of (indiscernible) hanging around

25  different kinds of people.  When I was young I

26  didn't have a father figure.  So I thought about

27  that and that the only reason I can come up

20

1   with.

2       **PRESIDING COMMISSIONER ST. JULIEN:**  But

3   do you think that there are other people who

4   were in your same situation and who didn't lead

5   this kind of life of extensive heroine use as

6   well as having such a long criminal history?

7   What was in you?  Do you know what was in your

8   personality?

9       **INMATE GLASGOW:**  I was rebellious

10  (indiscernible).

11      **PRESIDING COMMISSIONER ST. JULIEN:**  And

12  rebellious toward what?

13      **INMATE GLASGOW:**  I was rebellious toward

14  (indiscernible) my mother gave me and rebellious

15  toward authority.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  So

17  why was it difficult for you to want to accept

18  authority?

19      **INMATE GLASGOW:**  Well I just kept

20  rebelling when I was young.  (indiscernible)

21      **PRESIDING COMMISSIONER ST. JULIEN:**  So is

22  going in and out of jail and using heroine, is

23  that an easy life?

24      **INMATE GLASGOW:**  It was very hard.

25      **PRESIDING COMMISSIONER ST. JULIEN:**  I

26  note that you had gone to recovery centers

27  periodically but apparently they didn't seem to

1    work for you.  So it was a hard life and you did
2    seek out help every now and then.  What do you
3    think still made you pursue this path?
4         **INMATE GLASGOW:**  I didn't accept, I
5    thought about that to.  I didn't accept God in
6    my life then.  To follow in his steps I have
7    accepted God in my life now.
8         **PRESIDING COMMISSIONER ST. JULIEN:**  What
9    do you think took you so long?
10        **INMATE GLASGOW:**  Well the drugs probably
11   was strong and just kept me going back and
12   forth.  I know it wasn't right and I know it
13   wasn't helpful and I continue to seek some kind
14   of help.
15        **PRESIDING COMMISSIONER ST. JULIEN:**  With
16   this very, very long history of criminal drug
17   problems with drug use, why should we think that
18   you are different today?
19        **INMATE GLASGOW:**  I think I learned my
20   lesson.  I think I have matured.  I think that I
21   ready to accept responsibility.
22        **PRESIDING COMMISSIONER ST. JULIEN:**  How
23   old were you when this crime was committed, when
24   Mr. Collins was shot?
25        **INMATE GLASGOW:**  26 years ago, 1980.
26        **PRESIDING COMMISSIONER ST. JULIEN:**  So
27   how old were you then?

22

1          **INMATE GLASGOW:**  Maybe 38.

2          **PRESIDING COMMISSIONER ST. JULIEN:**  So

3    that's -- you lived pretty much half your life

4    on the wrong track.

5          **INMATE GLASGOW:**  Yes Ma'am, I know it.  I

6    don't have very many years left and I want to do

7    it right.

8          **PRESIDING COMMISSIONER ST. JULIEN:**  So

9    when you were on the outside and you working,

10   you were a construction laborer and a master

11   barber?

12         **INMATE GLASGOW:**  Yes Ma'am.

13         **PRESIDING COMMISSIONER ST. JULIEN:**  And

14   at the time of this crime you were married to

15   Yvette and you have one child.  Was it a boy or

16   a girl?

17         **INMATE GLASGOW:**  Girl.

18         **PRESIDING COMMISSIONER ST. JULIEN:**  Is it

19   --

20         **INMATE GLASGOW:**  Abidania.

21         **PRESIDING COMMISSIONER ST. JULIEN:**

22   Abidania.  And how is she doing now?

23         **INMATE GLASGOW:**  She very

24   (indiscernible).  She lives in Santa Clara

25   County.

26         **PRESIDING COMMISSIONER ST. JULIEN:**  And

27   are you currently married?

23

1          **INMATE GLASGOW:**  Yes Ma'am.

2          **PRESIDING COMMISSIONER ST. JULIEN:**  And

3    is that still to Yvette?

4          **INMATE GLASGOW:**  No Ma'am.  I am married

5    to Diane in Stockton.

6          **DEPUTY COMMISSIONER WOLK:**  You just got

7    married didn't you, couple years ago?

8          **INMATE GLASGOW:**  Couple years ago.  Yes

9    Sir.

10          **PRESIDING COMMISSIONER ST. JULIEN:**  And

11   how did you meet Diane?

12          **INMATE GLASGOW:**  I've known her for

13   awhile, since 1963.

14          **PRESIDING COMMISSIONER ST. JULIEN:**  And

15   if you were paroled you would choose to live

16   with Diane?

17          **INMATE GLASGOW:**  Yes Ma'am.

18          **PRESIDING COMMISSIONER ST. JULIEN:**  She

19   lives in Stockton?

20          **INMATE GLASGOW:**  Yes Ma'am.

21          **PRESIDING COMMISSIONER ST. JULIEN:**  If

22   you couldn't go to Stockton and you lived with

23   your brother in law Louis in San Jose?

24          **INMATE GLASGOW:**  Yes Ma'am.

25          **PRESIDING COMMISSIONER ST. JULIEN:**  And

26   in terms of employment you would work at Big

27   Ed's Furniture and that is in Stockton?  And the

24

1   owner of Big Ed's is Edward Smith and he is

2   married to your grand daughter?

3         **INMATE GLASGOW:**  Yes Ma'am.

4         **PRESIDING COMMISSIONER ST. JULIEN:**  And

5   then you also have a job offer from Irving

6   Goodwin and he has a non-profit organization in

7   Menlo Park, (indiscernible) County.  Then it

8   notes that you also have your sponsor?  Is that

9   in NA or AA sponsor?

10        **INMATE GLASGOW:**  NA.

11        **PRESIDING COMMISSIONER ST. JULIEN:**

12  (indiscernible) Sponsor is your step daughter.

13        **INMATE GLASGOW:**  Yes Ma'am.

14        **PRESIDING COMMISSIONER ST. JULIEN:**  And

15  then apparently you have written a letter of

16  remorse to the families of the victims.

17        **INMATE GLASGOW:**  Three times.

18        **PRESIDING COMMISSIONER ST. JULIEN:**  And

19  what happened to Patricia Watts?  She changed to

20  another last name now right?

21        **INMATE GLASGOW:**  She is deceased.

22        **PRESIDING COMMISSIONER ST. JULIEN:**  Oh

23  she died?

24        **INMATE GLASGOW:**  Yes Ma'am.

25        **PRESIDING COMMISSIONER ST. JULIEN:**  Of

26  what?

27        **INMATE GLASGOW:**  I am not certain.

25

1          **PRESIDING COMMISSIONER ST. JULIEN:**   Do

2   you know how long ago she died?

3          **INMATE GLASGOW:**   About six years prior to

4   this hearing.

5          **PRESIDING COMMISSIONER ST. JULIEN:**   So

6   for your support letters, you have a petition

7   that was done on your behalf and I think that

8   your wife Diane had initiated the petition and

9   on the cover she did reasons why you should be

10  paroled and these are taken from some

11  (indiscernible).  And she has, I think there are

12  two pages of the petition.  It looks like we

13  have about 50 signatures.

14         **INMATE GLASGOW:**   Ya.

15         **PRESIDING COMMISSIONER ST. JULIEN:**   A

16  petition of people who have signed between 2004

17  and 2005 for you to (indiscernible).  That must

18  be a nice feeling to have that type of support.

19         **INMATE GLASGOW:**   Yes it does.

20         **PRESIDING COMMISSIONER ST. JULIEN:**   And

21  then we also have a letter from Jay Monteo-Mery,

22  is this a hyphenated name and the last name is

23  M-O-N-T-E-O dash M-E-R-Y and she is your great

24  grand daughter.  Is that correct?

25         **INMATE GLASGOW:**   Yes Ma'am.

26         **PRESIDING COMMISSIONER ST. JULIEN:**   She

27  says that I know that he will be a good grand

26

1    father.  I want him to come home.  She is eight

2    years old.  Then we have a letter from the

3    Veterans Emergency Housing.  Now were you a

4    veteran?

5         INMATE GLASGOW:  No Ma'am.

6         PRESIDING COMMISSIONER ST. JULIEN:  It's

7    signed by Irving Goodwin  G-O-O-D-W-I-N and he

8    is the (indiscernible) and I am not sure where

9    it is.  It must be in the --

10        INMATE GLASGOW:  Palo Alto.

11        PRESIDING COMMISSIONER ST. JULIEN:  And

12   this is a letter of employment and Mr. Goodwin

13   says that he is the Chief Executive Officer of a

14   non-profit organization and I have committed

15   myself to providing steady employment in the

16   areas (indiscernible).  Mr. Glasgow will be

17   working Monday through Friday from eight to four

18   thirty at the rate of eleven dollars an hour

19   (indiscernible).

20        DEPUTY COMMISSIONER WOLK:  Are we still

21   on record?

22        PRESIDING COMMISSIONER ST. JULIEN:  I

23   think we have to stop.

24        DEPUTY COMMISSIONER WOLK:  We are back on

25   record.

26        PRESIDING COMMISSIONER ST. JULIEN:  Okay,

27   so we are going through the letters here and we

 1    have a (indiscernible) they were offering you
 2    employment and then Mr. Goodwin also explained
 3    that he knows that you will have different
 4    restrictions on parole and he is willing to
 5    adjust your work schedule.  And then Big Ed, I
 6    think that I read that one already.  Then Lloyd
 7    Woods who is your brother in law and he says, my
 8    brother in law Mr. Brice Glasgow has shown an
 9    overwhelming amount of remorse over the crime
10    which he committed over 20 years ago.  While
11    serving his sentence he has missed out on the
12    birth of his daughter, he has missed birthdays,
13    holidays and graduations.  Brice (indiscernible)
14    death of his mother.  He has missed out on
15    spending time with her and his family during her
16    illness which caused her death.  Not being
17    allowed to take part in the funeral services for
18    his mother was very important to Brice.  We love
19    Brice and miss him and would love for him to
20    come home.  And then Diann Glasgow and that is
21    D-I-A-N-N and she is your wife and she lives in
22    Stockton.  She says that we met in 1962 and I
23    have (indiscernible) for years.  I have been a
24    licensed cosmetologist for 30 years and she has
25    lived in her current home for 16 years.  She
26    goes on to say, he has my support emotionally
27    and financially.  I will encourage him and

1   assist him as needed which is accompany him to

2   appointments and provide him transportation

3   (indiscernible). Brice has always been a very

4   nice to me and treated me with respect. I feel

5   that he has learned from his mistakes and will

6   be a good citizen. (indiscernible) excellent

7   youth advisor and a faithful member of Second

8   Baptist Church (indiscernible). And then Denise

9   Sanders S-A-N-D-E-R-S and she is your step

10  daughter and she says that she is a licensed by

11  the board of vocational nurses and psychiatric

12  technician. A major part of my training was at

13  Recovery House an alcohol and drug treatment

14  facility. I am very familiar with the 12 step

15  alcohol and drug treatment program. And she

16  says that I am willing to sponsor him upon his

17  release on parole for the purpose of his

18  continued sobriety. I have also talked to him

19  about sharing his experiences with troubled

20  youth in the community. He has expressed a

21  sincere desire to become a valuable part of our

22  community (indiscernible). And then there is a

23  letter from Jeffry Glasgow and he must be a

24  relative of yours. How is he related to you?

25          **INMATE GLASGOW:** My brother's son.

26          **PRESIDING COMMISSIONER ST. JULIEN:** Okay

27  your nephew.

1          **INMATE GLASGOW:** Yes.

2          **PRESIDING COMMISSIONER ST. JULIEN:** He

3    says dear Brice we have received your letter of

4    remorse after many meetings and discussion we

5    have agreed to welcome you back into the family

6    under certain conditions.  Number one, change

7    your environment.  I don't know what that means.

8    Number two find employment.  Number three

9    continue to be involved with some kind of

10   sobriety program (indiscernible) parole.  You

11   have changed into another person and we want you

12   to keep up the good work.  And then this is a

13   copy of (indiscernible).  Did I miss any

14   letters?  Is there anything -- . · We have -- the

15   board sends out 3042 notices and those are noted

16   that go to law enforcement and the courts

17   letting them know that you are having this

18   parole consideration hearing and we have a

19   letter here from the Palo Alto police department

20   and it is signed by Agent Natasha Powers P-O-W-

21   E-R-S and she is the detective from robbery

22   homicide and she says actually, she has some

23   names mixed up here in this letter and but they

24   are recommending against the parole Vosgow and

25   she has your name spelled wrong Mr. Vosgow is

26   convicted of intentionally killing Ralph Collins

27   and inflicting a gunshot wound to the back of

1    his niece Patricia Watts in March of 1980.

2         **DEPUTY DISTRICT ATTORNEY RICO:**  Sorry to

3    interrupt but I had faxed to me a copy of a

4    letter signed by Agent Robert Vonilla from the

5    police department that may supersede that.  Do

6    you have that?

7         **PRESIDING COMMISSIONER ST. JULIEN:**  Yes I

8    have it but it came in the late mail and it

9    doesn't have a date.

10        **DEPUTY DISTRICT ATTORNEY RICO:**  I don't

11   see a date on it but I just received it and I

12   note that the former letter was March 28th of 05

13   and I think that the letter that was in the late

14   mail is the updated letter that may resolve

15   those issues.

16        **PRESIDING COMMISSIONER ST. JULIEN:**  I'm

17   sorry.

18        **ATTORNEY HALL:**  What letter is that

19   Commissioner?

20        **PRESIDING COMMISSIONER ST. JULIEN:**  It's

21   the very last letter in the updated materials

22   and it's signed by Agent Robert Vonilla V-O-N-I-

23   L-L-A.

24        **ATTORNEY HALL:**  It looks like November 2nd

25   which would be today's date.  And we would

26   object to its use at this hearing.

27        **PRESIDING COMMISSIONER ST. JULIEN:**  Both

31

1    letters I think pretty much contain the same

2    information.  Ms. Powers's letter however has

3    some errors in it.  But like I said before I

4    think we know the jest of this and Mr. Vonilla's

5    letter will take into consideration today and we

6    will make due with Agent Powers letter and she

7    goes on to recount the particulars of the crime

8    but she does remark that the detectives who

9    responded to the case said that Mr. Glasgow was

10   detached and showed absolutely no emotion.  The

11   detectives that prepared the case commented that

12   Mr. Glasgow understood the gravity of his

13   actions and accepted no responsibility for

14   (indiscernible) and demonstrated no remorse.

15   And then she goes on to say the shooting of his

16   niece and the murder of her boyfriend was a

17   result of Glasgow not liking Collins.  Watts

18   willingly allowed Glasgow into her home

19   believing he was there for innocent purposes.

20   She had no idea he planned to shoot and kill

21   Collins.  The shooting occurred after Glasgow

22   allowed Duhart into the home and (indiscernible)

23   killing.  Glasgow was so full of hate for

24   Collins that he did not care that his own niece

25   (indiscernible) to prevent Glasgow from killing

26   him.  So Mr. Glasgow was Mr. Collins sleeping

27   when he was shot?

32

1          **INMATE GLASGOW:** No Ma'am.

2          **PRESIDING COMMISSIONER ST. JULIEN:** Did

3 you hate him?

4          **INMATE GLASGOW:** I didn't hate him I was

5 scared of him.

6          **PRESIDING COMMISSIONER ST. JULIEN:** Did

7 you plan to kill him?

8          **INMATE GLASGOW:** No Ma'am.

9          **PRESIDING COMMISSIONER ST. JULIEN:** So do

10 you think that this letter that from the Palo

11 Alto police department is this letter accurate?

12          **INMATE GLASGOW:** No Ma'am.

13          **PRESIDING COMMISSIONER ST. JULIEN:** So we

14 have done your parole plans and job offers,

15 Commissioner Wolk would you like to continue?

16          **DEPUTY COMMISSIONER WOLK:** Okay. I am to

17 talk about your programming and you post-

18 conviction factors and when I am done you can

19 add anything that you'd like or correct any

20 mistakes that I have made. I show that you are

21 currently working in PIA textiles.

22          **INMATE GLASGOW:** Yes Sir.

23          **DEPUTY COMMISSIONER WOLK:** And you have

24 been there about the last twenty years or so.

25          **INMATE GLASGOW:** Yes Sir.

26          **DEPUTY COMMISSIONER WOLK:** And you have

27 learned to operate several different types of

33

1    machines and you are currently a sewing machine

2    operator.

3          **INMATE GLASGOW:** Yes.

4          **DEPUTY COMMISSIONER WOLK:** Is it possible

5    to receive a certificate of completion in PIA

6    textiles?

7          **INMATE GLASGOW:** No, they was talking

8    about it but they never did (indiscernible).

9          **DEPUTY COMMISSIONER WOLK:** So you have

10   gone -- it looks like you have done about

11   everything that you can possibly do in that

12   program and you have become skilled and could

13   probably get employment in that area if you

14   wanted to.

15         **INMATE GLASGOW:** Developmental upholstery

16   with (indiscernible) talked to the guy and if I

17   could possibly get out (indiscernible).

18         **DEPUTY COMMISSIONER WOLK:** You have also

19   worked in culinary on the lunch box crew, you

20   were a lock stitch operator, trash crew, porter,

21   small press operator, dining hall worker, and

22   you worked in the vocational print shop for

23   awhile as well. Did you complete that program?

24         **INMATE GLASGOW:** Yes Sir.

25         **DEPUTY COMMISSIONER WOLK:** You have a

26   vocational certificate of completion?

27         **INMATE GLASGOW:** Yes, it should be in

34

1    that file somewhere.

2         **DEPUTY COMMISSIONER WOLK:**  Okay, I

3    thought I saw it but I wasn't -- well anyway.

4    You also worked as a yard attendant and in the

5    license plate factory way back when in Folsom.

6         **INMATE GLASGOW:**  Yes Sir.

7         **DEPUTY COMMISSIONER WOLK:**  You have your

8    GED?

9         **INMATE GLASGOW:**  Yes Sir.

10        **DEPUTY COMMISSIONER WOLK:**  You are a

11   volunteer in the academic department distance

12   learning program, you participate in the life

13   skills program, and you also took a course in

14   introduction to Spanish.  As far as self help is

15   concerned, you have been a regular participant

16   in NA and AA for many years.  You have also

17   taken anger management, the impact program,

18   inmate employability program, key to father hood

19   class, you have taken several anger management

20   classes, also the entrepreneur development

21   class, the infectious disease series, science of

22   the mind foundation course, you participated in

23   the (indiscernible), and you have been a member

24   of the lifer's association community awareness

25   group.  You have more laudatory chronos in your

26   file than I have ever seen before.  There must

27   be a hundred of them in there.

35

1          **INMATE GLASGOW:**  I try to better myself.

2          **DEPUTY COMMISSIONER WOLK:**  You are to be

3     commended for that.

4          **INMATE GLASGOW:**  Thank you.

5          **DEPUTY COMMISSIONER WOLK:**  As far as your

6     disciplinary history is concerned, you have

7     three CDC 115.  The first was June 1993 for

8     disobeying a direct order to submit a urine

9     sample.  The second was June 15th, of 1993 for

10    disobeying a direct order to submit to a urine

11    sample and the last one was October 24th of 1999

12    for possession of poker chips.  Is that right?

13         **INMATE GLASGOW:**  Yes Sir.

14         **DEPUTY COMMISSIONER WOLK:**  Were you

15    gambling?

16         **INMATE GLASGOW:**  No I just had the chips.

17         **DEPUTY COMMISSIONER WOLK:**  So you have

18    three 115's, two in 1993 and one in 1999.  You

19    have five 128A's the first one was in 1986

20    failing to answer to docket, second in 1989

21    failing to lock up, third in 1996 for poor job

22    performance, the fourth in 1999 for altering

23    state property, and the fifth was in 2002 for

24    smoking.  Have you stopped smoking?

25         **INMATE GLASGOW:**  Yes Sir.

26         **DEPUTY COMMISSIONER WOLK:**  After that?

27         **INMATE GLASGOW:**  I don't smoke anymore,

1   they made me stop.

2        **DEPUTY COMMISSIONER WOLK:**   Well that's

3   good.   Add a few more years onto your life.

4   Okay, last item I am going to talk about is the

5   psych report that was done in December of 2004

6   at least that is the last one I have.   Have you

7   had one since then?

8        **ATTORNEY HALL:**   That's the one, December

9   of 2004.

10       **DEPUTY COMMISSIONER WOLK:**   This was done

11   by Doctor Reed staff psychologist.   During the

12   clinical interview inmate Glasgow was alert and

13   oriented to person, place and time.   He was well

14   dressed and groomed.   His speech was articulate

15   and contextually meaningful.   His mood and

16   affect were within normal limits.   His behavior

17   was appropriate to the setting.   No evidence of

18   mood or thought disorder was demonstrated.   His

19   estimated intellectual functioning is within the

20   average range.   His current diagnostic

21   impression under Axis I, heroine dependence is

22   sustained full remission in a controlled

23   environment.   He notes that you pick at several

24   self help groups, anger management, and

25   participate in AA and NA through out the years,

26   also life skills program.   He assesses your

27   dangerousness within a controlled setting to be

37

1  low relative to the average level two inmate

2  population.  He states that if released to the

3  community his violence potential is considered

4  to be no more than that of the average citizen

5  in the community.  There are no significant risk

6  factors which may be a precursor to violence for

7  this individual.  He is competent and reasonable

8  and responsible for his behavior.  He has the

9  capacity to abide by institutional standards.

10  He does not have a mental health disorder which

11  would necessitate treatment either during his

12  incarceration period or following upon parole.

13  This inmate does have a heroine abuse history

14  however he has remained abstinent from abuse of

15  heroine for over 23 years and has regularly

16  attended NA within CDC.  And does not appear at

17  this point to be a significant risk factor for

18  violence.  Continued participation with NA

19  within CDC no longer appears to be warranted,

20  however participation within NA as a contingency

21  for parole for one year is suggested.  That

22  pretty much covers everything that I have been

23  able see in your file that has to do with

24  programming.  Is there anything that you would

25  like to add?

26        INMATE GLASGOW:  No Sir, that is just

27  about it.

38

1    **ATTORNEY HALL:** I don't know Commissioner
2    if you mentioned his participation in the Muslim
3    Development (indiscernible) anger management
4    program.

5    **INMATE GLASGOW:** That's true
6    (indiscernible).

7    **DEPUTY COMMISSIONER WOLK:** And I will now
8    turn it back over to my colleague.

9    **PRESIDING COMMISSIONER ST. JULIEN:** Thank
10   you. (indiscernible)2000 in your psychological
11   evaluation when you were talking about the life
12   crime you said that the victim had beaten you up
13   before?

14   **INMATE GLASGOW:** Yes Ma'am.

15   **PRESIDING COMMISSIONER ST. JULIEN:** Is
16   that correct?

17   **INMATE GLASGOW:** Yes.

18   **PRESIDING COMMISSIONER ST. JULIEN:** Why
19   did he beat you up?

20   **INMATE GLASGOW:** Well (indiscernible)
21   four or five guys (indiscernible) come from a
22   (indiscernible).

23   **PRESIDING COMMISSIONER ST. JULIEN:** How
24   old was he, I mean were you close in age?

25   **INMATE GLASGOW:** Ya, I think I was two
26   years older.

27   **PRESIDING COMMISSIONER ST. JULIEN:** Then

 1  how did he get involved with your niece?

 2       **INMATE GLASGOW:**  I don't know.  I was

 3  kind of curious about that also because she is

 4  my sister's daughter and I was concerned about

 5  that and come to find out that she

 6  (indiscernible).  I was concerned about it.

 7       **PRESIDING COMMISSIONER ST. JULIEN:**  So

 8  did you know he was there the day of the

 9  shooting?

10       **INMATE GLASGOW:**  No Ma'am.

11       **PRESIDING COMMISSIONER ST. JULIEN:**  So

12  going back to your heroine days, were you using

13  heroine at the time of the crime?

14       **INMATE GLASGOW:**  No, I was doin a

15  maintenance program.

16       **PRESIDING COMMISSIONER ST. JULIEN:**  And

17  how long had you been on that?

18       **INMATE GLASGOW:**  For about a year.

19       **PRESIDING COMMISSIONER ST. JULIEN:**  So

20  again, do you know why you stayed addicted to

21  heroine for so many years?  I know you have the

22  previous attempts at trying to stop.

23       **INMATE GLASGOW:**  I just determined not to

24  let it kill me off completely.  It's a strong

25  drug and takes control of you but I kept

26  fighting it and wouldn't give into it.  This is

27  why I got on the (indiscernible) maintenance

# EXHIBIT 2
# Part 2 of 2

40

1  program.

2      **PRESIDING COMMISSIONER ST. JULIEN:**  And

3  how do you feel about your heroine use now?

4      **INMATE GLASGOW:**  I feel good about my

5  (indiscernible).

6      **PRESIDING COMMISSIONER ST. JULIEN:**  When

7  you were using heroine?  How do you think that

8  affected your life?

9      **INMATE GLASGOW:**  (indiscernible)

10      **PRESIDING COMMISSIONER ST. JULIEN:**  Would

11  you ever use it again?

12      **INMATE GLASGOW:**  No Ma'am.

13      **PRESIDING COMMISSIONER ST. JULIEN:**  Why

14  not?

15      **INMATE GLASGOW:**  Because I know what it

16  will do to you Ma'am.  (indiscernible).

17      **PRESIDING COMMISSIONER ST. JULIEN:**  How

18  do you explain the long heroine use and your

19  offenses, arrest record with all of your

20  laudatories and good behavior in prison?  How

21  did that change come about?

22      **INMATE GLASGOW:**  I had to work

23  (indiscernible) and all different arrests the

24  main thing Ma'am, drug addiction.

25  (indiscernible) and habit.  Now I don't have the

26  habit.

27      **PRESIDING COMMISSIONER ST. JULIEN:**  And

1   how were you able to stop because I think that

2   we all know that heroine use is often available

3   in prison.

4           INMATE GLASGOW:  By participating in the

5   programs and being active and doin the right

6   thing.  Positive things.  Do things to better my

7   life.  (indiscernible) and that's my future.  I

8   know that you made a statement that they said

9   that I didn't feel no remorse, I have to feel

10  remorse because my family is involved.  My niece

11  was pregnant (indiscernible).  When they was

12  babies I used to send my niece all the money I

13  could (indiscernible) everything I could but I

14  knew it wasn't much but it was the best that I

15  could do.

16          PRESIDING COMMISSIONER ST. JULIEN:  You

17  would send them money?

18          INMATE GLASGOW:  Ya.  I knew it was the

19  kid's father so I tried to do did everything I

20  could (indiscernible).  (indiscernible) where

21  there father was.  It kind of hurts me

22  (indiscernible).

23          PRESIDING COMMISSIONER ST. JULIEN:  Any

24  other questions?  Mr. Rico do you have questions

25  for Mr. Glasgow?

26          DEPUTY DISTRICT ATTORNEY RICO:  Yes I do

27  Commissioner and I will address them to the

42

1   panel. .I am a little bit confused about some

2   things, I don't mean to repeat.  It is my

3   understanding that Mr. Glasgow was 38 at the

4   time of the life crime and the victim according

5   to the autopsy information was 30 is that about

6   right.  Does Mr. Glasgow remember that?

7        **INMATE GLASGOW:**  I don't really know his

8   age.

9        **DEPUTY DISTRICT ATTORNEY RICO:**  That's

10  fine.  I guess that some of the things that I am

11  wondering about in terms of the life crime.  The

12  file indicates that on March 1st, 1980 that Mr.

13  Glasgow went over to his niece's residence about

14  five o'clock in the morning.  Is that accurate?

15       **INMATE GLASGOW:**  It was early.

16       **DEPUTY DISTRICT ATTORNEY RICO:**  Why did

17  you go over so early?

18       **INMATE GLASGOW:**  Because as it was stated

19  I was on this methadone maintenance program and

20  you had to pick your medicine up early and I

21  didn't want to miss that so I stayed up.

22       **DEPUTY DISTRICT ATTORNEY RICO:**  So I

23  guess what I am asking you is why did he go over

24  to his niece's residence that morning?

25       **INMATE GLASGOW:**  Because I was concerned

26  about her.

27       **DEPUTY DISTRICT ATTORNEY RICO:**  Concerned

43

1   about what?

2       **INMATE GLASGOW:**  I was going to San

3   Francisco so I was concerned about my niece so I

4   stopped there.

5       **DEPUTY DISTRICT ATTORNEY RICO:**  And I

6   heard Mr. Glasgow indicate earlier that it was

7   his gun and he took it with him is that

8   accurate?

9       **INMATE GLASGOW:**  Yes.

10      **DEPUTY DISTRICT ATTORNEY RICO:**  What I am

11  wondering is since it looks like Mr. Glasgow in

12  addition to the 82 arrests, had four prior

13  felony convictions.  What did he have a gun for

14  anyway?

15      **INMATE GLASGOW:**  Because the area that I

16  was in.  (indiscernible) been beaten up there a

17  couple times before.

18      **DEPUTY DISTRICT ATTORNEY RICO:**  But the

19  crime itself took place in the city of Palo Alto

20  which is in Santa Clara County and not East Palo

21  Alto which is in San Mateo County.  Isn't that

22  true?

23      **INMATE GLASGOW:**  Well it split up, they

24  split the county.  Palo Alto is split county.

25      **DEPUTY DISTRICT ATTORNEY RICO:**  I guess

26  what I am asking is it would appear that the

27  shooting took place at his niece's residence at

44

1   1179 Amarillo A-M-A-R-I-L-L-O in Palo Alto.

2   Where exactly was that?  Does Mr. Glasgow

3   remember what area of town?

4          **INMATE GLASGOW:**  No, it's Palo Alto

5   (indiscernible).

6          **DEPUTY DISTRICT ATTORNEY RICO:**  In terms

7   of the weapon, I note that in that report

8   Commissioner you referred to the psych report

9   from May 4th, of 2000 under review of the life

10  crime, at that time Mr. Glasgow was saying that

11  he killed the victim with the victim's own gun

12  purely in self defense which is different from

13  what he is saying today.  Could he comment on

14  those discrepancies in the last five years, the

15  different stories?

16         **INMATE GLASGOW:**  It because she had lies.

17  I am telling the truth today.

18         **DEPUTY DISTRICT ATTORNEY RICO:**  So does

19  Mr. Glasgow say that he was lying as recently as

20  May of 2000 about how the life crime took place?

21         **INMATE GLASGOW:**  I am sorry.

22         **DEPUTY DISTRICT ATTORNEY RICO:**  I will

23  rephrase that.  Commissioner do you see the

24  question that I am talking about under the life

25  crime there?  It's on page four of the 540  --

26         **PRESIDING COMMISSIONER ST. JULIEN:**  I see

27  it.  So this statement says that you said that

45

1   you killed Mr. Collins with his gun and you were

2   acting in self defense.  Now did you kill Mr.

3   Collins with his gun?

4       **INMATE GLASGOW:**  I had the gun.

5       **PRESIDING COMMISSIONER ST. JULIEN:**  So

6   why did you say you killed Mr. Collins with his

7   gun.

8       **INMATE GLASGOW:**  I was under the

9   impression that he had a gun.

10      **PRESIDING COMMISSIONER ST. JULIEN:**  Do

11  you that this doesn't make sense to us?

12      **ATTORNEY HALL:**  He said earlier that he

13  thought that Mr. Collins had a gun.

14      **PRESIDING COMMISSIONER ST. JULIEN:**  He

15  says here that he says he killed the victim with

16  the victims own gun.

17      **INMATE GLASGOW:**  No I had the gun

18  (indiscernible).

19      **PRESIDING COMMISSIONER ST. JULIEN:**  Maybe

20  the psychologist -- I don't know.

21      **DEPUTY DISTRICT ATTORNEY RICO:**  I thought

22  I heard Mr. Glasgow say a minute ago that he was

23  telling the truth today.  Is he acknowledging

24  that maybe he wasn't being truthful in 2000

25  about how the crime really took place?  Is that

26' what he was indicating?

27      **INMATE GLASGOW:**  Well if I told him that

46

1   then it stayed my mind.  I was under the

2   impression that he had a gun.

3       **DEPUTY DISTRICT ATTORNEY RICO:**  I will

4   let that be enough and not pursue that anymore.

5   There was some materials that I had submitted to

6   the board on October 6th that included an

7   autopsy report and crime scene diagram and three

8   crime scene photos.

9       **PRESIDING COMMISSIONER ST. JULIEN:**  Yes,

10  we received that.  I didn't see the photos

11  unless they are in the C File.  We did see the

12  report of the crime scene and the autopsy and

13  all of that.

14      **ATTORNEY HALL:**  And which I just received

15  today and again I would urge that it not be

16  considered as submitted untimelyness.

17      **DEPUTY DISTRICT ATTORNEY RICO:**  Well

18  Commissioner I also would point out that when I

19  did submit that it was on October 6th, 2005 I

20  overnighted them to Soledad and the last line in

21  the cover letter said that I am enclosing copies

22  of the materials for the inmates C File, the BPH

23  panel and inmate Glasgow's attorney.  I would

24  ask that you forward the copy provided for the

25  inmate's attorney to counsel immediately so it

26  is received in timely fashion prior to the above

27  referred to lifer hearing scheduled for November

47

1   2nd.  That was on October 6th.  I did everything

2   that I could.

3           **PRESIDING COMMISSIONER ST. JULIEN:**  We

4   all just got these today.  I don't know.   Mr.

5   Hall did you receive this before?

6           **ATTORNEY HALL:**  No I did not.  This is

7   the first time I am seeing it.

8           **PRESIDING COMMISSIONER ST. JULIEN:**  It

9   was in our updated materials that I actually

10  gave Mr. Hall his copy.  But we just got those

11  today.

12          **DEPUTY DISTRICT ATTORNEY RICO:**  I terms

13  of submitting it timely, there is nothing more

14  that I could do unless --

15          **PRESIDING COMMISSIONER ST. JULIEN:**  That

16  is correct.  I don't know.  The information

17  would probably be the determining factor.

18          **DEPUTY DISTRICT ATTORNEY RICO:**  In any

19  event, I am also told that sometimes crime scene

20  photographs are put in something called a sluff

21  file which is --

22          **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

23  Wolk is looking for them now.

24          **DEPUTY DISTRICT ATTORNEY RICO:**  Thank

25  you.  The line is going to ask the panel for

26  submission to the inmate is this.  I have seen

27  the letter that Mr. Glasgow wrote to, and it

48

1    says to the Glasgow, Watts, and Collins Family

2    and it indicates in it that his, meaning Mr.

3    Collins, death was never intentional.  I guess

4    what I am kind of confused about here, the

5    photos show, and I could just ask Mr. Glasgow

6    that, wasn't Mr. Collins completely naked at the

7    time he was shot?

8        **INMATE GLASGOW:**  I don't know, I didn't

9    have time enough to view him (indiscernible)

10   because I was afraid and I was scared.

11       **DEPUTY DISTRICT ATTORNEY RICO:**  I guess

12   he was shot in the bedroom.  It that accurate?

13       **INMATE GLASGOW:**  It was up against the

14   door, between the hallway and the bedroom.

15       **DEPUTY DISTRICT ATTORNEY RICO:**  I guess

16   one of the things that confuses me, Mr. Glasgow

17   came to the apartment and was refused entrance

18   the first time, the second time he was let in.

19   Why did Mr. Glasgow after he gained access to

20   the apartment let in a second individual, Edmond

21   Duhart, through a back door?  Why did he do

22   that?

23       **INMATE GLASGOW:**  It was the first time I

24   was at the apartment and I didn't know

25   (indiscernible) was coming in the back.  I

26   didn't know I had someone in the car waitin.

27       **DEPUTY DISTRICT ATTORNEY RICO:**  And if

49

1    Mr. Glasgow was afraid of the victim who

2    apparently was in the back bedroom, why did Mr.

3    Glasgow walk from the apartment, the living

4    area, down the hallway into the bedroom where

5    Mr. Collins was if Mr. Glasgow was afraid of

6    him?  Why did he go to him?

7         **INMATE GLASGOW:**  I didn't walk to the

8    bedroom, I went to the bathroom.

9         **DEPUTY DISTRICT ATTORNEY RICO:**  How did

10   Mr. Glasgow then wind up in the bedroom with the

11   gun and with the victim?

12        **INMATE GLASGOW:**  He was standing at the

13   door between the hallway and the bedroom.

14        **DEPUTY DISTRICT ATTORNEY RICO:**

15   Completely naked?

16        **INMATE GLASGOW:**  I don't know if he was

17   naked or not.

18        **DEPUTY DISTRICT ATTORNEY RICO:**  And how

19   was it, the report seems to indicate that at

20   some point, when Mr. Glasgow went down and

21   confronted the victim who was asleep in the bed

22   in the bedroom and started shooting that Mr.

23   Glasgow's niece threw her self over the victim

24   to try to shield him and Mr. Glasgow fired

25   through the niece into the victim?  Is that

26   accurate?

27        **INMATE GLASGOW:**  No Sir.

50

1          **DEPUTY DISTRICT ATTORNEY RICO:**  How did

2    bullets pass through Mr. Glasgow's niece then?

3          **INMATE GLASGOW:**  I don't know as to the

4    question how.

5          **DEPUTY DISTRICT ATTORNEY RICO:**  And the

6    autopsy report indicates that among the many

7    wounds to the victim, Ralph Collins, there were

8    a couple of bullets, one directly above the

9    right ear canal which had a marginal rim of

10   abrasion suggesting that the gun was put right

11   up against the head.  How did Mr. Glasgow shoot

12   the victim in that manner up against the back of

13   the head if he was fighting him as he has

14   indicated?

15         **INMATE GLASGOW:**  (indiscernible).

16         **DEPUTY DISTRICT ATTORNEY RICO:**  I don't

17   know if those photos have been located but they

18   show two bullets.  All I know is that I sent

19   them.  I don't know what the institution did

20   with them.

21         **DEPUTY COMMISSIONER WOLK:**  We'll take

22   your word for it.

23         **DEPUTY DISTRICT ATTORNEY RICO:**  I will

24   just ask Mr. Glasgow through the panel this.

25   Did Mr. Glasgow put the muzzle of the gun right

26   up against the victim's head and pull the

27   trigger?

51

1      **INMATE GLASGOW:**  Sir, I know this is not

2    the time nor the place but nothin no way

3    (indiscernible) fightin and I was afraid for my

4    life and I don't know what position the man was

5    in all I know is that I was fightin for my life.

6    (indiscernible).

7      **DEPUTY DISTRICT ATTORNEY RICO:**  I guess

8    what I don't understand Mr. Glasgow is

9    indicating that he was fighting for his life but

10   it would appear that the victim had no clothing

11   on and no weapon and Mr. Glasgow was the only

12   one with a gun and had gone to the victim.  Can

13   he explain how it was that he somehow was

14   fighting for his life under those circumstances?

15     **ATTORNEY HALL:**  We will object to the

16   premise that in fact that the person was nude or

17   naked at the time.  Mr. Glasgow has said that he

18   didn't know whether he recall if the man  was

19   naked or not so to include that in the question,

20   the premise that he was naked I think is

21   improper.

22     **DEPUTY DISTRICT ATTORNEY RICO:**  May I

23   have just a moment?

24     **PRESIDING COMMISSIONER ST. JULIEN:**  Yes.

25   Can you limit it to one more question?

26     **DEPUTY DISTRICT ATTORNEY RICO:**

27   Certainly.  I know Mr. Glasgow has indicated

52

1   that his niece was convicted of perjury for

2   lying but isn't the lie that she was convicted

3   of perjury for telling the recanting of her

4   original version.  So I guess what I am saying

5   she wasn't convicted for lying that he did the

6   crime but she was convicted for lying after the

7   fact that he hadn't been involved.  Isn't that

8   accurate?

9         **INMATE GLASGOW:**  I don't know.

10        **DEPUTY DISTRICT ATTORNEY RICO:**  Did Mr.

11  Glasgow do anything to get his niece to change

12  her story to try to get him out of trouble?

13        **INMATE GLASGOW:**  Got arrested on March

14  the 1st and I been in jail ever since.

15        **DEPUTY DISTRICT ATTORNEY RICO:**  I have

16  nothing further.

17        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay

18  Mr. Hall.

19        **ATTORNEY HALL:**  Thank you.  This crime

20  occurred some twenty five years ago, twenty five

21  and a half years ago, and you are now 64 years

22  old?

23        **INMATE GLASGOW:**  Yes.

24        **ATTORNEY HALL:**  In respect to some of the

25  questions that the Deputy District Attorney was

26  asking you about in detail about the crime.

27  Your memory is quite clear as to what happened

53

1  next?

2          **INMATE GLASGOW:**  Yes.

3          **ATTORNEY HALL:**  Your memory is quite

4  clear?

5          **INMATE GLASGOW:**  Yes.

6          **ATTORNEY HALL:**  Do you have any

7  recollection during the struggle that your niece

8  participated in that struggle?

9          **INMATE GLASGOW:**  Yes she did.

10         **ATTORNEY HALL:**  And as you testified,

11 this occurred outside the bedroom?

12         **INMATE GLASGOW:**  Yes.

13         **ATTORNEY HALL:**  And your testimony you

14 thought that Mr. Collins had a weapon.  Is that

15 correct?

16         **INMATE GLASGOW:**  Yes.

17         **ATTORNEY HALL:**  You saw that report, or

18 you heard that various statements that you had

19 no weapon.  Is that true?

20         **INMATE GLASGOW:**  Yes.

21         **ATTORNEY HALL:**  But you know for sure

22 that you did have a weapon?

23         **INMATE GLASGOW:**  Yes.

24         **ATTORNEY HALL:**  And that the shooting

25 occurred while you were struggling for the

26 weapon?

27         **INMATE GLASGOW:**  Yes.

54

```
 1        ATTORNEY HALL:  I have no further
 2   questions.
 3        PRESIDING COMMISSIONER ST. JULIEN:  Mr.
 4   Rico do you have a closing statement?
 5        DEPUTY DISTRICT ATTORNEY RICO:  Yes,
 6   briefly Commissioner.  It's true that this life
 7   crime took place some 25 years ago on March 1st
 8   or 1980.  And here we are 25 years later and Mr.
 9   Glasgow is indicating his version of the events
10   and they just don't seem to fit what the
11   information in the packet, in the probation
12   report, in the file, in the materials that I
13   submitted.  On March 1st, 1980 at approximately
14   five o'clock in the morning the defendant knocks
15   on the door of his niece, Patricia Watts and she
16   doesn't let him in because the victim,
17   apparently someone that Mr. Glasgow has had
18   issues with in the past is there.  According to
19   all of the information here, asleep in the back
20   bedroom.  So later that morning Mr. Glasgow
21   returns and his niece lets him in and then for
22   some reason Mr. Glasgow let's in an acquaintance
23   this Edmond Duhart in through the back door and
24   I know that Mr. Glasgow is indicating that
25   simply went to the bathroom but the indications
26   are that Mr. Glasgow walked down the hall into
27   the bedroom where Mr. Collins, this person that
```

55

 1    he didn't like or had fights with in the past

 2    was in bed.  I don't know where those photos

 3    went that I sent on October 6th but they the

 4    condition of the victim.  I will leave it at

 5    that.  But the victim was shot two times in the

 6    back and the head, upper abdomen and indications

 7    are that Patricia Watts at one point during this

 8    attack covered the victim with her own body and

 9    that Mr. Glasgow fired through her into the

10    victim.  Mr. Glasgow seems to be saying that he

11    has remorse that he is no longer involved with

12    drugs and that he is a changed person but I do

13    not hear him coming to terms with the crime.  I

14    hear, but when I look at that 2000 psych eval it

15    troubles me that according to the clear words by

16    the author of that report as recently as 2000

17    Mr. Glasgow is indicating that he killed the

18    victim with the victims own gun clearly in self

19    defense.  That is what the report says in its

20    very words.  And now he is indicating that yes

21    it was his gun, Mr. Glasgow's gun that he took

22    to the residence that day.  Somehow because he

23    was afraid of the area.  Although the crime took

24    place in Palo Alto which is clearly not a high

25    crime area.  It's not the same thing as East

26    Palo Alto.  And we have Mr. Glasgow who has four

27    prior felony convictions.  It's a crime to be a

56

1    felon in possession of a firearm that he seems
2    to have no qualms about arming himself and
3    walking around.  He was going up to San
4    Francisco that day apparently going to take the
5    gun.  There is much more going on here in terms
6    of how his life crime took place than Mr.
7    Glasgow seems to be owning up to or accepting
8    responsibility for.  And the current psych eval
9    I have to take issue with.  On page two it says
10   that under review of the life crime that he,
11   meaning Mr. Glasgow, showed good insight into
12   the causative factors related to the instance
13   offense and I am not seeing that at all.  I am
14   seeing an individual who still can't come to
15   terms why there is a bullet above the right ear
16   canal and there is an indication of a muzzle
17   being pressed up to the skull when he is
18   claiming that he, Mr. Glasgow was fighting for
19   his life although the victim wasn't armed and
20   Mr. Glasgow was the only one armed.  The version
21   I hearing does not make sense and when he says
22   that the shooting wasn't intentional Mr. Glasgow
23   is the one that went down the hall.  So I think
24   he has a long way to go.  I am not quite sure
25   and I didn't specifically ask in terms of the
26   plans getting out, his work plans, the owner of
27   Big Ed's Furniture seems to indicate that Mr.

57

1  Glasgow would be employed in sales and delivery
2  and I'm not sure if that is going to mean that
3  Mr. Glasgow at age 64 with medical issues that
4  he's got is going to be out in a truck
5  delivering heavy furniture.  So I don't know if
6  that is truly a practical plan for him at this
7  stage in his life.  But all things considered
8  and when we get down to the remorse issue, when
9  Mr. Glasgow was asked he felt about the crime I
10  heard him talk about his family, I heard him
11  talk about the victim's family, and maybe I
12  missed it but I didn't hear him specifically
13  talk about how he feels for Mr. Collins loosing
14  his life.  He talked about Mr. Collins family
15  and Mr. Glasgow's family but I didn't hear what
16  sounded to my like a true indication of remorse
17  for Mr. Collins loosing his life and I don't
18  know if there is still animosity there.  So my
19  concern is that even though Mr. Glasgow is 64,
20  is no doubt is a much perhaps living a gentler
21  or less aggressive lifestyle behind bars but if
22  he is to get out, if he was to be given a date
23  and to go back out.  I know he has taken anger
24  management classes while he has been in but when
25  he was out last time with four prior felony
26  convictions he didn't hesitate to arm himself
27  and I truly do not feel from what I have heard

58

1  today that Mr. Glasgow has reassured anyone that

2  if he is released he is not going to fall back

3  into patterns that maybe have gotten him to

4  where he is today.  And I think that until such

5  time as he truly looks inward and is perhaps

6  more forthright  and comes to terms and gains

7  insight, true insight into how this crime took

8  place.  What he really did that there is not

9  indication that under certain circumstances he

10  wouldn't act like this again.  And I think that

11  he still has work to do and in that regard  and

12  I would submit on those comments I ask that he

13  be found not suitable.  Thank you.

14      **PRESIDING COMMISSIONER ST. JULIEN:**  Thank

15  you.  And Mr. Rico we did find the crime scene

16  photographs.  They were in a folder under some

17  other things.  Did you hear me?

18      **DEPUTY DISTRICT ATTORNEY RICO:**  Yes I did

19  but I talked enough so thank you.

20      **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

21  Hall closing statement.

22      **ATTORNEY HALL:**  Yes, thank you.  I think

23  that the Deputy District Attorney's statement

24  amounts to really an attempt to retry the case.

25  That was the implication of the questioning of

26  Mr. Glasgow.  Perhaps that was not his intent

27  but it amounts to that.  I think the real issue

1   is whether or not Mr. Glasgow would pose an

2   unreasonable risk upon society should he be

3   paroled.  And I think the conclusion has to be

4   that he would not pose such a risk.  Here is a

5   person who is been working on him self, working

6   through heroine addiction, working through the

7   fact that having killed someone and taking

8   responsibility for it.  And he has done that.

9   And I think that he has done that sufficiently

10  that the psychologist who evaluated him through

11  out his incarceration has mapped his progress in

12  that regard and we could go back to the

13  evaluation that was done by Doctor Kidd back in

14  1992.  Doctor Kidd points out that Mr. Glasgow

15  violence potential outside the controlled

16  setting in the past appeared less than average

17  then at present has decreased.  Then we come to

18  earlier in 1989 Doctor Martin stated that less

19  controlled setting such as a return to the

20  community the inmate will likely continue the

21  present gains if he does not return to his

22  addiction.  In 2000 Doctor Reed wrote that if

23  released to the community his violence potential

24  is considered to be no more than the average

25  citizen in the community.  And the Commissioner

26  has put on the record already the present

27  psychological assessment essentially that Mr.

60

 1    Glasgow would pose no more risk than the average

 2    citizen in the community if he was to be

 3    paroled.  The statements made by Patricia Watts

 4    should be taken with a grain of salt when her

 5    entire testimony in fact.  I mean here is a

 6    person convicted of a felony of perjury.  I know

 7    the Deputy District Attorney asks questions as

 8    to the specific comments or statements made by

 9    Ms. Watts for which he was convicted of perjury.

10    We don't know that, if not presented to the

11    board any transcript of what was said by her,

12    what the court deemed to have been perjury

13    (indiscernible).  Mr. Glasgow does not know

14    exactly what lies she told when she testified

15    but in fact he testified to how the crime

16    occurred and she testified and between the three

17    individuals, Mr. Collins, Ms. Watts, and Mr.

18    Glasgow, she and Mr. Glasgow were the only

19    remaining witnesses.  Any statements that she

20    made as to how the instances occurred, how the

21    murder occurred should be taken with a grain of

22    salt.  Certainly Mr. Glasgow has been

23    forthright, he has been convicted of this crime

24    and really has no reason to lie about what

25    happened.  The statement by the Agent Powers

26    describing Mr. Glasgow's domineer stating that

27    he show no sign of remorse, that was at the time

1    of the crime.  I don't know if Agent Powers has

2    seen any of the psychological evaluations.  I

3    don't know if she has seen or spoken to anyone

4    since this crime occurred in 1980 and so to base

5    a conclusion on what she perceived Mr. Glasgow

6    to be demonstrating back in March of 1980

7    certainly would be unfair to Mr. Glasgow but

8    than unfair it's just unreliable and it's not a

9    reflection of who Mr. Glasgow is today.  So I

10   think that comment, any comment regarding Mr.

11   Glasgow's perceived lack of remorse should be

12   discounted and not observed at all.  Instead the

13   various evaluators that assessed Mr. Glasgow has

14   pointed out that he has shown remorse through

15   out the time that he has been incarcerated and

16   again he has demonstrated that the various

17   petitions submitted on his behalf as his

18   expressed remorse of Mr. Collins death and the

19   harm to the families.  It is true that he does

20   mention his family and I think we should keep in

21   mind that this is a family that two families are

22   intertwined both are Ms. Watts was his niece

23   since she is now deceased.  Certainly there

24   would be remorse on both sides and these family

25   members have, some family members have forgiven

26   Mr. Glasgow and are urging his release on

27   parole.  Again the evaluators have expressed

62

1    that Mr. Glasgow has demonstrated that he has

2    gained insight into what he has done.  Certainly

3    being incarcerated for so long without any kind

4    of violation for drugs, or controlled substances

5    of any kind clearly demonstrates that in fact

6    that he has kicked the habit, that he has been

7    fighting the heroine addiction that he has been

8    fighting at a time of the crime.  And I think

9    that he has realistic parole plans.  He's got

10   employment offers as well as marketable skills

11   and commitment to a residence with his wife.

12   Given Mr. Glasgow's medical condition I think it

13   is very unlikely that he would be at risk of

14   committing any kind of violence or

15   (indiscernible) against anyone in the community.

16   And then when you add his age of 64 to that it

17   certainly would minimize any potential what so

18   ever he would commit any kind of aggression or

19   violence against anyone.  He has family support,

20   various family members who will again on his

21   behalf written parole as well as other community

22   members and I believe it amounts to some 60

23   individuals who voice there support as members

24   of the community supporting Mr. Glasgow's

25   release on parole.  I think overall given Mr.

26   Glasgow's following of the rules with in the

27   institution, having rehabilitated him self,

63

1    having kicked the heroine addiction, and having

2    sincere and competent plans for the future we

3    believe at this time he is suitable for parole

4    and we urge this panel to so decide and grant

5    Mr. Glasgow parole.  Thank you.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

7    thank you.  Actually I have an unusual – Mr.

8    Rico I have a question for you before we go on.

9    Was Mr. Duhart convicted of anything?  I know

10   that he was --

11       **DEPUTY DISTRICT ATTORNEY RICO:**  I have a

12   note here that at the jury trial December 19th,

13   1980 he was found not guilty.  I don't have --

14   The trial prosecutor is here but I don't have a

15   note about that aspect of it.  I don't know if

16   you wish to –

17       **MS. NEDDE:**  As I recall he was acquitted

18   of everything.  There was no evidence that he

19   participated in the shooting or anything else.

20   My argument to the jury of course was that he

21   was an accomplice that having more than one

22   person there, that increased the victim's

23   danger.

24       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay

25   thank you.  Mr. Glasgow would you like to give a

26   statement as to your parole suitability?

27       **INMATE GLASGOW:**  Well at this point in my

64

1    life.

2         **DEPUTY COMMISSIONER WOLK:**  Why don't you

3    go ahead and start over again.

4         **INMATE GLASGOW:**  What I am doing now for

5    my life I am planning on doin the rest of my

6    life.  I don't plan on doin any thing backward

7    and doin what I used to do.  I learned my lesson

8    and I live my self in life and all I can do is

9    continue to do the right things.  I know

10   (indiscernible).  I am not on trial anymore but

11   I (indiscernible).  I won't disappoint anyone.

12   Please let me (indiscernible).  I love my family

13   and I want to be with them.  If there is

14   anything more I can do (indiscernible).

15        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

16   Is there anything else that you would like to

17   say Sir?

18        **INMATE GLASGOW:**  Just that I extend my

19   remorse to the Collins family and I put it on

20   paper but I pray for his soul.  I pray

21   (indiscernible) taking his life (indiscernible).

22        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

23   thank you Sir.  We will now recess for

24   deliberations.

25                   **R E C E S S**

26                      --oOo—

27

65

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER WOLK:**  We're back on

4     record.

5          **PRESIDING COMMISSIONER ST. JULIEN:**  All

6     parties have returned to the room for the

7     hearing of Brice Glasgow.  Mr. Glasgow we are

8     going to deny your parole, we are going to deny

9     your parole for a year.  The main reason, the

10    commitment crime.  It just doesn't, we just

11    can't reconcile the facts of the crime with your

12    accounts, we can't say, we don't who's right and

13    who's wrong and who is telling the truth and who

14    isn't.  But as long as there are lingering

15    doubts we just can't do it.  We have reviewed

16    all the information received from the public and

17    relied on the following circumstances in

18    concluding that the inmate is not suitable for

19    parole and would pose and unreasonable risk of

20    danger to society or a threat to public safety

21    if released from prison.  The commitment offense

22    was carried out in an especially cruel and

23    callous manner in that the inmate shot and

24    killed Mr. Ralph Collins and there were three

25    bullet wounds to the back and two to the back of

26    the head and also a shot into Patricia Watts who

27    **BRICE GLASGOW C-26529  DECISION PAGE 1  11/2/05**

66

1    was the inmates niece and she was shot once in

2    the back.  Multiple victims were attacked in the

3    same incident and one was killed and one was

4    injured and the motive for the crime was

5    explicable or very trivial in relation to the

6    offense and on the one hand we have as a result

7    of and altercation and (indiscernible) and on

8    the other hand we have that there was

9    intentional motives behind the shooting.  So it

10   is hard for us to draw a conclusion here and we

11   would suggest that you really, really think

12   about this and try to go back and research your

13   memory as much as you can and perhaps even write

14   something down.  Make a statement as to the

15   events of that night or that morning in its

16   entirety and what you did afterwards because the

17   fact that you left, you basically left Mr.

18   Collins.  I don't know if you knew he was dead

19   or (indiscernible) So I think all of those

20   things (indiscernible).  In terms of your

21   previous record, you do have an escalated

22   pattern of criminal conduct and violence and a

23   history of unstable relationships with others

24   and you have failed previous rounds of probation

25   and parole and can't (indiscernible) want you to

26   avoid future criminalities and that

27   **BRICE GLASGOW C-26529  DECISION PAGE 2  11/2/05**

```
 1  (indiscernible). The probation and parole stems
 2  from approximately 82 arrests and the arrests
 3  were for various crimes but they include
 4  battery, illegal weapon, burglary, conspiracy
 5  and forgery. And I also note that you have
 6  failed to profit from societies previous
 7  attempts to correct your criminality and these
 8  include CYA commitment, (indiscernible), being
 9  on parole and probation, (indiscernible). In
10  terms of your programming you have done very
11  well. And as my colleague previously noted you
12  have numerous laudatory chronos and you have
13  done exceptionally well while you have been
14  here. Your last 115 was in 1999 and you have
15  only had 3 total since you have been here and
16  that is indeed a very good record. We also note
17  that your psychological report dated December
18  1st, 2004 authored by Doctor Reed is favorable
19  and that he states that you need no more risk of
20  violence that the average citizen however I also
21  do note on that psychological report that Doctor
22  Reed really didn't delve into your prior
23  criminal history and the heroine use and as it
24  relates to the crime and perhaps if you had some
25  more discussions with a therapist or a
26  psychologist you to maybe could reconcile some
27  BRICE GLASGOW C-26529  DECISION PAGE 3  11/2/05
```

68

1   of the issued that we are so concerned about.
2   In terms of your parole plans you do have viable
3   residential plans in the County of
4   (indiscernible) as well as in Stockton area and
5   you do have acceptable employment plans and that
6   you have two job offers and you do have a
7   marketable skill.  And we note that in response
8   to 3042 notices for opposition of parole
9   suitability we have that opposition
10  (indiscernible) by the District Attorney of
11  Santa Clara as well as the Palo Alto police
12  department and I am referring to the letter that
13  was in the file.  And we made the following
14  findings that the prisoner needs therapy in
15  order to face (indiscernible) cope with stress
16  in a nondestructive manner.  Until progress is
17  made we maintain that you may be unpredictable
18  and a threat to others.  However we would like
19  to commend you for participating in anger
20  management, the PIA textiles for over 20 years,
21  project impact, and disciplinary free since 1999
22  as well as your exceptional record in receiving
23  over approximately 50 laudatory chronos.
24  However the positive aspects of you behavior do
25  not out weigh the factors of unsuitability that
26  were mentioned and we are hopeful that in one
27  **BRICE GLASGOW C-26529  DECISION PAGE 4  11/2/05**

69

1    year that you read through all your prior

2    transcripts, this one included, all your

3    transcripts and really try to connect the pieces

4    of this puzzle for the next panel.  I would

5    really encourage you to do that.  And therefore

6    I want to prepare your observation and

7    evaluation is required before the board should

8    find that you are suitable for parole.

9    Commissioner Wolk?

10           **DEPUTY COMMISSIONER WOLK:**  That's

11    everything.

12           **PRESIDING COMMISSIONER ST. JULIEN:**  And

13    we will recess and it's ten minutes to eleven.

14                    --oOo--

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON: <u>Mar. 2, 2006</u>**

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **BRICE GLASGOW C-26529 DECISION PAGE 5  11/2/05**

70

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, SUE GERDES, a duly designated transcriber,
PETERS SHORTHAND REPORTING, do hereby declare and
certify under penalty of perjury that I have
transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 69, and which
recording was duly recorded at CORRECTIONAL TRAINING
FACILITY, SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF BRICE
GLASGOW,  CDC NO. C-26529, ON NOVEMBER 2, 2005, and
that the foregoing pages constitute a true, complete,
and accurate transcription of the aforementioned tape
to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated NOVEMBER 20, 2005, at Sacramento,
California.

SUE GERDES
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT 3

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA

Plaintiff,

vs.

BRICE GLASGOW                    Defendant,

**REPORT OF
ADULT PROBATION OFFICER**
No. 75071
January 29, 1981
J. Nedde, D.A.
B. Shechmeister, P.D.

COURT DATA

SENTENCING COURT: Honorable Frank Cliff

COURT OF CONVICTION: Honorable Frank Cliff

CHARGE: Count One, Section 187 of the Penal Code (Murder), First
Degree;

Count Two, Section 245(a) of the Penal Code (Assault With
a Deadly Weapon) with the allegation the defendant personally
used a firearm within the meaning of Section 12022.5 of the
Penal Code found to be true.

Four prior Felony convictions were Admitted.

Prior Number One: Section 475a of the Penal Code (Possession
of Completed Check)

Prior Number Two: Section 459 of the Penal Code (Burglary),
Second Degree

Prior Number Three: Section 182 of the Penal Code (Conspiracy)

Prior Number Four: Section 459 of the Penal Code (Burglary)

DATE OF OFFENSE: March 1, 1980

DATE OF ARREST: March 1, 1980  (Palo Alto Police Department)

CONVICTION: Found guilty by jury trial December 19, 1980. The
defendant admitted four prior felony convictions on
October 15, 1980.

REMAINING CHARGES: The defendant was found not guilty as to Count
Three, an alleged violation of Section 182 of
the Penal Code (Conspiracy).

CONDITIONS: None

6170 REV 6/77

In the Case of:  BRICE GLASGOW
Charge:  Section 187 & 245(a) PC
Santa Clara County Number:  75071                    January 29, 1981

DAYS IN CUSTODY:  335 actual days; 167 days pursuant to Section
                  4019 of the Penal Code; 502 total days; presently
                  in custody.

AGE & DATE OF BIRTH:  39; April 23, 1941; Prescott, Arkansas

CODEFENDANTS & STATUS:

Edmund Duhart aka William Lipford aka William James Reid was found
not guilty of all charges by jury trial December 19, 1980.

SUMMARY OF OFFENSE:

On March 1, 1980, at approximately 8:15 a.m., officers of the Palo
Alto Police Department responded to 1179 Amarillo on the report of
a shooting.  Upon arrival at the scene, the investigating officers
observed victim Ralph Collins on the floor of the bedroom.  Victim
Collins had been shot several times and was bleeding from back and
head wounds.  No vital signs could be detected and Palo Alto Para-
medics were allowed to attempt to render assistance.

At this time the investigating officers made contact with victim
Patricia Watts who was sitting on a fold out bed in the living room
of the apartment.  Watts had suffered a gunshot wound to her back.
Watts explained at approximately 5:00 a.m. she had heard a knock on
the door and observed the defendant in front of the apartment.  She
indicated she did not open the door at that time and returned to her
bed.  She related later in the morning the defendant returned and
she allowed him to enter the apartment.  She indicated he sat in the
living room for approximately ten minutes and played with her daughter.
She related the defendant then went into the bathroom in the hallway
of the apartment and during this time she heard a knock at the back
door.  She related the defendant then allowed Edmund Duhart to enter
the apartment.  Watts explained the defendant then began walking
towards the hallway and she observed that he had a gun in his hand.
She indicated she ran into the bedroom and attempted to wake victim
Ralph Collins; however, the defendant was at the door of the bedroom
and attempting to get in.  She related the defendant pushed his way
into the bedroom and during the ensuing struggle the defendant was
firing the weapon at victim Collins and as she was attempting to
protect the victim she also was wounded.

Victim Watts related during the time that she was in the bedroom the
defendant called for Duhart to come into the room and asked him to
remove victim Watts.  She indicated he tried to pull her off victim
Collins while the defendant was still shooting at the victim.  She
indicated when the defendant had fired several shots from the weapon,
he pulled the trigger one more time and the gun was apparently empty.
She related the defendant and Duhart then left the apartment.

In the Case of: BRICE GLASGOW
Charge: Section 187 & 245(a) PC
Santa Clara County Number: 75071                    January 29, 1981

SUMMARY OF OFFENSE:   (Continued)

An all points bulletin was issued for the defendant and Duhart's
apprehension and he was subsequently placed under arrest by Stockton
officials at approximately 7:00 p.m.  Subsequent investigation
revealed a rubber glove found on the floor of the apartment by
victim Patricia Watts and she related she had observed the glove
on the defendant's hand while he was handling the weapon and that
she had not previously had rubber gloves of this kind in the apartment.
Two witnesses in the neighborhood also stated they had observed the
defendant removing a rubber glove as he left the apartment.

An autopsy report performed on victim Collins revealed the cause of
death to be gunshot wounds of the head, chest and abdomen.  Two of
the gunshot wounds entered the victim's body through the upper back,
one to the head and one to the upper abdomen.

VICTIM'S STATEMENT:

The undersigned officer has been unable to reach members of victim
Collins' family or victim Patricia Watts.  Any information received
prior to the sentencing date will be attached for the Court's obser-
vance.

DEFENDANT'S STATEMENT:   (Requested - received)

The defendant was interviewed in custody in Santa Clara County Main
Jail in the presence of his Public Defender.  During the interview
the defendant related he was sorry for what had happened; however,
he has gone over the incident many times in his own mind and does
not know how he could have avoided the incident.

The defendant went on to explain on the morning the present offense
was committed he had gone to Palo Alto to locate Charles Watts in
order to get some aid in repairing his car.  He indicated he was
unable to locate Watts and proceeded to victim Patricia Watts' resi-
dence as he hoped she might know where her brother was.  He indicated
when she did not answer the door he then drove to San Francisco where
he picked up Edmund Duhart to bring him back to the San Jose area.
The defendant explained on his way back to San Jose he again decided
to stop at Patricia Watts' apartment in an effort to locate Charles
Watts.  He indicated he was out of money and needed gas and he also
needed to return to the San Jose area quickly so that he might receive
his methadone injections.  He related while he was visiting with his
niece's daughter and his niece he went into the hallway and used the
bathroom.  He indicated while in the bathroom he heard someone knock-
ing at the back door and realized it must be Duhart who had become
impatient waiting in the car.  He indicated he went to the back door
and let Duhart in and then returned to the hallway with the intention
of going back to the bathroom.  He indicated when he got to the hall-
way he was attacked by victim Collins who had come out of the bedroom
and was holding a weapon.  The defendant explained during the ensuing

-3-

In the Case of:  BRICE GLASGOW
Charge:  Section 187 & 245(a) PC
Santa Clara County Number:  75071                    January 29, 1981

DEFENDANT'S STATEMENT:   (Continued)

struggle, the gun went off several times striking both victim Collins
and victim Watts.  The defendant indicated he at no time had the gun
in his sole possession and did not intentionally shot either victim.
The defendant explained after the shooting he took the weapon and
left the area.  He explained he threw the weapon away somewhere in
San Mateo near the freeway.

Concerning information given to police officers by victim Watts, the
defendant indicated his niece had been upset with him because he had
informed her mother that she had been attempting to become involved
with an associate of his.  He related he does not know if she pur-
posely lied to police officers or if she told them what she thought
she saw.  The defendant related he knows that he is not guilty of
the crime explaining Collins was not asleep and that he had actually
attacked him.  The defendant indicated he was merely protecting him-
self.  The defendant further indicated had he known victim Collins
was in his niece's apartment he would not have gone to visit her in
the first place and if he was going to do something like this he would
not have waited until he had changed his lifestyle with plans to marry
and his common-law wife expecting a child.

The defendant further explained at no time was he wearing rubber
gloves while he was in his niece's apartment and he was not in poss-
ession of a weapon when he arrived.  Concerning letters of a threatening
nature received by witnesses in this matter, the defendant explained
he simply wished to warn witnesses that associates of victim Collins
were dangerous people and his concern was for their safety.  The
defendant insisted the letters were not meant to be threats.

INTERESTED PARTIES:

A review of the probation file showed the defendant has been referred
to the Adult Probation Department on four prior occasions with pro-
bation being granted on two occasions.  The defendant was last placed
on probation on January 26, 1973 for a period of three years for a
violation of Section 475a of the Penal Code (Insufficient Funds-Checks).
Followup notes in the file reveal the defendant reported only marginally
and although he was enrolled in a drug-abuse counseling program he
continued to use heroin as evidenced by urinalysis tests showing
positive presence of morphine.

DISCUSSION:

Judicial Council Rules 414, 421 and 423:   (Attached)

Enhancements:

Because the allegation the defendant personally used a firearm
within the meaning of section 12022.5 of the Penal Code was found
to be true with regard to Count Two of the Information, any State
Prison sentence imposed with regard to that count should be enhanced
by two years.

In the Case of: BRICE GLASGOW
Charge: Section 187 & 245(a) PC
Santa Clara County Number: 75071                    January 29, 1981

Case Evaluation:

Before the Court is a 37-year-old male who has been found guilty
by jury trial of Murder in the First Degree and Assault With a
Deadly Weapon with the allegation he personally used a firearm
found to be true. The defendant admitted four prior felony con-
victions. The defendant's prior record is lengthy and the defendant
has previously been convicted of offenses involving weapons. The
defendant is ineligible for probation with regard to the present
conviction and in view of the serious nature of the defendant's
actions, it is felt a State Prison commitment is warranted.

The defendant is presently in custody and has no savings. It is,
therefore, believed he cannot afford to pay a fine to the State
Indemnity Fund.

SUGGESTED PRISON TERM:

| CRIME | MITIGATED | AGGRAVATED | RANGE | ENHANCEMENTS | TOTAL TERM |
|---|---|---|---|---|---|
| Ct. 1,<br>Sec. 187 PC<br>1st deg. | Indeterminate sentence - 25 years to life | | | | |
| Ct. 2,<br>Sec. 245a PC | No | Yes | 2, 3, or<br>4 yrs. | 2 years<br>(Sec. 12022.5<br>of P.C.) | 6 years<br>(Consecutive) |
| | | | | TOTAL TERM: | 31 years to<br>life |

In the Case of:  BRICE GLASGOW
Charge:   Section 187 & 245(a) PC
Santa Clara County Number:  75071                    January 29, 1981

RECOMMENDATION:

It is respectfully recommended probation be denied and the defendant
be committed to the California Medical Facility at Vacaville for a
term of thirty-one (31) years to life and be advised of a subsequent
five year period of parole supervision.

                                    Respectfully submitted,

                                    WALTER D. MORSE, Chief
                                    Adult Probation Officer

                                    *Geraldine Arcarese*

                                    Geraldine Arcarese, Deputy
                                    Adult Probation Officer
GA:rmt

Attachments

Reviewed by:

*A. R. Barish*
Supervising Adult
Probation Officer


The above report has been read and considered by the Court.


                        FRANK CLIFF
                        Judge of the Superior Court
                        Santa Clara County, California

# EXHIBIT 4

COPY TO INMATE ON
AUG 27 2004

# LIFE PRISONER EVALUATION REPORT
## PAROLE CONSIDERATION HEARING
### JULY, 2004 CALENDAR

**GLASGOW, BRICE**                                              **C26529**

## I. COMMITMENT FACTORS:

**A.**  **Life Crime**: Murder 1st, 187 PC, count 1 and Assault with a Deadly Weapon, 245(a) PC, with Use of Firearm, 12022.5 PC, count 2. Santa Clara County case number 75071. Victims: Ralph Collins, age unknown, count 1, and Patricia Watts, count 2. Received in CDC on 2/19/81. Sentenced to 25 years to Life on count 1 and 3 years plus 2 years on count 2 for a total term of 25 years to Life plus 5 years (Life term started 5/17/83). MEPD is 3/18/98.

  **1.**  **Summary of Crime**: All relevant documents from the previous hearings have been considered, and that information appears valid. The writer has no further information to add.

  **2.**  **Prisoner's Version**: In an interview for this report, Inmate Glasgow indicated that his version remains the same as stated in the previous hearings.

  **3.**  **Aggravating/Mitigating Circumstances**:

   **a.**  The following factors in aggravation were noted per Title 15 CCR §2404:

   - During the commission of the crime, the prisoner had a clear opportunity to cease but instead continued.

   - The prisoner has a history of criminal behavior for which the term is not being enhanced under Section 2407.

   There are other items that have been listed in previous reports as factors in aggravation, but inasmuch as they involve issues that resulted in additional conviction and additional sentence of time to serve, they already aggravated the sentence and are not otherwise articulated here.

   **b.**  No factors in mitigation were noted per Title 15 CCR §2405.

## II. PRECONVICTION FACTORS: 
Documents from the previous hearings have been considered, and that information appears valid. The writer has no further information to add.

## III. POSTCONVICTION FACTORS: 
Documents from the previous hearings have been considered, and the information remains valid. Glasgow went to his Subsequent Parole Consideration Hearing on 7/16/03. The panel acted to deny parole consideration for one

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JULY, 2004 CALENDAR

year, placed him on the 7/04 Calendar for his Subsequent Hearing #4 and recommended that he remain disciplinary free, upgrade vocationally and participate in self-help programs, as available. The panel also requested, via a BPT Form 1000(a), that Glasgow receive a new psych report. During the period of time since the last hearing, the prisoner's behavior has remained stable, in that he has remained disciplinary free, continued his participation in the available self-help programs, including the local AA Group as well as completing the 13-week IMPACT program and has maintained his work skills through his assignment to PIA Textiles as a sewing machine operator. See Postconviction Progress Report for details.

IV.    **FUTURE PLANS**:  Glasgow's future plans have changed from those indicated in the previous Board Report, in that he got married, on 11/6/03, to Diann (nee Lewis) Glasgow. In an interview for this report, Glasgow stated that should he receive parole consideration, he would be able to live with his wife, Diann, at 323 S. Golden Gate Avenue in Stockton (95205).  The telephone number at that address is (209) 464-5824.  Should the Board nevertheless insist on Glasgow paroling to his county of commitment, he would still be able to live with a brother-in-law, Lloyd Woods at 248 Alpine Avenue in San Jose (95127).  The telephone number at that address is (408) 259-7832.  He has offers of employment from Edward Smith, owner of a furniture store, Big Ed's Furniture, and a delivery business in Stockton. Mr. Smith is married to Glasgow's granddaughter.  Irvin Goodwin has also offered Glasgow full time employment in a non-profit organization located in Menlo Park.  Glasgow's step-daughter, Denise Sanders, is a Licensed Psychiatric Technician living in Stockton who has offered to sponsor him in regards to 12-step programs upon his release for the purpose of supporting his continued sobriety.

As a consequence of his participation in the NA Group, Glasgow wrote a letter addressed to the Glasgow, Watts and Collins family (the three families are interrelated) expressing the desire to make amends (step nine).  He received a response from the Glasgow, Watts and Collins Family, Santa Clara County, dated 6/9/04 that acknowledged receipt of his letter of remorse and collectively agreed to accept and welcome him back into the family with three conditions:  "1) Change your environment; 2) find employment; and 3) continue to be involved with some kind of sobriety program if you are found suitable for parole."

Glasgow's parole plans for parole are specific, detailed and appropriate.  It is unusual but encouraging to see such a detailed community of support available to someone who has been incarcerated for 24 years.

V.    **USINS Status**:  None.

VI.    **SUMMARY**:

A.    Not applicable, per the 8/5/04 memo of Cheryl K. Pliler, Deputy Director, Institutions Division.

B.    Prior to release, the prisoner could benefit from remaining disciplinary free, continuing his participation in the local AA Group and remaining in his full-time work assignment.

C.    This report is based upon an interview with the prisoner on 8/25/04 lasting approximately one hour and a complete review of the central file.

GLASGOW, BRICE        C26529        CTF-Soledad        JUL/2004

BOARD OF PRISON TERMS                                                                              STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING          **(Life term started 5/17/03)**

INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 12/02 to 5/03 | | | **PLACEMENT:** Remained at CTF during this period. **CUSTODY:** Medium A. **VOCATION:** Assigned to PIA Textiles as a sewing machine operator during this period. **ACADEMIC:** None during this period. **WORK:** Assigned to PIA Textiles as a sewing machine operator during this period with Satisfactory ratings and positive comments on CDC 101 chronos dated 12/1/02 and 3/1/03. Laudatory chrono dated 5/7/03 documents good skills and attitudes. **GROUP ACTIVITIES:** Participated in a 3-hour video instruction/discussion of issues associated with the Inmate Employability Program offered through the PIA, per 128-B dated 12/6/02. Continued participation in the AA/NA Groups per 128-B chronos dated 12/31/02, 1/6/03 and 4/2/03. 2/24/03 128-B noted volunteer work in the service of the Academic Dept.'s Distance Learning Program. **PSYCH TREATMENT:** None during this period. **PRISON BEHAVIOR:** Remained disciplinary free during this period. **OTHER:** Low bunk/low tier placement recommended for one year, per 128-C chrono dated 2/1/03. TB Alert Code 32 dated 5/5/03. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE  8/26/04

GLASGOW, BRICE          C26529                    CTF SOLEDAD          JUL/2004

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/03 to 5/04 | | | **PLACEMENT:** Remained at CTF during this period.<br>**CUSTODY:** Medium A.<br>**VOCATION:** Assigned to PIA Textiles as a sewing machine operator during this period.<br>**ACADEMIC:** None during this period.<br>**WORK:** Assigned to PIA Textiles as a sewing machine operator during this period with Satisfactory ratings and positive comments on CDC 101 chronos dated 6/1/03, 9/1/03 and 3/1/04. CDC 101 chrono dated 4/17/04 notes a Below Average rating on Quality of Work and a comment that he needed to improve the quality of his work.<br>**GROUP ACTIVITIES:** Continued participation in NA Group per 128-B chronos dated 6/13/03, 10/7/03 and 3/24/04.<br>**PSYCH TREATMENT:** None during this period.<br>**PRISON BEHAVIOR:** Remained disciplinary free during this period.<br>**OTHER:** TB Alert Code 32 is dated 10/7/03 and 11/20/03. As noted on 128-B dated 11/5/03, Glasgow married Diann Lewis on 11/6/03. Cotton blankets issued due to wool allergy, per 128-C dated 12/19/03. Physical limitations chrono 128-C dated 1/14/04 recommended to "permit patient to go to BR every hour as needed" for one year. |

ORDER:
☐  BPT date advanced by          months.        ☐  BPT date affirmed without change.
☐  PBR date advanced by          months.        ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐  Previously imposed conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

GLASGOW, BRICE          C26529                    CTF SOLEDAD          JUL/2004

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                          Page  2

BOARD OF PRISON TERMS                                                                      STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/04 to Present (8/26/04) | | | **PLACEMENT**:  Remained at CTF during this period. **CUSTODY**:  Medium A. **VOCATION**:  Assigned to PIA Textiles as a sewing machine operator during this period. **ACADEMIC**:  None during this period. **WORK**:  Assigned to PIA Textiles as a sewing machine operator during this period with Satisfactory ratings and a comment: "Quality has improved.  Steady worker." on CDC 101 chrono dated 6/1/04. **GROUP ACTIVITIES**:  Completed the 13-week IMPACT workshop per 128-B dated 6/8/04.  Continued participation in NA Group per 128-B chrono dated 6/28/04. **PSYCH TREATMENT**:  None during this period. **PRISON BEHAVIOR**:  Remained disciplinary free during this period. **OTHER**:  TB Alert Code 32 is dated 5/7/04.  Low bunk/low tier placement recommended for one year, per 128-C chrono dated 5/28/04. |

ORDER:

☐    BPT date advanced by            months.            ☐    BPT date affirmed without change.
☐    PBR date advanced by            months.            ☐    PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐       Previously imposed  conditions affirmed.
☐       Add or modify

☐       Schedule for Progress Hearing on appropriate institutional calendar

GLASGOW, BRICE            C26529                    CTF SOLEDAD            JUL/2004

BOARD OF PRISON TERMS                                                                      STATE OF CALIFORNIA

# EXHIBIT 5

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## FEBRUARY 2003 CALENDAR

**GLASGOW, BRICE**                                                                            **C26529**

## I.     COMMITMENT FACTORS:

**A.     Life Crime:** Murder 1st, PC 187 with Use of a Handgun, with a consecutive
sentence of five years for Assault with a Deadly Weapon, PC 245 with the Use of
a Handgun. Santa Clara County case number 75071. Victim in Murder case:
Ralph Collins, age unknown. Victim in ADW case: Patricia Watts. Received
into the CDC on 2/19/81. Sentence: 25 years to Life plus five years. MEPD:
3/18/98.

1.     **Summary of Crime:** On 3/1/80, at approximately 8:15 a.m., officers of
the Palo Alto Police Department responded to 1179 Amarillo, on the
report of a shooting. Upon arrival at the scene, the investigating officers
observed victim Ralph Collins on the floor of the bedroom. Victim
Collins had been shot several times and was bleeding from back and head
wounds. No vital signs could be detected and Palo Alto Paramedics were
allowed to attempt to render assistance.

At this time investigating officers made contact with victim Patricia Watts
who was sitting on a foldout bed in the living room of the apartment.
Watts had suffered a gunshot wound to her back. Watts explained that at
approximately 5:00 a.m. she had heard a knock on the door and observed
the defendant in front of the apartment. She indicated she did not open the
door at that time and returned to her bed. She related that later in the
morning the defendant returned and she allowed him to enter the
apartment. She indicated he sat in the living room for approximately 10
minutes and played with her daughter. She related the defendant then
went into the bathroom in the hallway of the apartment and during this
time she heard a knock at the back door. She related the defendant then
allowed Edmund Duhart to enter into the apartment. Watts explained the
defendant then began walking towards the hallway and she observed that
he had a gun in his hand. She indicated she ran into the bedroom and
attempted to waken victim Ralph Collins, however, the defendant was at
the door of the bedroom and attempting to get in. She related that the
defendant pushed his way into the bedroom and during the ensuing
struggle, the defendant was firing the weapon at victim Collins and as she

was attempting to protect the victim she was also wounded. Victim Watts related during the time that she was in the bedroom the defendant called for Duhart to come into the room and remove victim Watts. She indicated he tried to pull her off victim Collins while the defendant was still shooting at the victim. She indicated when the defendant had fired several shots from the weapon, he pulled the trigger one more time but the gun was apparently empty. She related the defendant and Duhart then left the apartment. An All Points Bulletin was issued for the defendant and Duhart's apprehension and he was subsequently placed under arrest by Stockton officials at approximately 7:00 p.m. Subsequent investigation revealed that a rubber glove was found on the floor by victim Patricia Watts and she related that she had observed the glove on the defendant while he was handling the weapon. She stated that she had not previously had rubber gloves of this kind in the apartment. Two witnesses in the neighborhood also stated that they had observed the defendant removing a rubber glove as he left the apartment. An autopsy report performed on victim Collins revealed the cause of death to be gunshot wounds to the head, chest, and abdomen. Two of the gunshot wounds entered the victim's body through the upper back, one to the head and one to the upper abdomen. This information was obtained from pages 2 and 3 of the POR dated 1/29/81.

2.    **Prisoner's Version:** In an interview on 11/25/02, in preparation for the writing of this Board Report, Glasgow read the prisoner's version detailed in the January 2002 Board Report. He indicated this version is accurate. In that version he indicated that the testimony of Patricia Watts was subsequently recanted and that she was convicted of perjury shortly after his trial for her false testimony. He presented a document dated 10/30/81 showing that Patricia N. Watts had been convicted of Perjury under Section 118 for the Penal Code. However, it does not indicate that this perjury conviction was in relation to her testimony provided during Glasgow's court trial in the instant offense. He did however state that he had further documentation, which would prove that this conviction was for her giving false testimony in Glasgow's murder trial. Glasgow states that he went to his niece's home, Patricia Watts, in order to locate her brother, his nephew, Charles Watts. He was hoping to have Charles Watts assist him in repairing his vehicle. Charles Watts was not home so Glasgow entered the residence leaving Duhart in a car outside. Glasgow states that he played for approximately 10 minutes with Patricia Watts' daughter. He then went to use the bathroom to check on his eye as he had glaucoma. He heard a knock at the door and left the bathroom, noticing Duhart at the door speaking with Patricia Watts. Duhart was anxious to leave and Watts spoke with him for a short amount of time while Patricia Watts left the room. Glasgow states that he attempted to return to the bathroom when

Ralph Collins appeared and hit him in the face, striking his jaw with a gun. A struggle ensued in the hallway between him and Collins at which time both wrestled for the gun. Patricia Watts involved herself at this time and began to jerk on the barrel of the gun. The gun started firing while he held the grip of the gun and she held the barrel. He stated that at no time did he purposely shoot Ralph Collins.

**B.**   **Aggravating/Mitigating Circumstances:**

    **1.**   **Aggravating Factors:**

        **a.**   Glasgow had an opportunity to cease but continued with the crime.

        **b.**   Circumstances of the crime created a potential risk to others.

        **c.**   Glasgow has a lengthy criminal history.

        **d.**   Glasgow used a weapon.

        **e.**   Glasgow engaged in other reliably documented criminal conduct which was an intregal part of the crime for which he is currently committed in which he committed Assault with a Deadly Weapon on his own niece, Patricia Watts.

    **2.**   **Mitigating Factors:**  None.

**II.**   **PRECONVICTION FACTORS:**

**A.**   **Juvenile Record:**  It is difficult to determine at what age Glasgow was when he was first arrested. The POR indicates that his date of birth is 4/23/41, a date which Glasgow says is correct. However, his FBI "rap" sheet indicates that his date of birth is 4/23/42. At any rate, the suffered his first arrest on 11/3/59 by the Stockton Sheriffs Office for failure to follow a juvenile detention order. No disposition is shown. His next entry on his "rap" sheet is 12/29/59 when he was sent to the California Youth Authority (CYA) on 12/29/59 for Battery and Carrying a Concealed Weapon. He paroled from CYA on 12/23/60.

**B.**   **Adult Convictions:**  Glasgow was arrested on 7/24/61 for involvement in a riot and carrying a concealed weapon. The charges were dismissed on 8/23/61. He was arrested again about a month later on 8/29/61 by the Los Angeles Police Department for Assault with Intent to Commit Murder and he was also arrested on the same day by the Los Angeles Sheriffs Office for Assault with a Deadly Weapon. No disposition is showing on the "rap" sheet. On 1/3/62 he was

returned to the CYA as a parole violator. He was paroled on 1/23/63 and
discharged on 5/9/63. He was arrested on 5/4/63 by the Stockton Sheriffs Office
for Robbery and Assault with a Deadly Weapon. He was convicted of the ADW,
which resulted in nine months county jail time. He was arrested on 6/3/64 by the
El Cerrito Police Department for Burglary and was fined $56. Two days later on
6/5/64 he was arrested by the El Cerrito Police Department for Theft with no
disposition shown. On 9/24/64 he was arrested by the Oakland Police Department
for Shoplifting and was sentenced to a fine of $50 or five days in the county jail
plus a fine of $8. He was arrested on 10/7/64 by the Stockton Sheriffs Office for
Attempted Burglary. These charges were dismissed on 10/13/64. On Christmas
Eve 1964 he was arrested by the Richmond Police Department for Burglary with
no disposition shown. On 6/21/65 he was arrested by the Stockton Sheriffs Office
for Assault with a Deadly Weapon which was dismissed on 11/2/65. On 7/27/65
he was arrested by the Long Beach Police Department for Shoplifting and was
sentenced to five days in the county jail and a $56 fine. On 8/27/65 he was
arrested by the San Jose Police Department for Grand Theft and Conspiracy. He
was sentenced to nine months in the county jail on 1/27/66 for Burglary and
Conspiracy. His next arrest came on 9/7/65 by the San Jose Police Department
for Burglary but was released later that day. On 10/1/65 once again he was
arrested by the San Jose Police Department for Burglary and Conspiracy and
sentenced to nine months in the county jail. On 10/28/65, he was arrested by the
Stockton Sheriffs Office for Fighting and was sentenced to 90 days county jail
with the jail time being commuted. On 1/18/66 the San Jose Police Department
arrested him for Burglary and Conspiracy as well as Battery. He was convicted of
the Burglary and Conspiracy and sentenced to nine months in the county jail and
allowed to post bail on the Battery charge. On 9/22/66 he was arrested by the
Fairbanks, Alaska, authorities for Receiving Stolen Property with no disposition
shown. On 2/17/67 he was arrested by the Stockton Sheriffs Office for Arson
with no disposition shown. On 5/9/67 he was arrested by the San Jose Police
Department for Forgery with no disposition shown. On 10/27/67 he was arrested
by the Yakima, Washington Police Department for Defrauding an Innkeeper,
Carrying a Concealed Weapon, and Possession of a Gambling Device. He was
released to the Alaska State Police. On 4/19/69 he was arrested by the Stockton
Sheriffs Office for Shooting Craps. He was given a 180 day suspended jail
sentence, three years probation, and a $500 fine. On 5/1/69 he was arrested by the
Stockton Sheriffs Office for Shooting Craps and was fined $500. On 10/5/69 he
was arrested by the Seaside Police Department for PC 330 (Gaming). He was
given a two year suspended sentence and fined $150. On Christmas Day 1969 he
was arrested by the San Jose Police Department for Burglary and Conspiracy but
later released the next day by the court. On 4/5/70 he was arrested by Monterey
Police Department for Driving Without a Driver's License in his Possession with
an unknown disposition. On 5/17/70 he was arrested by the San Francisco Police
Department for Winning at Play by Fraudulent Means, Carrying a Concealed
Weapon, and Loitering or Wandering the Streets at Night without Apparent

Reason. There is no disposition shown. On 7/22/70 he was arrested under the name of Ward Odell for Burglary but was detained only and released due to insufficient evidence. On 8/29/70 he was arrested under the name Michael Stevenson by the Sacramento Police Department for Conspiracy. He failed to appear and a bench warrant was issued. There is no further disposition shown. On 9/26/70 he was arrested by the Stockton Sheriffs Office for Theft and was released to the San Joaquin County Sheriff. On 10/19/70 he was arrested by the Stockton Sheriffs Office for Driving Without an Operators License in his Possession and HS 11721-Addiction. He was found guilty of being under the influence and given a 180 day suspended sentence. On 11/1/70 he was arrested by the San Jose Police Department under the name of Thomas Ronald Green for Grand Theft and Burglary. He was released the next day with no further disposition. On 1/4/71 he was arrested under the name Michael Stevenson by the Sacramento Police Department for Failure to Appear and Conspiracy. He was sentenced to 22 days in the county jail. The very next day he was arrested once again this time by the Sacramento Sheriffs Office under the name Michael Stevenson for Conspiracy to Commit Theft. He was remanded to the city of Sacramento with no further disposition available. On 1/28/71 he was arrested by the Stockton Sheriffs Office for Theft and Health and Safety as well as Vehicle Code violations. He was sentenced to 180 days in the county jail, which was suspended for three years. On 2/9/71 he was arrested by the San Jose Police Department for Burglary and a Vehicle Code violation with no disposition shown. On 6/24/71 he was arrested by the Oakland Sheriffs Office for Acting in an Assumed Character and Having an Open Alcoholic Container in the Vehicle. The charges were later dismissed. On 7/2/71 he was arrested by the Seaside Police Department for a misdemeanor traffic warrant and was fined $19.00. On 7/17/71 he was arrested by the Redwood City Sheriffs Office for Burglary but was released due to the unavailability of evidence. There is also a second entry for 7/17/71 showing he was arrested by the Brisbane Police Department for Burglary with no disposition shown. On 10/14/71 he was arrested by the San Jose Police Department for Giving False Information to a Peace Officer, a Health and Safety narcotics violation, and two Vehicle Code violations. There is no disposition shown. On 10/21/71 he was arrested by the San Jose Police Department for Theft with no disposition showing. On 11/27/71 he was arrested by the San Jose Police Department for Burglary and Grand Theft with no disposition shown. On 12/28/71 he was arrested by San Jose Police Department on a warrant for PC 475A Forgery. There is no disposition shown. On 1/6/74 he was arrested by the San Jose Police Department for Petty Theft with no disposition shown. On 1/23/72 he was arrested by the San Mateo Police Department for Possession of Stolen Property. He was sentenced to three days in the county jail for Forgery with the other charges being dismissed. On 1/24/72 he was arrested by the Redwood City Sheriffs Office for two counts of Forgery and one count of Receiving Stolen Property. He was detained only and later released. On 2/4/72 he was arrested by the San Jose Police Department for Attempted Petty Theft with

no disposition shown. On 2/9/72 he was arrested by the Redwood City Sheriffs
Office for Burglary and Theft with no disposition shown. On 2/16/72 he was
arrested by the Redwood City Sheriffs Office for Theft and Burglary with no
disposition shown. On 3/24/72 he was arrested by the San Jose Police
Department on a bench warrant for Theft. He was sentenced to six months in the
county jail, which was suspended, and he was given two years summary probation
and 90 days in the county jail with 45 of those suspended. On 5/26/72 he was
arrested for Health and Safety Addiction violation with no disposition shown. On
5/30/72 he was arrested by Modesto Sheriffs Office under the name of Alfred
Waller for Petty Theft with no disposition shown. On 7/21/72 he was arrested by
the Merced Sheriffs Office under the name of Al Bryce Wheeler for Robbery and
was convicted of Burglary with a sentence of 12 months in the county jail and 18
months probation. On 11/8/72 he was arrested by the San Jose Sheriffs Office for
PC 475A, which has since been repealed. That penal code apparently was for
Receipt or Possession of Forged Bills. There is no disposition shown. On 5/2/74
he was arrested by the San Jose Police Department for a miscellaneous Health and
Safety drug violation. He was detained only and then released on 6/14/74. He
was arrested by the Santa Clara Police Department under the name of Otis Wood
for Receipt or Possession of Forged Bills and Resisting or Delaying a Peace
Officer as well as Loitering. There is no disposition shown on these charges. On
7/8/74 he was arrested by the San Mateo Police Department for Vehicle Code
violation which was dismissed due to a lack of evidence. On 9/29/74 he was
arrested by the Alameda County Sheriffs Office for Theft which was later
dismissed. On 7/11/75 he was arrested by the San Jose Police Department for
Vehicle Code violations. He was detained only. He was convicted of Felony
Probation/Parole Hold. He was given five days in the county jail. On 1/16/76 he
was arrested by the San Rafael Sheriffs Office under the name Lee Glascow for
Burglary. This count was dismissed. On 3/25/76 he was arrested by San
Francisco Police Department under the name Lee B. Glasgow for Petty Theft with
no disposition shown. On 7/27/76 he was arrested by the San Francisco Police
Department under the name L.B. Glasgow for Grand Theft with no disposition
shown. On 11/20/76 he was arrested by the Sunnyvale Police Department under
the name Tyrone Lee Carmon for Forgery and Possession and Control of
Hypodermic Needle as well as Conspiracy. No disposition shown. On 8/21/77 he
was arrested under the name Lee Bryant Glasgow for Burglary. This case was
dismissed. On 9/29/77 he was arrested by Alameda County Sheriffs Office under
the name Lavern Glasgow for Burglary with no disposition shown. On 11/27/77
he was arrested by the Burlingame Police Department under the name Lee Bryant
Glasgow for Petty Theft and was released due to insufficient evidence. On
11/28/77 he was arrested by the Redwood City Sheriffs Office under the name
Lee Bryant Glasgow for Theft of Personal Property and was released to the
Burlingame Police Department. No further disposition available. On 3/19/78 he
was arrested by the San Francisco Police Department under the name Levine
Glasglow for PC 488 Petty Theft. That case was suspended. On 4/14/78 he was

arrested by the San Francisco Police Department under the name Laverne Glasgow for two counts of Petty Theft. That case was also dismissed. On 5/18/78 he was arrested by the San Francisco Police Department for Shoplifting under the name Laverne Glasgow. He was given 36 months court probation and 30 days in the county jail. On 6/23/78 he was arrested under the name Laverne Glascow for Robbery and Failure to Appear. He was sentenced to 180 days in the county jail. On 1/30/79 he was arrested by the San Francisco Police Department for Possession/Manufacture Dangerous Weapons. He was sentenced to six months in county jail, which was suspended, and he was sentenced to six days in the county jail. On 2/4/79 he was arrested by the San Rafael Sheriffs Office for Burglary and Conspiracy to Commit a Crime. He was found guilty of the Conspiracy charge and sentenced to 36 months summary probation without supervision and 20 days in the county jail. On 2/20/79 he was arrested by the San Jose Police Department under a warrant with no further disposition shown. On 4/7/79 he was arrested by the Richmond Police Department for Conspiracy. That case was discharged. On 3/1/80 he was arrested by the Stockton Sheriffs Office for Homicide. This is the instant offense. He was later arrested on 3/4/80 by the Palo Alto Police Department for the PC 187 Murder charge and ADW charge in this case.

C.    **Personal Factors:**  Glasgow was born in Prescott, Arkansas, and moved to California in 1950. He dropped out of high school in 1960 when he was a senior. He has no military history. At the time of the instant offense he was married to Yvette Scott with one child named Abidemi Glasgow. He was employed as a construction laborer and was also a student under a master barber. At the time of the incident, Glasgow was on probation for burglary. He has a long history of drug abuse, having first smoked marijuana at age 13 or 14. He then began using heroin in 1965. The POR indicates that he became addicted to heroin in 1969 or 1970 and participated in several drug rehabilitation programs in 1974 and 1975. He first entered the methadone program in 1978 but returned to the use of heroin twice before entering another methadone program 10 months before his arrest. He stated in the POR that he remained drug free during that 10-month period.

III.    **POSTCONVICTION FACTORS:**

A.    **Special Accommodations/Disability:**  None.

B.    **Custody History:**  Since his last parole hearing, Glasgow has remained housed in the general population at the Correctional Training Facility (CTF). His classification score has remained zero. He continued working in Culinary until 3/16/02 when he was assigned to Textiles, a job, which he currently holds. He has consistently received satisfactory grades in his work assignments. The last time that Glasgow actually appeared before the BPT was on 4/3/97 when he was

denied parole for three years and it was recommended that he remain disciplinary free, upgrade educationally, and participate in self-help and therapy programs. He was not scheduled again until 11/23/01 when he was given a one-year denial based on his stipulating to his unsuitability for his parole. The BPT form 1001A dated 2/20/02 indicates that the waiver and stipulation to unsuitability was granted per the prisoner's request in order to update his parole plans. Glasgow now indicates that the real reason he requested the stipulation was for him to be able to obtain complete documentation verifying that Patricia Watts was convicted of perjury for the testimony she offered during Glasgow's trial. The Life Prisoner Decision Facesheet dated 2/20/02 indicates that parole was denied per stipulation for one year with the recommendations that Glasgow remain disciplinary free and participate in self-help programs when available. Glasgow did comply with these recommendations. On 2/28/01, Glasgow filed a BPT 1040 requesting that his waiver of hearing be invalidated as it violated statutory law and administrative mandates. In his appeal he stated that the decision is illegal and that the BPT did not have the lawful authority to make the prisoner waive his hearing. His appeal states that on 1/23/01 at CTF, commissioners did require under threat of multiple year denial if prisoner entered the hearing room for his statutorily mandated parole hearing. He states his attorney presented him with a waiver of hearing and stipulation of unsuitability form. In preparation for his 1/23/01 hearing he states that he collected the trial hearing testimony of Ms. Watts, the court documents showing her perjury conviction for this testimony and provided them to the attorney appointed by the BPT. Glasgow states that he was deprived of lawful opportunity to present these court documents and critical information upon which the alleged finding of unsuitability was based. He states one of the commissioners accused him of lying based on the perjured testimony of Ms. Watts and following that, commissioners demanded he sign a waiver under threat and was not permitted or allowed to have his legally required parole hearing. His appeal was returned to him on 3/9/01 with a notation that according to BPT records, on 1/23/01 Glasgow stipulated to a one-year denial of parole. In doing so he also waived his right to appeal the decision and therefore his appeal was dismissed. During an interview with Glasgow in preparation for the writing of this Board Report, Glasgow presented one court document dated 11/9/81, order for probation on Patricia Ann Watts with the indication that the charge was for perjury. That form has been placed into the miscellaneous section of the Central File. The form makes no reference to the fact that Watts perjured herself during testimony presented at Glasgow's murder trial. However, Glasgow indicated that prior to his next scheduled BPT hearing, he would have complete documentation to verify that Watts was convicted of perjuring herself during his trial.

C.   **Therapy and Self-Help Activities:** Glasgow received a Certificate of Completion dated 12/14/00 for having successfully completed the Salesmanship II and Key to Fatherhood classes offered by the Muslim Chaplain through the Muslim Development Center at CTF. He also received a CDC 128B dated

2/20/02 indicating that he had successfully participated in and completed the Muslim Development Center's Anger Management course. The chrono states that this course is based on principles rooted in interfaith religious scripture and spiritual models of exemplary social behavior. The course was offered over a two-week period of seminar-based lectures and class participation. The chrono states Glasgow was awarded a Certificate of Completion for his participation in this course. Glasgow also received several CDC 128B's indicating his continued attendance at Alcoholics Anonymous/Narcotics Anonymous meetings at CTF-C. The chronos state that Glasgow has been a contributing member of this group since 7/96.

**D.**    **Disciplinary History:**

**CDC 128A's**

| 6/16/86 | CTF | Failure to respond to a ducat. |
| 6/14/89 | CTF | Failure to lockup. |
| 8/25/96 | CTF | Poor job performance. |
| 12/14/99 | CTF | Altering State property. |
| 1/29/02 | CTF | Smoking inside a State building. |

**CDC 115's**

| 6/14/93 | CTF | 3005(B) | Disobeying a Direct Order to Submit a Urine Sample; Guilty: assessed 30 days LOC. |
| 6/15/93 | CTF | 3005(B) | Disobeying a Direct Order to Submit a Urine Sample; Guilty: assessed 30 days LOC. |
| 10/24/99 | CTF | 3006(C) | Possession of Gambling Paraphernalia; Guilty: This is an Administrative CDC 115, counseled, warned, and reprimanded. |

**IV.**    **FUTURE PLANS:**

**A.**    **Residence:** Glasgow indicated that his future plans as documented in the Board Report dated January, 2002 remain the same. He states he would like to parole to San Jose, CA, to reside with his brother-in-law Lloyd Woods. Mr. Woods resides

at 248 Alpine Avenue, San Jose, CA 95127. Telephone number (408) 259-7832. There is a letter dated 10/16/02 from his brother-in-law Lloyd Woods indicating that Glasgow would be able to live with Woods and that he would help support him. That letter has been placed in the miscellaneous section of the Central File. San Jose is in Glasgow's county of commitment, Santa Clara.

**B.**   **Employment:** Glasgow stated that his employment plans as stated in the January, 2002 Board Report remain the same. He has a letter dated 10/21/02 from Irvin Goodwin, which has been placed into the miscellaneous section of the Central File. Mr. Goodwin is the CEO of a non-profit corporation and has offered employment to Glasgow as a building maintenance man at a rate of $11.00 per hour. The employment location would be at Goodwin's office, 795 Willow Road, Menlo Park, CA 94025. Goodwin's telephone number is (650) 493-5000, extension 22453.

**V.**   **USINS STATUS:** Glasgow is a U.S. citizen.


**VI.**   **SUMMARY:**

**A.**   Considering the commitment offense, prior record and prison adjustment, Glasgow would probably pose a low degree of threat to the public safety if released from prison at this time. This is based on the fact that Glasgow has programmed successfully over the years with a fairly minor disciplinary record. He has complied with the recommendations of the BPT and appears to have good parole plans.

**B.**   Prior to release Glasgow could benefit from remaining disciplinary free, continuing to program successfully and continuing to attend any self-help programs that become available.

**C.**   This report is based on an interview with the prisoner on 11/25/02 lasting approximately one hour and a complete review of his Central File lasting about two hours.

**D.**   Glasgow was afforded an opportunity to examine his Central File on 11/25/02. He signed a CDC 128B dated 11/25/02 indicating he did review his Central File in preparation for his appearance before the BPT.

**E.**   No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan (ARP).


GLASGOW, BRICE          C26529                CTF-Soledad           FEB/2003

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
FEBRUARY 2003 CALENDAR


_____     1/7/03
P.R. Miner                          Date
Correctional Counselor I


_____     1/21/03
C. Plymesser                        Date
Correctional Counselor II


_____     1-21-03
L. Trexler                          Date
Facility Captain


_____     CPR 1-27-03
D.S. Levorse                        Date
Classification and Parole Representative


GLASGOW, BRICE        C26529              CTF-Soledad        FEB/2003

BOARD OF PRISON TERMS                                                                        STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 10/01 to 10/02 | | | **PLACEMENT**: General population at CTF. <br> **CUSTODY**:  MED A <br> **CLASSIFICATION SCORE**:  0 <br> **ACADEMIC**:  None noted this period. <br> **WORK**:  Remained assigned to the Culinary until 3/16/02 when he was assigned to Textiles, a position, which he continues to hold.  He received Work Supervisor Reports dated 1/26/02, 1/29/02, 5/1/02, and 6/1/02, all with satisfactory grades. <br> **VOCATION**:  None noted this period. <br> **GROUP ACTIVITIES**:  Received CDC 128B's dated 1/1/02, 3/10/02, 4/1/02, 6/26/02, 7/1/02, 10/1/02, 10/2/02, all indicating his continued attendance at Alcoholics Anonymous/Narcotics Anonymous meetings.  The chronos state that he has been a contributing member of these groups since 7/1/96.  Glasgow also received CDC 128B's dated 2/19/02, 6/20/02, and 9/26/02, indicating that he has been actively participating in the Distance Learning Program.  He has continued to upgrade educationally in life skills lessons for the quarter ended 9/02.  He also received a CDC 128B dated 2/20/02 indicating that he had successfully participated in and completed the Muslim Development Center's Anger Management course.  This course is based on principles based on interfaith religious scripture and spiritual models of exemplary social behavior.  The course was offered over a 2-week period of seminar-based lectures and class participation.  The chrono goes on to state that he was awarded a Certificate of Completion. <br> **PSYCH TREATMENT**:  None noted. <br> **PRISON BEHAVIOR**:  Remained disciplinary free this period. |

| | DATE |
|---|---|
| *[signature]* | 1/13/02 |

| GLASGOW, BRICE | C26529 | CTF | FEB/2003 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
| YEAR | BPT | PBR | REASONS |
| --- | --- | --- | --- |
| 10/02 to 12/02 | | | **PLACEMENT:**  General population at CTF.<br>**CUSTODY:**  MED A<br>**CLASSIFICATION SCORE:**  0<br>**ACADEMIC:**  None noted this period.<br>**WORK:**  Continues to be assigned to Textiles.  His most recent Work Supervisor Report dated 9/1/02 indicates all satisfactory grades.<br>**VOCATION:**  None noted this period.<br>**GROUP ACTIVITIES:**  Received CDC 128B dated 10/1/02 indicating continued attendance at Alcoholics Anonymous/Narcotics Anonymous group meetings.  It indicates he has been a contributing member of this group since 7/1/96.<br>**PSYCH TREATMENT:**  None noted.<br>**PRISON BEHAVIOR:**  Remained disciplinary free this period. |

ORDER:
☐    BPT date advanced by          months.          ☐    BPT date affirmed without change.
☐    PBR date advanced by          months.          ☐    PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐      Previously imposed  conditions affirmed.
☐      Add or modify

☐      Schedule for Progress Hearing on appropriate institutional calendar

GLASGOW, BRICE              C26529                        CTF                          FEB/2003


BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                              Page _2_

# EXHIBIT 6

C 12

M

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE

**BUREAU OF IDENTIFICATION**
P.O. BOX 13417, SACRAMENTO

FBI #986653 D
SN# 573 56 2387
OL# P565783
SN# 732 97 8792
OL# FF055870 (AZ)
IS FOR OFFICIAL USE ONLY

The following CII record, NUMBER        1 610 650

18  M  13  U- OOM  16        NEGRO  5-10  165  ARK.  4-23-1942
    1   2  U  101  15
                                GLASGOW:  BRICE
AKW

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| | | ALIAS: BRICE GLASCOW; MICHAEL BRICE; ODELL WARD; MICHAEL STEVENSON; THOMAS RONALD GREEN; ALFRED WALLER; AL BRYCE WHEELER; OTIS WOOD; BRYANT GLASCOW; LLOYD WOOD; LEE GLASCOW; TYRONE LEE CARMON; LAVERN GLASGOW; LEE BRYANT GLASGOW; LAVERNE GLASGOW; SAMMIE SMITH; LEVINE GLASGLOW; | | |
| 11-3-59 | SO STOCKTON 71614 | BRICE GLASGOW | JUV.DET.ORDER | |
| 12-29-59 | CALIF.YOUTH AUTH. PERKINS 40484 | BRICE GLASGOW | SUB M; CARRYING A CONCEALED WEAPON & VIO. QR PROB.BATT. | FROM: SAN JOAQUIN JUV.CRT. 12-23-60,PAROLED (S 4-23-63,TENT.DISCH |
| 1-12-60 | SO STOCKTON 71614 | BRICE GLASGOW | DETENTION ORDER | |
| 7-24-61 | PD SANTA MONICA CR 37420/MUG 44113 | BRICE GLASGOW | 404 PC(RIOT) 12020 PC(CCW) & DIS.COND. | 8-23-61,DISM. |
| 8-20-61 | PD LOS ANGELES 582085-G | BRICE GLASGOW | 217 PC (ASSLT W/I TO COMM. MURDER) | |
| 8-20-61 | SO LOS ANGELES B-797084 | BRICE GLASGOW | ADW | |
| 1-3-62 | CALIF.YOUTH AUTH. PERKINS 40484 | BRICE GLASGOW | RET.PV | FROM: SAN JOAQUIN CO.JUV.CRT. 1-23-63,PAROLED(OA) 5-9-63,DISCH. |
| -- -- | | | | -- -- |

Since neither fingerprints nor an identifying number which is indexed in our files accompanied your request, this Bureau cannot guarantee in any manner that this material concerns the individual in whom you are interested.

CONTINUED PAGE 2

90408-552 2-72 500M △ O6P

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
BUREAU OF CRIMINAL IDENTIFICATION AND INVESTIGATION
P. O. BOX 1859, SACRAMENTO

The following CII record, NUMBER   1 610 650   IS FOR OFFICIAL USE ONLY

BRICE GLASGOW

PAGE 2

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| -4-63 | SO STOCKTON,71614 | BRICE GLASGOW | 1:INV.211 PC<br>2:245 PC<br>3:4-040 SMC<br>DANG.WEAPON | 7-23,63,1:DISM.,<br>INTEREST OF JUSTICE<br>2:9 MOS.CO.JL.,<br>5-6-63,3:90 DS.JL.,<br>1 SUSP. |
| -3-64 | PD EL CERRITO 13478 | BRICE GLASGOW | INV.459 PC<br>(BURG) | 6-17-64,$56.FINE |
| -5-64 | SO MARTINEZ,109301 | BRICE GLASGOW | 484 PC<br>(THEFT)<br>(EL CERRITO<br>PD ARR.) | |
| -24-64 | PD OAKLAND,171613 | BRICE GLASGOW | 484 PC<br>(SHOPLIFT) | 9-25-64,$50.OR 5 DS.<br>CO.JL.& $8.PEN |
| 0-7-64 | SO STOCKTON,71614 | BRICE GLASGOW | 459 PC(ATT.)<br>Burg. | 10-13-64,DISM. |
| 2-24-64 | PD RICHMOND,39692 | BRICE GLASGOW | INV.459 PC<br>(TILL TAP)<br>Burg | NCF |
| -21-65 | SO STOCKTON,71614 | BRICE GLASGOW | 245 PC ADW | 11-2-65,242 PC,DISM. |
| -27-65 | PD LONG BEACH 172903/DR 216298 | BRICE GLASGOW | PT(SHOPLIFT) | 8-11-65,5 DS.JL.,'<br>$56.FINE |
| -27-65 | PD SAN JOSE 116704/180961 | BRICE GLASCOW | 487 PC(GT)<br>182 PC(CONSP) | 1-27-66,CONV.OF 459<br>182 PC,9 MOS.JL.,<br>3 YRS.PROB. |
| - - | | CONTINUED PAGE 3 | | - - |

ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
BUREAU OF CRIMINAL IDENTIFICATION AND INVESTIGATION
P. O. BOX 1859, SACRAMENTO

The following CII record, NUMBER    1 610 650          IS FOR OFFICIAL USE ONLY

BRICE GLASGOW

PAGE 3

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| -7-65 | PD SAN JOSE 116704/181757 | BRICE GLASGOW | 459 PC *Burg.* | 9-7-65,HTA |
| 0-1-65 | PD SAN JOSE 116704/183545 | BRICE GLASGOW | 182.1 PC & OVERT ACT I (SELF SURRENDER) CHGD: 459,182 PC *Burg.* | 1-27-66,9 MOS.JL., 3 YRS.PROB. |
| 0-1-65 | PD SAN JOSE 116704/183545 | BRICE GLASGOW | 182.1 PC *Conspiracy* | 1-27-66,CONV.OF 459, 182 PC,9 MOS.JL., 3 YRS.PROB. |
| 0-28-65 | SO STOCKTON,71614 | BRICE GLASGOW | 415 PC *Fighting* | 10-29-65,90-1 SS 90 DS JL., 12-1-65,SENT.COMMUT TIME SERVED,BAL. SUSP.3 YRS.FROM 10-29-65 |
| -18-66 | PD SAN JOSE 116704/191555 | BRICE GLASGOW | *Burg. Consp* 459,182 PC (SO ARR.) 242 PC *Bat.* | 1-27-66,459,182 PC, 9 MOS. 8-17-66,242 PC,BAIL |
| 9-22-66 | ST.JL.,FAIRBANKS ALASKA,FJ 3410 | BRICE GLASCOW | POSS.STOLEN PROP. *RSP* | |
| -17-67 | SO STOCKTON,71614 | BRICE GLASGOW | 447A,452 PC *ARSON* | |
| | | CONTINUED PAGE 4 | | |
| - - | | | | - - |

ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.

STATE OF CALIFORNIA
**DEPARTMENT OF JUSTICE**
BUREAU OF CRIMINAL IDENTIFICATION AND INVESTIGATION
P. O. BOX 1859, SACRAMENTO

**The following CII record, NUMBER**     1 610 650             **IS FOR OFFICIAL USE ONLY**

BRICE GLASGOW

PAGE 4

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| -9-67 | PD SAN JOSE 116704/227254 | BRICE GLASGOW | 470 PC(FORG) | |
| 10-27-67 | PD YAKIMA,WASH., 28398 | BRICE GLASGOW | DEF.INNKEEPER CCW-ILLEG. POSS.GAMB. DEVICE-HOLD FOR ALASKA (GT) | DISM DISM DISM REL TO ALASKA STATE POLICE |
| -19-69 | SO STOCKTON,71614 | BRICE GLASGOW | 5-002.1 SMC (SHOOT CRAPS) (STOCKTON PD ARR.) | 5-1-69,"J" PG 180 DS.SUSP.3 YRS.& $500.OR 1 FOR $10. COMMITMENT ISSUED |
| -1-69 | SO STOCKTON,71614 | BRICE GLASGOW | 5001.2 SMC (STOCKTON PD ARR.) | 5-2-69,$500.OR 1/10 |
| 0-5-69 | PD SEASIDE DR 10017 | BRICE GLASGOW | 330 PC (GAMING) | $100.,$50.SS 2 YRS. |
| 12-25-69 | PD SAN JOSE 116704/303265 | BRICE GLASGOW | #1,459 PC BURG. #2,182 PC CONSP. | 12-26-69,REL.BY CRT |
| -5-70 | PD MONTEREY 20394 | MICHAEL BRICE | 12951A VC NO DRIV.LIC. IN POSS. | 4-6-70,B/F. |
| - - | | CONTINUED PAGE 5 | | - - |

**ENTRIES INDICATED BY ASTERISK (\*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.**

①L

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
BUREAU OF CRIMINAL IDENTIFICATION AND INVESTIGATION
P. O. BOX 1859, SACRAMENTO

1 610 650

The following CII record, NUMBER

BRICE GLASGOW

IS FOR OFFICIAL USE ONLY

PAGE 5

KM

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 5-17-70 | PD SAN FRANCISCO 252320 | BRICE GLASGOW | 1-332 PC, WINNING AT PLAY BY FRAUDULENT MEANS 2-1291A MPC CARRYING CONCEALED WPN. 3-647E PC, LOITERS OR WANDERS THE STREET AT NIGHT W/OUT APPARENT REASON | |
| '-22-70 | PD SAN FRANCISCO 252320 | ODELL WARD | 459 PC BURG. | 7-23-70,DISCH.PER 849B(1)PC/NOT AN ARREST,DETENTION ONLY.(INSUFF.EVID. |
| 8-29-70 | PD SACRAMENTO S-31660 | MICHAEL STEVENSON | 182.1 PC CONSPIRACY | FAIL TO APP.B/W ISS'D |
| 9-26-70 | SO STOCKTON 71614 | BRICE GLASGOW | 484 PC THEFT (DEFINED) | RELEASED TO SAN JOAQUIN CO. SHERIFF |
| 10-19-70 | SO STOCKTON 71614 | BRICE GLASGOW | 12951A CVC NO OPER.LIC. IN POSS. 11721 H&S ADDICTION | 3-9-71, 12951A VI PG TO 647F PC DRK "A"DISM.; "J"PG, DI 180 DS SUSP F/3 YRS |
| - - | | CONTINUED PAGE 6 | | |

ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
## BUREAU OF IDENTIFICATION
P.O. BOX 1859, SACRAMENTO

The following CII record, NUMBER    1 610 650    IS FOR OFFICIAL USE ONLY

PAGE 6

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 1-1-70 | PD SAN JOSE 116704/B-331501 | THOMAS RONALD GREEN | 1-487 PC GRAND THEFT 2-459 PC BURG.(ARR BY PD MILPITAS) | 11-2-70, REL.849B(1 PC, NOT DEEMED ARR. |
| -4-71 | PD SACRAMENTO S-31660 | MICHAEL STEVENSON | FTA(182.1PC) CONSPIRACY | 1-26-71, 22 DS.CO. JL.CTS PG 434 PC |
| -5-71 | SO SACRAMENTO, 127893 | MICHAEL STEVENSON | CONSP. TO COMM.THEFT | CITY REMAND |
| -28-71 | SO STOCKTON 71614 | BRICE GLASGOW | WT.484 PC, 11721 H&S, 12951A VC (PD STOCKTON ARR.) | 3-9-71,647F PC,"J" PG,180 DS.SUSP.FOR 3 YRS;12951 VC,"A" DISM.FOJ PG TO 647F PC |
| -9-71 | PD SAN JOSE, 116704/341014 | BRICE GLASGOW | 1-WARR. (4000A VC) 2-459 PC,BURG | |
| -24-71 | SO OAKLAND, 71/11456 | BRICE GLASGOW | 1-148 PC(R. ARR.)2-529.3 PC(ACT IN AN ASSUMED CHAR-ACTER) 3-23128 VC (OPEN ALCO. CONT.VEH.) | 10-10-72,484,148 PC,MISD.,"A"DISM., FURTHER.OF JUST., MTN.DEP.DA |
| -2-71 | PD SEASIDE, DR-10017 | BRICE GLASGOW | MISD.TRAFF. WARR. | FN $19 |
| -- | | CONTINUED PAGE 7 | | -- |

ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.

54441-552 7-71 300M △ OSP

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
## BUREAU OF IDENTIFICATION
P. O. BOX 1859, SACRAMENTO

The following CII record, NUMBER        1 610 650                    IS FOR OFFICIAL USE ONLY

PAGE 7

RMS

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 7-17-71 | SO REDWOOD CITY 74533 | BRICE GLASGOW | 459 PC | E/R PD BRISBANE 8-24-71, 484 PC W/PR. FEL.CONV."A", DISM. FURTHER. OF JUSTICE,UNAVAIL.OF EVID. |
| 7-17-71 | PD BRISBANE 71-1030 | BRICE GLASGOW | 459 PC,BURG. | |
| 10-14-71 | PD SAN JOSE 36259 | BRICE GLASGOW | 1)31 VC,FALSE INF. TO PO 2)11721 H&S NARC.ADDICT. 3)12951 VC, WARR. 4)26710 VC, WARR. (ARR BY PD MOUNTAIN VIEW) | |
| 10-21-71 | PD SAN JOSE 365366 | BRICE GLASGOW | 484 PC, WARR. | |
| 11-27-71 | PD SAN JOSE 116704/370590 | BRICE GLASGOW | 1)459 PC,BURG 2)487 PC,G.T. | |
| 12-28-71 | PD SAN JOSE 116704/373416 | BRICE GLASGOW | WARR. 475A PC | |
| 1-6-72 | PD SAN JOSE 116704/374265 | BRICE GLASGOW | 488 PC, P.T. | |
| - - | | CONTINUED PAGE 8 | | - - |

ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.

54641-552 7-71 500M △ OSP

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
## BUREAU OF IDENTIFICATION
P. O. BOX 1859, SACRAMENTO

**The following CII record, NUMBER**      1 610 650                    **IS FOR OFFICIAL USE ONLY**

PAGE 8

| RFS<br>ARRESTED OR<br>RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 1-23-72 | PD SAN MATEO<br>51144 | BRICE GLASGOW | 496 PC, POSS.<br>STOLEN PROP. | 10-26-72,"J"CONV.OF<br>484PC,PG,30DS,CJ CC<br>496PC,DISM.,INT.OF<br>JUST.,PUR.TO NEG. |
| 1-24-72 | SO REDWOOD CITY<br>74533 | BRICE GLASGOW | 1)484 PC<br>2)496 PC | E/R SAN MATEO PD |
| 1-31-72 | SO SAN JOSE<br>7202343 | BRICE GLASGOW | 484 PC | 2-1-72 DETENTION<br>ONLY,TRANSF.FOR PRO |
| 2-4-72 | PD SAN JOSE<br>116704 | BRICE GLASGOW | 664 PC, ATT.<br>P.T. | |
| -9-72 | SO REDWOOD CITY<br>74533 | BRICE GLASGOW | 1)484 PC<br>2)496 PC | E/R PD SAN MATEO |
| 2-16-72 | SO REDWOOD CITY<br>74533 | BRICE GLASGOW | 1)484 PC<br>2)496 PC | E/R SAN MATEO PD |
| 3-24-72 | PD SAN JOSE<br>7208672 | BRICE GLASGOW | 484 PC B/W | 12-13-71 #F4948 48.<br>PC B/W MISD.6 MOS..<br>CC,1-26-73 #53330.<br>CONV.475A PC FEL.3<br>YRS,PROB.,12 MOS.JL<br>CS,2-5-73 #M24061<br>CONV.664 PC MISD.<br>SENT.SUSP.2 YRS.SU<br>PROB,90 DS.JL.,45 |
| 5-26-72 | SO STOCKTON 71614 | BRICE GLASGOW | 11721 H&S<br>ADDICTION | SUSP. |
| 5-30-72 | SO MODESTO<br>73630 | ALFRED WALLER | 484-488 PC,<br>PT | |
| 7-21-72 | SO MERCED, 30075 | AL BRYCE WHEELER | 211 PC | 9-21-72"J"CONV.OF<br>459 PC,PG,18 MOS.<br>PROB.,12 MOS.CO.JL<br>CREDIT TIME IN<br>CUSTODY |
| - - | | CONTINUED PAGE 9 | | - - |

**ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.**

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE

# BUREAU OF IDENTIFICATION

P.O. BOX 13417, SACRAMENTO

**The following CII record, NUMBER**     1 610 650     **IS FOR OFFICIAL USE ONLY**

IWT                              PAGE 9

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 1-8-72 | SO SAN JOSE 7235063 | BRICE GLASCOW | 475A PC | |
| 5-2-74 | PD SAN JOSE 116704/7416628 | BRICE GLASGOW | 11550 H&S, MISD. | 5-6-74/REL.849B(1)P DEEMED NOT ARR., DET ONLY. |
| 6-14-74 | PD SANTA CLARA 30175 | OTIS WOOD | 1. 475A PC RECEIPT OR POSS.FORGED BILLS 2. 148 PC RESIST.OR DELAYING PEACE OFF. 3. 647E PC LOITERING | |
| 7-8-74 | PD SAN MATEO 57500 | BRICE GLASGOW | SM WT/14601 VC | 8-15-74,12500 VC: DISM./LACK OF PROS. |
| 9-29-74 | ALAMEDA CO.CIB., 54529AA1841 | BRICE GLASGOW | 484/PC | DISM/,NEG.PLEA |
| 7-11-75 | PD SAN JOSE 7531284 | BRICE GLASGOW | 1-11550 H&S MISD. 2-20002AVC MISD. 3-23105AVC MISD. | 7-14-75,CT 1,2,&3 REL.849B.1 PC,DEEME NOT ARR.,DET.ONLY: CONV. OF 1203PC,FEL PROB/PAROLE HOLD/RE 2-21-79 #75293,JD# 43470 20002A VC MISD, PG 5 DS.JL, 5 DS. CTS |
| | | CONTINUED PAGE 10 | | |

**ENTRIES INDICATED BY ASTERISK (°) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.**

80406-182 2-72 300M △ OSP

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
**BUREAU OF IDENTIFICATION**
P. O. BOX 13417, SACRAMENTO

**The following CII record, NUMBER**   1 610 650                **IS FOR OFFICIAL USE ONL**

PAGE 10

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 1-16-76 | SO SAN RAFAEL 61287 | LEE GLASCOW | 459PC/BURG | 4-14-77/#CR 86407; JD#21420,459 PC, FEL,3 CTS.,DISM. |
| 3-25-76 | PD SAN FRANCISCO 252320 | LEE B. GLASGOW | 488 PC PETTY THEFT | |
| 7-27-76 | PD SAN FRANCISCO 252320 | L. B. GLASGOW | 487.1PC GL/PROP. | |
| 11-20-76 | PD SUNNYVALE 7055281 | TYRONE LEE CARMON GLASGOW | 1)484 PC,L. THEFT 2)4143A B&P, POSS.& CONTROL HYPO NEEDLE 3)182 PC,CONSP. | |
| 8-21-77 | SO SAN RAFAEL 61287 | LEE BRYANT GLASGOW | 459 PC,FEL. | 7-26-78 #C 8237,JD 21420 490.5 PC MIS 2 CTS.#D# DISM.DU TO DELAY |
| 9-29-77 | ALAMEDA CO CIB 66670AA1341 | LAVERN GLASGOW | 459PC FEL (ARR BY PD ALAMEDA) | |
| - - | | CONTINUED PAGE 11 | | |

**ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.**

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
**BUREAU OF IDENTIFICATION**
P.O. BOX 13417, SACRAMENTO

**The following CII record, NUMBER**    1 610 650    **IS FOR OFFICIAL USE ONLY**

## PAGE 11

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 1-27-77 | PD BURLINGAME 260444/7228 | LEE BRYANT GLASGOW | 484 PC,PT | 1-12-78 #M 61323,JD# 41420 664/484 PC MISD, DISM, INSUFF.EVID, DDA MOT. |
| 11-28-77 | SO REDWOOD CITY 122355 | LEE BRYANT GLASGOW | 664/484A PC THEFT PERS PROP (ARR BY PD BURLINGAME) | PD BURLINGAME COMMIT |
| 3-19-78 | PD SAN FRANCISCO 252320 | LEVINE GLASGLOW | 488PC/P.T. | 6-27-78,#166701,JD# 38460,MISD,PROC SUSP BWI |
| 4-14-78 | PD SAN FRANCISCO 252320 | LAVERNE GLASGOW | #1. 488 PC PETTY THEFT #2. 488 PC PETTY THEFT | 6-27-78,#172356,JD# 38460,CTS 1 & 2,MISD, PROC SUSP,BWI |
| 5-18-78 | PD SAN FRANCISCO 252320 | LAVERNE GLASGOW | 488 PC,SHOP- LIFTING | 6-27-78,#178989,JD# 38460,488 & 242PC,MI PROC SUSP,BWI;7-25- 488PC,PG,6MOS JL SS 36MOS CRT PROB,30DS CJ;242PC,"A",DISM,F 2-13-79,PROB VIO RE BWI |
| 5-23-78 | ALAMEDA CO CIB 042239AA1841 | LAVERN GLASGOW | 1-211PC FEL 2-W#CR8841 664/488PC 3-W#C8237 FTA 490.5PC (ARR BY PD BERKELEY) | 7-11-78,#70521,JD# 01420,CONV 484PC,PC MISD,180DS JL,1DAY SUSP |
| - - | | CONTINUED PAGE 12 | | - - |

CONTINUED PAGE 12

**ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.**

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
## BUREAU OF IDENTIFICATION
P.O. BOX 13417, SACRAMENTO
1 610 650

The following CII record, NUMBER

IS FOR OFFICIAL USE ONLY

PAGE 12

5M

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| -30-79 | PD SAN FRANCISCO 252320 | BRICE GLASGOW | 12020APC POSS MFG SELL DANG WPN | 2-13-79 #233807,JD#3846 12020A PC MISD,PROC.SUSP B/WT.ISS,FTA;3-1-79 PG, 6 MOS. JL.SENT.SUSP,36 MOS.CT.PROB,6 DS.JL,6DS CTS |
| 2-4-79 | SO SAN RAFAEL 71711 | BRICE GLASGOW | 1)459 PC BURG 2)182.1 PC CONSP TO COMMIT CRIME (ARR BY PD SAN RAFAEL, 79 1025) | 2-14-79 #C 19895A,JD# 21420 459 PC MISD, DISM 490.5 PC MISD, PG, 36 MOS.SUM.PROB. W/O SUPV, 20 DS.JL. |
| 2-20-79 | PD SAN JOSE 7952972/AGL945 | BRICE GLASGOW | WRT#M75293 20002A VC H&R PROP DMG 2CTS,MISD | |
| -7-79 | PD RICHMOND 39692 | BRICE GLASGOW | 182.1PC FEL CONSP | 10-26-79,#192357 JD# 07460,484-666 PC,459 PC,FELS.DISM.JUDG.ARR. DEFT.DISCH. |
| 3-1-80 | SO, STOCKTON 71614 | BRICE GLASGOW | 1)187PC HOMICIDE ON WARR 2)217PC,ON WARR ASLT.W/I TO COM. MURDER | 3-3-80,E/R PD PALO ALTO |
| 3-4-80 | PD PALO ALTO 8039743/AGL945 | BRICE GLASGOW | 1-187 PC MURDER 2-245A PC ADW | |
| -- | | | | -- |

CONT. PAGE 13

**ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.**

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
## BUREAU OF IDENTIFICATION
P. O. BOX 13417, SACRAMENTO

**The following CII record, NUMBER**    1 610 650    **IS FOR OFFICIAL USE ONLY**

PAGE 13

| ARRESTED OR RECEIVED | DEPARTMENT AND NUMBER | NAME | CHARGE | DISPOSITION |
|---|---|---|---|---|
| 2-19-81 | CALIF.DEPT. OF CORRECTIONS, C-26529 | BRICE GLASGOW | CS.#75071., CT.1,MURDER 1ST (187 PC) CT.2,ADW(245A PC)W/USE OF F'ARM(12022.5 PC) | TERM: CT.1:25-LIFE CT.2:5 YRS., |

**ENTRIES INDICATED BY ASTERISK (*) ARE NOT VERIFIED BY FINGERPRINTS IN CII FILES.**

# EXHIBIT 7

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1999)**
**PAROLE CONSIDERATION HEARING**
**DECEMBER 2004 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**DECEMBER 1, 2004**

This is a psychological evaluation for the Board of Prison Terms on inmate Brice Glasgow, CDC# C-26529. This is an addendum to a previous psychological evaluation completed 05/04/00. This report is based upon a personal clinical interview of the inmate, conducted on 12/01/04, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

Inmate Glasgow is a 63-year-old, black male whose date of birth is 04/23/41. He is a U.S. citizen and speaks fluent English. No obvious unusual physical characteristics were observed, and he denied ever using any nicknames or aliases.

Inmate Glasgow said that he has maintained good relations with his 24-year-old daughter who was born from his first marriage. He noted that he is now married a second time. His second marriage began in 2003, and he has maintained a warm and supportive relationship with his current wife. He also noted that he has known his current wife since the 1960s.

Inmate Glasgow said that he has remained regularly employed by PIA industries in materials cutting and sewing since 1996. He also said that he is on the waiting list for a real estate training program. Inmate Glasgow also said that he still regularly attends Alcoholics Anonymous.

Inmate Glasgow has hypertension, noting the symptoms are well controlled by medication.

Inmate Glasgow's plans if granted parole also include two additional job offers from his family members, which include furniture delivery and apartment managing.

### CLINICAL ASSESSMENT

**XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:**

During the clinical interview, inmate Glasgow was alert and oriented to person, place, and time. He was well dressed and groomed. His speech was articulate and contextually meaningful. His mood and affect were within normal limits, and his behavior was appropriate to the setting. No evidence of a mood or thought disorder was demonstrated. His estimated level of intellectual functioning was within the average range.

**GLASGOW          C-26529          CTF-CENTRAL          12/01/04          gmj**

GLASGOW, BRICE
CDC NUMBER: C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

| | |
|---|---|
| **AXIS I:** | Heroin dependence, in sustained full remission in a controlled environment. |
| **AXIS II:** | No contributory personality disorder. |
| **AXIS III:** | Hypertension. |

In addition to regularly attending Alcoholics Anonymous and Narcotics Anonymous, inmate Glasgow also completed a number of other self-help groups since the completion of his first evaluation. In 2002, he completed an Anger Management group, and also a Life Skills program obtained through Distance Learning. In 2004, he completed the Impact group, and another Anger Management group.

## XIII.   REVIEW OF LIFE CRIME:

Inmate Glasgow described the circumstances surrounding his commitment offense, involving first-degree murder and assault with a deadly weapon. His recollection of the instant offense was consistent with that of the record and the previous psychological evaluation. He acknowledged the damage done to the victims, including his niece and the victim's family. He showed good insight into the causative factors related to the instant offense, and seemed genuinely penitent for his crime.

## XIV.   ASSESSMENT OF DANGEROUSNESS:

A.   His risk for violent behavior within a controlled setting is considered to be low relative to the average level II inmate population in a controlled setting. This conclusion is based upon several factors.

On the one hand, he does have a juvenile criminal history, and he was placed in CYA on two occasions. His adult criminal history includes numerous arrests. He has three CDC-115 disciplinaries, the last received in 1999 for possessing gambling paraphernalia (gambling chips). He has received five CDC-128 minor disciplinaries, the last received in 2002 for a smoking violation.

On the other hand, however, he has never received a violent disciplinary or a substance abuse disciplinary during his 23 years completed within CDC. He has also received only five minor disciplinaries, and no disciplinaries for the last two years. He has also completed a number of self-help programs and has regularly attended Alcoholics Anonymous and Narcotics Anonymous groups for many years. He also has developed a good job ethic, having worked for approximately eight years in PIA industries, and also has print shop and fabric-cutting skills.

| | | | | |
|---|---|---|---|---|
| GLASGOW | C-26529 | CTF-CENTRAL | 12/01/04 | gmj |

GLASGOW, BRICE
CDC NUMBER:  C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

In addition to the clinical interview, he was also administered two additional psychological instruments.  Results from the HCR-20 indicate a low risk of violence for this individual relative to the inmate population in a controlled setting.  Results from the Hare Psychopathy Checklist, Short Version, do not suggest the presence of psychopathy.

Therefore, in light of these factors, his violence potential is considered to be significantly below that of the inmate population in a structured setting and in the community setting.

B.      If released to the community, clinically assessed, his violence potential is considered to be no more than that of the average citizen in the community.

C.      There are no significant risk factors which may be a precursor to violence for this individual.

XV.     **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

A.      This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards.

B.      This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole.

C.      This inmate does have a heroin abuse history.  However, he has remained abstinent from abuse of heroin for over 23 years, and has regularly attended Narcotics Anonymous within CDC, and does not appear at this point to be a significant risk factor for violence.  Continued participation within Narcotics Anonymous within CDC no longer appears to be warranted.  However, participation within Narcotics Anonymous as a contingency for parole for one year is suggested.

*Joe Reed*

Joe Reed, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

GLASGOW          C-26529          CTF-CENTRAL          12/01/04          gmj

GLASGOW, BRICE
CDC NUMBER:  C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JR/gmj

D:  12/01/04
T:  12/02/04

*D:\Word Files\BPT - 2004\GLASGOW, BRICE    C-26529    12-04    REED.doc*

# EXHIBIT 8
# Part 1 of 2

Name  Brice Glasgow

Address  Post Box 689

Soledad, Ca 93960-0689

ORIGINAL **FILED**

CDC or ID Number  C-26529

**AUG 18 2006**

THE SUPERIOR COURT OF CALIFORNIA

THE COUNTY OF SANTA CLARA

*(Court)*

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA  County of Santa Clara
By _____ Deputy
S. Chua

---

| | |
|---|---|
| Brice Glasgow | **PETITION FOR WRIT OF HABEAS CORPUS** |
| Petitioner | |
| vs. | No. 75071 |
| B. Curry, Warden (A) | *(To be supplied by the Clerk of the Court)* |
| Respondent A. SCHWAREZENEGGER, GOVERNOR: et al., | |

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

---

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six
Form Approved by the
Judicial Council of California
MC 275 [Rev. January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rules 56.5, 201(h)

**This petition concerns:**

| | |
|---|---|
| ☐ A conviction | ☒ Parole |
| ☐ A sentence | ☐ Credits |
| ☐ Jail or prison conditions | ☐ Prison discipline |

☒ Other *(specify):*  __Illegal denial of Parole Suitability by California Board of Prison Terms.__

1. Your name: _____

2. Where are you incarcerated?   __Correctional Training Facility - Soledad__

3. Why are you in custody?   ☒ Criminal Conviction   ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

  __12022.5__

b. Penal or other code sections: _____ __245A,__ _____ __12022.5__

c. Name and location of sentencing or committing court:   __Santa Clara County__

d. Case number:   __75071__

e. Date convicted or committed:   __December 19, 1980__

f. Date sentenced:   __Feb 11, 1981__

g. Length of sentence:   __First Degree Murder (25 Years to Life)__

h. When do you expect to be released?   __At the Minimum Release Date__

i. Were you represented by counsel in the trial court?   ☒ Yes.   ☐ No.   If yes, state the attorney's name and address:

_____

4. What was the LAST plea you entered? *(check one)*

☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6.  GROUNDS FOR RELIEF

Ground 1:  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement."  *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See Attached

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

See Attached

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

See Attached

THE BOARD OF PRISON TERMS ILLEGALLY USED PENAL CODE
SECTION 3041 (b) [THE EXCEPTION] TO FIND PETITIONER
UNSUITABLE FOR PAROLE. THE DECISION WAS ARBITRARY
AND CAPRICIOUS, INDIRECT VIOLATION OF PETITIONER'S
STATE AND FEDERAL DUE PROCESS RIGHTS. THERE IS NOT
A MODICUM OF EVIDENCE THAT PETITIONER IS A CURRENT
THREAT TO SOCIETY OR UNSUITABLE FOR PAROLE.

On November 2, 2005, Petitioner Brice Glasgow, (hereinafter "Petitioner"), was provided a Life Term Parole Consideration Hearing before the Board of Parole Hearings (hereinafter "Board"; please refer to Exhibit "A", which is the Hearing Transcript, hereinafter "HT".) Said Board hearing was petitioner's fourth (4th) parole suitability hearing. Petitioner's minimum leligible release date was March 18th, 1998. The purpose of this Board hearing was for the setting of Petitioner's term uniformly to his offense and for a finding of suitability for parole (please See Penal Code § 3041.5; In re Edward Ramirez 94 Cal. Appl 4th 541 (2001); McQuillion v. Duncan, (9th Cir.) 306 F. 3d 895 In re Norman G. Morrall, (2002) 102 Cal. App. 4th 280; In re Rosenkrantz, (2002) 29 Cal. 4th 660; In re Mark Smith (2003) Cal. App 4th 343 and Biggs v. Terhume, (2003 9th Cir.) 334 F. 3d 910.

The consequent result of this Board hearing was an erroneous and unlawful finding of unsuitability and a release date was not set; Petitioner was given a one (1) year denial and did not appeal this decision through the Administrative remedy because the Board of Parole Hearing has eliminated the Appeal Unit and no longer allows for the fining of administrative appeals on BHp denials of parole for indeterminately sentenced prisoners such as myself. Petitioner submits that the Board's regulation, that is the California Code of Regulations (hereinafter "CCR") § 2402 (a). **DEMANDS**

1 that the Board set a release date unless Petitioner CURRENTLY
2 presents a risk of danger to the public. Petitioner submits tht
3 the representing District Attorney did not provide any new and
4 /or additional evidence whatsoever that Petitioner was an
5 unreasonable risk, a danger to the public, or otherwise
6 unsuitable for parole.

7     Additionally, Petitioner submits that the Board speaks in
8 meaningless generalities and fails to address the exact nature
9 of Petitioner's CURRENT character. By not doing so, the Board
10 violated the intent and spirit Penal Code (hereinafter "PC"), §
11 3041.5, and In re Ramerez, supra, which dictates that "[T]he
12 Board NORMALLY set a parole release." (citing Biggs v. Terhune,
13 et al., supra).

14     The Court in Biggs, supra, held that the Board's continued
15 use of the crime as a basis for denial of parole violates both
16 State and Federal due process. For the past three years the
17 Petitioner has had no occurrence of serious violent
18 disciplinary action, thus exemplifying himself as a model
19 prisoner; Petitioner seeks acknowledgement of the facts that
20 since 2002, there has been therafter a continuous four (4)
21 years history free of any disciplinary action and or
22 occurrence. Petitioner submits that the Board's failure to
23 uniformly measure his offense and setting his term
24 proportionately to others similarly situated, and to find him
25 suitable for parole, violates both State and Federal due
26 process. Also, the current policy of the Board, which will be
27 discussed more fully infra, is the setting of a parole date
28 which is all too often the exception rather then the norm, and

1  thus violates the Petitioner's liberty interest tht is present

2  in a parole date; In re Rosenkrantz, supra; McQuillion v.

3  Duncan, supra Biggs v. Terhune, et al., supra.    At the

4  Petitioner's Board hearing, the Board relied SOLELY on the

5  commitment offense and prior history to justify it's unlawful

6  finding of unsuitability.   Beginning at Ht, pg. 65, the Board

7  stated:  That the commitment offense was carried out in an

8  especially cruel and callous manner in that the inmate shot and

9  killed Mr. Ralph Collins and there were three bullet wounds to

10 the back and two to the back of the head and also a shot into

11 Patricia Watts who was the inmates niece and she was shot once

12 in the back.   That multiple victims were attacked in the same

13 incident and one was killed and one was injured and the motive

14 for the crime was explicable or very trivial in relation to the

15 offense and on the one hand we have as a result of and

16 altercation and on the hand we have that there was intentional

17

18 1. The Court of Appeal in In re George Scott, (2004) 119 Cal. App. 4th 871, reaffirmed the
   rationale of the Ramirez and Smith Courts when it declared "..parole is the rule, rather than
19 the exception, and conviction for second degree murder does not authomatically render one
   unsuitable. (In re Smith, (2003) 114 Cal..Appl 4th 343, 366). In re Ramirez, supra, 94 Cal.
20 App. 4th 549..[a]ll violent crimes demonstrates the perpetrator's potential for posing a
   grace risk to public safety, yet parole is mandatory for violent felons serving determinate
21 sentences. Pen Code § 3000, subd. (b)(1).) And the Legislature has clearly expressed its
   intent that  when murders- who are the grate majority of inmates serving indeterminate
22 sentences - approach their minimum eligible parole date, the Board 'shall normally set a
   parole release date..." (id. at p. 570).
23 2. The Court of Appeal on June 24, 2004, In re George Scott, supra 119 Cal. App. 4th at 887
   fn, 7, also reaffirmed the Legislative Intent of Uniform Terms by stating; "The first two
24 sentences of the DSL declare that the purpose of imprisonment or a crime is punishment and
   that '[t]his purpose is best served by terms proportionate to the seriousness of the offense
25 with provisions for uniformity in the sentences of offenders committing the same offense
   under similar circumstances. (Pen. code, § 1170, subd. (a)(1).) Nothing in the DSL or its
26 legislative history suggests that legislative concern with uniformity was limited to those
   serving determinate terms. Penal Code 3041 shows that this interest does extend to
27 individuals such a s [Petitioner] who are serving indeterminate life terms (id., ciating,
   Ramirez, supra, 94 Cal. App. 4th at 559.)

28

1  motives behind the shooting.

2      In addition, and with regard to the Petitioner's

3  suitability, the board erred in it's conclusion that Petitioner

4  was a threat to society and would pose an unreasonable risk of

5  danger. Petitioner's Psychiatric Reports have been much to the

6  contrary, and specifically, Dr Reed stated: that you are no

7  more risk of violence then the average citizen. (See Psych

8  Evaluation Exhibit "B" attached hereto).

9      Additionally, the Board ignored that Petitioner has been

10  deemed by the California Department of Corrections a Model

11  prisoner with A-1-A status, and Not a threat to society, and

12  further ignored that Petitioner's crime is not "particularly

13  egregious" by placing Petitioner in a Level II prison setting.

14      Again, In re Norman G. Morrall, supra, the Court concluded "

15  A refusal to consider the particular circumstances relevant to

16  an inmate's individual suitability for parole would be contrary

17  to law." Moreover, the Court in Biggs, supra, addressed the

18  Board's continued illegal usage of the crime and /or prior

19  history to justify a denial of parole:

20          "...a continued reliance... on an unchaging factor,
            the circumstances of the offense and conduct prior
21          to imprisonment, runs contrary to the rehabilitative
            goals espoused by the prison system and could result
22          in a due process violation." (Biggs, supra,334 F. 3d
            at 917).
23

24      In Biggs, supra, the appeal pursuant to his initial

25  suitability hearing. The Petitioner has now had four (4) Board

26  hearings and submits that his most recent denial rests solely

27  on the commitment offense, and therefore violates both State

28  and Federal due process. Most importantly, there is no

1    evidence that the public requires a lengthier period of

2    incarceration (please refer to PC § 3041 (b)), in relation to

3    other instances of the same crime (please refer to 3041.5).

4    Petitioner submits understanding and perspective of the

5    crime is compelled by the Board's own proportionately matrix

6    (please refer to CCR Division 2, 2403 (c). The matrix scale

7    and rating of the more common and routine variations of murder

8    appear to be codification of when a crime of this nature can

9    be more egregious than average. Petitioner submits that his

10   crime falls squarely in the matrix [category of "twenty-six"

11   (26) years. With post-conviction credits, Petitioner has

12   exceeded the matrix by more than four (4) years - and without

13   post conviction credit application, the Petitioner has served

14   his matrix. The Board fails in any attempt to substantiate

15   why Petitioner's crime is so heinous as to require that

16   Petitioner be expected time and time again from the general

17   rule that a parole date shall normally be set; please see In

18   re Ramirez, supra, wherein the court:

19            "The Board must weigh the inmate's criminal conduct
20        not against ordinary social norms, but against other
          instances of the same crime or crimes. (Ramirez,
21        supra, 94 Cal.App 4th at p. 570).

22   Petitioner's Psychiatric Report evidence, like Biggs supra,

23   is supportive of release; contrary to the Board's erroneous

24   and specious findings (please see Exhibit "B"). The Court in

25   Biggs, addressed the Board's illegal usage of needed therapy

26   and other illegal reasons to justify a highly illegal denial;

27   the Court concluded:

28

1      "The record in this case and the transcript of Biggs
2      hearing before the Board clearly show that many of
       the conclusions and factors relied on by the Board
3      were devoid of evidentiary basis, (Biggs, supra,
       334 F. 3d at p. 915)

4      The Court in Biggs, supra, went on to warn the Board that

5      while there was "some evidence" to use the crime as a basis

6      for denial at his initial hearing, the board's continued use

7      of the crime as a basis for continuous denials would be

8      violative of Bigg's Federal due process rights.    Petitioner

9      submits that the Board's sole unage of the initial commitment

10     offense and/or prior social history, as a continued basis to

11     deny him a parole date, has violated his 5th and 14th

12     Amendment rights under the United States Constitution to not

13     be deprived of his liberty.    The Court in Biggs, supra, also

14     held:

15         "[T]o ensure that a state created parole scheme
            serves the public interest purposes of rehabilitation
16          and deterrence, the Parole Board must be cognizant
            not only of the factors required by state statute
17          to be considered, but also the concepts embodied
            in the Constitution requiring due process of law..."
18          [please see e.g. in Greenholtz, 443 U.S. at 7-8.]."
            (Biggs, supra, 334 F.3d at p. 916)
19
           "The Parole Board's sole supportable reliance on
20          the gravity of the offense and conduct prior to
            imprisonment to justify denial of Parole
21          can be initially justified as fulfilling the
            requirements set forth by state law.    Over time
22          however, should Biggs continue to demonstrate
            exemplary behavior and evidence of rehabilitation,
23          denying him a parole date simply because of the
            nature of his offense and prior conduct would raise
24          serious questions involving his liberty interest
            in parole..." (id).
25

26     Petitioner also submits that the Board has adopted an anti

27     and / or no parole policy per se, or a policy of

28     underinclusion demonstrating a policy of systematic bias;

1  granting parole to approximately 1% (one percent) of the
2  lifers population, thus violating the legislative intent of
3  PC § 3041.5, that "... a parole release date shall normally be
4  set in manner that will provide uniform terms for offenders
5  with crimes of similar gravity and magnitude..." and,
6  petitioner's State and Federal due process rights as well
7  (please refer to In re Ramirez, supra, pg. 565). Petitioner
8  contends that the evidence behavior by a quasi-ljudicial
9  Board, of policy demonstrating an approximate 98.5% denial
10 rate, supports the premise that such a policy exists (i.e.,
11 anti and /or no parole policy, or, a policy of systematic
12 bias); this policy violates the strictures of substantive due
13 process.

14     If there is any question as to the meaning and legislative
15 intent of Penal Code §3041 as discussed above, which
16 Petitioner asserts that there clearly is not, then Petitioner
17 is entitled to the interpretation that Penal Code §3041 and 15
18 CCR §2400 et seq. apply to provide an exception to the
19 protected liberty interest in a presumption to release on
20 parole only if support by evidence that Petitioner poses a
21 threat of future violence if released. On the other hand, if
22 courts reasonably can so differ in the interpretation of the
23 statute and regulations at issue, then they must be deemed
24 overly vague, so as to violate Petitioner's constitutional
25 right to due process.

26        A.    The Some Evidence Relied On to Deny Parole
               Must be Relevant And Reliable In Establishing
27             Current, Unreasonable Threat to Public Safety.

28     In explaining what the "some evidence" standard meant, the

1    Rosenkrantz court stated that "[o]nly a modicum of evidence
2    required." Rosenkrantz, 29 Cal. 4th at 677. On its face, this
3    standard could thus be seen as remarkably broad - that the
4    barest speck or mote of evidence, no matter its relevance,
5    reliability, place in the context of other evidence or the
6    government's assessment of it - would be enough to completely
7    immunize Executive parole decisions from judicial review.
8    Such a reading, however, would effectively serve to nullify
9    the Rosenkrantz court's holding that courts are required to
10   review the factual basis of an Executive parole decision. An
11   unpacking of the "some evidence" standard ifself - both
12   conceptually and through a review of the application of this
13   standard in Rosenkrantz and its progeny - makes clear that
14   the standard is meaningful.  Properly understood, it strikes
15   an appropriate balance between judicial deference to difficult
16   Executive decisions and the protection of constitution liberty
17   interests.

18                        CONCLUSION

19      Petitioner did not receive a fair hearing from the Board,
20   nor wil he ever, because the results are predetermined, in
21   violation of Petitioner's 5th and 14th amendment rights under
22   the U.S. Constitution.  The denial of Petitioner's parole date
23   is no more than ipse dixit a sham.  Petitioner did not receive
24   the "individualized consideration" to which is
25   constitutionally entitled.  In re george Scott,
26   (Cal.App.1st.Dist) June 24, 2004, 119 Cal.App.4th. 871, 899.

27      The court must order Petitioner discharged and or released
28   or at the very least a decision within ten (10) days granting

1  Petitioner parole, setting his term "uniformly" as mandated by
2  the Legislature.

3                         PRAYER FOR RELIEF

4       1.   Issue an Order To Show Cause on an expedited basis;

5       2.   Appoint Counsel;

6       3.   Order Discovery;

7       4.   Conduct an Evidentary Hearing;

8       5.   Order Petitioner's appearance before the court;

9       6.   Order Petitioner discharged, or in the laternative
10  order petitioner by given a parole date, then released on
11  parole,

12      7.   Issue an Order for Declatory Relief

13      8.   Issue an Order for Injunctive Relief;

14      9.   Any other relief this court deems fair, just and
15  appropriate.

19  Date  8/14/06

23  *Brice Hogan*
          In Pro Se

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   _____

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:   (1) _____

       (2) _____

       (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____

_____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   The Board of Parole Hearings has eliminated the BPH Appeals Unit process

   and no longer allows the filing of Administrative Appeals of BPH denials

   of parole for indeterminately sentenced prisoners such as myself.

   There is No longer an administrative remedy, therefore exhaustion is

   impossible.

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
   *Attach documents that show you have exhausted your administrative remedies.*

**PETITION FOR WRIT OF HABEAS CORPUS**

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

          (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

          (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

    There has been no delays

16. Are you presently represented by counsel? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

    This Court has original jurisdiction in habeas proceedings

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 8/14/06

▶ _Brue Glaspar_
(SIGNATURE OF PETITIONER)

# EXHIBIT   "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number C-26529
)
BRICE GLASGOW )
)
_____)

# INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 2, 2005

8:45 A.M.

PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Chuck Wolk, Deputy Commissioner

OTHERS PRESENT:

Mr. Brice Glasgow, Inmate
Mr. Anthony Hall, Attorney for Inmate
Mr. Ronald Rico, Deputy District Attorney
Ms. Joyce Nedde, Observer
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

RECEIVED
DEC 8 2005
BY: CTF/BPH

Sue Gerdes, Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 11 |
| Pre-Commitment Factors | 18 |
| Parole Plans | 22 |
| Post-Commitment Factors | 32 |
| Closing Statements | 54 |
| Recess | 64 |
| Decision | 65 |
| Adjournment | 69 |
| Transcriber Certification | 70 |

--oOo--

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DEPUTY COMMISSIONER WOLK:** We're on |
| 3 | record. |
| 4 | **PRESIDING COMMISSIONER ST. JULIEN:** It's |
| 5 | 8:45 A.M. and this is a Subsequent Parole |
| 6 | Hearing for Brice Glasgow CDC number C-26529. |
| 7 | Today is November 2nd, 2005 and we are at the |
| 8 | Correctional Training Facility in Soledad.  The |
| 9 | inmate was received on February 19th, 1981 for a |
| 10 | life term starting date (indiscernible) 17th, |
| 11 | 1983 from the County of Santa Clara case number |
| 12 | 75071 count one Penal Code section violation 187 |
| 13 | murder first, count two assault with a deadly |
| 14 | weapon Penal Code section 245A, count two as |
| 15 | well, use of a firearm, Penal Code section |
| 16 | violation 12022.5 and inmates are all from the |
| 17 | County of Santa Clara case number 75079.  The |
| 18 | inmate received a term of 25 years to life plus |
| 19 | five years.  First eligible parole date March |
| 20 | 18th, 1998.  Is that correct? |
| 21 | **INMATE GLASGOW:** (indiscernible) |
| 22 | **PRESIDING COMMISSIONER ST. JULIEN:** We |
| 23 | might need to have (indiscernible).  We are tape |
| 24 | recording the hearing so we are going to go |
| 25 | around the room and introduce our selves.  We |
| 26 | will say our first and last name, spell our last |
| 27 | name and if you could also state your CDC number |

2

1    after you spell your last name.  My name is
2    Tracey St. Julien S-T capital J-U-L-I-E-N
3    Commissioner.

4         DEPUTY COMMISSIONER WOLK:  Chuck Wolk W-
5    O-L-K Deputy Commissioner.

6         ATTORNEY HALL:  Anthony Hall H-A-L-L
7    attorney for Mr. Glasgow.

8         INMATE GLASGOW:  Glasgow  C-26529 G-L-A-
9    S-G-O-W.

10        PRESIDING COMMISSIONER ST. JULIEN:  Your
11   first name.

12        INMATE GLASGOW:  Brice B-R-I-C-E.

13        PRESIDING COMMISSIONER ST. JULIEN:  Mr.
14   Rico.

15        DEPUTY DISTRICT ATTORNEY RICO:  Thank you
16   Commissioner.  Ronald Rico R-I-C-O Deputy
17   District Attorney for Santa Clara County.  And I
18   have a second individual in the room.  The
19   former trial prosecutor in the case who is here
20   as an observer only.  I will let the identify
21   herself.

22        MS. NEDDE: My name is Joyce Nedde N-E-D-
23   D-E.

24        PRESIDING COMMISSIONER ST. JULIEN:  And
25   we also have two correctional officers in the
26   room who are here for security purposes.  And
27   Mr. Glasgow, that form in front of you that

3

1    addresses your ADA rights I need you to please

2    read that aloud and then I am going to ask you

3    some questions about what you have read.

4          INMATE GLASGOW:  The Americans with

5    Disabilities Act, AFA, is a law to help people

6    with disabilities.  Disabilities are problems

7    that make it harder for some people to see,

8    hear, breathe, talk, walk, learn, think, work or

9    take care of them selves than it is for others.

10   No one can be kept out of pubic places or

11   activities because of a disability.  If you have

12   a disability you have the right to ask for help

13   to get ready for your court or parole hearing

14   and BPT hearing.  To get to the hearing, talk,

15   read forms and papers and understand the hearing

16   process.  The BPT will look at what you ask for

17   to make sure that you have a disability that is

18   covered by the ADA and that you have asked for

19   the right kind of help.  If you do not get help

20   or if you don't think you got the kind of help

21   you need, ask for a BPT 1074 grievance form.

22   You can also get help to fill it out.

23          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

24   I note that on May 3rd, 2004 you signed a BPT

25   form 1073 indicating that you do not have

26   disabilities, is that still correct?

27          INMATE GLASGOW:  What it is I have a

4

1    bladder infection and I was concerned

2    (indiscernible) an enlargement in my lower

3    (indiscernible) just an infection.

4    (indiscernible).

5         PRESIDING COMMISSIONER ST. JULIEN:   Are

6    you taking antibiotics?

7         INMATE GLASGOW:  Yes I did.

8         PRESIDING COMMISSIONER ST. JULIEN:   You

9    said that you are currently taking medication.

10   What are you currently taking?

11        INMATE GLASGOW:  (indiscernible)

12        PRESIDING COMMISSIONER ST. JULIEN:

13   Probably and antibiotic.  And is that medication

14   giving you any side affects?

15        INMATE GLASGOW:  Dries me up.

16        PRESIDING COMMISSIONER ST. JULIEN:   Okay,

17   makes you thirsty.  Is that uncomfortable enough

18   that you can't participate in the hearing today?

19        INMATE GLASGOW:  No.

20        PRESIDING COMMISSIONER ST. JULIEN:   Now I

21   noticed that you are wearing glasses, with those

22   glasses on, eyeglasses, can you see around the

23   room clearly?

24        INMATE GLASGOW:  Yes.

25        PRESIDING COMMISSIONER ST. JULIEN:   Okay,

26   and you can read?

27        INMATE GLASGOW:  Yes.

5

1          **PRESIDING COMMISSIONER ST. JULIEN:**  And

2  you can see the (indiscernible).

3          **INMATE GLASGOW:**  Yes Ma'am.

4          **PRESIDING COMMISSIONER ST. JULIEN:**  Do

5  you have any hearing impairments?

6          **INMATE GLASGOW:**  No.

7          **PRESIDING COMMISSIONER ST. JULIEN:**

8  (indiscernible).

9          **ATTORNEY HALL:**  It has to do with his

10  medical condition.  In the 1073 he mentioned he

11  has frequent (indiscernible).

12          **PRESIDING COMMISSIONER ST. JULIEN:**  And

13  that's (indiscernible).  If you feel the need

14  that you need to be excused for a few minutes or

15  whatever while we are at the hearing today you

16  can just ask and we can take a recess.  Okay?

17          **INMATE GLASGOW:**  Yes Ma'am.

18          **PRESIDING COMMISSIONER ST. JULIEN:**  And

19  do you know what the Triple CMS and the EOP

20  programs are?

21          **INMATE GLASGOW:**  I think it has something

22  to do with mental health.

23          **PRESIDING COMMISSIONER ST. JULIEN:**  Yes

24  exactly.  They are the mental health services

25  programs that the department offers.  Have you

26  ever been a part of those programs?

27          **INMATE GLASGOW:**  No Ma'am.

6

1         PRESIDING COMMISSIONER ST. JULIEN:  And

2    have you ever taken any psychotropic

3    medications?

4         INMATE GLASGOW:  No.

5         PRESIDING COMMISSIONER ST. JULIEN:  And

6    you did mention that you are on medicines now

7    for bladder issues.  Are you taking any other

8    medications?

9         INMATE GLASGOW:  Hyper tension

10   (indiscernible).

11        PRESIDING COMMISSIONER ST. JULIEN:  And

12   again, do the medications that you are taking

13   for that condition will they cause you not to be

14   able to participate in the hearing today?

15        INMATE GLASGOW:  No.

16        PRESIDING COMMISSIONER ST. JULIEN:  And

17   Mr. Hall, are you satisfied that your client's

18   ADA rights have met?

19        ATTORNEY HALL:  Yes I do.

20        PRESIDING COMMISSIONER ST. JULIEN:  I am

21   going to go ahead then and give you an outline

22   of the hearing procedure today.  And I will note

23   that you (indiscernible) ADA issues that you do

24   have your GED.

25        INMATE GLASGOW:  Yes.

26        PRESIDING COMMISSIONER ST. JULIEN:  You

27   didn't have any problem (indiscernible).  We are

7

1    conducting the hearing pursuant to Penal Code
2    sections 3041 and 3042 of the rules and
3    regulations of the Board of Parole Hearings
4    governing parole consideration hearings for life
5    inmates.  The purpose of the hearing today is to
6    consider your suitability for parole.  We will
7    reach a decision today and inform you whether or
8    not we find you suitable or the reasons for that
9    decision.  If you are found suitable for parole
10   the length of your confinement will be explained
11   to you.  The hearing will be conducted in two
12   parts.  First I am going to discuss the number
13   and the nature of crimes you were committed for,
14   your prior criminal and social history and your
15   parole plans and letters of support or
16   opposition that you may have.  Then Commission
17   Wolk will discuss with you your behavior and
18   programming history as well as your
19   psychological evaluations and counselors
20   reports.  When that is done the District
21   Attorney and your attorney will be able to ask
22   you questions and then the District Attorney
23   actually asks the questions to the panel and you
24   answer in turn to us.  And then the District
25   Attorney, your attorney and you will be given an
26   opportunity to make a final statement as to your
27   suitability.  We will recess to deliberate and

8

1    when we reach a decision we will reconvene the

2    hearing and announce our decision.  The

3    California Code of Regulations state that

4    regardless of time served, a life inmate shall

5    be found unsuitable for and denied parole if in

6    the judgment of the panel the inmate still pose

7    an unreasonable risk of danger to society if

8    released from prison.  You also have certain

9    rights.  Those rights include the right to a

10   timely notice of this hearing, the right to

11   review your Central File, and the right to

12   present relevant documents.  Mr. Hall, have you

13   client's rights been met?

14        **ATTORNEY HALL:**  Yes they have.

15        **PRESIDING COMMISSIONER ST. JULIEN:**  You

16   also have the right to be heard by an impartial

17   panel.  Do you have any objections to today's

18   panel?

19        **INMATE GLASGOW:**  No Ma'am.

20        **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

21   Hall?

22        **ATTORNEY HALL:**  No objections.

23        **PRESIDING COMMISSIONER ST. JULIEN:**  You

24   will receive a copy of our written tentative

25   decision today and that decision is subject to

26   review by the decision review unit and the

27   entire board meeting as a whole. That decision

9

1  becomes effective within 120 days.  In the

2  future you will receive a copy of that decision

3  and a copy of the transcripts once they are

4  transcribed.  The board no longer has an appeals

5  process.  So if you have any objections or

6  complaints about anything that happens here

7  today you need to file those directly to the

8  court.  You can find information on how going

9  about doing that in the prison law library.

10  (indiscernible) Administrative Appeals

11  Correspondence and Grievances Concerning BPT

12  Hearings.  You are not required to admit your

13  offense or discuss your offense if you do not

14  wish to do so.  However, we accept as truth the

15  findings of the court.  We invite you to discuss

16  the facts and circumstances of the crime if you

17  wish.  We will consider and review any prior

18  statements you've made regarding your offense in

19  determining your suitability for parole.

20  Commissioner Wolk, is there confidential

21  information?

22         **DEPUTY COMMISSIONER WOLK:**  Not that we

23  will be using today.

24         **PRESIDING COMMISSIONER ST. JULIEN:**

25  Earlier I passed a checklist marked exhibit one

26  to your attorney and I note that I received it

27  back.  Are all of those documents in order?

10

1            **ATTORNEY HALL:**  Yes we have those.

2            **PRESIDING COMMISSIONER ST. JULIEN:**  And

3    Mr. Rico I am looking at a hearing checklist

4    that has gone by, it looks like the name on here

5    is Villego V-I-L-L-E-G-O and it's dated maybe

6    9/27/05.

7            **DEPUTY DISTRICT ATTORNEY RICO:**  I have

8    that same checklist and those documents and I am

9    prepared to --

10           **PRESIDING COMMISSIONER ST. JULIEN:** Okay

11   thank you.  Do you have any additional

12   documents?

13           **ATTORNEY HALL:**  Yes Commissioner we have

14   a chrono and a checklist and a couple other

15   documents.

16           **PRESIDING COMMISSIONER ST. JULIEN:**  One

17   of the officers will -- And do you have any

18   preliminary objections?

19           **DEPUTY DISTRICT ATTORNEY RICO:**  There

20   isn't any.

21           **PRESIDING COMMISSIONER ST. JULIEN:**  Thank

22   you.  And will Mr. Glasgow be speaking with us

23   today?

24           **ATTORNEY HALL:**  Yes he will.

25           **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

26   Glasgow I need you to get an oath.  Do you

27   solemnly swear or affirm that the testimony you

11

1   give at this hearing will be the truth, the

2   whole truth and nothing but the truth?

3          INMATE GLASGOW:  Yes Ma'am.

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

5   I am going to go ahead then and read the summary

6   of the crime as it appears in the February 2003

7   board report.  And that report was prepared by

8   Correction Counselor (indiscernible) last name

9   Minor M-I-N-E-R and approved by the

10  classification (indiscernible).  It states that

11  on March 4th, 1980 the Palo Alto police

12  department officers responded to the report of a

13  shooting.  On arrival at the scene, the officers

14  observed the victim (indiscernible) Collins on

15  the floor of the bedroom.  Victim Collins had

16  been shot several times (indiscernible).  No

17  vital signs were detected and the Palo Alto

18  paramedics were (indiscernible).  At this time

19  the investigating officers made contact with the

20  victim Patricia Watts (indiscernible) who was

21  sitting on a fold out bed (indiscernible)

22  apartment.  Watts had suffered a gunshot wound

23  to her back.  Watts explained that at

24  approximately five A.M. she heard a knock on the

25  door and observed the defendant (indiscernible)

26  inmate in front of the apartment.  She indicated

27  that she would not open the door at that time

12

1   and returning to bed she remained that way until

2   morning.  The defendant returned and she allowed

3   him to enter the apartment.  She indicated that

4   he sat in the living room for approximately ten

5   minutes and played with her daughter.

6   (indiscernible) bathroom in the hallway of the

7   apartment and during this time she heard a knock

8   at the back door.  The defendant then allowed

9   Edmond Duhart D-U-H-A-R-T to enter the

10  apartment.  Watts explained the defendant then

11  began walking toward the hallway and she

12  observed that he had a gun in his hand.  She

13  indicated that she ran to the bedroom and

14  attempted to arouse Collins however the

15  defendant was at the door to the bedroom and

16  attempted to get in.  She related that the

17  defendant pushed his way into the bedroom and

18  during the ensuing struggle the defendant was

19  firing (indiscernible) at Collins and as she

20  attempted to protect the victim she was also

21  wounded.  Victim Watts relayed that during this

22  time that she was in bedroom, the defendant call

23  for Duhart to come into the room and remove

24  victim Watts indicating that he tried to pull

25  her off victim Collins while the defendant was

26  still shooting at the victim.  She indicated

27  that the defendant fired several shots from the

13

1    weapon (indiscernible).  She then related that

2    defendant Duhart then left the apartment.  So

3    apparently your (indiscernible) so we will have

4    to (indiscernible).

5        DEPUTY COMMISSIONER WOLK:  We are back on

6    record.

7        PRESIDING COMMISSIONER ST. JULIEN:  There

8    seems to be some discrepancies between your

9    version of what happened that day and what's on

10   the record here in terms of Ms. Watts and her

11   testimony.  Do you recall that?

12       INMATE GLASGOW:  Ya, I am not sure what

13   the Commissioner is mentioning.

14       PRESIDING COMMISSIONER ST. JULIEN:  Well

15   the prior transcripts you mentioned that Ms.

16   Watts was subsequently convicted of perjury for

17   giving false testimony in your case.

18       INMATE GLASGOW:  Yes.

19       PRESIDING COMMISSIONER ST. JULIEN:  So

20   did you shoot Mr. Collins?

21       INMATE GLASGOW:  Yes, yes I did.

22       PRESIDING COMMISSIONER ST. JULIEN:  And

23   did you shoot him when he was unarmed?

24       INMATE GLASGOW:  I believe he was armed.

25   This is what the discrepancy is.

26       PRESIDING COMMISSIONER ST. JULIEN:  So

27   why don't you tell us what happened.

14

1          INMATE GLASGOW:  He came to the door and

2     he had somethin in his hand (indiscernible)bein

3     fired (indiscernible) and we was fighten and she

4     was pulling on it.

5          PRESIDING COMMISSIONER ST. JULIEN:  So it

6     was the three of you correct?

7          INMATE GLASGOW:  Ya.

8          PRESIDING COMMISSIONER ST. JULIEN:  Mr.

9     Collins, Ms. Watts, and yourself?

10          INMATE GLASGOW:  Yes Ma'am.

11          PRESIDING COMMISSIONER ST. JULIEN:  And

12     whose gun was it?

13          INMATE GLASGOW:  It was my gun.

14          PRESIDING COMMISSIONER ST. JULIEN:  And

15     did you bring it to the house with you?

16          INMATE GLASGOW:  Yes Ma'am.

17          PRESIDING COMMISSIONER ST. JULIEN:  And

18     how did they know that you had a gun?

19          INMATE GLASGOW:  They didn't know, until

20     after was bein fired.

21          PRESIDING COMMISSIONER ST. JULIEN:  So

22     you all just kind of got in a fight?

23          INMATE GLASGOW:  No, when I went to open

24     the door for Mr. Dunhart evidentially she woke

25     Mr. Collins up.  I was in the bathroom and

26     that's when we started fighten.

27          PRESIDING COMMISSIONER ST. JULIEN:  So

15

1   you came out of the bathroom then did Mr.

2   Collins approach you at start physically

3   fighting with you?

4         INMATE GLASGOW:  He had somethin in his

5   had.

6         PRESIDING COMMISSIONER ST. JULIEN:  Do

7   you know what that was?

8         INMATE GLASGOW:  I thought it was a gun,

9   maybe it was a gun.  But I was afraid of it and

10  the fear might a took over.  But I did shoot

11  him.

12         PRESIDING COMMISSIONER ST. JULIEN:  How

13  many times did you shoot him?

14         INMATE GLASGOW:  I don't know nothin

15  about nothin.

16         PRESIDING COMMISSIONER ST. JULIEN:  Do

17  you remember how Ms. Watts got shot?

18         INMATE GLASGOW:  No I don't.  I didn't

19  know she been shot.

20         PRESIDING COMMISSIONER ST. JULIEN:  So

21  were there just bullets going off?

22         INMATE GLASGOW:  She was jerking on his

23  arm and all three of us was fighten.  It's hard

24  for me to describe but I was afraid and I don't

25  think she intentionally lied.  I think she was

26  hollering and screaming.  I know I was afraid of

27  I had contact with this man before.

16

1     PRESIDING COMMISSIONER ST. JULIEN:  So

2  you were afraid of him, did he live there?  Did

3  he live with Ms. Watts?

4     INMATE GLASGOW:  No, they just

5  occasionally stayed together.

6     PRESIDING COMMISSIONER ST. JULIEN:  Did

7  you know that he was there?

8     INMATE GLASGOW:  No.

9     PRESIDING COMMISSIONER ST. JULIEN:  So

10  when you went to Ms. Watts' apartment and you

11  spent some time with her child and all that you

12  didn't know that Collins' was there?

13     INMATE GLASGOW:  No.

14     DEPUTY COMMISSIONER WOLK:  What were you

15  doing there?

16     INMATE GLASGOW:  I just stopped there to

17  see my niece.  I heard she was havin trouble.

18     DEPUTY COMMISSIONER WOLK:  The girl that

19  you were talking with in the living room was

20  your niece?

21     INMATE GLASGOW:  Yes, it my gran --

22     PRESIDING COMMISSIONER ST. JULIEN:  So do

23  remember pulling the trigger?

24     INMATE GLASGOW:  I had my hand on the

25  trigger and she was pulling the gun.

26     PRESIDING COMMISSIONER ST. JULIEN:  The

27  gun was fired several times.

17

1        **INMATE GLASGOW:**  Ya but I never did stand

2    back and fire all them in his body or anything

3    that the crime say.  She was hollering and

4    screaming and pulling on the gun.

5        **PRESIDING COMMISSIONER ST. JULIEN:**  So

6    how do you feel about this crime now?

7        **INMATE GLASGOW:**  I feel like I am

8    responsible for it and I sorry it had to happen.

9    It affected me and it affected my family and it

10    affected his family.  And I know that they

11    suffer from it and so have I.  If I could redo

12    it again I would do it much different.

13        **PRESIDING COMMISSIONER ST. JULIEN:**  And

14    how would you redo it?

15        **INMATE GLASGOW:**  I would take the chance

16    in turning myself over to the care of God and I

17    wouldn't leave the scene like I did.

18        **PRESIDING COMMISSIONER ST. JULIEN:**  And

19    why do you think that you left?

20        **INMATE GLASGOW:**  I was afraid.  Fear took

21    over and I was afraid.  I did shoot the man and

22    I proves I was (indiscernible).

23        **PRESIDING COMMISSIONER ST. JULIEN:**  In

24    some of letters from law enforcement following

25    your arrest it said that you didn't show any

26    remorse about shooting Mr. Collins and Ms.

27    Watts.  Do you remember that?  That you didn't

18

1   show that you were sorry for killing Mr.

2   Collins?

3         INMATE GLASGOW:  It was murder, I killed

4   a man I am sorry. That's my family.  I love my

5   niece.  I (indiscernible) that's why I stopped.

6         DEPUTY COMMISSIONER WOLK:  Why were you

7   carrying a gun?

8         INMATE GLASGOW:  Palo Alto is a very bad

9   place.  When I go there, I been jumped before I

10   been a couple of times.  It's a bad place and

11   they have a lot of after hours (indiscernible).

12         PRESIDING COMMISSIONER ST. JULIEN:  Up

13   until that shooting you were in trouble a lot.

14         INMATE GLASGOW:  Yes.

15         PRESIDING COMMISSIONER ST. JULIEN:  I

16   have over 82 arrests.  That is a huge, huge

17   extensive arrest record.  Can you explain that?

18         INMATE GLASGOW:  I (indiscernible).

19         PRESIDING COMMISSIONER ST. JULIEN:  A lot

20   of burglaries, forgery, carrying concealed

21   weapons, battery.  So what kind of life were you

22   leading?

23         INMATE GLASGOW:  Terrible life Ma'am.

24         PRESIDING COMMISSIONER ST. JULIEN:  And

25   then that we have that you had a heroine

26   addiction for over 23 years?

27         INMATE GLASGOW:  Yes, that's part of the

19

1    reason.

2           PRESIDING COMMISSIONER ST. JULIEN:  So

3    did you become addicted to heroine?

4           INMATE GLASGOW:  Living (indiscernible).

5           PRESIDING COMMISSIONER ST. JULIEN:  But

6    there are -- how many other people did you know

7    from the same environment and the same

8    conditions that became addicted to heroine?

9           INMATE GLASGOW:  All my associates.

10          PRESIDING COMMISSIONER ST. JULIEN:  What

11   about member's or your family?

12          INMATE GLASGOW:  No.

13          PRESIDING COMMISSIONER ST. JULIEN:  So

14   what made you different from them?

15          INMATE GLASGOW:  I guess the time and

16   era.

17          PRESIDING COMMISSIONER ST. JULIEN:  What

18   do you think was in your character or your

19   personality or your life that led you to become

20   addicted to heroine and do all these crimes

21   other than the conditions that you were living

22   in?

23          INMATE GLASGOW:  Well my association in a

24   count of (indiscernible) hanging around

25   different kinds of people.  When I was young I

26   didn't have a father figure.  So I thought about

27   that and that the only reason I can come up

20

1   with.

2          PRESIDING COMMISSIONER ST. JULIEN:  But

3   do you think that there are other people who

4   were in your same situation and who didn't lead

5   this kind of life of extensive heroine use as

6   well as having such a long criminal history?

7   What was in you?  Do you know what was in your

8   personality?

9          INMATE GLASGOW:  I was rebellious

10  (indiscernible).

11         PRESIDING COMMISSIONER ST. JULIEN:  And

12  rebellious toward what?

13         INMATE GLASGOW:  I was rebellious toward

14  (indiscernible) my mother gave me and rebellious

15  toward authority.

16         PRESIDING COMMISSIONER ST. JULIEN:  So

17  why was it difficult for you to want to accept

18  authority?

19         INMATE GLASGOW:  Well I just kept

20  rebelling when I was young.  (indiscernible)

21         PRESIDING COMMISSIONER ST. JULIEN:  So is

22  going in and out of jail and using heroine, is

23  that an easy life?

24         INMATE GLASGOW:  It was very hard.

25         PRESIDING COMMISSIONER ST. JULIEN:  I

26  note that you had gone to recovery centers

27  periodically but apparently they didn't seem to

21

1   work for you.  So it was a hard life and you did

2   seek out help every now and then.  What do you

3   think still made you pursue this path?

4          INMATE GLASGOW:  I didn't accept, I

5   thought about that to.  I didn't accept God in

6   my life then.  To follow in his steps I have

7   accepted God in my life now.

8          PRESIDING COMMISSIONER ST. JULIEN:  What

9   do you think took you so long?

10         INMATE GLASGOW:  Well the drugs probably

11  was strong and just kept me going back and

12  forth.  I know it wasn't right and I know it

13  wasn't helpful and I continue to seek some kind

14  of help.

15         PRESIDING COMMISSIONER ST. JULIEN:  With

16  this very, very long history of criminal drug

17  problems with drug use, why should we think that

18  you are different today?

19         INMATE GLASGOW:  I think I learned my

20  lesson.  I think I have matured.  I think that I

21  ready to accept responsibility.

22         PRESIDING COMMISSIONER ST. JULIEN:  How

23  old were you when this crime was committed, when

24  Mr. Collins was shot?

25         INMATE GLASGOW:  26 years ago, 1980.

26         PRESIDING COMMISSIONER ST. JULIEN:  So

27  how old were you then?

22

1        **INMATE GLASGOW:**  Maybe 38.

2        **PRESIDING COMMISSIONER ST. JULIEN:**  So

3   that's -- you lived pretty much half your life

4   on the wrong track.

5        **INMATE GLASGOW:**  Yes Ma'am, I know it.  I

6   don't have very many years left and I want to do

7   it right.

8        **PRESIDING COMMISSIONER ST. JULIEN:**  So

9   when you were on the outside and you working,

10  you were a construction laborer and a master

11  barber?

12       **INMATE GLASGOW:**  Yes Ma'am.

13       **PRESIDING COMMISSIONER ST. JULIEN:**  And

14  at the time of this crime you were married to

15  Yvette and you have one child.  Was it a boy or

16  a girl?

17       **INMATE GLASGOW:**  Girl.

18       **PRESIDING COMMISSIONER ST. JULIEN:**  Is it

19  --

20       **INMATE GLASGOW:**  Abidania.

21       **PRESIDING COMMISSIONER ST. JULIEN:**

22  Abidania.  And how is she doing now?

23       **INMATE GLASGOW:**  She very

24  (indiscernible).  She lives in Santa Clara

25  County.

26       **PRESIDING COMMISSIONER ST. JULIEN:**  And

27  are you currently married?

23

1           INMATE GLASGOW:  Yes Ma'am.

2           PRESIDING COMMISSIONER ST. JULIEN:  And

3   is that still to Yvette?

4           INMATE GLASGOW:  No Ma'am.  I am married

5   to Diane in Stockton.

6           DEPUTY COMMISSIONER WOLK:  You just got

7   married didn't you, couple years ago?

8           INMATE GLASGOW:  Couple years ago.  Yes

9   Sir.

10          PRESIDING COMMISSIONER ST. JULIEN:  And

11  how did you meet Diane?

12          INMATE GLASGOW:  I've known her for

13  awhile, since 1963.

14          PRESIDING COMMISSIONER ST. JULIEN:  And

15  if you were paroled you would choose to live

16  with Diane?

17          INMATE GLASGOW:  Yes Ma'am.

18          PRESIDING COMMISSIONER ST. JULIEN:  She

19  lives in Stockton?

20          INMATE GLASGOW:  Yes Ma'am.

21          PRESIDING COMMISSIONER ST. JULIEN:  If

22  you couldn't go to Stockton and you lived with

23  your brother in law Louis in San Jose?

24          INMATE GLASGOW:  Yes Ma'am.

25          PRESIDING COMMISSIONER ST. JULIEN:  And

26  in terms of employment you would work at Big

27  Ed's Furniture and that is in Stockton?  And the

24

1  owner of Big Ed's is Edward Smith and he is

2  married to your grand daughter?

3          INMATE GLASGOW:  Yes Ma'am.

4          PRESIDING COMMISSIONER ST. JULIEN:  And

5  then you also have a job offer from Irving

6  Goodwin and he has a non-profit organization in

7  Menlo Park, (indiscernible) County.  Then it

8  notes that you also have your sponsor?  Is that

9  in NA or AA sponsor?

10          INMATE GLASGOW:  NA.

11          PRESIDING COMMISSIONER ST. JULIEN:

12  (indiscernible) Sponsor is your step daughter.

13          INMATE GLASGOW:  Yes Ma'am.

14          PRESIDING COMMISSIONER ST. JULIEN:  And

15  then apparently you have written a letter of

16  remorse to the families of the victims.

17          INMATE GLASGOW:  Three times.

18          PRESIDING COMMISSIONER ST. JULIEN:  And

19  what happened to Patricia Watts?  She changed to

20  another last name now right?

21          INMATE GLASGOW:  She is deceased.

22          PRESIDING COMMISSIONER ST. JULIEN:  Oh

23  she died?

24          INMATE GLASGOW:  Yes Ma'am.

25          PRESIDING COMMISSIONER ST. JULIEN:  Of

26  what?

27          INMATE GLASGOW:  I am not certain.

25

1          PRESIDING COMMISSIONER ST. JULIEN:  Do

2    you know how long ago she died?

3          INMATE GLASGOW:  About six years prior to

4    this hearing.

5          PRESIDING COMMISSIONER ST. JULIEN:  So

6    for your support letters, you have a petition

7    that was done on your behalf and I think that

8    your wife Diane had initiated the petition and

9    on the cover she did reasons why you should be

10   paroled and these are taken from some

11   (indiscernible).  And she has, I think there are

12   two pages of the petition.  It looks like we

13   have about 50 signatures.

14         INMATE GLASGOW:  Ya.

15         PRESIDING COMMISSIONER ST. JULIEN:  A

16   petition of people who have signed between 2004

17   and 2005 for you to (indiscernible).  That must

18   be a nice feeling to have that type of support.

19         INMATE GLASGOW:  Yes it does.

20         PRESIDING COMMISSIONER ST. JULIEN:  And

21   then we also have a letter from Jay Monteo-Mery,

22   is this a hyphenated name and the last name is

23   M-O-N-T-E-O dash M-E-R-Y and she is your great

24   grand daughter.  Is that correct?

25         INMATE GLASGOW:  Yes Ma'am.

26         PRESIDING COMMISSIONER ST. JULIEN:  She

27   says that I know that he will be a good grand

26

1    father.  I want him to come home.  She is eight

2    years old.  Then we have a letter from the

3    Veterans Emergency Housing.  Now were you a

4    veteran?

5             INMATE GLASGOW:  No Ma'am.

6             PRESIDING COMMISSIONER ST. JULIEN:  It's

7    signed by Irving Goodwin  G-O-O-D-W-I-N and he

8    is the (indiscernible) and I am not sure where

9    it is.  It must be in the --

10            INMATE GLASGOW:  Palo Alto.

11            PRESIDING COMMISSIONER ST. JULIEN:  And

12   this is a letter of employment and Mr. Goodwin

13   says that he is the Chief Executive Officer of a

14   non-profit organization and I have committed

15   myself to providing steady employment in the

16   areas (indiscernible).  Mr. Glasgow will be

17   working Monday through Friday from eight to four

18   thirty at the rate of eleven dollars an hour

19   (indiscernible).

20            DEPUTY COMMISSIONER WOLK:  Are we still

21   on record?

22            PRESIDING COMMISSIONER ST. JULIEN:  I

23   think we have to stop.

24            DEPUTY COMMISSIONER WOLK:  We are back on

25   record.

26            PRESIDING COMMISSIONER ST. JULIEN:  Okay,

27   so we are going through the letters here and we

27

1   have a (indiscernible) they were offering you

2   employment and then Mr. Goodwin also explained

3   that he knows that you will have different

4   restrictions on parole and he is willing to

5   adjust your work schedule. And then Big Ed, I

6   think that I read that one already. Then Lloyd

7   Woods who is your brother in law and he says, my

8   brother in law Mr. Brice Glasgow has shown an

9   overwhelming amount of remorse over the crime

10   which he committed over 20 years ago. While

11   serving his sentence he has missed out on the

12   birth of his daughter, he has missed birthdays,

13   holidays and graduations. Brice (indiscernible)

14   death of his mother. He has missed out on

15   spending time with her and his family during her

16   illness which caused her death. Not being

17   allowed to take part in the funeral services for

18   his mother was very important to Brice. We love

19   Brice and miss him and would love for him to

20   come home. And then Diann Glasgow and that is

21   D-I-A-N-N and she is your wife and she lives in

22   Stockton. She says that we met in 1962 and I

23   have (indiscernible) for years. I have been a

24   licensed cosmetologist for 30 years and she has

25   lived in her current home for 16 years. She

26   goes on to say, he has my support emotionally

27   and financially. I will encourage him and

28

1   assist him as needed which is accompany him to

2   appointments and provide him transportation

3   (indiscernible).  Brice has always been a very

4   nice to me and treated me with respect.  I feel

5   that he has learned from his mistakes and will

6   be a good citizen.  (indiscernible) excellent

7   youth advisor and a faithful member of Second

8   Baptist Church (indiscernible).  And then Denise

9   Sanders S-A-N-D-E-R-S and she is your step

10  daughter and she says that she is a licensed by

11  the board of vocational nurses and psychiatric

12  technician.  A major part of my training was at

13  Recovery House an alcohol and drug treatment

14  facility.  I am very familiar with the 12 step

15  alcohol and drug treatment program.  And she

16  says that I am willing to sponsor him upon his

17  release on parole for the purpose of his

18  continued sobriety.  I have also talked to him

19  about sharing his experiences with troubled

20  youth in the community.  He has expressed a

21  sincere desire to become a valuable part of our

22  community (indiscernible).  And then there is a

23  letter from Jeffry Glasgow and he must be a

24  relative of yours.  How is he related to you?

25          INMATE GLASGOW:  My brother's son.

26          PRESIDING COMMISSIONER ST. JULIEN:  Okay

27  your nephew.

29

1      **INMATE GLASGOW:**  Yes.

2      **PRESIDING COMMISSIONER ST. JULIEN:**  He

3  says dear Brice we have received your letter of

4  remorse after many meetings and discussion we

5  have agreed to welcome you back into the family

6  under certain conditions.  Number one, change

7  your environment.  I don't know what that means.

8  Number two find employment.  Number three

9  continue to be involved with some kind of

10  sobriety program (indiscernible) parole.  You

11  have changed into another person and we want you

12  to keep up the good work.  And then this is a

13  copy of (indiscernible).  Did I miss any

14  letters?  Is there anything -- .  We have -- the

15  board sends out 3042 notices and those are noted

16  that go to law enforcement and the courts

17  letting them know that you are having this

18  parole consideration hearing and we have a

19  letter here from the Palo Alto police department

20  and it is signed by Agent Natasha Powers P-O-W-

21  E-R-S and she is the detective from robbery

22  homicide and she says actually, she has some

23  names mixed up here in this letter and but they

24  are recommending against the parole Vosgow and

25  she has your name spelled wrong Mr. Vosgow is

26  convicted of intentionally killing Ralph Collins

27  and inflicting a gunshot wound to the back of

30

1   his niece Patricia Watts in March of 1980.

2         DEPUTY DISTRICT ATTORNEY RICO:  Sorry to

3   interrupt but I had faxed to me a copy of a

4   letter signed by Agent Robert Vonilla from the

5   police department that may supersede that.  Do

6   you have that?

7         PRESIDING COMMISSIONER ST. JULIEN:  Yes I

8   have it but it came in the late mail and it

9   doesn't have a date.

10         DEPUTY DISTRICT ATTORNEY RICO:  I don't

11  see a date on it but I just received it and I

12  note that the former letter was March 28th of 05

13  and I think that the letter that was in the late

14  mail is the updated letter that may resolve

15  those issues.

16         PRESIDING COMMISSIONER ST. JULIEN:  I'm

17  sorry.

18         ATTORNEY HALL:  What letter is that

19  Commissioner?

20         PRESIDING COMMISSIONER ST. JULIEN:  It's

21  the very last letter in the updated materials

22  and it's signed by Agent Robert Vonilla V-O-N-I-

23  L-L-A.

24         ATTORNEY HALL:  It looks like November 2nd

25  which would be today's date.  And we would

26  object to its use at this hearing.

27         PRESIDING COMMISSIONER ST. JULIEN:  Both

31

1    letters I think pretty much contain the same
2    information.  Ms. Powers's letter however has
3    some errors in it.  But like I said before I
4    think we know the jest of this and Mr. Vonilla's
5    letter will take into consideration today and we
6    will make due with Agent Powers letter and she
7    goes on to recount the particulars of the crime
8    but she does remark that the detectives who
9    responded to the case said that Mr. Glasgow was
10   detached and showed absolutely no emotion.  The
11   detectives that prepared the case commented that
12   Mr. Glasgow understood the gravity of his
13   actions and accepted no responsibility for
14   (indiscernible) and demonstrated no remorse.
15   And then she goes on to say the shooting of his
16   niece and the murder of her boyfriend was a
17   result of Glasgow not liking Collins.  Watts
18   willingly allowed Glasgow into her home
19   believing he was there for innocent purposes.
20   She had no idea he planned to shoot and kill
21   Collins.  The shooting occurred after Glasgow
22   allowed Duhart into the home and (indiscernible)
23   killing.  Glasgow was so full of hate for
24   Collins that he did not care that his own niece
25   (indiscernible) to prevent Glasgow from killing
26   him.  So Mr. Glasgow was Mr. Collins sleeping
27   when he was shot?

32

1          INMATE GLASGOW:   No Ma'am.

2          PRESIDING COMMISSIONER ST. JULIEN:   Did

3    you hate him?

4          INMATE GLASGOW:   I didn't hate him I was

5    scared of him.

6          PRESIDING COMMISSIONER ST. JULIEN:   Did

7    you plan to kill him?

8          INMATE GLASGOW:   No Ma'am.

9          PRESIDING COMMISSIONER ST. JULIEN:   So do

10   you think that this letter that from the Palo

11   Alto police department is this letter accurate?

12         INMATE GLASGOW:   No Ma'am.

13         PRESIDING COMMISSIONER ST. JULIEN:   So we

14   have done your parole plans and job offers,

15   Commissioner Wolk would you like to continue?

16         DEPUTY COMMISSIONER WOLK:   Okay.   I am to

17   talk about your programming and you post-

18   conviction factors and when I am done you can

19   add anything that you'd like or correct any

20   mistakes that I have made.   I show that you are

21   currently working in PIA textiles.

22         INMATE GLASGOW:   Yes Sir.

23         DEPUTY COMMISSIONER WOLK:   And you have

24   been there about the last twenty years or so.

25         INMATE GLASGOW:   Yes Sir.

26         DEPUTY COMMISSIONER WOLK:   And you have

27   learned to operate several different types of

33

1   machines and you are currently a sewing machine

2   operator.

3           INMATE GLASGOW:  Yes.

4           DEPUTY COMMISSIONER WOLK:  Is it possible

5   to receive a certificate of completion in PIA

6   textiles?

7           INMATE GLASGOW:  No, they was talking

8   about it but they never did (indiscernible).

9           DEPUTY COMMISSIONER WOLK:  So you have

10  gone -- it looks like you have done about

11  everything that you can possibly do in that

12  program and you have become skilled and could

13  probably get employment in that area if you

14  wanted to.

15          INMATE GLASGOW:  Developmental upholstery

16  with (indiscernible) talked to the guy and if I

17  could possibly get out (indiscernible).

18          DEPUTY COMMISSIONER WOLK:  You have also

19  worked in culinary on the lunch box crew, you

20  were a lock stitch operator, trash crew, porter,

21  small press operator, dining hall worker, and

22  you worked in the vocational print shop for

23  awhile as well.  Did you complete that program?

24          INMATE GLASGOW:  Yes Sir.

25          DEPUTY COMMISSIONER WOLK:  You have a

26  vocational certificate of completion?

27          INMATE GLASGOW:  Yes, it should be in

34

1   that file somewhere.

2           DEPUTY COMMISSIONER WOLK:   Okay, I

3   thought I saw it but I wasn't -- well anyway.

4   You also worked as a yard attendant and in the

5   license plate factory way back when in Folsom.

6           INMATE GLASGOW:   Yes Sir.

7           DEPUTY COMMISSIONER WOLK:   You have your

8   GED?

9           INMATE GLASGOW:   Yes Sir.

10          DEPUTY COMMISSIONER WOLK:   You are a

11  volunteer in the academic department distance

12  learning program, you participate in the life

13  skills program, and you also took a course in

14  introduction to Spanish.   As far as self help is

15  concerned, you have been a regular participant

16  in NA and AA for many years.   You have also

17  taken anger management, the impact program,

18  inmate employability program, key to father hood

19  class, you have taken several anger management

20  classes, also the entrepreneur development

21  class, the infectious disease series, science of

22  the mind foundation course, you participated in

23  the (indiscernible), and you have been a member

24  of the lifer's association community awareness

25  group.   You have more laudatory chronos in your

26  file than I have ever seen before.   There must

27  be a hundred of them in there.

35

1          INMATE GLASGOW:  I try to better myself.

2          DEPUTY COMMISSIONER WOLK:  You are to be

3    commended for that.

4          INMATE GLASGOW:  Thank you.

5          DEPUTY COMMISSIONER WOLK:  As far as your

6    disciplinary history is concerned, you have

7    three CDC 115.  The first was June 1993 for

8    disobeying a direct order to submit a urine

9    sample.  The second was June 15th, of 1993 for

10   disobeying a direct order to submit to a urine

11   sample and the last one was October 24th of 1999

12   for possession of poker chips.  Is that right?

13         INMATE GLASGOW:  Yes Sir.

14         DEPUTY COMMISSIONER WOLK:  Were you

15   gambling?

16         INMATE GLASGOW:  No I just had the chips.

17         DEPUTY COMMISSIONER WOLK:  So you have

18   three 115's, two in 1993 and one in 1999.  You

19   have five 128A's the first one was in 1986

20   failing to answer to docket, second in 1989

21   failing to lock up, third in 1996 for poor job

22   performance, the fourth in 1999 for altering

23   state property, and the fifth was in 2002 for

24   smoking.  Have you stopped smoking?

25         INMATE GLASGOW:  Yes Sir.

26         DEPUTY COMMISSIONER WOLK:  After that?

27         INMATE GLASGOW:  I don't smoke anymore,

# EXHIBIT 8
# Part 2 of 2

36

1    they made me stop.

2           **DEPUTY COMMISSIONER WOLK:**  Well that's

3    good.  Add a few more years onto your life.

4    Okay, last item I am going to talk about is the

5    psych report that was done in December of 2004

6    at least that is the last one I have.  Have you

7    had one since then?

8           **ATTORNEY HALL:**  That's the one, December

9    of 2004.

10          **DEPUTY COMMISSIONER WOLK:**  This was done

11   by Doctor Reed staff psychologist.  During the

12   clinical interview inmate Glasgow was alert and

13   oriented to person, place and time.  He was well

14   dressed and groomed.  His speech was articulate

15   and contextually meaningful.  His mood and

16   affect were within normal limits.  His behavior

17   was appropriate to the setting.  No evidence of

18   mood or thought disorder was demonstrated.  His

19   estimated intellectual functioning is within the

20   average range.  His current diagnostic

21   impression under Axis I, heroine dependence is

22   sustained full remission in a controlled

23   environment.  He notes that you pick at several

24   self help groups, anger management, and

25   participate in AA and NA through out the years,

26   also life skills program.  He assesses your

27   dangerousness within a controlled setting to be

37

1  low relative to the average level two inmate

2  population.  He states that if released to the

3  community his violence potential is considered

4  to be no more than that of the average citizen

5  in the community.  There are no significant risk

6  factors which may be a precursor to violence for

7  this individual.  He is competent and reasonable

8  and responsible for his behavior.  He has the

9  capacity to abide by institutional standards.

10  He does not have a mental health disorder which

11  would necessitate treatment either during his

12  incarceration period or following upon parole.

13  This inmate does have a heroine abuse history

14  however he has remained abstinent from abuse of

15  heroine for over 23 years and has regularly

16  attended NA within CDC.  And does not appear at

17  this point to be a significant risk factor for

18  violence.  Continued participation with NA

19  within CDC no longer appears to be warranted,

20  however participation within NA as a contingency

21  for parole for one year is suggested.  That

22  pretty much covers everything that I have been

23  able see in your file that has to do with

24  programming.  Is there anything that you would

25  like to add?

26          **INMATE GLASGOW:**  No Sir, that is just

27  about it.

38

1          **ATTORNEY HALL:**  I don't know Commissioner

2     if you mentioned his participation in the Muslim

3     Development (indiscernible) anger management

4     program.

5          **INMATE GLASGOW:**  That's true

6     (indiscernible).

7          **DEPUTY COMMISSIONER WOLK:**  And I will now

8     turn it back over to my colleague.

9          **PRESIDING COMMISSIONER ST. JULIEN:**  Thank

10    you.  (indiscernible) 2000 in your psychological

11    evaluation when you were talking about the life

12    crime you said that the victim had beaten you up

13    before?

14         **INMATE GLASGOW:**  Yes Ma'am.

15         **PRESIDING COMMISSIONER ST. JULIEN:**  Is

16    that correct?

17         **INMATE GLASGOW:**  Yes.

18         **PRESIDING COMMISSIONER ST. JULIEN:**  Why

19    did he beat you up?

20         **INMATE GLASGOW:**  Well (indiscernible)

21    four or five guys (indiscernible) come from a

22    (indiscernible).

23         **PRESIDING COMMISSIONER ST. JULIEN:**  How

24    old was he, I mean were you close in age?

25         **INMATE GLASGOW:**  Ya, I think I was two

26    years older.

27         **PRESIDING COMMISSIONER ST. JULIEN:**  Then

39

1  how did he get involved with your niece?

2        INMATE GLASGOW:  I don't know.  I was

3  kind of curious about that also because she is

4  my sister's daughter and I was concerned about

5  that and come to find out that she

6  (indiscernible).  I was concerned about it.

7        PRESIDING COMMISSIONER ST. JULIEN:  So

8  did you know he was there the day of the

9  shooting?

10        INMATE GLASGOW:  No Ma'am.

11        PRESIDING COMMISSIONER ST. JULIEN:  So

12  going back to your heroine days, were you using

13  heroine at the time of the crime?

14        INMATE GLASGOW:  No, I was doin a

15  maintenance program.

16        PRESIDING COMMISSIONER ST. JULIEN:  And

17  how long had you been on that?

18        INMATE GLASGOW:  For about a year.

19        PRESIDING COMMISSIONER ST. JULIEN:  So

20  again, do you know why you stayed addicted to

21  heroine for so many years?  I know you have the

22  previous attempts at trying to stop.

23        INMATE GLASGOW:  I just determined not to

24  let it kill me off completely.  It's a strong

25  drug and takes control of you but I kept

26  fighting it and wouldn't give into it.  This is

27  why I got on the (indiscernible) maintenance

40

1   program.

2          PRESIDING COMMISSIONER ST. JULIEN:   And

3   how do you feel about your heroine use now?

4          INMATE GLASGOW:   I feel good about my

5   (indiscernible).

6          PRESIDING COMMISSIONER ST. JULIEN:   When

7   you were using heroine?  How do you think that

8   affected your life?

9          INMATE GLASGOW:   (indiscernible)

10          PRESIDING COMMISSIONER ST. JULIEN:   Would

11  you ever use it again?

12          INMATE GLASGOW:   No Ma'am.

13          PRESIDING COMMISSIONER ST. JULIEN:   Why

14  not?

15          INMATE GLASGOW:   Because I know what it

16  will do to you Ma'am.  (indiscernible).

17          PRESIDING COMMISSIONER ST. JULIEN:   How

18  do you explain the long heroine use and your

19  offenses, arrest record with all of your

20  laudatories and good behavior in prison?  How

21  did that change come about?

22          INMATE GLASGOW:   I had to work

23  (indiscernible) and all different arrests the

24  main thing Ma'am, drug addiction.

25  (indiscernible) and habit.  Now I don't have the

26  habit.

27          PRESIDING COMMISSIONER ST. JULIEN:   And

41

1    how were you able to stop because I think that

2    we all know that heroine use is often available

3    in prison.

4         INMATE GLASGOW:  By participating in the

5    programs and being active and doin the right

6    thing.  Positive things.  Do things to better my

7    life.  (indiscernible) and that's my future.  I

8    know that you made a statement that they said

9    that I didn't feel no remorse, I have to feel

10   remorse because my family is involved.  My niece

11   was pregnant (indiscernible).  When they was

12   babies I used to send my niece all the money I

13   could (indiscernible) everything I could but I

14   knew it wasn't much but it was the best that I

15   could do.

16        PRESIDING COMMISSIONER ST. JULIEN:   You

17   would send them money?

18        INMATE GLASGOW:  Ya.  I knew it was the

19   kid's father so I tried to do did everything I

20   could (indiscernible).  (indiscernible) where

21   there father was.  It kind of hurts me

22   (indiscernible).

23        PRESIDING COMMISSIONER ST. JULIEN:  Any

24   other questions?  Mr. Rico do you have questions

25   for Mr. Glasgow?

26        DEPUTY DISTRICT ATTORNEY RICO:  Yes I do

27   Commissioner and I will address them to the

42

1  panel.  I am a little bit confused about some

2  things, I don't mean to repeat.  It is my

3  understanding that Mr. Glasgow was 38 at the

4  time of the life crime and the victim according

5  to the autopsy information was 30 is that about

6  right.  Does Mr. Glasgow remember that?

7       INMATE GLASGOW:  I don't really know his

8  age.

9       DEPUTY DISTRICT ATTORNEY RICO:  That's

10  fine.  I guess that some of the things that I am

11  wondering about in terms of the life crime.  The

12  file indicates that on March 1st, 1980 that Mr.

13  Glasgow went over to his niece's residence about

14  five o'clock in the morning.  Is that accurate?

15       INMATE GLASGOW:  It was early.

16       DEPUTY DISTRICT ATTORNEY RICO:  Why did

17  you go over so early?

18       INMATE GLASGOW:  Because as it was stated

19  I was on this methadone maintenance program and

20  you had to pick your medicine up early and I

21  didn't want to miss that so I stayed up.

22       DEPUTY DISTRICT ATTORNEY RICO:  So I

23  guess what I am asking you is why did he go over

24  to his niece's residence that morning?

25       INMATE GLASGOW:  Because I was concerned

26  about her.

27       DEPUTY DISTRICT ATTORNEY RICO:  Concerned

43

1   about what?

2        INMATE GLASGOW:   I was going to San

3   Francisco so I was concerned about my niece so I

4   stopped there.

5        DEPUTY DISTRICT ATTORNEY RICO:   And I

6   heard Mr. Glasgow indicate earlier that it was

7   his gun and he took it with him is that

8   accurate?

9        INMATE GLASGOW:   Yes.

10       DEPUTY DISTRICT ATTORNEY RICO:   What I am

11  wondering is since it looks like Mr. Glasgow in

12  addition to the 82 arrests, had four prior

13  felony convictions.   What did he have a gun for

14  anyway?

15       INMATE GLASGOW:   Because the area that I

16  was in.   (indiscernible) been beaten up there a

17  couple times before.

18       DEPUTY DISTRICT ATTORNEY RICO:   But the

19  crime itself took place in the city of Palo Alto

20  which is in Santa Clara County and not East Palo

21  Alto which is in San Mateo County.   Isn't that

22  true?

23       INMATE GLASGOW:   Well it split up, they

24  split the county.   Palo Alto is split county.

25       DEPUTY DISTRICT ATTORNEY RICO:   I guess

26  what I am asking is it would appear that the

27  shooting took place at his niece's residence at

44

1    1179 Amarillo A-M-A-R-I-L-L-O in Palo Alto.

2    Where exactly was that?  Does Mr. Glasgow

3    remember what area of town?

4         INMATE GLASGOW:  No, it's Palo Alto

5    (indiscernible).

6         DEPUTY DISTRICT ATTORNEY RICO:  In terms

7    of the weapon, I note that in that report

8    Commissioner you referred to the psych report

9    from May 4th, of 2000 under review of the life

10   crime, at that time Mr. Glasgow was saying that

11   he killed the victim with the victim's own gun

12   purely in self defense which is different from

13   what he is saying today.  Could he comment on

14   those discrepancies in the last five years, the

15   different stories?

16        INMATE GLASGOW:  It because she had lies.

17   I am telling the truth today.

18        DEPUTY DISTRICT ATTORNEY RICO:  So does

19   Mr. Glasgow say that he was lying as recently as

20   May of 2000 about how the life crime took place?

21        INMATE GLASGOW:  I am sorry.

22        DEPUTY DISTRICT ATTORNEY RICO:  I will

23   rephrase that.  Commissioner do you see the

24   question that I am talking about under the life

25   crime there?  It's on page four of the 540   --

26        PRESIDING COMMISSIONER ST. JULIEN:  I see

27   it.  So this statement says that you said that

45

1    you killed Mr. Collins with his gun and you were

2    acting in self defense.  Now did you kill Mr.

3    Collins with his gun?

4           INMATE GLASGOW:   I had the gun.

5           PRESIDING COMMISSIONER ST. JULIEN:   So

6    why did you say you killed Mr. Collins with his

7    gun.

8           INMATE GLASGOW:   I was under the

9    impression that he had a gun.

10          PRESIDING COMMISSIONER ST. JULIEN:   Do

11   you that this doesn't make sense to us?

12          ATTORNEY HALL:   He said earlier that he

13   thought that Mr. Collins had a gun.

14          PRESIDING COMMISSIONER ST. JULIEN:   He

15   says here that he says he killed the victim with

16   the victims own gun.

17          INMATE GLASGOW:   No I had the gun

18   (indiscernible).

19          PRESIDING COMMISSIONER ST. JULIEN:   Maybe

20   the psychologist -- I don't know.

21          DEPUTY DISTRICT ATTORNEY RICO:   I thought

22   I heard Mr. Glasgow say a minute ago that he was

23   telling the truth today.  Is he acknowledging

24   that maybe he wasn't being truthful in 2000

25   about how the crime really took place?  Is that

26   what he was indicating?

27          INMATE GLASGOW:   Well if I told him that

46

1   then it stayed my mind.  I was under the

2   impression that he had a gun.

3        **DEPUTY DISTRICT ATTORNEY RICO:**  I will

4   let that be enough and not pursue that anymore.

5   There was some materials that I had submitted to

6   the board on October 6th that included an

7   autopsy report and crime scene diagram and three

8   crime scene photos.

9        **PRESIDING COMMISSIONER ST. JULIEN:**  Yes,

10  we received that.  I didn't see the photos

11  unless they are in the C File.  We did see the

12  report of the crime scene and the autopsy and

13  all of that.

14       **ATTORNEY HALL:**  And which I just received

15  today and again I would urge that it not be

16  considered as submitted untimelyness.

17       **DEPUTY DISTRICT ATTORNEY RICO:**  Well

18  Commissioner I also would point out that when I

19  did submit that it was on October 6th, 2005 I

20  overnighted them to Soledad and the last line in

21  the cover letter said that I am enclosing copies

22  of the materials for the inmates C File, the BPH

23  panel and inmate Glasgow's attorney.  I would

24  ask that you forward the copy provided for the

25  inmate's attorney to counsel immediately so it

26  is received in timely fashion prior to the above

27  referred to lifer hearing scheduled for November

47

1   2nd.  That was on October 6th.  I did everything

2   that I could.

3            PRESIDING COMMISSIONER ST. JULIEN:  We

4   all just got these today.  I don't know.   Mr.

5   Hall did you receive this before?

6            ATTORNEY HALL:  No I did not.  This is

7   the first time I am seeing it.

8            PRESIDING COMMISSIONER ST. JULIEN:  It

9   was in our updated materials that I actually

10  gave Mr. Hall his copy.  But we just got those

11  today.

12           DEPUTY DISTRICT ATTORNEY RICO:  I terms

13  of submitting it timely, there is nothing more

14  that I could do unless --

15           PRESIDING COMMISSIONER ST. JULIEN:  That

16  is correct.  I don't know.  The information

17  would probably be the determining factor.

18           DEPUTY DISTRICT ATTORNEY RICO:  In any

19  event, I am also told that sometimes crime scene

20  photographs are put in something called a sluff

21  file which is --

22           PRESIDING COMMISSIONER ST. JULIEN:  Mr.

23  Wolk is looking for them now.

24           DEPUTY DISTRICT ATTORNEY RICO:  Thank

25  you.  The line is going to ask the panel for

26  submission to the inmate is this.  I have seen

27  the letter that Mr. Glasgow wrote to, and it

48

1   says to the Glasgow, Watts, and Collins Family

2   and it indicates in it that his, meaning Mr.

3   Collins, death was never intentional.  I guess

4   what I am kind of confused about here, the

5   photos show, and I could just ask Mr. Glasgow

6   that, wasn't Mr. Collins completely naked at the

7   time he was shot?

8          **INMATE GLASGOW:**  I don't know, I didn't

9   have time enough to view him (indiscernible)

10  because I was afraid and I was scared.

11         **DEPUTY DISTRICT ATTORNEY RICO:**  I guess

12  he was shot in the bedroom.  It that accurate?

13         **INMATE GLASGOW:**  It was up against the

14  door, between the hallway and the bedroom.

15         **DEPUTY DISTRICT ATTORNEY RICO:**  I guess

16  one of the things that confuses me, Mr. Glasgow

17  came to the apartment and was refused entrance

18  the first time, the second time he was let in.

19  Why did Mr. Glasgow after he gained access to

20  the apartment let in a second individual, Edmond

21  Duhart, through a back door?  Why did he do

22  that?

23         **INMATE GLASGOW:**  It was the first time I

24  was at the apartment and I didn't know

25  (indiscernible) was coming in the back.  I

26  didn't know I had someone in the car waitin.

27         **DEPUTY DISTRICT ATTORNEY RICO:**  And if

49

1    Mr. Glasgow was afraid of the victim who

2    apparently was in the back bedroom, why did Mr.

3    Glasgow walk from the apartment, the living

4    area, down the hallway into the bedroom where

5    Mr. Collins was if Mr. Glasgow was afraid of

6    him?  Why did he go to him?

7         INMATE GLASGOW:  I didn't walk to the

8    bedroom, I went to the bathroom.

9         DEPUTY DISTRICT ATTORNEY RICO:  How did

10   Mr. Glasgow then wind up in the bedroom with the

11   gun and with the victim?

12        INMATE GLASGOW:  He was standing at the

13   door between the hallway and the bedroom.

14        DEPUTY DISTRICT ATTORNEY RICO:

15   Completely naked?

16        INMATE GLASGOW:  I don't know if he was

17   naked or not.

18        DEPUTY DISTRICT ATTORNEY RICO:  And how

19   was it, the report seems to indicate that at

20   some point, when Mr. Glasgow went down and

21   confronted the victim who was asleep in the bed

22   in the bedroom and started shooting that Mr.

23   Glasgow's niece threw her self over the victim

24   to try to shield him and Mr. Glasgow fired

25   through the niece into the victim?  Is that

26   accurate?

27        INMATE GLASGOW:  No Sir.

50

1      **DEPUTY DISTRICT ATTORNEY RICO:**  How did

2  bullets pass through Mr. Glasgow's niece then?

3      **INMATE GLASGOW:**  I don't know as to the

4  question how.

5      **DEPUTY DISTRICT ATTORNEY RICO:**  And the

6  autopsy report indicates that among the many

7  wounds to the victim, Ralph Collins, there were

8  a couple of bullets, one directly above the

9  right ear canal which had a marginal rim of

10  abrasion suggesting that the gun was put right

11  up against the head.  How did Mr. Glasgow shoot

12  the victim in that manner up against the back of

13  the head if he was fighting him as he has

14  indicated?

15      **INMATE GLASGOW:**  (indiscernible).

16      **DEPUTY DISTRICT ATTORNEY RICO:**  I don't

17  know if those photos have been located but they

18  show two bullets.  All I know is that I sent

19  them.  I don't know what the institution did

20  with them.

21      **DEPUTY COMMISSIONER WOLK:**  We'll take

22  your word for it.

23      **DEPUTY DISTRICT ATTORNEY RICO:**  I will

24  just ask Mr. Glasgow through the panel this.

25  Did Mr. Glasgow put the muzzle of the gun right

26  up against the victim's head and pull the

27  trigger?

51

1        INMATE GLASGOW:   Sir, I know this is not

2   the time nor the place but nothin no way

3   (indiscernible) fightin and I was afraid for my

4   life and I don't know what position the man was

5   in all I know is that I was fightin for my life.

6   (indiscernible).

7        DEPUTY DISTRICT ATTORNEY RICO:   I guess

8   what I don't understand Mr. Glasgow is

9   indicating that he was fighting for his life but

10  it would appear that the victim had no clothing

11  on and no weapon and Mr. Glasgow was the only

12  one with a gun and had gone to the victim.  Can

13  he explain how it was that he somehow was

14  fighting for his life under those circumstances?

15       ATTORNEY HALL:   We will object to the

16  premise that in fact that the person was nude or

17  naked at the time.  Mr. Glasgow has said that he

18  didn't know whether he recall if the man  was

19  naked or not so to include that in the question,

20  the premise that he was naked I think is

21  improper.

22       DEPUTY DISTRICT ATTORNEY RICO:   May I

23  have just a moment?

24       PRESIDING COMMISSIONER ST. JULIEN:   Yes.

25  Can you limit it to one more question?

26       DEPUTY DISTRICT ATTORNEY RICO:

27  Certainly.  I know Mr. Glasgow has indicated

52

1    that his niece was convicted of perjury for

2    lying but isn't the lie that she was convicted

3    of perjury for telling the recanting of her

4    original version.  So I guess what I am saying

5    she wasn't convicted for lying that he did the

6    crime but she was convicted for lying after the

7    fact that he hadn't been involved.  Isn't that

8    accurate?

9          INMATE GLASGOW:  I don't know.

10         DEPUTY DISTRICT ATTORNEY RICO:  Did Mr.

11   Glasgow do anything to get his niece to change

12   her story to try to get him out of trouble?

13         INMATE GLASGOW:  Got arrested on March

14   the 1st and I been in jail ever since.

15         DEPUTY DISTRICT ATTORNEY RICO:  I have

16   nothing further.

17         PRESIDING COMMISSIONER ST. JULIEN:  Okay

18   Mr. Hall.

19         ATTORNEY HALL:  Thank you.  This crime

20   occurred some twenty five years ago, twenty five

21   and a half years ago, and you are now 64 years

22   old?

23         INMATE GLASGOW:  Yes.

24         ATTORNEY HALL:  In respect to some of the

25   questions that the Deputy District Attorney was

26   asking you about in detail about the crime.

27   Your memory is quite clear as to what happened

53

1    next?

2            **INMATE GLASGOW:** Yes.

3            **ATTORNEY HALL:** Your memory is quite

4    clear?

5            **INMATE GLASGOW:** Yes.

6            **ATTORNEY HALL:** Do you have any

7    recollection during the struggle that your niece

8    participated in that struggle?

9            **INMATE GLASGOW:** Yes she did.

10           **ATTORNEY HALL:** And as you testified,

11   this occurred outside the bedroom?

12           **INMATE GLASGOW:** Yes.

13           **ATTORNEY HALL:** And your testimony you

14   thought that Mr. Collins had a weapon. Is that

15   correct?

16           **INMATE GLASGOW:** Yes.

17           **ATTORNEY HALL:** You saw that report, or

18   you heard that various statements that you had

19   no weapon. Is that true?

20           **INMATE GLASGOW:** Yes.

21           **ATTORNEY HALL:** But you know for sure

22   that you did have a weapon?

23           **INMATE GLASGOW:** Yes.

24           **ATTORNEY HALL:** And that the shooting

25   occurred while you were struggling for the

26   weapon?

27           **INMATE GLASGOW:** Yes.

54

1        ATTORNEY HALL:   I have no further

2   questions.

3        PRESIDING COMMISSIONER ST. JULIEN:   Mr.

4   Rico do you have a closing statement?

5        DEPUTY DISTRICT ATTORNEY RICO:   Yes,

6   briefly Commissioner.  It's true that this life

7   crime took place some 25 years ago on March 1st

8   or 1980.  And here we are 25 years later and Mr.

9   Glasgow is indicating his version of the events

10  and they just don't seem to fit what the

11  information in the packet, in the probation

12  report, in the file, in the materials that I

13  submitted.  On March 1st, 1980 at approximately

14  five o'clock in the morning the defendant knocks

15  on the door of his niece, Patricia Watts and she

16  doesn't let him in because the victim,

17  apparently someone that Mr. Glasgow has had

18  issues with in the past is there.  According to

19  all of the information here, asleep in the back

20  bedroom.  So later that morning Mr. Glasgow

21  returns and his niece lets him in and then for

22  some reason Mr. Glasgow let's in an acquaintance

23  this Edmond Duhart in through the back door and

24  I know that Mr. Glasgow is indicating that

25  simply went to the bathroom but the indications

26  are that Mr. Glasgow walked down the hall into

27  the bedroom where Mr. Collins, this person that

55

1   he didn't like or had fights with in the past

2   was in bed.  I don't know where those photos

3   went that I sent on October 6th but they the

4   condition of the victim.  I will leave it at

5   that.  But the victim was shot two times in the

6   back and the head, upper abdomen and indications

7   are that Patricia Watts at one point during this

8   attack covered the victim with her own body and

9   that Mr. Glasgow fired through her into the

10  victim.  Mr. Glasgow seems to be saying that he

11  has remorse that he is no longer involved with

12  drugs and that he is a changed person but I do

13  not hear him coming to terms with the crime.  I

14  hear, but when I look at that 2000 psych eval it

15  troubles me that according to the clear words by

16  the author of that report as recently as 2000

17  Mr. Glasgow is indicating that he killed the

18  victim with the victims own gun clearly in self

19  defense.  That is what the report says in its

20  very words.  And now he is indicating that yes

21  it was his gun, Mr. Glasgow's gun that he took

22  to the residence that day.  Somehow because he

23  was afraid of the area.  Although the crime took

24  place in Palo Alto which is clearly not a high

25  crime area.  It's not the same thing as East

26  Palo Alto.  And we have Mr. Glasgow who has four

27  prior felony convictions.  It's a crime to be a

56

1    felon in possession of a firearm that he seems

2    to have no qualms about arming himself and

3    walking around.  He was going up to San

4    Francisco that day apparently going to take the

5    gun.   There is much more going on here in terms

6    of how his life crime took place than Mr.

7    Glasgow seems to be owning up to or accepting

8    responsibility for.  And the current psych eval

9    I have to take issue with.  On page two it says

10   that under review of the life crime that he,

11   meaning Mr. Glasgow, showed good insight into

12   the causative factors related to the instance

13   offense and I am not seeing that at all.  I am

14   seeing an individual who still can't come to

15   terms why there is a bullet above the right ear

16   canal and there is an indication of a muzzle

17   being pressed up to the skull when he is

18   claiming that he, Mr. Glasgow was fighting for

19   his life although the victim wasn't armed and

20   Mr. Glasgow was the only one armed.   The version

21   I hearing does not make sense and when he says

22   that the shooting wasn't intentional Mr. Glasgow

23   is the one that went down the hall.  So I think

24   he has a long way to go.  I am not quite sure

25   and I didn't specifically ask in terms of the

26   plans getting out, his work plans, the owner of

27   Big Ed's Furniture seems to indicate that Mr.

57

1    Glasgow would be employed in sales and delivery
2    and I'm not sure if that is going to mean that
3    Mr. Glasgow at age 64 with medical issues that
4    he's got is going to be out in a truck
5    delivering heavy furniture.  So I don't know if
6    that is truly a practical plan for him at this
7    stage in his life.  But all things considered
8    and when we get down to the remorse issue, when
9    Mr. Glasgow was asked he felt about the crime I
10   heard him talk about his family, I heard him
11   talk about the victim's family, and maybe I
12   missed it but I didn't hear him specifically
13   talk about how he feels for Mr. Collins loosing
14   his life.  He talked about Mr. Collins family
15   and Mr. Glasgow's family but I didn't hear what
16   sounded to my like a true indication of remorse
17   for Mr. Collins loosing his life and I don't
18   know if there is still animosity there.  So my
19   concern is that even though Mr. Glasgow is 64,
20   is no doubt is a much perhaps living a gentler
21   or less aggressive lifestyle behind bars but if
22   he is to get out, if he was to be given a date
23   and to go back out.  I know he has taken anger
24   management classes while he has been in but when
25   he was out last time with four prior felony
26   convictions he didn't hesitate to arm himself
27   and I truly do not feel from what I have heard

58

1  today that Mr. Glasgow has reassured anyone that

2  if he is released he is not going to fall back

3  into patterns that maybe have gotten him to

4  where he is today.  And I think that until such

5  time as he truly looks inward and is perhaps

6  more forthright  and comes to terms and gains

7  insight, true insight into how this crime took

8  place.  What he really did that there is not

9  indication that under certain circumstances he

10  wouldn't act like this again.  And I think that

11  he still has work to do and in that regard  and

12  I would submit on those comments I ask that he

13  be found not suitable.  Thank you.

14        PRESIDING COMMISSIONER ST. JULIEN:  Thank

15  you.  And Mr. Rico we did find the crime scene

16  photographs.  They were in a folder under some

17  other things.  Did you hear me?

18        DEPUTY DISTRICT ATTORNEY RICO:  Yes I did

19  but I talked enough so thank you.

20        PRESIDING COMMISSIONER ST. JULIEN:  Mr.

21  Hall closing statement.

22        ATTORNEY HALL:  Yes, thank you.  I think

23  that the Deputy District Attorney's statement

24  amounts to really an attempt to retry the case.

25  That was the implication of the questioning of

26  Mr. Glasgow.  Perhaps that was not his intent

27  but it amounts to that.  I think the real issue

59

1   is whether or not Mr. Glasgow would pose an

2   unreasonable risk upon society should he be

3   paroled.  And I think the conclusion has to be

4   that he would not pose such a risk.  Here is a

5   person who is been working on him self, working

6   through heroine addiction, working through the

7   fact that having killed someone and taking

8   responsibility for it.  And he has done that.

9   And I think that he has done that sufficiently

10  that the psychologist who evaluated him through

11  out his incarceration has mapped his progress in

12  that regard and we could go back to the

13  evaluation that was done by Doctor Kidd back in

14  1992.  Doctor Kidd points out that Mr. Glasgow

15  violence potential outside the controlled

16  setting in the past appeared less than average

17  then at present has decreased.  Then we come to

18  earlier in 1989 Doctor Martin stated that less

19  controlled setting such as a return to the

20  community the inmate will likely continue the

21  present gains if he does not return to his

22  addiction.  In 2000 Doctor Reed wrote that if

23  released to the community his violence potential

24  is considered to be no more than the average

25  citizen in the community.  And the Commissioner

26  has put on the record already the present

27  psychological assessment essentially that Mr.

60

1    Glasgow would pose no more risk than the average
2    citizen in the community if he was to be
3    paroled.  The statements made by Patricia Watts
4    should be taken with a grain of salt when her
5    entire testimony in fact.  I mean here is a
6    person convicted of a felony of perjury.  I know
7    the Deputy District Attorney asks questions as
8    to the specific comments or statements made by
9    Ms. Watts for which he was convicted of perjury.
10   We don't know that, if not presented to the
11   board any transcript of what was said by her,
12   what the court deemed to have been perjury
13   (indiscernible).  Mr. Glasgow does not know
14   exactly what lies she told when she testified
15   but in fact he testified to how the crime
16   occurred and she testified and between the three
17   individuals, Mr. Collins, Ms. Watts, and Mr.
18   Glasgow, she and Mr. Glasgow were the only
19   remaining witnesses.  Any statements that she
20   made as to how the instances occurred, how the
21   murder occurred should be taken with a grain of
22   salt.  Certainly Mr. Glasgow has been
23   forthright, he has been convicted of this crime
24   and really has no reason to lie about what
25   happened.  The statement by the Agent Powers
26   describing Mr. Glasgow's domineer stating that
27   he show no sign of remorse, that was at the time

61

1   of the crime.  I don't know if Agent Powers has

2   seen any of the psychological evaluations.  I

3   don't know if she has seen or spoken to anyone

4   since this crime occurred in 1980 and so to base

5   a conclusion on what she perceived Mr. Glasgow

6   to be demonstrating back in March of 1980

7   certainly would be unfair to Mr. Glasgow but

8   than unfair it's just unreliable and it's not a

9   reflection of who Mr. Glasgow is today.  So I

10  think that comment, any comment regarding Mr.

11  Glasgow's perceived lack of remorse should be

12  discounted and not observed at all.  Instead the

13  various evaluators that assessed Mr. Glasgow has

14  pointed out that he has shown remorse through

15  out the time that he has been incarcerated and

16  again he has demonstrated that the various

17  petitions submitted on his behalf as his

18  expressed remorse of Mr. Collins death and the

19  harm to the families.  It is true that he does

20  mention his family and I think we should keep in

21  mind that this is a family that two families are

22  intertwined both are Ms. Watts was his niece

23  since she is now deceased.  Certainly there

24  would be remorse on both sides and these family

25  members have, some family members have forgiven

26  Mr. Glasgow and are urging his release on

27  parole.  Again the evaluators have expressed

62

```
 1   that Mr. Glasgow has demonstrated that he has
 2   gained insight into what he has done.  Certainly
 3   being incarcerated for so long without any kind
 4   of violation for drugs, or controlled substances
 5   of any kind clearly demonstrates that in fact
 6   that he has kicked the habit, that he has been
 7   fighting the heroine addiction that he has been
 8   fighting at a time of the crime.  And I think
 9   that he has realistic parole plans.  He's got
10   employment offers as well as marketable skills
11   and commitment to a residence with his wife.
12   Given Mr. Glasgow's medical condition I think it
13   is very unlikely that he would be at risk of
14   committing any kind of violence or
15   (indiscernible) against anyone in the community.
16   And then when you add his age of 64 to that it
17   certainly would minimize any potential what so
18   ever he would commit any kind of aggression or
19   violence against anyone.  He has family support,
20   various family members who will again on his
21   behalf written parole as well as other community
22   members and I believe it amounts to some 60
23   individuals who voice there support as members
24   of the community supporting Mr. Glasgow's
25   release on parole.  I think overall given Mr.
26   Glasgow's following of the rules with in the
27   institution, having rehabilitated him self,
```

63

1    having kicked the heroine addiction, and having

2    sincere and competent plans for the future we

3    believe at this time he is suitable for parole

4    and we urge this panel to so decide and grant

5    Mr. Glasgow parole.  Thank you.

6          PRESIDING COMMISSIONER ST. JULIEN:  Okay,

7    thank you.  Actually I have an unusual - Mr.

8    Rico I have a question for you before we go on.

9    Was Mr. Duhart convicted of anything?  I know

10   that he was --

11         DEPUTY DISTRICT ATTORNEY RICO:  I have a

12   note here that at the jury trial December 19th,

13   1980 he was found not guilty.  I don't have --

14   The trial prosecutor is here but I don't have a

15   note about that aspect of it.  I don't know if

16   you wish to -

17         MS. NEDDE:  As I recall he was acquitted

18   of everything.  There was no evidence that he

19   participated in the shooting or anything else.

20   My argument to the jury of course was that he

21   was an accomplice that having more than one

22   person there, that increased the victim's

23   danger.

24         PRESIDING COMMISSIONER ST. JULIEN:  Okay

25   thank you.  Mr. Glasgow would you like to give a

26   statement as to your parole suitability?

27         INMATE GLASGOW:  Well at this point in my

64

1    life.

2           **DEPUTY COMMISSIONER WOLK:**  Why don't you

3    go ahead and start over again.

4           **INMATE GLASGOW:**  What I am doing now for

5    my life I am planning on doin the rest of my

6    life.  I don't plan on doin any thing backward

7    and doin what I used to do.  I learned my lesson

8    and I live my self in life and all I can do is

9    continue to do the right things.  I know

10   (indiscernible).  I am not on trial anymore but

11   I (indiscernible).  I won't disappoint anyone.

12   Please let me (indiscernible).  I love my family

13   and I want to be with them.  If there is

14   anything more I can do (indiscernible).

15          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

16   Is there anything else that you would like to

17   say Sir?

18          **INMATE GLASGOW:**  Just that I extend my

19   remorse to the Collins family and I put it on

20   paper but I pray for his soul.  I pray

21   (indiscernible) taking his life (indiscernible).

22          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

23   thank you Sir.  We will now recess for

24   deliberations.

25                      R E C E S S

26                       --oOo--

27

65

1       CALIFORNIA BOARD OF PAROLE HEARINGS

2                 D E C I S I O N

3       DEPUTY COMMISSIONER WOLK:  We're back on

4   record.

5       PRESIDING COMMISSIONER ST. JULIEN:  All

6   parties have returned to the room for the

7   hearing of Brice Glasgow.  Mr. Glasgow we are

8   going to deny your parole, we are going to deny

9   your parole for a year.  The main reason, the

10  commitment crime.  It just doesn't, we just

11  can't reconcile the facts of the crime with your

12  accounts, we can't say, we don't who's right and

13  who's wrong and who is telling the truth and who

14  isn't.  But as long as there are lingering

15  doubts we just can't do it.  We have reviewed

16  all the information received from the public and

17  relied on the following circumstances in

18  concluding that the inmate is not suitable for

19  parole and would pose and unreasonable risk of

20  danger to society or a threat to public safety

21  if released from prison.  The commitment offense

22  was carried out in an especially cruel and

23  callous manner in that the inmate shot and

24  killed Mr. Ralph Collins and there were three

25  bullet wounds to the back and two to the back of

26  the head and also a shot into Patricia Watts who

27  **BRICE GLASGOW C-26529   DECISION PAGE 1   11/2/05**

66

1   was the inmates niece and she was shot once in

2   the back.   Multiple victims were attacked in the

3   same incident and one was killed and one was

4   injured and the motive for the crime was

5   explicable or very trivial in relation to the

6   offense and on the one hand we have as a result

7   of and altercation and (indiscernible) and on

8   the other hand we have that there was

9   intentional motives behind the shooting.   So it

10  is hard for us to draw a conclusion here and we

11  would suggest that you really, really think

12  about this and try to go back and research your

13  memory as much as you can and perhaps even write

14  something down.   Make a statement as to the

15  events of that night or that morning in its

16  entirety and what you did afterwards because the

17  fact that you left, you basically left Mr.

18  Collins.   I don't know if you knew he was dead

19  or (indiscernible) So I think all of those

20  things (indiscernible).   In terms of your

21  previous record, you do have an escalated

22  pattern of criminal conduct and violence and a

23  history of unstable relationships with others

24  and you have failed previous rounds of probation

25  and parole and can't (indiscernible) want you to

26  avoid future criminalities and that

27  BRICE GLASGOW C-26529   DECISION PAGE 2   11/2/05

67

1    (indiscernible). The probation and parole stems

2    from approximately 82 arrests and the arrests

3    were for various crimes but they include

4    battery, illegal weapon, burglary, conspiracy

5    and forgery.  And I also note that you have

6    failed to profit from societies previous

7    attempts to correct your criminality and these

8    include CYA commitment, (indiscernible), being

9    on parole and probation, (indiscernible).  In

10    terms of your programming you have done very

11    well.  And as my colleague previously noted you

12    have numerous laudatory chronos and you have

13    done exceptionally well while you have been

14    here.  Your last 115 was in 1999 and you have

15    only had 3 total since you have been here and

16    that is indeed a very good record.  We also note

17    that your psychological report dated December

18    1st, 2004 authored by Doctor Reed is favorable

19    and that he states that you need no more risk of

20    violence that the average citizen however I also

21    do note on that psychological report that Doctor

22    Reed really didn't delve into your prior

23    criminal history and the heroine use and as it

24    relates to the crime and perhaps if you had some

25    more discussions with a therapist or a

26    psychologist you to maybe could reconcile some

27    **BRICE GLASGOW C-26529   DECISION PAGE 3   11/2/05**

68

1   of the issued that we are so concerned about.

2   In terms of your parole plans you do have viable

3   residential plans in the County of

4   (indiscernible) as well as in Stockton area and

5   you do have acceptable employment plans and that

6   you have two job offers and you do have a

7   marketable skill.  And we note that in response

8   to 3042 notices for opposition of parole

9   suitability we have that opposition

10  (indiscernible) by the District Attorney of

11  Santa Clara as well as the Palo Alto police

12  department and I am referring to the letter that

13  was in the file.  And we made the following

14  findings that the prisoner needs therapy in

15  order to face (indiscernible) cope with stress

16  in a nondestructive manner.  Until progress is

17  made we maintain that you may be unpredictable

18  and a threat to others.  However we would like

19  to commend you for participating in anger

20  management, the PIA textiles for over 20 years,

21  project impact, and disciplinary free since 1999

22  as well as your exceptional record in receiving

23  over approximately 50 laudatory chronos.

24  However the positive aspects of you behavior do

25  not out weigh the factors of unsuitability that

26  were mentioned and we are hopeful that in one

27  BRICE GLASGOW C-26529  DECISION PAGE 4  11/2/05

69

1    year that you read through all your prior

2    transcripts, this one included, all your

3    transcripts and really try to connect the pieces

4    of this puzzle for the next panel.  I would

5    really encourage you to do that.  And therefore

6    I want to prepare your observation and

7    evaluation is required before the board should

8    find that you are suitable for parole.

9    Commissioner Wolk?

10          **DEPUTY COMMISSIONER WOLK:**  That's

11    everything.

12          **PRESIDING COMMISSIONER ST. JULIEN:**  And

13    we will recess and it's ten minutes to eleven.

14                    --oOo--

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON:_____      MAR  2 2006

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    BRICE GLASGOW C-26529 DECISION PAGE 5  11/2/05

70

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 69, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF BRICE

GLASGOW,   CDC NO. C-26529, ON NOVEMBER 2, 2005, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated NOVEMBER 20, 2005, at Sacramento,

California.

SUE GERDES
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT "B"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
FEBRUARY 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 3, 2002

Inmate Brice Glasgow, CDC# C-26529, was seen for a
psychological evaluation for the Board of Prison Terms by
Joe Reed, Ph.D., Staff Psychologist at the Correctional
Training Facility (CTF), on 05/01/00 for the April 2000
Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

BZ/gmj

D:   09/03/02
T:   09/03/02

GLASGOW        C-26529        CTF-CENTRAL        09/03/02        gmj

## MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### JANUARY 2002 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### OCTOBER 29, 2001

Inmate Brice Glasgow, CDC# C-26529, was seen for a mental health evaluation for the Board of Prison Terms by J. Reed, Ph.D., Staff Psychologist at CTF, on 05/01/00 for the April 2000 Lifer Calendar.

According to the agreement that CDC psychologists made with the Board of Prison Terms, once a mental health evaluation is completed in the new format, revised in August 1998, a new evaluation is not necessary each time the inmate appears before the Board of Prison Terms.

Therefore, a mental health evaluation was not conducted at this time.


JEFF HOWLIN, Ed.D.
Senior Supervising Staff Psychologist (A)
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JH/gmj

D:  10/29/01
T:  10/29/01


GLASGOW        C-26529        CTF-CENTRAL        10/29/01        gmj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
APRIL 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 1, 2000

This is a psychological evaluation for the Board of Prison
Terms for inmate Brice Glasgow, CDC# C-26529.  This report
is based upon a personal clinical interview of the inmate,
conducted on 05/01/00, as well as a review of his Central
file and unit health record.  This clinical interview and a
review of all pertinent documents were for the express
purpose of preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Glasgow is a 59-year-old, divorced, African-
      American male.  His date of birth is 04/23/41.  His
      stated religious affiliation is Protestant.  No obvious
      unusual physical characteristics were observed and he
      denied ever having used any nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      He had no significant developmental history.  He had no
      history of physical or sexual abuse as either a
      perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Inmate Glasgow attended public school and completed the
      tenth grade.  He said he received his GED in 1990 at
      CTF.  He has no college credits.  His records indicate
      a 1986, measured grade point level of 6.9 TABE.  He has
      no history of special education or academic or
      behavioral problems in school.  He has no current
      involvement or interest in educational activities.

IV.   FAMILY HISTORY:

      Inmate Glasgow said that there is no significant
      history of crime or drug abuse in his family.  He
      generally described his current relationships with his
      family members as supportive and that there is no
      history of abuse.

GLASGOW       C-26529       CTF-CENTRAL       05/04/00       gmj

GLASGOW, BRICE
CDC NUMBER:   C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Glasgow is a heterosexual male.  He denied any
history of sexual aggression or high-risk sexual
behavior.

VI.   MARITAL HISTORY:

Inmate Glasgow stated that he has been married one
time.  His marriage began in 1980 and ended in 1984 due
to incarceration-related problems.  He generally
described his current relationship with his ex-wife as
supportive with no history of abuse.  He acknowledged
having one daughter who is now 21 years of age from his
marriage.  He generally described his current
relationship with his daughter as supportive and that
there is no history of abuse.

VII.  MILITARY HISTORY:

The records indicate that this inmate has no military
history.

VIII. EMPLOYMENT AND INCOME HISTORY:

Inmate Glasgow reported that his preincarceration work
history includes working five years in construction and
one year training as a barber.  During his
incarceration, he worked from 1985 until 1994 in PIA in
fabric cutting and sewing.  In 1994, he became
certified in vocational print shop.  From 1996 until
the current date, he has worked in PIA in fabric
cutting and sewing.

IX.   SUBSTANCE ABUSE HISTORY:

Prior to his incarceration, inmate Glasgow acknowledged
having abused heroin.  He further stated that he has
been abstinent for over 24 years.  He reported that he
has attended Alcoholics Anonymous and Narcotics
Anonymous regularly from 1990 until the current date.
This inmate does appear to have a drug abuse problem.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

This inmate has recent psychiatric diagnoses of Heroin
Dependence, in institutional remission, and Antisocial

GLASGOW, BRICE
CDC NUMBER:   C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

Personality Disorder, improved.  He stated that in 1975
he attended a methadone treatment program, and after
completing the program remaining abstinent from heroin
for four to five years just prior to his current
incarceration.  He has no history of serious accident,
including head injury.  He has no history of suicidal
behavior, or a history of seizure or other neurological
conditions.  This inmate does have hypertension and is
currently receiving medication for this condition.

XI.    PLANS IF GRANTED RELEASE:

If granted parole, this inmate plans to live in Santa
Clara County with his brother, who has agreed to this
arrangement.  His financial and vocational plans
include using his savings and working in the
construction area in a job offered by his brother.
This inmate's prognosis for community living appears to
be good.

### CLINICAL ASSESSMENT

XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Glasgow was alert
and oriented to person, place and time.  He was well
dressed and groomed.  His speech was articulate and
contextually meaningful.  His mood and affect were
within normal limits and his behavior was appropriate
to the setting.  No evidence of a mood or thought
disorder was demonstrated.  His estimated level of
intellectual functioning was approximately within the
average range.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     Heroin Dependence, in sustained full
            remission.
AXIS II:    No Contributory Personality Disorder.
AXIS III:   Hypertension.

In addition to attending his Alcoholics Anonymous and
Narcotics Anonymous meetings, inmate Glasgow has
attended a number of other self-help programs.  In
1991, he complete the Life Skills group with Dr.
Bakeman at CTF.  In 1993, he completed one on one

GLASGOW, BRICE
CDC NUMBER:  C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


counseling with Dr. Bakeman.  In 1995, he completed the
Science of Mind Foundation course, and from 1996 until
1997, he attended the Milatti Islamic Program for
Addiction Recovery.

XIII. <u>REVIEW OF LIFE CRIME</u>:

Inmate Glasgow said that he killed the victim with the
victim's own gun, purely in self-defense.  He said that
he had previously been attacked by the victim and some
of the victim's friends.  At the time of the instant
offense, the inmate recalled that he was surprised and
attacked by the victim at the home of the inmate's
niece.  He further noted that he was very afraid of the
victim because of beatings suffered by him from the
victim on the two previous occasions.  Inmate Glasgow
did acknowledge the damage done to the victim and to
his niece, who was also injured during the instant
offense.  He did note that he has sent support money to
his now-deceased niece's children.  This inmate did
appear to have good insight into the causative factors
related to the instant offense.

XIV. <u>ASSESSMENT OF DANGEROUSNESS</u>:

A.  His violence potential within a controlled setting
    is considered to be below average to significantly
    below average relative to this Level II inmate
    population.  This conclusion is based upon several
    factors.

    On the one hand, inmate Glasgow had a juvenile
    criminal history involving numerous arrests, and he
    was committed to CYA on two occasions, once for
    Battery and Carrying a Concealed Weapon and once
    for Assault with a Deadly Weapon (a knife).  His
    adult criminal history includes over 50 arrests
    with two convictions, one for Burglary and one for
    Shoplifting.  He has three CDC-115 disciplinaries,
    the last received in 1999 for have gambling
    paraphernalia (gambling chips).  He obtained
    two disciplinaries in 1993 for refusing a urine
    sample;  these disciplinaries were received one day
    apart.  He has also received four CDC-128s, the
    last received in 1999.

GLASGOW       C-26529       CTF-CENTRAL       05/04/00       gmj

GLASGOW, BRICE
CDC NUMBER:  C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

On the other hand, however, he has never received a disciplinary for violent behavior during his 20 years of incarceration within CDC.  He has also received only three significant disciplinaries (as noted above) during this period.  He has no history of gang affiliation.  No significant psychopathy was observed.  He has also completed a number of self-help programs satisfactorily and continues to attend Alcoholics Anonymous programming.  Additionally, he developed job skills, including vocational print shop and fabric cutting.

Therefore, in light of these factors, his violence potential is considered to be below average to significantly below average relative to this Level II inmate population.

B.   If released to the community, his violence potential is considered to be no more than the average citizen in the community.

C.   Heroin abuse is a risk factor which may be a precursor to violence for this individual.

XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.   This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards.

B.   This inmate does not have a mental disorder which would necessitate treatment either during his incarceration period or following upon parole.

C.   This inmate does appear to have a heroin abuse problem and continued attendance at Alcoholics Anonymous or Narcotics Anonymous is suggested both during his incarceration and as a contingency for parole.

JOE REED, Ph.D., J.D.
Staff Psychologist
Correctional Training Facility, Soledad

GLASGOW        C-26529        CTF-CENTRAL        05/04/00        gmj

GLASGOW, BRICE
CDC NUMBER:   C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


*for*

STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JR/gmj

D:   03/03/00
T:   03/04/00

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
FEBRUARY 1997 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 7, 1996

This is either the fifth or the sixth psychological evaluation for the Board of Prison Terms on inmate Brice Glasgow. This report is the product of a personal interview, conducted on 11/07/96, as well as a review of his Central file and his unit health record. This interview was a single contact with this inmate for the sole purpose of preparing this report.

Inmate Glasgow was convicted of a 1980 murder. He continues to report that he did not know that the victim was in the apartment that he visited on that particular night. He also continues to state that the victim was shot in self-defense. Asked for his thoughts and feelings regarding this crime, he stated that he now knows that other people were hurt by this crime; in particular, his and the victim's family. He said if he had to do it all over again, he would not be involved with drugs.

Regarding CDC-115 violations, his most recent violation was on 06/14/93 for disobeying a direct order to submit to a urine sample.

Regarding drugs and alcohol, he admits to a heroin problem in the past. He is currently participating in a recovery group in this institution. He has participated in one-on-one BPT therapy with Dr. Bruce Bakeman and also participated in Dr. Bakeman's "Life Skills" group in the past. Educationally, he completed his GED during his incarceration. Vocationally, he has experience in the print shop, at one point being in the lead position in that vocation. This inmate stated he gets regular visits from family members, including his brother, mother and fiancee. His plans, if paroled, include getting married to his fiancee and finding work either in the printing or construction fields.

MENTAL STATUS EXAMINATION: Inmate Glasgow is a 55-year-old, black male of average to large build who appears his stated age. His dress and grooming were appropriate. He was calm, alert and cooperative during the interview. His speech; affect and flow of thought were all normal. His intellectual functioning was estimated to be within the average range.

GLASGOW        C-26529        CTF-CENTRAL        11/08/96        gj

GLASGOW
C-26529
Page Two

DIAGNOSTIC IMPRESSIONS:

AXIS I:     Heroin dependence, in institutional remission.
AXIS II:    Antisocial personality disorder, improved.
AXIS III:   High blood pressure.

CONCLUSIONS AND RECOMMENDATIONS:

1)  This inmate is competent and responsible for his behavior.
He has the capacity to abide by institutional standards and he
has generally done so during his incarceration.

2)  Regarding his violence potential, due to his maturity and
sobriety, his violence potential is estimated to be somewhat
below average relative to this inmate population.

3)  Conditions of parole should include no alcohol nor illicit
drugs and mandatory drug monitoring.

4)  This inmate has no psychiatric condition that would suggest
the need for any kind of mental health treatment at this time.

STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
SEPTEMBER 1993 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 17, 1993

This is the fourth psychiatric evaluation for the Board of Prison Terms on inmate Glasgow. This report is the product of a personal interview, as well as a review of his Central file and medical record.

He had no CDC 115s for a long period, but there is currently a CDC 115 pending from June 15, 1993, when he disobeyed an order to submit a urine sample for testing.

His crime consisted of the 1980 shooting of a man. He expressed regret for that incident. He has attained his GED educationally. Vocationally, he is now president of the print shop where he works. His future plans include moving to Santa Clara County to live and work in printing.

MENTAL STATUS EXAMINATION: Inmate Glasgow is a well developed, well nourished, muscular man who appeared to be his stated age of 52. He was appropriately dressed and groomed, and seemed to be relaxed and cooperative during the interview. His speech was of normal intensity, rate, inflection and quantity. His affect was normal and seemed appropriate to the content of his thought. His flow of thought was normal with no hallucinations nor delusions noted. He seemed to be fully oriented with normal intellectual functioning. His attention and concentration were good. His insight and judgment appear to be improving over that at the time of the shooting.

PSYCHIATRIC DIAGNOSIS: (DSM-III-R)

AXIS I:    304.00 - Heroin dependence, in institutional remission.
AXIS II:   301.70 - Antisocial personality disorder, improved.
AXIS III:  High blood pressure.
AXIS IV:   Psychosocial stress - two (incarceration).
AXIS V:    Global assessment of functioning: current 90, past year 90.

PSYCHIATRIC CONCLUSIONS: His diagnosed psychopathology appears to be indirectly related to his offense. It was a contributing factor in the way he thought and acted at that time, but it did not specifically determine

GLASGOW        C-26529          CIF-CENTRAL          07/12/93          gj

GLASGOW
C-26529
Page 2

his actions. He does not have a psychiatric condition which would benefit from mental health treatment following his release. He does appear to be showing improvement in his behavior, and if released, he should be able to maintain these gains, especially provided he avoids illicit drugs.

SUGGESTED ACTIONS: If he is to be continued in his present program, he should be encouraged to continue his attendance of Alcoholics Anonymous and to continue his vocational training in the printing trade. If he is considered for parole, his level of dangerousness should be no more than for the average inmate. Conditions for parole should include no alcohol nor illicit drugs.

RECOMMENDATION TO CLASSIFICATION COMMITTEE: Until released, he should: 1) Continue to attend Alcoholics Anonymous. 2) Continue his vocational training in the printing trade.

*Bruce Bakeman Ph.D.*
BRUCE M. BAKEMAN, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
JULY 1992 ISL CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 4, 1992

This is the third psychological evaluation for the Board of Prison Terms on inmate Brice Glasgow. He was seen for a 30 minute interview, including a review of his Central file and medical record, for the purpose of this evaluation.

His last psychiatric evaluation for the Board of Prison Terms in 1989 by Dr. Clyde Martin was positive. Despite a long criminal history, this inmate has been estimated to be below average in violence potential. He completed Dr. Bakeman's "Lifeskills" group in January of 1991. He is currently working in the print shop and is attending Alcoholics Anonymous meetings. He has not received any CDC 115s.

In describing his offense, he states that it was self-defense, and that the victim had severely beaten the inmate a year prior to the Life crime.

MENTAL STATUS EXAMINATION: This is a well developed, well nourished male who appears to be his stated age. He was neatly dressed and well groomed. He was relaxed and cooperative. His speech was normal. His affect was normal and appropriate. He denies any symptoms of depression, suicidal ideation, hallucinations, delusions or thought disorder. He was oriented and is not having any difficulty with his memory. His intellectual functioning is estimated to be in the average range. His attention and concentration are good. His insight and self-understanding are good. He appears to have a clear understanding of the causative factors related to his offense. His emotional stability is currently much improved. He appears to be sincere about his rehabilitation. His judgment for hypothetical situations indicates that his problem solving ability is good. He shows an ability to cooperate with authority during an emergency situation and has a prosocial orientation. His solutions for moral dilemmas indicate an above average ability to understand the rights and responsibilities of himself and others.

GLASGOW          C-26529          CTF-CENTRAL          06/06/92          gj

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
JULY 1989 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
APRIL 3, 1989

This is the second psychiatric evaluation for the Board of Prison Terms on Mr. Glasgow and is based on a 30-minute interview and a review of the Central file. The inmate had heroin addiction and was receiving methadone on the outside. A previous psychiatric report indicated heroin addiction and antisocial personality.

MENTAL STATUS EXAMINATION: The patient is a well developed, well nourished, muscular individual who appears his stated age. He was neatly dressed and well groomed. He was mildly tense. He was cooperative. His speech was of normal intensity, rate and inflection and he was spontaneous. His affect was normal. His thought content was appropriate to affect. His flow of thought was normal. He denies depressive or suicidal ideation. He has normal associations of thought. He is oriented as to time, place and person. His memory is intact. His intellectual functioning was not estimated. His attention and concentration were good. He has some insight and fair judgment at this point. He is currently remaining disciplinary-free and has a good work history. He seems to understand the causative factors of his crime, has some good self-understanding, positive attitudes for change, and good social identification. His sincerity for rehabilitation seems to be good.

PSYCHIATRIC CONCLUSIONS: The diagnosed psychopathology is only indirectly related to the crime. It predisposed to it, but did not determine it. Psychiatrically, he has improved moderately while in the institution. In a less controlled setting, such as a return to the community, the inmate is likely to continue the present gains if he does not return to his addiction. If not paroled, it is recommended that he be continued in his present rehabilitation program. If paroled, his potential for violence is probably less than that of the average inmate unless he returns to his addiction, at which time it would be greater. Any conditions for parole should include drug and alcohol counseling and testing, and close supervision. I have no other recommendations.

CLYDE V. MARTIN, M.D., F.A.P.A.
Staff Psychiatrist
Correctional Training Facility, Soledad

GLASGOW        C-26529        CTF-CENTRAL        04/10/89        gj

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
JULY 1986 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 9, 1986

This is the first psychiatric report to the Board of Prison Terms for this 45 year old black male serving a sentence for Murder First from Santa Clara County.

This report is based upon a review of the inmate's Central File and an interview of half an hour. The subject was born in Prescott, Arizona and moved with his family to California at age 3. He dropped out of school in the 11th grade and has been a construction laborer since that time, working sporadically. From his early 20's until the age of 36 he was a heroin addict. He stopped by himself when he "grew up". He had four felony convictions prior to the instant offense but no prior prison sentences (for theft, burglary, NSF). He is reluctant to discuss the details of the instant offense as he has it on appeal since his niece, one of the victims, was convicted of perjury for her testimony in his trial. The subject is married and has a nine year old child. He is currently employed in textiles at CTF and is housed at CTF-Central. He has mild hypertension which is controlled with Aldomet and Dyazine. He sustained head injuries during assaults connected with the instant offense and had three convulsive seizures later and glaucoma, traumatic type, which has improved. He has no CDC-115's since incarceration and no significant problems during incarceration.

MENTAL STATUS EXAMINATION: Is unremarkable. He is in good contact and fully oriented, without thought or mood disorder. Intellect is average. Memory is grossly normal and there are no overt signs of organicity. Insight and judgement are intact. He does not appear to have antisocial attitudes at the present time.

PSYCHIATRIC DIAGNOSIS:    Axis I:   Heroin Dependence, by history.
                          Axis II:  Antisocial Personality Disorder, Improved.

PSYCHIATRIC RECOMMENDATION: I can make no observations about the instant offense as the subject has it in appeal. He has a long history of criminal behavior, primarily associated with his drug dependence of many years. There is little evidence or prior violent behavior. He appears to have matured and "grown up", as he puts it, since incarceration. His disciplinary record supports this hypothesis. He does not appear to be in need of psychiatric treatment or vocational training.

PHILIP S. HICKS, M.D.
Staff Psychiatrist

GLASGOW          C-26529          CTF-CENTRAL          5/9/86          da

**F I L E D**

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

AUG 1 8 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
By _____, declare: _____ Deputy
S. Chua

I, _Brica Glasgow_

I am over 18 years of age and I am party to this action.  I am a

resident of CORRECTIONAL TRAINING FACILITY prison, in the County

of Monterrey, State of California.  My prison address is:

_Brica Glasgow_, CDCR #: _C-26529_
CORRECTIONAL TRAINING FACILITY,
P.O. BOX 689, CELL #: _4-131_
SOLEDAD, CA  93960-0689.

On _8/14/06_, I served the attached:

_Superior Court of Santa Clara_

on the parties herein by placing true and correct copies

thereof, enclosed in a sealed envelope (verified by prison

staff), with postage thereon fully paid, in the United States

Mail in a deposit box so provided at the above-named institution

in which I am presently confined.  The envelope was addressed as

follows:

_Superior Court of Santa Clara_
_County of Santa Clara_
_191 N. First St._
_San Jose, CA 95113_

I declare under penalty of perjury under the laws of the

State of California that the foregoing is true and correct.

Executed on _8/14/06_.

_Brice Glasgow_
_____
Declarant

# EXHIBIT 9

**FILED**

SEP 1 3 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

|  |  |
|---|---|
| In re | No.: 75071 |
|     BRICE GLASGOW, | |
| On Habeas Corpus | ORDER |

Pursuant to *In re Dannenberg* (2005) 34 Cal.4th 1061 parole can be denied if any one of several broadly interpreted, and extremely deferentially reviewed, unsuitability factors are present. In this case "multiple victims were attacked, injured or killed." The habeas petition is DENIED.

DATED: **13 Sep**, 2006 _____

PAUL BERNAL
JUDGE OF THE SUPERIOR COURT

cc: Petitioner
    Attorney General
    Research(A)
    CJIC

# EXHIBIT 10
# Part 1 of 2

MC-275

Name  Brice  Glasgow

Address  Post Box 689

Soledad, California

93960-0689

CDC or ID Number  C-26529

ORIGINAL
FILED

Court of Appeal Sixth App. Dist.

OCT 31 2006

MICHAEL J. YERLY Clerk

BY _____

CALIFORNIA COURT OF APPEAL

SIXTH APPELLANT DISTRICT

(Court)

| BRICE GLASGOW, | |
|---|---|
| Petitioner | |
| vs. | |
| B. CURRY, Warden (a) | |
| Respondent | |

PETITION FOR WRIT OF HABEAS CORPUS

H030793

No. _____

(To be supplied by the Clerk of the Court)

Superior Court No: 75071

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☐ A conviction  ☒ Parole

☐ A sentence  ☐ Credits

☐ Jail or prison conditions  ☐ Prison discipline

☒ Other (specify) __Illegal denial of Parole Suitability by California Board of Prison Terms.__

1. Your name: _____

2. Where are you incarcerated? __Correctional Training Facility - Soledad__

3. Why are you in custody? ☒ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      12022.5

   b. Penal or other code sections: ___245A,___  ___12022.5___

   c. Name and location of sentencing or committing court: __Santa Clara County__

   d. Case number: __75071__

   e. Date convicted or committed: __December  19, 1980__

   f. Date sentenced: __Feb 11, 1981__

   g. Length of sentence: __First Degree Murder (25 Years to Life)__

   h. When do you expect to be released? __At the Minimum Release Date__

   i. Were you represented by counsel in the trial court? ☒ Yes.  ☐ No. If yes, state the attorney's name and address:

      _____

      _____

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6.  GROUNDS FOR RELIEF
    Ground 1:  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal
    enhancement."  *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four.  For
    additional grounds, make copies of page four and number the additional grounds in order.)*

    See Attached
    _____
    _____
    _____
    _____

    a.  Supporting facts:
        Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon
        which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For
        example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or
        failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re*
        *Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at *what* time *(when)* or
        place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

        See Attached
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____

    b.  Supporting cases, rules, or other authority (optional):
        *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary,*
        *attach an extra page.)*

        See Attached
        _____
        _____
        _____

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

   There has been no delays

16. Are you presently represented by counsel? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

   This Court has original jurisdiction in habeas proceedings

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 10-24-06     Mr. Bruce Glasgow
                                        (SIGNATURE OF PETITIONER)

1 that the Board set a release date unless Petitioner CURRENTLY
2 presents a risk of danger to the public. Petitioner submits tht
3 the representing District Attorney did not provide any new and
4 /or additional evidence whatsoever that Petitioner was an
5 unreasonable risk, a danger to the public, or otherwise
6 unsuitable for parole.

7 Additionally, Petitioner submits that the Board speaks in
8 meaningless generalities and fails to address the exact nature
9 of Petitioner's CURRENT character. By not doing so, the Board
10 violated the intent and spirit Penal Code (hereinafter "PC"), §
11 3041.5, and In re Ramerez, supra, which dictates that "[T]he
12 Board NORMALLY set a parole release." (citing Biggs v. Terhune,
13 et al., supra).

14 The Court in Biggs, supra, held that the Board's continued
15 use of the crime as a basis for denial of parole violates both
16 State and Federal due process. For the past three years the
17 Petitioner has had no occurrence of serious violent
18 disciplinary action, thus exemplifying himself as a model
19 prisoner; Petitioner seeks acknowledgement of the facts that
20 since 2002, there has been therafter a continuous four (4)
21 years history free of any disciplinary action and or
22 occurrence. Petitioner submits that the Board's failure to
23 uniformly measure his offense and setting his term
24 proportionately to others similarly situated, and to find him
25 suitable for parole, violates both State and Federal due
26 process. Also, the current policy of the Board, which will be
27 discussed more fully infra, is the setting of a parole date
28 which is all too often the exception rather then the norm, and

1  thus violates the Petitioner's liberty interest tht is present

2  in a parole date; In re Rosenkrantz, supra; McQuillion v.

3  Duncan, supra Biggs v. Terhune, et al., supra.    At the

4  Petitioner's Board hearing, the Board relied SOLELY on the

5  commitment offense and prior history to justify it's unlawful

6  finding of unsuitability.  Beginning at Ht, pg. 65, the Board

7  stated:  That the commitment offense was carried out in an

8  especially cruel and callous manner in that the inmate shot and

9  killed Mr. Ralph Collins and there were three bullet wounds to

10 the back and two to the back of the head and also a shot into

11 Patricia Watts who was the inmates niece and she was shot once

12 in the back.    That multiple victims were attacked in the same

13 incident and one was killed and one was injured and the motive

14 for the crime was explicable or very trivial in relation to the

15 offense and on the one hand we have as a result of and

16 altercation and on the hand we have that there was intentional

17

18 1.  The Court of Appeal in In re George Scott, (2004) 119 Cal. App. 4th 871, reaffirmed the
   rationale of the Ramirez and Smith Courts when it declared "..parole is the rule, rather than
19 the exception, and conviction for second degree murder does not automatically render one
   unsuitable. (In re Smith, (2003) 114 Cal..Appl 4th 343, 366). In re Ramirez, supra, 94 Cal.
20 App. 4th 549..[a]ll violent crimes demonstrates the perpetrator's potential for posing a
   grave risk to public safety, yet parole is mandatory for violent felons serving determinate
   sentences. (Pen Code § 3000, subd. (b)(1).) And the Legislature has clearly expressed its
21 intent that  when murders- who are the grate majority of inmates serving indeterminate
   sentences - approach their minimum eligible parole date, the Board 'shall normally set a
22 parole release date..." (id. at p. 570).
   2.  The Court of Appeal on June 24, 2004, In re George Scott, supra 119 Cal. App. 4th at 887
23 fn, 7, also reaffirmed the Legislative Intent of Uniform Terms by stating;  "The first two
   sentences of the DSL declare that the purpose of imprisonment or a crime is punishment and
24 that '[t]his purpose is best served by terms proportionate to the seriousness of the offense
   with provisions for uniformity in the sentences of offenders committing the same offense
25 under similar circumstances. (Pen. code, § 1170, subd. (a)(1).) Nothing in the DSL or its
   legislative history suggests that legislative concern with uniformity was limited to those
26 serving determinate terms. Penal Code 3041 shows that this interest does extend to
   individuals such a s [Petitioner] who are serving indeterminate life terms (id., ciating,
27 Ramirez, supra, 94 Cal. App. 4th at 559.)

28

1 | motives behind the shooting.

2 |     In addition, and with regard to the Petitioner's

3 | suitability, the board erred in it's conclusion that Petitioner

4 | was a threat to society and would pose an unreasonable risk of

5 | danger. Petitioner's Psychiatric Reports have been much to the

6 | contrary, and specifically, Dr Reed stated: that you are no

7 | more risk of violence then the average citizen. (See Psych

8 | Evaluation Exhibit "B" attached hereto).

9 |     Additionally, the Board ignored that Petitioner has been

10 | deemed by the California Department of Corrections a Model

11 | prisoner with A-1-A status, and Not a threat to society, and

12 | further ignored that Petitioner's crime is not "particularly

13 | egregious" by placing Petitioner in a Level II prison setting.

14 |     Again, In re Norman G. Morrall, supra, the Court concluded "

15 | A refusal to consider the particular circumstances relevant to

16 | an inmate's individual suitability for parole would be contrary

17 | to law." Moreover, the Court in Biggs, supra, addressed the

18 | Board's continued illegal usage of the crime and /or prior

19 | history to justify a denial of parole:

20 |        "...a continued reliance... on an unchaging factor,

       the circumstances of the offense and conduct prior

21 |        to imprisonment, runs contrary to the rehabilitative

       goals espoused by the prison system and could result

22 |        in a due process violation." (Biggs, supra, 334 F. 3d

       at 917).

23 |

24 |     In Biggs, supra, the appeal pursuant to his initial

25 | suitability hearing. The Petitioner has now had four (4) Board

26 | hearings and submits that his most recent denial rests solely

27 | on the commitment offense, and therefore violates both State

28 | and Federal due process. Most importantly, there is no

1  evidence that the public requires a lengthier period of
2  incarceration (please refer to PC § 3041 (b)), in relation to
3  other instances of the same crime (please refer to 3041.5).

4      Petitioner submits understanding and perspective of the
5  crime is compelled by the Board's own proportionately matrix
6  (please refer to CCR Division 2, 2403 (c). The matrix scale
7  and rating of the more common and routine variations of murder
8  appear to be codification of when a crime of this nature can
9  be more egregious than average. Petitioner submits that his
10  crime falls squarely in the matrix [category of "twenty-six"
11  (26) years. . With post-conviction credits, Petitioner has
12  exceeded the matrix by more than four (4) years - and without
13  post conviction credit application, the Petitioner has served
14  his matrix. The Board fails in any attempt to substantiate
15  why Petitioner's crime is so heinous as to require that
16  Petitioner be expected time and time again from the general
17  rule that a parole date shall normally be set; please see In
18  re Ramirez, supra, wherein the court:

19      "The Board must weigh the inmate's criminal conduct
20      not against ordinary social norms, but against other
        instances of the same crime or crimes. (Ramirez,
21      supra, 94 Cal.App 4th at p. 570).

22  Petitioner's Psychiatric Report evidence, like Biggs supra,
23  is supportive of release; contrary to the Board's erroneous
24  and specious findings (please see Exhibit "B"). The Court in
25  Biggs, addressed the Board's illegal usage of needed therapy
26  and other illegal reasons to justify a highly illegal denial;
27  the Court concluded:

28

> "The record in this case and the transcript of Biggs
> hearing before the Board clearly show that many of
> the conclusions and factors relied on by the Board
> were devoid of evidentiary basis, (Biggs, supra,
> 334 F. 3d at p. 915)

The Court in Biggs, supra, went on to warn the Board that while there was "some evidence" to use the crime as a basis for denial at his initial hearing, the board's continued use of the crime as a basis for continuous denials would be violative of Bigg's Federal-due process rights.    Petitioner submits that the Board's sole unage of the initial commitment offense and/or prior social history, as a continued basis to deny him a parole date, has violated his 5th and 14th Amendment rights under the United States Constitution to not be deprived of his liberty.    The Court in Biggs, supra, also held:

> "[T]o ensure that a state created parole scheme
> serves the public interest purposes ofrehabilitation
> and deterrence, the Parole Board must be cognizant
> not only of the factors required by state statute
> to be considered, but also the concepts embodied
> in the Constitution requiring due process of law..."
> [please see e.g. in Greenholtz, 443 U.S. at 7-8.]."
> (Biggs, supra, 334 F.3d at p. 916)

> "The Parole Board's sole supportable reliance on
> the gravity of the offense and conduct prior to
> imprisonment to justify denial of Parole
> can be initially justified as fulfilling the
> requirements set forth by state law.   Over time
> however, should Biggs continue to demonstrate
> exemplary behavior and evidence of rehabilitation,
> denying him a parole date simply because of the
> nature of his offense and prior conduct would raise
> serious questions involving his liberty interest
> in parole..." (id).

Petitioner also submits that the Board has adopted an anti and / or no parole policy per se, or a policy of underinclusion demonstrating a policy of systematic bias;

granting parole to approximately 1% (one percent) of the lifers population, thus violating the legislative intent of PC § 3041.5, that "... a parole release date shall normally be set in manner that will provide uniform terms for offenders with crimes of similar gravity and magnitude..." and, petitioner's State and Federal due process rights as well (please refer to In re Ramirez, supra, pg. 565). Petitioner contends that the evidence behavior by a quasi-ljudicial Board, of policy demonstrating an approximate 98.5% denial rate, supports the premise that such a policy exists (i.e., anti and /or no parole policy, or, a policy of systematic bias); this policy violates the strictures of substantive due process.

If there is any question as to the meaning and legislative intent of Penal Code §3041 as discussed above, which Petitioner asserts that there clearly is not, then Petitioner is entitled to the interpretation that Penal Code §3041 and 15 CCR §2400 et seq. apply to provide an exception to the protected liberty interest in a presumption to release on parole only if support by evidence that Petitioner poses a threat of future violence if released. On the other hand, if courts reasonably can so differ in the interpretation of the statute and regulations at issue, then they must be deemed overly vague, so as to violate Petitioner's constitutional right to due process.

     A.    The Some Evidence Relied On to Deny Parole Must be Relevant And Reliable In Establishing Current, Unreasonable Threat to Public Safety.

In explaining what the "some evidence" standard meant, the

1  Rosenkrantz court stated that "[o]nly a modicum of evidence
2  required." Rosenkrantz, 29 Cal. 4th at 677. On its face, this
3  standard could thus be seen as remarkably broad - that the
4  barest speck or mote of evidence, no matter its relevance,
5  reliability, place in the context of other evidence or the
6  government's assessment of it - would be enough to completely
7  immunize Executive parole decisions from judicial review.
8  Such a reading, however, would effectively serve to nullify
9  the Rosenkrantz court's holding that courts are required to
10 review the factual basis of an Executive parole decision. An
11 unpacking of the "some evidence" standard itself - both
12 conceptually and through a review of the application of this
13 standard in Rosenkrantz and its progeny - makes clear that
14 the standard is meaningful.  Properly understood, it strikes
15 an appropriate balance between judicial deference to difficult
16 Executive decisions and the protection of constitution liberty
17 interests.

18                        CONCLUSION

19    Petitioner did not receive a fair hearing from the Board,
20 nor wil he ever, because the results are predetermined, in
21 violation of Petitioner's 5th and 14th amendment rights under
22 the U.S. Constitution.  The denial of Petitioner's parole date
23 is no more than ipse dixit a sham.  Petitioner did not receive
24 the    "individualized    consideration"    to    which    is
25 constitutionally    entitled.    In    re    george    Scott,
26 (Cal.App.1st.Dist) June 24, 2004, 119 Cal.App.4th. 871, 899.

27   The court must order Petitioner discharged and or released
28 or at the very least a decision within ten (10) days granting

1 Petitioner parole, setting his term "uniformly" as mandated by

2 the Legislature.

3                    PRAYER FOR RELIEF

4        1.   Issue an Order To Show Cause on an expedited basis;

5        2.   Appoint Counsel;

6        3.   Order Discovery;

7        4.   Conduct an Evidentary Hearing;

8        5.   Order Petitioner's appearance before the court;

9        6.   Order Petitioner discharged, or in the laternative

10 order petitioner by given a parole date, then released on

11 parole,

12       7.   Issue an Order for Declatory Relief

13       8.   Issue an Order for Injunctive Relief;

14       9.   Any other relief this court deems fair, just and

15 appropriate.

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.    If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:   (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

      _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    _____

    _____

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See In re Muszalski (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    The Board of Parole Hearings has eliminated the BPH Appeals Unit process

    and no longer allows the filing of Administrative Appeals of BPH denials

    of parole for indeterminately sentenced prisoners such as myself.

    There is No longer an administrative remedy, therefore exhaustion is

    impossible.

    _____

    _____

    _____

    _____

    b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
       Attach documents that show you have exhausted your administrative remedies.

FILED

SEP 1 3 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| In re | No.: 75071 |
|     BRICE GLASGOW, | ORDER |
| On Habeas Corpus | |

    Pursuant to *In re Dannenberg* (2005) 34 Cal.4th 1061 parole can be denied if any one of several broadly interpreted, and extremely deferentially reviewed, unsuitability factors are present.  In this case "multiple victims were attacked, injured or killed."  The habeas petition is DENIED.


DATED: __13 Sep__, 2006

            PAUL BERNAL
            JUDGE OF THE SUPERIOR COURT


cc:  Petitioner
      Attorney General
      Research(A)
      CJIC

| IN THE SUPERIOR COURT OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA CLARA | **F I L E D** |
|---|---|
| Plaintiff/Petitioner<br>Brice Glasgow | SEP 1 3 2006 |
| In re: People vs. Glasgow | KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of CA County of Santa Clara<br>BY _____ DEPUTY |
| PROOF OF SERVICE OF: Order in re: Habeas Corpus | Case Number:<br>75071 |

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this cause and that a true copy of this document was mailed first class postage fully prepaid in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on SEP 1 3 2006 . I declare under penalty of perjury that the foregoing is true and correct.

DATED: SEP 1 3 2006

Kiri Torre, Chief Executive Officer

BY: Catherine Guerra, Deputy Clerk

| Brice Glasgow<br>#C-26529<br>P.O. Box 689<br>Soledad, CA 93960-0689 | Research Attorney Criminal Division<br>190 W. Hedding Street<br>San Jose, CA 95110<br>*Placed in Research Attorney pick up box at HOJ |
|---|---|
| | Office of the District Attorney<br>70 West Hedding Street<br>San Jose, CA 95110<br>*Placed in District Attorney pick up box at HOJ |
| | CJIC |
| | |

Proof of service
Clerk's Certificate of Service

THE BOARD OF PRISON TERMS ILLEGALLY USED PENAL CODE
SECTION 3041 (b) [THE EXCEPTION] TO FIND PETITIONER
UNSUITABLE FOR PAROLE. THE DECISION WAS ARBITRARY
AND CAPRICIOUS, INDIRECT VIOLATION OF PETITIONER'S
STATE AND FEDERAL DUE PROCESS RIGHTS. THERE IS NOT
A MODICUM OF EVIDENCE THAT PETITIONER IS A CURRENT
THREAT TO SOCIETY OR UNSUITABLE FOR PAROLE.

On November 2, 2005, Petitioner Brice Glasgow, (hereinafter "Petitioner"), was provided a Life Term Parole Consideration Hearing before the Board of Parole Hearings (hereinafter "Board"; please refer to Exhibit "A", which is the Hearing Transcript, hereinafter "HT".) Said Board hearing was petitioner's fourth ( 4th) parole suitability hearing. Petitioner's minimum leligible release date was March 18th, 1998. The purpose of this Board hearing was for the setting of Petitioner's term uniformly [2] to his offense and for a finding of suitability for parole (please See Penal Code § 3041.5; In re Edward Ramirez 94 Cal. Appl 4th 541 (2001); McQuillion v. Duncan, (9th Cir.) 306 F. 3d 895 In re Norman G. Morrall, (2002) 102 Cal. App. 4th 280; In re Rosenkrantz, (2002) 29 Cal. 4th 660; In re Mark Smith (2003) Cal. App 4th 343 and Biggs v. Terhume, (2003 9th Cir.) 334 F. 3d 910.

The consequent result of this Board hearing was an erroneous and unlawful finding of unsuitability and a release date was not set; Petitioner was given a one (1) year denial and did not appeal this decision through the Administrative remedy because the Board of Parole Hearing has eliminated the Appeal Unit and no longer allows for the fining of administrative appeals on BHp denials of parole for indeterminately sentenced prisoners such as myself. Petitioner submits that the Board's regulation, that is the California Code of Regulations (hereinafter "CCR") § 2402 (a). DEMANDS

EXHIBIT  "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of: )                CDC Number C-26529
                           )
BRICE GLASGOW )
                           )
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 2, 2005

8:45 A.M.


PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Chuck Wolk, Deputy Commissioner



OTHERS PRESENT:

Mr. Brice Glasgow, Inmate
Mr. Anthony Hall, Attorney for Inmate
Mr. Ronald Rico, Deputy District Attorney
Ms. Joyce Nedde, Observer
Correctional Officers Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No     See Review of Hearing
_____ Yes    Transcript Memorandum


RECEIVED
DEC 8 2005
BY: CTF/BPH

Sue Gerdes, Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 11 |
| Pre-Commitment Factors | 18 |
| Parole Plans | 22 |
| Post-Commitment Factors | 32 |
| Closing Statements | 54 |
| Recess | 64 |
| Decision | 65 |
| Adjournment | 69 |
| Transcriber Certification | 70 |

--oOo--

1

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | DEPUTY COMMISSIONER WOLK:  We're on |
| 3 | record. |
| 4 | PRESIDING COMMISSIONER ST. JULIEN:  It's |
| 5 | 8:45 A.M. and this is a Subsequent Parole |
| 6 | Hearing for Brice Glasgow CDC number C-26529. |
| 7 | Today is November 2nd, 2005 and we are at the |
| 8 | Correctional Training Facility in Soledad.  The |
| 9 | inmate was received on February 19th, 1981 for a |
| 10 | life term starting date (indiscernible) 17th, |
| 11 | 1983 from the County of Santa Clara case number |
| 12 | 75071 count one Penal Code section violation 187 |
| 13 | murder first, count two assault with a deadly |
| 14 | weapon Penal Code section 245A, count two as |
| 15 | well, use of a firearm, Penal Code section |
| 16 | violation 12022.5 and inmates are all from the |
| 17 | County of Santa Clara case number 75079.  The |
| 18 | inmate received a term of 25 years to life plus |
| 19 | five years.  First eligible parole date March |
| 20 | 18th, 1998.  Is that correct? |
| 21 | INMATE GLASGOW:  (indiscernible) |
| 22 | PRESIDING COMMISSIONER ST. JULIEN:  We |
| 23 | might need to have (indiscernible).  We are tape |
| 24 | recording the hearing so we are going to go |
| 25 | around the room and introduce our selves.  We |
| 26 | will say our first and last name, spell our last |
| 27 | name and if you could also state your CDC number |

1   after you spell your last name.  My name is

2   Tracey St. Julien S-T capital J-U-L-I-E-N

3   Commissioner.

4        DEPUTY COMMISSIONER WOLK:  Chuck Wolk W-

5   O-L-K Deputy Commissioner.

6        ATTORNEY HALL:  Anthony Hall H-A-L-L

7   attorney for Mr. Glasgow.

8        INMATE GLASGOW:  Glasgow  C-26529 G-L-A-

9   S-G-O-W.

10        PRESIDING COMMISSIONER ST. JULIEN:  Your

11   first name.

12        INMATE GLASGOW:  Brice B-R-I-C-E.

13        PRESIDING COMMISSIONER ST. JULIEN:  Mr.

14   Rico.

15        DEPUTY DISTRICT ATTORNEY RICO:  Thank you

16   Commissioner.  Ronald Rico R-I-C-O Deputy

17   District Attorney for Santa Clara County.  And I

18   have a second individual in the room.  The

19   former trial prosecutor in the case who is here

20   as an observer only.  I will let the identify

21   herself.

22        MS. NEDDE: My name is Joyce Nedde N-E-D-

23   D-E.

24        PRESIDING COMMISSIONER ST. JULIEN:  And

25   we also have two correctional officers in the

26   room who are here for security purposes.  And

27   Mr. Glasgow, that form in front of you that

3

1   addresses your ADA rights I need you to please

2   read that aloud and then I am going to ask you

3   some questions about what you have read.

4          INMATE GLASGOW:   The Americans with

5   Disabilities Act, AFA, is a law to help people

6   with disabilities.   Disabilities are problems

7   that make it harder for some people to see,

8   hear, breathe, talk, walk, learn, think, work or

9   take care of them selves than it is for others.

10   No one can be kept out of pubic places or

11   activities because of a disability.   If you have

12   a disability you have the right to ask for help

13   to get ready for your court or parole hearing

14   and BPT hearing.   To get to the hearing, talk,

15   read forms and papers and understand the hearing

16   process.   The BPT will look at what you ask for

17   to make sure that you have a disability that is

18   covered by the ADA and that you have asked for

19   the right kind of help.   If you do not get help

20   or if you don't think you got the kind of help

21   you need, ask for a BPT 1074 grievance form.

22   You can also get help to fill it out.

23          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

24   I note that on May 3rd, 2004 you signed a BPT

25   form 1073 indicating that you do not have

26   disabilities, is that still correct?

27          INMATE GLASGOW:   What it is I have a

4

1    bladder infection and I was concerned

2    (indiscernible) an enlargement in my lower

3    (indiscernible) just an infection.

4    (indiscernible).

5          PRESIDING COMMISSIONER ST. JULIEN:  Are

6    you taking antibiotics?

7          INMATE GLASGOW:  Yes I did.

8          PRESIDING COMMISSIONER ST. JULIEN:  You

9    said that you are currently taking medication.

10   What are you currently taking?

11         INMATE GLASGOW:  (indiscernible)

12         PRESIDING COMMISSIONER ST. JULIEN:

13   Probably and antibiotic.  And is that medication

14   giving you any side affects?

15         INMATE GLASGOW:  Dries me up.

16         PRESIDING COMMISSIONER ST. JULIEN:  Okay,

17   makes you thirsty.  Is that uncomfortable enough

18   that you can't participate in the hearing today?

19         INMATE GLASGOW:  No.

20         PRESIDING COMMISSIONER ST. JULIEN:  Now I

21   noticed that you are wearing glasses, with those

22   glasses on, eyeglasses, can you see around the

23   room clearly?

24         INMATE GLASGOW:  Yes.

25         PRESIDING COMMISSIONER ST. JULIEN:  Okay,

26   and you can read?

27         INMATE GLASGOW:  Yes.

5

1        PRESIDING COMMISSIONER ST. JULIEN:    And

2    you can see the (indiscernible).

3        INMATE GLASGOW:  Yes Ma'am.

4        PRESIDING COMMISSIONER ST. JULIEN:    Do

5    you have any hearing impairments?

6        INMATE GLASGOW:  No.

7        PRESIDING COMMISSIONER ST. JULIEN:

8    (indiscernible).

9        ATTORNEY HALL:  It has to do with his

10   medical condition.  In the 1073 he mentioned he

11   has frequent (indiscernible).

12       PRESIDING COMMISSIONER ST. JULIEN:    And

13   that's (indiscernible).  If you feel the need

14   that you need to be excused for a few minutes or

15   whatever while we are at the hearing today you

16   can just ask and we can take a recess.  Okay?

17       INMATE GLASGOW:  Yes Ma'am.

18       PRESIDING COMMISSIONER ST. JULIEN:    And

19   do you know what the Triple CMS and the EOP

20   programs are?

21       INMATE GLASGOW:  I think it has something

22   to do with mental health.

23       PRESIDING COMMISSIONER ST. JULIEN:    Yes

24   exactly.  They are the mental health services

25   programs that the department offers.  Have you

26   ever been a part of those programs?

27       INMATE GLASGOW:  No Ma'am.

6

1        PRESIDING COMMISSIONER ST. JULIEN:  And

2   have you ever taken any psychotropic

3   medications?

4.        INMATE GLASGOW:  No.

5        PRESIDING COMMISSIONER ST. JULIEN:  And

6   you did mention that you are on medicines now

7   for bladder issues.  Are you taking any other

8   medications?

9        INMATE GLASGOW:  Hyper tension

10  (indiscernible).

11       PRESIDING COMMISSIONER ST. JULIEN:  And

12  again, do the medications that you are taking

13  for that condition will they cause you not to be

14  able to participate in the hearing today?

15       INMATE GLASGOW:  No.

16       PRESIDING COMMISSIONER ST. JULIEN:  And

17  Mr. Hall, are you satisfied that your client's

18  ADA rights have met?

19       ATTORNEY HALL:  Yes I do.

20       PRESIDING COMMISSIONER ST. JULIEN:  I am

21  going to go ahead then and give you an outline

22  of the hearing procedure today.  And I will note

23  that you (indiscernible) ADA issues that you do

24  have your GED.

25       INMATE GLASGOW:  Yes.

26       PRESIDING COMMISSIONER ST. JULIEN:  You

27  didn't have any problem (indiscernible).  We are

7

1    conducting the hearing pursuant to Penal Code
2    sections 3041 and 3042 of the rules and
3    regulations of the Board of Parole Hearings
4    governing parole consideration hearings for life
5    inmates.  The purpose of the hearing today is to
6    consider your suitability for parole.  We will
7    reach a decision today and inform you whether or
8    not we find you suitable or the reasons for that
9    decision.  If you are found suitable for parole
10   the length of your confinement will be explained
11   to you.  The hearing will be conducted in two
12   parts.  First I am going to discuss the number
13   and the nature of crimes you were committed for,
14   your prior criminal and social history and your
15   parole plans and letters of support or
16   opposition that you may have.  Then Commission
17   Wolk will discuss with you your behavior and
18   programming history as well as your
19   psychological evaluations and counselors
20   reports.  When that is done the District
21   Attorney and your attorney will be able to ask
22   you questions and then the District Attorney
23   actually asks the questions to the panel and you
24   answer in turn to us.  And then the District
25   Attorney, your attorney and you will be given an
26   opportunity to make a final statement as to your
27   suitability.  We will recess to deliberate and

8

1  when we reach a decision we will reconvene the

2  hearing and announce our decision.  The

3  California Code of Regulations state that

4  regardless of time served, a life inmate shall

5  be found unsuitable for and denied parole if in

6  the judgment of the panel the inmate still pose

7  an unreasonable risk of danger to society if

8  released from prison.  You also have certain

9  rights.  Those rights include the right to a

10  timely notice of this hearing, the right to

11  review your Central File, and the right to

12  present relevant documents.  Mr. Hall, have you

13  client's rights been met?

14        ATTORNEY HALL:  Yes they have.

15        PRESIDING COMMISSIONER ST. JULIEN:  You

16  also have the right to be heard by an impartial

17  panel.  Do you have any objections to today's

18  panel?

19        INMATE GLASGOW:  No Ma'am.

20        PRESIDING COMMISSIONER ST. JULIEN:  Mr.

21  Hall?

22        ATTORNEY HALL:  No objections.

23        PRESIDING COMMISSIONER ST. JULIEN:  You

24  will receive a copy of our written tentative

25  decision today and that decision is subject to

26  review by the decision review unit and the

27  entire board meeting as a whole. That decision

9

1  becomes effective within 120 days. In the

2  future you will receive a copy of that decision

3  and a copy of the transcripts once they are

4  transcribed. The board no longer has an appeals

5  process. So if you have any objections or

6  complaints about anything that happens here

7  today you need to file those directly to the

8  court. You can find information on how going

9  about doing that in the prison law library.

10  (indiscernible) Administrative Appeals

11  Correspondence and Grievances Concerning BPT

12  Hearings. You are not required to admit your

13  offense or discuss your offense if you do not

14  wish to do so. However, we accept as truth the

15  findings of the court. We invite you to discuss

16  the facts and circumstances of the crime if you

17  wish. We will consider and review any prior

18  statements you've made regarding your offense in

19  determining your suitability for parole.

20  Commissioner Wolk, is there confidential

21  information?

22      DEPUTY COMMISSIONER WOLK: Not that we

23  will be using today.

24      PRESIDING COMMISSIONER ST. JULIEN:

25  Earlier I passed a checklist marked exhibit one

26  to your attorney and I note that I received it

27  back. Are all of those documents in order?

10

1          ATTORNEY HALL:  Yes we have those.

2          PRESIDING COMMISSIONER ST. JULIEN:  And

3    Mr. Rico I am looking at a hearing checklist

4    that has gone by, it looks like the name on here

5    is Villego V-I-L-L-E-G-O and it's dated maybe

6    9/27/05.

7          DEPUTY DISTRICT ATTORNEY RICO:  I have

8    that same checklist and those documents and I am

9    prepared to --

10          PRESIDING COMMISSIONER ST. JULIEN: Okay

11    thank you.  Do you have any additional

12    documents?

13          ATTORNEY HALL:  Yes Commissioner we have

14    a chrono and a checklist and a couple other

15    documents.

16          PRESIDING COMMISSIONER ST. JULIEN:  One

17    of the officers will -- And do you have any

18    preliminary objections?

19          DEPUTY DISTRICT ATTORNEY RICO:  There

20    isn't any.

21          PRESIDING COMMISSIONER ST. JULIEN:  Thank

22    you.  And will Mr. Glasgow be speaking with us

23    today?

24          ATTORNEY HALL:  Yes he will.

25          PRESIDING COMMISSIONER ST. JULIEN:  Mr.

26    Glasgow I need you to get an oath.  Do you

27    solemnly swear or affirm that the testimony you

11

1   give at this hearing will be the truth, the

2   whole truth and nothing but the truth?

3           INMATE GLASGOW:  Yes Ma'am.

4           PRESIDING COMMISSIONER ST. JULIEN:  Okay.

5   I am going to go ahead then and read the summary

6   of the crime as it appears in the February 2003

7   board report.  And that report was prepared by

8   Correction Counselor (indiscernible) last name

9   Minor M-I-N-E-R and approved by the

10  classification (indiscernible).  It states that

11  on March 4th, 1980 the Palo Alto police

12  department officers responded to the report of a

13  shooting.  On arrival at the scene, the officers

14  observed the victim (indiscernible) Collins on

15  the floor of the bedroom.  Victim Collins had

16  been shot several times (indiscernible).  No

17  vital signs were detected and the Palo Alto

18  paramedics were (indiscernible).  At this time

19  the investigating officers made contact with the

20  victim Patricia Watts (indiscernible) who was

21  sitting on a fold out bed (indiscernible)

22  apartment.  Watts had suffered a gunshot wound

23  to her back.  Watts explained that at

24  approximately five A.M. she heard a knock on the

25  door and observed the defendant (indiscernible)

26  inmate in front of the apartment.  She indicated

27  that she would not open the door at that time

12

1  and returning to bed she remained that way until

2  morning.  The defendant returned and she allowed

3  him to enter the apartment.  She indicated that

4  he sat in the living room for approximately ten

5  minutes and played with her daughter.

6  (indiscernible) bathroom in the hallway of the

7  apartment and during this time she heard a knock

8  at the back door.  The defendant then allowed

9  Edmond Duhart D-U-H-A-R-T to enter the

10  apartment.  Watts explained the defendant then

11  began walking toward the hallway and she

12  observed that he had a gun in his hand.  She

13  indicated that she ran to the bedroom and

14  attempted to arouse Collins however the

15  defendant was at the door to the bedroom and

16  attempted to get in.  She related that the

17  defendant pushed his way into the bedroom and

18  during the ensuing struggle the defendant was

19  firing (indiscernible) at Collins and as she

20  attempted to protect the victim she was also

21  wounded.  Victim Watts relayed that during this

22  time that she was in bedroom, the defendant call

23  for Duhart to come into the room and remove

24  victim Watts indicating that he tried to pull

25  her off victim Collins while the defendant was

26  still shooting at the victim.  She indicated

27  that the defendant fired several shots from the

13

1   weapon (indiscernible).  She then related that

2   defendant Duhart then left the apartment.  So

3   apparently your (indiscernible) so we will have

4   to (indiscernible).

5       DEPUTY COMMISSIONER WOLK:  We are back on

6   record.

7       PRESIDING COMMISSIONER ST. JULIEN:  There

8   seems to be some discrepancies between your

9   version of what happened that day and what's on

10  the record here in terms of Ms. Watts and her

11  testimony.  Do you recall that?

12      INMATE GLASGOW:  Ya, I am not sure what

13  the Commissioner is mentioning.

14      PRESIDING COMMISSIONER ST. JULIEN:  Well

15  the prior transcripts you mentioned that Ms.

16  Watts was subsequently convicted of perjury for

17  giving false testimony in your case.

18      INMATE GLASGOW:  Yes.

19      PRESIDING COMMISSIONER ST. JULIEN:  So

20  did you shoot Mr. Collins?

21      INMATE GLASGOW:  Yes, yes I did.

22      PRESIDING COMMISSIONER ST. JULIEN:  And

23  did you shoot him when he was unarmed?

24      INMATE GLASGOW:  I believe he was armed.

25  This is what the discrepancy is.

26      PRESIDING COMMISSIONER ST. JULIEN:  So

27  why don't you tell us what happened.

14

1      INMATE GLASGOW:  He came to the door and

2   he had somethin in his hand (indiscernible)bein

3   fired (indiscernible) and we was fighten and she

4   was pulling on it.

5      PRESIDING COMMISSIONER ST. JULIEN:  So it

6   was the three of you correct?

7      INMATE GLASGOW:  Ya.

8      PRESIDING COMMISSIONER ST. JULIEN:  Mr.

9   Collins, Ms. Watts, and yourself?

10     INMATE GLASGOW:  Yes Ma'am.

11     PRESIDING COMMISSIONER ST. JULIEN:  And

12  whose gun was it?

13     INMATE GLASGOW:  It was my gun.

14     PRESIDING COMMISSIONER ST. JULIEN:  And

15  did you bring it to the house with you?

16     INMATE GLASGOW:  Yes Ma'am.

17     PRESIDING COMMISSIONER ST. JULIEN:  And

18  how did they know that you had a gun?

19     INMATE GLASGOW:  They didn't know, until

20  after was bein fired.

21     PRESIDING COMMISSIONER ST. JULIEN:  So

22  you all just kind of got in a fight?

23     INMATE GLASGOW:  No, when I went to open

24  the door for Mr. Dunhart evidentially she woke

25  Mr. Collins up.  I was in the bathroom and

26  that's when we started fighten.

27     PRESIDING COMMISSIONER ST. JULIEN:  So

15

1  you came out of the bathroom then did Mr.

2  Collins approach you at start physically

3  fighting with you?

4         INMATE GLASGOW:  He had somethin in his

5  had.

6         PRESIDING COMMISSIONER ST. JULIEN:  Do

7  you know what that was?

8         INMATE GLASGOW:  I thought it was a gun,

9  maybe it was a gun.  But I was afraid of it and

10  the fear might a took over.  But I did shoot

11  him.

12         PRESIDING COMMISSIONER ST. JULIEN:  How

13  many times did you shoot him?

14         INMATE GLASGOW:  I don't know nothin

15  about nothin.

16         PRESIDING COMMISSIONER ST. JULIEN:  Do

17  you remember how Ms. Watts got shot?

18         INMATE GLASGOW:  No I don't.  I didn't

19  know she been shot.

20         PRESIDING COMMISSIONER ST. JULIEN:  So

21  were there just bullets going off?

22         INMATE GLASGOW:  She was jerking on his

23  arm and all three of us was fighten.  It's hard

24  for me to describe but I was afraid and I don't

25  think she intentionally lied.  I think she was

26  hollering and screaming.  I know I was afraid of

27  I had contact with this man before.

16

1          PRESIDING COMMISSIONER ST. JULIEN:    So

2    you were afraid of him, did he live there?    Did

3    he live with Ms. Watts?

4          INMATE GLASGOW:    No, they just

5    occasionally stayed together.

6          PRESIDING COMMISSIONER ST. JULIEN:    Did

7    you know that he was there?

8          INMATE GLASGOW:    No.

9          PRESIDING COMMISSIONER ST. JULIEN:    So

10   when you went to Ms. Watts' apartment and you

11   spent some time with her child and all that you

12   didn't know that Collins' was there?

13         INMATE GLASGOW:    No.

14         DEPUTY COMMISSIONER WOLK:    What were you

15   doing there?

16         INMATE GLASGOW:    I just stopped there to

17   see my niece.    I heard she was havin trouble.

18         DEPUTY COMMISSIONER WOLK:    The girl that

19   you were talking with in the living room was

20   your niece?

21         INMATE GLASGOW:    Yes, it my gran --

22         PRESIDING COMMISSIONER ST. JULIEN:    So do

23   remember pulling the trigger?

24         INMATE GLASGOW:    I had my hand on the

25   trigger and she was pulling the gun.

26         PRESIDING COMMISSIONER ST. JULIEN:    The

27   gun was fired several times.

17

1       INMATE GLASGOW:  Ya but I never did stand

2   back and fire all them in his body or anything

3   that the crime say.  She was hollering and

4   screaming and pulling on the gun.

5       PRESIDING COMMISSIONER ST. JULIEN:  So

6   how do you feel about this crime now?

7       INMATE GLASGOW:  I feel like I am

8   responsible for it and I sorry it had to happen.

9   It affected me and it affected my family and it

10  affected his family.  And I know that they

11  suffer from it and so have I.  If I could redo

12  it again I would do it much different.

13      PRESIDING COMMISSIONER ST. JULIEN:  And

14  how would you redo it?

15      INMATE GLASGOW:  I would take the chance

16  in turning myself over to the care of God and I

17  wouldn't leave the scene like I did.

18      PRESIDING COMMISSIONER ST. JULIEN:  And

19  why do you think that you left?

20      INMATE GLASGOW:  I was afraid.  Fear took

21  over and I was afraid.  I did shoot the man and

22  I proves I was (indiscernible).

23      PRESIDING COMMISSIONER ST. JULIEN:  In

24  some of letters from law enforcement following

25  your arrest it said that you didn't show any

26  remorse about shooting Mr. Collins and Ms.

27  Watts.  Do you remember that?  That you didn't

18

1    show that you were sorry for killing Mr.

2    Collins?

3        INMATE GLASGOW:  It was murder, I killed

4    a man I am sorry. That's my family.  I love my

5    niece.  I (indiscernible) that's why I stopped.

6        DEPUTY COMMISSIONER WOLK:  Why were you

7    carrying a gun?

8        INMATE GLASGOW:  Palo Alto is a very bad

9    place.  When I go there, I been jumped before I

10    been a couple of times.  It's a bad place and

11    they have a lot of after hours (indiscernible).

12        PRESIDING COMMISSIONER ST. JULIEN:  Up

13    until that shooting you were in trouble a lot.

14        INMATE GLASGOW:  Yes.

15        PRESIDING COMMISSIONER ST. JULIEN:  I

16    have over 82 arrests.  That is a huge, huge

17    extensive arrest record.  Can you explain that?

18        INMATE GLASGOW:  I (indiscernible).

19        PRESIDING COMMISSIONER ST. JULIEN:  A lot

20    of burglaries, forgery, carrying concealed

21    weapons, battery.  So what kind of life were you

22    leading?

23        INMATE GLASGOW:  Terrible life Ma'am.

24        PRESIDING COMMISSIONER ST. JULIEN:  And

25    then that we have that you had a heroine

26    addiction for over 23 years?

27        INMATE GLASGOW:  Yes, that's part of the

19

1   reason.

2          PRESIDING COMMISSIONER ST. JULIEN:  So

3   did you become addicted to heroine?

4          INMATE GLASGOW:  Living (indiscernible).

5          PRESIDING COMMISSIONER ST. JULIEN:  But

6   there are -- how many other people did you know

7   from the same environment and the same

8   conditions that became addicted to heroine?

9          INMATE GLASGOW:  All my associates.

10          PRESIDING COMMISSIONER ST. JULIEN:  What

11   about member's or your family?

12          INMATE GLASGOW:  No.

13          PRESIDING COMMISSIONER ST. JULIEN:  So

14   what made you different from them?

15          INMATE GLASGOW:  I guess the time and

16   era.

17          PRESIDING COMMISSIONER ST. JULIEN:  What

18   do you think was in your character or your

19   personality or your life that led you to become

20   addicted to heroine and do all these crimes

21   other than the conditions that you were living

22   in?

23          INMATE GLASGOW:  Well my association in a

24   count of (indiscernible) hanging around

25   different kinds of people.  When I was young I

26   didn't have a father figure.  So I thought about

27   that and that the only reason I can come up

20

1    with.

2            PRESIDING COMMISSIONER ST. JULIEN:   But

3    do you think that there are other people who

4    were in your same situation and who didn't lead

5    this kind of life of extensive heroine use as

6    well as having such a long criminal history?

7    What was in you?  Do you know what was in your

8    personality?

9            INMATE GLASGOW:   I was rebellious

10   (indiscernible).

11           PRESIDING COMMISSIONER ST. JULIEN:   And

12   rebellious toward what?

13           INMATE GLASGOW:   I was rebellious toward

14   (indiscernible) my mother gave me and rebellious

15   toward authority.

16           PRESIDING COMMISSIONER ST. JULIEN:   So

17   why was it difficult for you to want to accept

18   authority?

19           INMATE GLASGOW:   Well I just kept

20   rebelling when I was young.  (indiscernible)

21           PRESIDING COMMISSIONER ST. JULIEN:   So is

22   going in and out of jail and using heroine, is

23   that an easy life?

24           INMATE GLASGOW:   It was very hard.

25           PRESIDING COMMISSIONER ST. JULIEN:   I

26   note that you had gone to recovery centers

27   periodically but apparently they didn't seem to

21

1  work for you.  So it was a hard life and you did

2  seek out help every now and then.  What do you

3  think still made you pursue this path?

4          INMATE GLASGOW:  I didn't accept, I

5  thought about that to.  I didn't accept God in

6  my life then.  To follow in his steps I have

7  accepted God in my life now.

8          PRESIDING COMMISSIONER ST. JULIEN:  What

9  do you think took you so long?

10          INMATE GLASGOW:  Well the drugs probably

11  was strong and just kept me going back and

12  forth.  I know it wasn't right and I know it

13  wasn't helpful and I continue to seek some kind

14  of help.

15          PRESIDING COMMISSIONER ST. JULIEN:  With

16  this very, very long history of criminal drug

17  problems with drug use, why should we think that

18  you are different today?

19          INMATE GLASGOW:  I think I learned my

20  lesson.  I think I have matured.  I think that I

21  ready to accept responsibility.

22          PRESIDING COMMISSIONER ST. JULIEN:  How

23  old were you when this crime was committed, when

24  Mr. Collins was shot?

25          INMATE GLASGOW:  26 years ago, 1980.

26          PRESIDING COMMISSIONER ST. JULIEN:  So

27  how old were you then?

22

1        INMATE GLASGOW:  Maybe 38.

2        PRESIDING COMMISSIONER ST. JULIEN:  So

3   that's -- you lived pretty much half your life

4   on the wrong track.

5        INMATE GLASGOW:  Yes Ma'am, I know it.  I

6   don't have very many years left and I want to do

7   it right.

8        PRESIDING COMMISSIONER ST. JULIEN:  So

9   when you were on the outside and you working,

10  you were a construction laborer and a master

11  barber?

12       INMATE GLASGOW:  Yes Ma'am.

13       PRESIDING COMMISSIONER ST. JULIEN:  And

14  at the time of this crime you were married to

15  Yvette and you have one child.  Was it a boy or

16  a girl?

17       INMATE GLASGOW:  Girl.

18       PRESIDING COMMISSIONER ST. JULIEN:  Is it

19  --

20       INMATE GLASGOW:  Abidania.

21       PRESIDING COMMISSIONER ST. JULIEN:

22  Abidania.  And how is she doing now?

23       INMATE GLASGOW:  She very

24  (indiscernible).  She lives in Santa Clara

25  County.

26       PRESIDING COMMISSIONER ST. JULIEN:  And

27  are you currently married?

23

1          INMATE GLASGOW:  Yes Ma'am.

2          PRESIDING COMMISSIONER ST. JULIEN:  And

3    is that still to Yvette?

4          INMATE GLASGOW:  No Ma'am.  I am married

5    to Diane in Stockton.

6          DEPUTY COMMISSIONER WOLK:  You just got

7    married didn't you, couple years ago?

8          INMATE GLASGOW:  Couple years ago.  Yes

9    Sir.

10         PRESIDING COMMISSIONER ST. JULIEN:  And

11   how did you meet Diane?

12         INMATE GLASGOW:  I've known her for

13   awhile, since 1963.

14         PRESIDING COMMISSIONER ST. JULIEN:  And

15   if you were paroled you would choose to live

16   with Diane?

17         INMATE GLASGOW:  Yes Ma'am.

18         PRESIDING COMMISSIONER ST. JULIEN:  She

19   lives in Stockton?

20         INMATE GLASGOW:  Yes Ma'am.

21         PRESIDING COMMISSIONER ST. JULIEN:  If

22   you couldn't go to Stockton and you lived with

23   your brother in law Louis in San Jose?

24         INMATE GLASGOW:  Yes Ma'am.

25         PRESIDING COMMISSIONER ST. JULIEN:  And

26   in terms of employment you would work at Big

27   Ed's Furniture and that is in Stockton?  And the

24

1    owner of Big Ed's is Edward Smith and he is

2    married to your grand daughter?

3           INMATE GLASGOW:  Yes Ma'am.

4           PRESIDING COMMISSIONER ST. JULIEN:  And

5    then you also have a job offer from Irving

6    Goodwin and he has a non-profit organization in

7    Menlo Park, (indiscernible) County.  Then it

8    notes that you also have your sponsor?  Is that

9    in NA or AA sponsor?

10          INMATE GLASGOW:  NA.

11          PRESIDING COMMISSIONER ST. JULIEN:

12   (indiscernible) Sponsor is your step daughter.

13          INMATE GLASGOW:  Yes Ma'am.

14          PRESIDING COMMISSIONER ST. JULIEN:  And

15   then apparently you have written a letter of

16   remorse to the families of the victims.

17          INMATE GLASGOW:  Three times.

18          PRESIDING COMMISSIONER ST. JULIEN:  And

19   what happened to Patricia Watts?  She changed to

20   another last name now right?

21          INMATE GLASGOW:  She is deceased.

22          PRESIDING COMMISSIONER ST. JULIEN:  Oh

23   she died?

24          INMATE GLASGOW:  Yes Ma'am.

25          PRESIDING COMMISSIONER ST. JULIEN:  Of

26   what?

27          INMATE GLASGOW:  I am not certain.

25

1          PRESIDING COMMISSIONER ST. JULIEN:  Do

2    you know how long ago she died?

3          INMATE GLASGOW:  About six years prior to

4    this hearing.

5          PRESIDING COMMISSIONER ST. JULIEN:  So

6    for your support letters, you have a petition

7    that was done on your behalf and I think that

8    your wife Diane had initiated the petition and

9    on the cover she did reasons why you should be

10   paroled and these are taken from some

11   (indiscernible).  And she has, I think there are

12   two pages of the petition.  It looks like we

13   have about 50 signatures.

14         INMATE GLASGOW:  Ya.

15         PRESIDING COMMISSIONER ST. JULIEN:  A

16   petition of people who have signed between 2004

17   and 2005 for you to (indiscernible).  That must

18   be a nice feeling to have that type of support.

19         INMATE GLASGOW:  Yes it does.

20         PRESIDING COMMISSIONER ST. JULIEN:  And

21   then we also have a letter from Jay Monteo-Mery,

22   is this a hyphenated name and the last name is

23   M-O-N-T-E-O dash M-E-R-Y and she is your great

24   grand daughter.  Is that correct?

25         INMATE GLASGOW:  Yes Ma'am.

26         PRESIDING COMMISSIONER ST. JULIEN:  She

27   says that I know that he will be a good grand

26

1    father.  I want him to come home.  She is eight

2    years old.  Then we have a letter from the

3    Veterans Emergency Housing.  Now were you a

4    veteran?

5              INMATE GLASGOW:  No Ma'am.

6              PRESIDING COMMISSIONER ST. JULIEN:  It's

7    signed by Irving Goodwin  G-O-O-D-W-I-N and he

8    is the (indiscernible) and I am not sure where

9    it is.  It must be in the --

10             INMATE GLASGOW:  Palo Alto.

11             PRESIDING COMMISSIONER ST. JULIEN:  And

12   this is a letter of employment and Mr. Goodwin

13   says that he is the Chief Executive Officer of a

14   non-profit organization and I have committed

15   myself to providing steady employment in the

16   areas (indiscernible).  Mr. Glasgow will be

17   working Monday through Friday from eight to four

18   thirty at the rate of eleven dollars an hour

19   (indiscernible).

20             DEPUTY COMMISSIONER WOLK:  Are we still

21   on record?

22             PRESIDING COMMISSIONER ST. JULIEN:  I

23   think we have to stop.

24             DEPUTY COMMISSIONER WOLK:  We are back on

25   record.

26             PRESIDING COMMISSIONER ST. JULIEN:  Okay,

27   so we are going through the letters here and we

27

1  have a (indiscernible) they were offering you

2  employment and then Mr. Goodwin also explained

3  that he knows that you will have different

4  restrictions on parole and he is willing to

5  adjust your work schedule.  And then Big Ed, I

6  think that I read that one already.  Then Lloyd

7  Woods who is your brother in law and he says, my

8  brother in law Mr. Brice Glasgow has shown an

9  overwhelming amount of remorse over the crime

10  which he committed over 20 years ago.  While

11  serving his sentence he has missed out on the

12  birth of his daughter, he has missed birthdays,

13  holidays and graduations.  Brice (indiscernible)

14  death of his mother.  He has missed out on

15  spending time with her and his family during her

16  illness which caused her death.  Not being

17  allowed to take part in the funeral services for

18  his mother was very important to Brice.  We love

19  Brice and miss him and would love for him to

20  come home.  And then Diann Glasgow and that is

21  D-I-A-N-N and she is your wife and she lives in

22  Stockton.  She says that we met in 1962 and I

23  have (indiscernible) for years.  I have been a

24  licensed cosmetologist for 30 years and she has

25  lived in her current home for 16 years.  She

26  goes on to say, he has my support emotionally

27  and financially.  I will encourage him and

28

1    as'sist him as needed which is accompany him to

2    appointments and provide him transportation

3    (indiscernible).  Brice has always been a very

4    nice to me and treated me with respect.  I feel

5    that he has learned from his mistakes and will

6    be a good citizen.  (indiscernible) excellent

7    youth advisor and a faithful member of Second

8    Baptist Church (indiscernible).  And then Denise

9    Sanders S-A-N-D-E-R-S and she is your step

10   daughter and she says that she is a licensed by

11   the board of vocational nurses and psychiatric

12   technician.  A major part of my training was at

13   Recovery House an alcohol and drug treatment

14   facility.  I am very familiar with the 12 step

15   alcohol and drug treatment program.  And she

16   says that I am willing to sponsor him upon his

17   release on parole for the purpose of his

18   continued sobriety.  I have also talked to him

19   about sharing his experiences with troubled

20   youth in the community.  He has expressed a

21   sincere desire to become a valuable part of our

22   community (indiscernible).  And then there is a

23   letter from Jeffry Glasgow and he must be a

24   relative of yours.  How is he related to you?

25          INMATE GLASGOW:  My brother's son.

26          PRESIDING COMMISSIONER ST. JULIEN:  Okay

27   your nephew.

29

1        INMATE GLASGOW:  Yes.

2        PRESIDING COMMISSIONER ST. JULIEN:  He

3    says dear Brice we have received your letter of

4    remorse after many meetings and discussion we

5    have agreed to welcome you back into the family

6    under certain conditions.  Number one, change

7    your environment.  I don't know what that means.

8    Number two find employment.  Number three

9    continue to be involved with some kind of

10   sobriety program (indiscernible) parole.  You

11   have changed into another person and we want you

12   to keep up the good work.  And then this is a

13   copy of (indiscernible).  Did I miss any

14   letters?  Is there anything -- .  We have -- the

15   board sends out 3042 notices and those are noted

16   that go to law enforcement and the courts

17   letting them know that you are having this

18   parole consideration hearing and we have a

19   letter here from the Palo Alto police department

20   and it is signed by Agent Natasha Powers P-O-W-

21   E-R-S and she is the detective from robbery

22   homicide and she says actually, she has some

23   names mixed up here in this letter and but they

24   are recommending against the parole Vosgow and

25   she has your name spelled wrong Mr. Vosgow is

26   convicted of intentionally killing Ralph Collins

27   and inflicting a gunshot wound to the back of

30

1    his niece Patricia Watts in March of 1980.

2          DEPUTY DISTRICT ATTORNEY RICO:  Sorry to

3    interrupt but I had faxed to me a copy of a

4    letter signed by Agent Robert Vonilla from the

5    police department that may supersede that.  Do

6    you have that?

7          PRESIDING COMMISSIONER ST. JULIEN:  Yes I

8    have it but it came in the late mail and it

9    doesn't have a date.

10          DEPUTY DISTRICT ATTORNEY RICO:  I don't

11    see a date on it but I just received it and I

12    note that the former letter was March 28th of 05

13    and I think that the letter that was in the late

14    mail is the updated letter that may resolve

15    those issues.

16          PRESIDING COMMISSIONER ST. JULIEN:  I'm

17    sorry.

18          ATTORNEY HALL:  What letter is that

19    Commissioner?

20          PRESIDING COMMISSIONER ST. JULIEN:  It's

21    the very last letter in the updated materials

22    and it's signed by Agent Robert Vonilla V-O-N-I-

23    L-L-A.

24          ATTORNEY HALL:  It looks like November 2nd

25    which would be today's date.  And we would

26    object to its use at this hearing.

27          PRESIDING COMMISSIONER ST. JULIEN:  Both

1   letters I think pretty much contain the same

2   information.  Ms. Powers's letter however has

3   some errors in it.  But like I said before I

4   think we know the jest of this and Mr. Vonilla's

5   letter will take into consideration today and we

6   will make due with Agent Powers letter and she

7   goes on to recount the particulars of the crime

8   but she does remark that the detectives who

9   responded to the case said that Mr. Glasgow was

10  detached and showed absolutely no emotion.  The

11  detectives that prepared the case commented that

12  Mr. Glasgow understood the gravity of his

13  actions and accepted no responsibility for

14  (indiscernible) and demonstrated no remorse.

15  And then she goes on to say the shooting of his

16  niece and the murder of her boyfriend was a

17  result of Glasgow not liking Collins.  Watts

18  willingly allowed Glasgow into her home

19  believing he was there for innocent purposes.

20  She had no idea he planned to shoot and kill

21  Collins.  The shooting occurred after Glasgow

22  allowed Duhart into the home and (indiscernible)

23  killing.  Glasgow was so full of hate for

24  Collins that he did not care that his own niece

25  (indiscernible) to prevent Glasgow from killing

26  him.  So Mr. Glasgow was Mr. Collins sleeping

27  when he was shot?

32

1          INMATE GLASGOW:  No Ma'am.

2          PRESIDING COMMISSIONER ST. JULIEN:  Did

3    you hate him?

4          INMATE GLASGOW:  I didn't hate him I was

5    scared of him.

6          PRESIDING COMMISSIONER ST. JULIEN:  Did

7    you plan to kill him?

8          INMATE GLASGOW:  No Ma'am.

9          PRESIDING COMMISSIONER ST. JULIEN:  So do

10   you think that this letter that from the Palo

11   Alto police department is this letter accurate?

12         INMATE GLASGOW:  No Ma'am.

13         PRESIDING COMMISSIONER ST. JULIEN:  So we

14   have done your parole plans and job offers,

15   Commissioner Wolk would you like to continue?

16         DEPUTY COMMISSIONER WOLK:  Okay.  I am to

17   talk about your programming and you post-

18   conviction factors and when I am done you can

19   add anything that you'd like or correct any

20   mistakes that I have made.  I show that you are

21   currently working in PIA textiles.

22         INMATE GLASGOW:  Yes Sir.

23         DEPUTY COMMISSIONER WOLK:  And you have

24   been there about the last twenty years or so.

25         INMATE GLASGOW:  Yes Sir.

26         DEPUTY COMMISSIONER WOLK:  And you have

27   learned to operate several different types of

33

1    machines and you are currently a sewing machine

2    operator.

3        INMATE GLASGOW:  Yes.

4        DEPUTY COMMISSIONER WOLK:  Is it possible

5    to receive a certificate of completion in PIA

6    textiles?

7        INMATE GLASGOW:  No, they was talking

8    about it but they never did (indiscernible).

9        DEPUTY COMMISSIONER WOLK:  So you have

10   gone -- it looks like you have done about

11   everything that you can possibly do in that

12   program and you have become skilled and could

13   probably get employment in that area if you

14   wanted to.

15        INMATE GLASGOW:  Developmental upholstery

16   with (indiscernible) talked to the guy and if I

17   could possibly get out (indiscernible).

18        DEPUTY COMMISSIONER WOLK:  You have also

19   worked in culinary on the lunch box crew, you

20   were a lock stitch operator, trash crew, porter,

21   small press operator, dining hall worker, and

22   you worked in the vocational print shop for

23   awhile as well.  Did you complete that program?

24        INMATE GLASGOW:  Yes Sir.

25        DEPUTY COMMISSIONER WOLK:  You have a

26   vocational certificate of completion?

27        INMATE GLASGOW:  Yes, it should be in

# EXHIBIT 10
# Part 2 of 2

34

1    that file somewhere.

2        DEPUTY COMMISSIONER WOLK:  Okay, I

3    thought I saw it but I wasn't -- well anyway.

4    You also worked as a yard attendant and in the

5    license plate factory way back when in Folsom.

6        INMATE GLASGOW:  Yes Sir.

7        DEPUTY COMMISSIONER WOLK:  You have your

8    GED?

9        INMATE GLASGOW:  Yes Sir.

10        DEPUTY COMMISSIONER WOLK:  You are a

11    volunteer in the academic department distance

12    learning program, you participate in the life

13    skills program, and you also took a course in

14    introduction to Spanish.  As far as self help is

15    concerned, you have been a regular participant

16    in NA and AA for many years.  You have also

17    taken anger management, the impact program,

18    inmate employability program, key to father hood

19    class, you have taken several anger management

20    classes, also the entrepreneur development

21    class, the infectious disease series, science of

22    the mind foundation course, you participated in

23    the (indiscernible), and you have been a member

24    of the lifer's association community awareness

25    group.  You have more laudatory chronos in your

26    file than I have ever seen before.  There must

27    be a hundred of them in there.

35

1          INMATE GLASGOW:  I try to better myself.

2          DEPUTY COMMISSIONER WOLK:  You are to be

3     commended for that.

4          INMATE GLASGOW:  Thank you.

5          DEPUTY COMMISSIONER WOLK:  As far as your

6     disciplinary history is concerned, you have

7     three CDC 115.  The first was June 1993 for

8     disobeying a direct order to submit a urine

9     sample.  The second was June 15th, of 1993 for

10    disobeying a direct order to submit to a urine

11    sample and the last one was October 24th of 1999

12    for possession of poker chips.  Is that right?

13         INMATE GLASGOW:  Yes Sir.

14         DEPUTY COMMISSIONER WOLK:  Were you

15    gambling?

16         INMATE GLASGOW:  No I just had the chips.

17         DEPUTY COMMISSIONER WOLK:  So you have

18    three 115's, two in 1993 and one in 1999.  You

19    have five 128A's the first one was in 1986

20    failing to answer to docket, second in 1989

21    failing to lock up, third in 1996 for poor job

22    performance, the fourth in 1999 for altering

23    state property, and the fifth was in 2002 for

24    smoking.  Have you stopped smoking?

25         INMATE GLASGOW:  Yes Sir.

26         DEPUTY COMMISSIONER WOLK:  After that?

27         INMATE GLASGOW:  I don't smoke anymore,

36

1    they made me stop.

2        **DEPUTY COMMISSIONER WOLK:**   Well that's

3    good.  Add a few more years onto your life.

4    Okay, last item I am going to talk about is the

5    psych report that was done in December of 2004

6    at least that is the last one I have.  Have you

7    had one since then?

8        **ATTORNEY HALL:**   That's the one, December

9    of 2004.

10       **DEPUTY COMMISSIONER WOLK:**   This was done

11   by Doctor Reed staff psychologist.  During the

12   clinical interview inmate Glasgow was alert and

13   oriented to person, place and time.  He was well

14   dressed and groomed.  His speech was articulate

15   and contextually meaningful.  His mood and

16   affect were within normal limits.  His behavior

17   was appropriate to the setting.  No evidence of

18   mood or thought disorder was demonstrated.  His

19   estimated intellectual functioning is within the

20   average range.  His current diagnostic

21   impression under Axis I, heroine dependence is

22   sustained full remission in a controlled

23   environment.  He notes that you pick at several

24   self help groups, anger management, and

25   participate in AA and NA through out the years,

26   also life skills program.  He assesses your

27   dangerousness within a controlled setting to be

37

1   low relative to the average level two inmate

2   population.  He states that if released to the

3   community his violence potential is considered

4   to be no more than that of the average citizen

5   in the community.  There are no significant risk

6   factors which may be a precursor to violence for

7   this individual.  He is competent and reasonable

8   and responsible for his behavior.  He has the

9   capacity to abide by institutional standards.

10  He does not have a mental health disorder which

11  would necessitate treatment either during his

12  incarceration period or following upon parole.

13  This inmate does have a heroine abuse history

14  however he has remained abstinent from abuse of

15  heroine for over 23 years and has regularly

16  attended NA within CDC.  And does not appear at

17  this point to be a significant risk factor for

18  violence.  Continued participation with NA

19  within CDC no longer appears to be warranted,

20  however participation within NA as a contingency

21  for parole for one year is suggested.  That

22  pretty much covers everything that I have been

23  able see in your file that has to do with

24  programming.  Is there anything that you would

25  like to add?

26          INMATE GLASGOW:  No Sir, that is just

27  about it.

38

1          ATTORNEY HALL:   I don't know Commissioner

2     if you mentioned his participation in the Muslim

3     Development (indiscernible) anger management

4     program.

5          INMATE GLASGOW:   That's true

6     (indiscernible).

7          DEPUTY COMMISSIONER WOLK:   And I will now

8     turn it back over to my colleague.

9          PRESIDING COMMISSIONER ST. JULIEN:   Thank

10    you.   (indiscernible)2000 in your psychological

11    evaluation when you were talking about the life

12    crime you said that the victim had beaten you up

13    before?

14          INMATE GLASGOW:   Yes Ma'am.

15          PRESIDING COMMISSIONER ST. JULIEN:   Is

16    that correct?

17          INMATE GLASGOW:   Yes.

18          PRESIDING COMMISSIONER ST. JULIEN:   Why

19    did he beat you up?

20          INMATE GLASGOW:   Well (indiscernible)

21    four or five guys (indiscernible) come from a

22    (indiscernible).

23          PRESIDING COMMISSIONER ST. JULIEN:   How

24    old was he, I mean were you close in age?

25          INMATE GLASGOW:   Ya, I think I was two

26    years older.

27          PRESIDING COMMISSIONER ST. JULIEN:   Then

39

1    how did he get involved with your niece?

2           INMATE GLASGOW:   I don't know.   I was

3    kind of curious about that also because she is

4    my sister's daughter and I was concerned about

5    that and come to find out that she

6    (indiscernible).  I was concerned about it.

7           PRESIDING COMMISSIONER ST. JULIEN:  So

8    did you know he was there the day of the

9    shooting?

10          INMATE GLASGOW:  No Ma'am.

11          PRESIDING COMMISSIONER ST. JULIEN:  So

12   going back to your heroine days, were you using

13   heroine at the time of the crime?

14          INMATE GLASGOW:  No, I was doin a

15   maintenance program.

16          PRESIDING COMMISSIONER ST. JULIEN:  And

17   how long had you been on that?

18          INMATE GLASGOW:  For about a year.

19          PRESIDING COMMISSIONER ST. JULIEN:  So

20   again, do you know why you stayed addicted to

21   heroine for so many years?  I know you have the

22   previous attempts at trying to stop.

23          INMATE GLASGOW:  I just determined not to

24   let it kill me off completely.  It's a strong

25   drug and takes control of you but I kept

26   fighting it and wouldn't give into it.  This is

27   why I got on the (indiscernible) maintenance

40

1   program.

2          PRESIDING COMMISSIONER ST. JULIEN:   And

3   how do you feel about your heroine use now?

4          INMATE GLASGOW:   I feel good about my

5   (indiscernible).

6          PRESIDING COMMISSIONER ST. JULIEN:   When

7   you were using heroine?  How do you think that

8   affected your life?

9          INMATE GLASGOW:   (indiscernible)

10         PRESIDING COMMISSIONER ST. JULIEN:   Would

11  you ever use it again?

12         INMATE GLASGOW:   No Ma'am.

13         PRESIDING COMMISSIONER ST. JULIEN:   Why

14  not?

15         INMATE GLASGOW:   Because I know what it

16  will do to you Ma'am.   (indiscernible).

17         PRESIDING COMMISSIONER ST. JULIEN:   How

18  do you explain the long heroine use and your

19  offenses, arrest record with all of your

20  laudatories and good behavior in prison?  How

21  did that change come about?

22         INMATE GLASGOW:   I had to work

23  (indiscernible) and all different arrests the

24  main thing Ma'am, drug addiction.

25  (indiscernible) and habit.  Now I don't have the

26  habit.

27         PRESIDING COMMISSIONER ST. JULIEN:   And

41

1  how were you able to stop because I think that

2  we all know that heroine use is often available

3  in prison.

4      INMATE GLASGOW:  By participating in the

5  programs and being active and doin the right

6  thing.  Positive things.  Do things to better my

7  life.  (indiscernible) and that's my future.  I

8  know that you made a statement that they said

9  that I didn't feel no remorse, I have to feel

10  remorse because my family is involved.  My niece

11  was pregnant (indiscernible).  When they was

12  babies I used to send my niece all the money I

13  could (indiscernible) everything I could but I

14  knew it wasn't much but it was the best that I

15  could do.

16      PRESIDING COMMISSIONER ST. JULIEN:  You

17  would send them money?

18      INMATE GLASGOW:  Ya.  I knew it was the

19  kid's father so I tried to do did everything I

20  could (indiscernible).  (indiscernible) where

21  there father was.  It kind of hurts me

22  (indiscernible).

23      PRESIDING COMMISSIONER ST. JULIEN:  Any

24  other questions?  Mr. Rico do you have questions

25  for Mr. Glasgow?

26      DEPUTY DISTRICT ATTORNEY RICO:  Yes I do.

27  Commissioner and I will address them to the

42

1    panel.  I am a little bit confused about some

2    things, I don't mean to repeat.  It is my

3    understanding that Mr. Glasgow was 38 at the

4    time of the life crime and the victim according

5    to the autopsy information was 30 is that about

6    right.  Does Mr. Glasgow remember that?

7        INMATE GLASGOW:  I don't really know his

8    age.

9        DEPUTY DISTRICT ATTORNEY RICO:  That's

10   fine.  I guess that some of the things that I am

11   wondering about in terms of the life crime.  The

12   file indicates that on March 1st, 1980 that Mr.

13   Glasgow went over to his niece's residence about

14   five o'clock in the morning.  Is that accurate?

15       INMATE GLASGOW:  It was early.

16       DEPUTY DISTRICT ATTORNEY RICO:  Why did

17   you go over so early?

18       INMATE GLASGOW:  Because as it was stated

19   I was on this methadone maintenance program and

20   you had to pick your medicine up early and I

21   didn't want to miss that so I stayed up.

22       DEPUTY DISTRICT ATTORNEY RICO:  So I

23   guess what I am asking you is why did he go over

24   to his niece's residence that morning?

25       INMATE GLASGOW:  Because I was concerned

26   about her.

27       DEPUTY DISTRICT ATTORNEY RICO:  Concerned

43

1  about what?

2      INMATE GLASGOW:  I was going to San

3  Francisco so I was concerned about my niece so I

4  stopped there.

5      DEPUTY DISTRICT ATTORNEY RICO:  And I

6  heard Mr. Glasgow indicate earlier that it was

7  his gun and he took it with him is that

8  accurate?

9      INMATE GLASGOW:  Yes.

10     DEPUTY DISTRICT ATTORNEY RICO:  What I am

11  wondering is since it looks like Mr. Glasgow in

12  addition to the 82 arrests, had four prior

13  felony convictions.  What did he have a gun for

14  anyway?

15     INMATE GLASGOW:  Because the area that I

16  was in.  (indiscernible) been beaten up there a

17  couple times before.

18     DEPUTY DISTRICT ATTORNEY RICO:  But the

19  crime itself took place in the city of Palo Alto

20  which is in Santa Clara County and not East Palo

21  Alto which is in San Mateo County.  Isn't that

22  true?

23     INMATE GLASGOW:  Well it split up, they

24  split the county.  Palo Alto is split county.

25     DEPUTY DISTRICT ATTORNEY RICO:  I guess

26  what I am asking is it would appear that the

27  shooting took place at his niece's residence at

44

1   1179 Amarillo A-M-A-R-I-L-L-O in Palo Alto.

2   Where exactly was that?  Does Mr. Glasgow

3   remember what area of town?

4           INMATE GLASGOW:  No, it's Palo Alto

5   (indiscernible).

6           DEPUTY DISTRICT ATTORNEY RICO:  In terms

7   of the weapon, I note that in that report

8   Commissioner you referred to the psych report

9   from May 4th, of 2000 under review of the life

10  crime, at that time Mr. Glasgow was saying that

11  he killed the victim with the victim's own gun

12  purely in self defense which is different from

13  what he is saying today.  Could he comment on

14  those discrepancies in the last five years, the

15  different stories?

16          INMATE GLASGOW:  It because she had lies.

17  I am telling the truth today.

18          DEPUTY DISTRICT ATTORNEY RICO:  So does

19  Mr. Glasgow say that he was lying as recently as

20  May of 2000 about how the life crime took place?

21          INMATE GLASGOW:  I am sorry.

22          DEPUTY DISTRICT ATTORNEY RICO:  I will

23  rephrase that.  Commissioner do you see the

24  question that I am talking about under the life

25  crime there?  It's on page four of the 540  --

26          PRESIDING COMMISSIONER ST. JULIEN:  I see

27  it.  So this statement says that you said that

45

1    you killed Mr. Collins with his gun and you were

2    acting in self defense.  Now did you kill Mr.

3    Collins with his gun?

4         INMATE GLASGOW:  I had the gun.

5         PRESIDING COMMISSIONER ST. JULIEN:  So

6    why did you say you killed Mr. Collins with his

7    gun.

8         INMATE GLASGOW:  I was under the

9    impression that he had a gun.

10        PRESIDING COMMISSIONER ST. JULIEN:  Do

11   you that this doesn't make sense to us?

12        ATTORNEY HALL:  He said earlier that he

13   thought that Mr. Collins had a gun.

14        PRESIDING COMMISSIONER ST. JULIEN:  He

15   says here that he says he killed the victim with

16   the victims own gun.

17        INMATE GLASGOW:  No I had the gun

18   (indiscernible).

19        PRESIDING COMMISSIONER ST. JULIEN:  Maybe

20   the psychologist -- I don't know.

21        DEPUTY DISTRICT ATTORNEY RICO:  I thought

22   I heard Mr. Glasgow say a minute ago that he was

23   telling the truth today.  Is he acknowledging

24   that maybe he wasn't being truthful in 2000

25   about how the crime really took place?  Is that

26   what he was indicating?

27        INMATE GLASGOW:  Well if I told him that

46

1  then it stayed my mind.  I was under the
2  impression that he had a gun.
3        DEPUTY DISTRICT ATTORNEY RICO:  I will
4  let that be enough and not pursue that anymore.
5  There was some materials that I had submitted to
6  the board on October 6th that included an
7  autopsy report and crime scene diagram and three
8  crime scene photos.
9        PRESIDING COMMISSIONER ST. JULIEN:  Yes,
10  we received that.  I didn't see the photos
11  unless they are in the C File.  We did see the
12  report of the crime scene and the autopsy and
13  all of that.
14        ATTORNEY HALL:  And which I just received
15  today and again I would urge that it not be
16  considered as submitted untimelyness.
17        DEPUTY DISTRICT ATTORNEY RICO:  Well.
18  Commissioner I also would point out that when I
19  did submit that it was on October 6th, 2005 I
20  overnighted them to Soledad and the last line in
21  the cover letter said that I am enclosing copies
22  of the materials for the inmates C File, the BPH
23  panel and inmate Glasgow's attorney.  I would
24  ask that you forward the copy provided for the
25  inmate's attorney to counsel immediately so it
26  is received in timely fashion prior to the above
27  referred to lifer hearing scheduled for November

47

1    2nd.   That was on October 6th.   I did everything

2    that I could.

3         PRESIDING COMMISSIONER ST. JULIEN:   We

4    all just got these today.   I don't know.   Mr.

5    Hall did you receive this before?

6         ATTORNEY HALL:   No I did not.   This is

7    the first time I am seeing it.

8         PRESIDING COMMISSIONER ST. JULIEN:   It

9    was in our updated materials that I actually

10   gave Mr. Hall his copy.   But we just got those

11   today.

12        DEPUTY DISTRICT ATTORNEY RICO:   I terms

13   of submitting it timely, there is nothing more

14   that I could do unless --

15        PRESIDING COMMISSIONER ST. JULIEN:   That

16   is correct.   I don't know.   The information

17   would probably be the determining factor.   .

18        DEPUTY DISTRICT ATTORNEY RICO:   In any

19   event, I am also told that sometimes crime scene

20   .photographs are put in something called a sluff

21   file which is --

22        PRESIDING COMMISSIONER ST. JULIEN:   Mr.

23   Wolk is looking for them now.

24        DEPUTY DISTRICT ATTORNEY RICO:   Thank

25   you.   The line is going to ask the panel for

26   submission to the inmate is this.   I have seen

27   the letter that Mr. Glasgow wrote to, and it

48

1   says to the Glasgow, Watts, and Collins Family

2   and it indicates in it that his, meaning Mr.

3   Collins, death was never intentional.  I guess

4   what I am kind of confused about here, the

5   photos show, and I could just ask Mr. Glasgow

6   that, wasn't Mr. Collins completely naked at the

7   time he was shot?

8        INMATE GLASGOW:  I don't know, I didn't

9   have time enough to view him (indiscernible)

10  because I was afraid and I was scared.

11       DEPUTY DISTRICT ATTORNEY RICO:  I guess

12  he was shot in the bedroom.  It that accurate?

13       INMATE GLASGOW:  It was up against the

14  door, between the hallway and the bedroom.

15       DEPUTY DISTRICT ATTORNEY RICO:  I guess

16  one of the things that confuses me, Mr. Glasgow

17  came to the apartment and was refused entrance

18  the first time, the second time he was let in.

19  Why did Mr. Glasgow after he gained access to

20  the apartment let in a second individual, Edmond

21  Duhart, through a back door?  Why did he do

22  that?

23       INMATE GLASGOW:  It was the first time I

24  was at the apartment and I didn't know

25  (indiscernible) was coming in the back.  I

26  didn't know I had someone in the car waitin.

27       DEPUTY DISTRICT ATTORNEY RICO:  And if

49

1   Mr. Glasgow was afraid of the victim who

2   apparently was in the back bedroom, why did Mr.

3   Glasgow walk from the apartment, the living

4   area, down the hallway into the bedroom where

5   Mr. Collins was if Mr. Glasgow was afraid of

6   him?  Why did he go to him?

7          INMATE GLASGOW:  I didn't walk to the

8   bedroom, I went to the bathroom.

9          DEPUTY DISTRICT ATTORNEY RICO:  How did

10  Mr. Glasgow then wind up in the bedroom with the

11  gun and with the victim?

12          INMATE GLASGOW:  He was standing at the

13  door between the hallway and the bedroom.

14          DEPUTY DISTRICT ATTORNEY RICO:

15  Completely naked?

16          INMATE GLASGOW:  I don't know if he was

17  naked or not.

18          DEPUTY DISTRICT ATTORNEY RICO:  And how

19  was it, the report seems to indicate that at

20  some point, when Mr. Glasgow went down and

21  confronted the victim who was asleep in the bed

22  in the bedroom and started shooting that Mr.

23  Glasgow's niece threw her self over the victim

24  to try to shield him and Mr. Glasgow fired

25  through the niece into the victim?  Is that

26  accurate?

27          INMATE GLASGOW:  No Sir.

50

1          DEPUTY DISTRICT ATTORNEY RICO:  How did
2    bullets pass through Mr. Glasgow's niece then?
3          INMATE GLASGOW:  I don't know as to the
4    question how.
5          DEPUTY DISTRICT ATTORNEY RICO:  And the
6    autopsy report indicates that among the many
7    wounds to the victim, Ralph Collins, there were
8    a couple of bullets, one directly above the
9    right ear canal which had a marginal rim of
10    abrasion suggesting that the gun was put right
11    up against the head.  How did Mr. Glasgow shoot
12    the victim in that manner up against the back of
13    the head if he was fighting him as he has
14    indicated?
15          INMATE GLASGOW:  (indiscernible).
16          DEPUTY DISTRICT ATTORNEY RICO:  I don't
17    know if those photos have been located but they
18    show two bullets.  All I know is that I sent
19    them.  I don't know what the institution did
20    with them.
21          DEPUTY COMMISSIONER WOLK:  We'll take
22    your word for it.
23          DEPUTY DISTRICT ATTORNEY RICO:  I will
24    just ask Mr. Glasgow through the panel this.
25    Did Mr. Glasgow put the muzzle of the gun right
26    up against the victim's head and pull the
27    trigger?

51

1         INMATE GLASGOW:  Sir, I know this is not

2    the time nor the place but nothin no way

3    (indiscernible) fightin and I was afraid for my

4    life and I don't know what position the man was

5    in all I know is that I was fightin for my life.

6    (indiscernible).

7         DEPUTY DISTRICT ATTORNEY RICO:  I guess

8    what I don't understand Mr. Glasgow is

9    indicating that he was fighting for his life but

10   it would appear that the victim had no clothing

11   on and no weapon and Mr. Glasgow was the only

12   one with a gun and had gone to the victim.  Can

13   he explain how it was that he somehow was

14   fighting for his life under those circumstances?

15        ATTORNEY HALL:  We will object to the

16   premise that in fact that the person was nude or

17   naked at the time.  Mr. Glasgow has said that he

18   didn't know whether he recall if the man  was

19   naked or not so to include that in the question,

20   the premise that he was naked I think is

21   improper.

22        DEPUTY DISTRICT ATTORNEY RICO:  May I

23   have just a moment?

24        PRESIDING COMMISSIONER ST. JULIEN:  Yes.

25   Can you limit it to one more question?

26        DEPUTY DISTRICT ATTORNEY RICO:

27   Certainly.  I know Mr. Glasgow has indicated

52

1   that his niece was convicted of perjury for

2   lying but isn't the lie that she was convicted

3   of perjury for telling the recanting of her

4   original version.  So I guess what I am saying

5   she wasn't convicted for lying that he did the

6   crime but she was convicted for lying after the

7   fact that he hadn't been involved.  Isn't that

8   accurate?

9           INMATE GLASGOW:  I don't know.

10          DEPUTY DISTRICT ATTORNEY RICO:  Did Mr.

11  Glasgow do anything to get his niece to change

12  her story to try to get him out of trouble?

13          INMATE GLASGOW:  Got arrested on March

14  the 1st and I been in jail ever since.

15          DEPUTY DISTRICT ATTORNEY RICO:  I have

16  nothing further.

17          PRESIDING COMMISSIONER ST. JULIEN:  Okay

18  Mr. Hall.

19          ATTORNEY HALL:  Thank you.  This crime

20  occurred some twenty five years ago, twenty five

21  and a half years ago, and you are now 64 years

22  old?

23          INMATE GLASGOW:  Yes.

24          ATTORNEY HALL:  In respect to some of the

25  questions that the Deputy District Attorney was

26  asking you about in detail about the crime.

27  Your memory is quite clear as to what happened

53

1    next?

2            INMATE GLASGOW:  Yes.

3            ATTORNEY HALL:  Your memory is quite

4    clear?

5            INMATE GLASGOW:  Yes.

6            ATTORNEY HALL:  Do you have any

7    recollection during the struggle that your niece

8    participated in that struggle?

9            INMATE GLASGOW:  Yes she did.

10           ATTORNEY HALL:  And as you testified,

11   this occurred outside the bedroom?

12           INMATE GLASGOW:  Yes.

13           ATTORNEY HALL:  And your testimony you

14   thought that Mr. Collins had a weapon.  Is that

15   correct?

16           INMATE GLASGOW:  Yes.

17           ATTORNEY HALL:  You saw that report, or

18   you heard that various statements that you had

19   no weapon.  Is that true?

20           INMATE GLASGOW:  Yes.

21           ATTORNEY HALL:  But you know for sure

22   that you did have a weapon?

23           INMATE GLASGOW:  Yes.

24           ATTORNEY HALL:  And that the shooting

25   occurred while you were struggling for the

26   weapon?

27           INMATE GLASGOW:  Yes.

54

1          ATTORNEY HALL:   I have no further

2     questions.

3          PRESIDING COMMISSIONER ST. JULIEN:   Mr.

4     Rico do you have a closing statement?

5          DEPUTY DISTRICT ATTORNEY RICO:   Yes,

6     briefly Commissioner.   It's true that this life

7     crime took place some 25 years ago on March 1st

8     or 1980.   And here we are 25 years later and Mr.

9     Glasgow is indicating his version of the events

10    and they just don't seem to fit what the

11    information in the packet, in the probation

12    report, in the file, in the materials that I

13    submitted.   On March 1st, 1980 at approximately

14    five o'clock in the morning the defendant knocks

15    on the door of his niece, Patricia Watts and she

16    doesn't let him in because the victim,

17    apparently someone that Mr. Glasgow has had

18    issues with in the past is there.   According to

19    all of the information here, asleep in the back

20    bedroom.   So later that morning Mr. Glasgow

21    returns and his niece lets him in and then for

22    some reason Mr. Glasgow let's in an acquaintance

23    this Edmond Duhart in through the back door and

24    I know that Mr. Glasgow is indicating that

25    simply went to the bathroom but the indications

26    are that Mr. Glasgow walked down the hall into

27    the bedroom where Mr. Collins, this person that

55

1    he didn't like or had fights with in the past

2    was in bed.  I don't know where those photos

3    went that I sent on October 6th but they the

4    condition of the victim.  I will leave it at

5    that.  But the victim was shot two times in the

6    back and the head, upper abdomen and indications

7    are that Patricia Watts at one point during this

8    attack covered the victim with her own body and

9    that Mr. Glasgow fired through her into the

10   victim.  Mr. Glasgow seems to be saying that he

11   has remorse that he is no longer involved with

12   drugs and that he is a changed person but I do

13   not hear him coming to terms with the crime.  I

14   hear, but when I look at that 2000 psych eval it

15   troubles me that according to the clear words by

16   the author of that report as recently as 2000

17   Mr. Glasgow is indicating that he killed the

18   victim with the victims own gun clearly in self

19   defense.  That is what the report says in its

20   very words.  And now he is indicating that yes

21   it was his gun, Mr. Glasgow's gun that he took

22   to the residence that day.  Somehow because he

23   was afraid of the area.  Although the crime took

24   place in Palo Alto which is clearly not a high

25   crime area.  It's not the same thing as East

26   Palo Alto.  And we have Mr. Glasgow who has four

27   prior felony convictions.  It's a crime to be a

56

1  felon in possession of a firearm that he seems
2  to have no qualms about arming himself and
3  walking around.  He was going up to San
4  Francisco that day apparently going to take the
5  gun.  There is much more going on here in terms
6  of how his life crime took place than Mr.
7  Glasgow seems to be owning up to or accepting
8  responsibility for.  And the current psych eval
9  I have to take issue with.  On page two it says
10  that under review of the life crime that he,
11  meaning Mr. Glasgow, showed good insight into
12  the causative factors related to the instance
13  offense and I am not seeing that at all.  I am
14  seeing an individual who still can't come to
15  terms why there is a bullet above the right ear
16  canal and there is an indication of a muzzle
17  being pressed up to the skull when he is
18  claiming that he, Mr. Glasgow was fighting for
19  his life although the victim wasn't armed and
20  Mr. Glasgow was the only one armed.  The version
21  I hearing does not make sense and when he says
22  that the shooting wasn't intentional Mr. Glasgow
23  is the one that went down the hall.  So I think
24  he has a long way to go.  I am not quite sure
25  and I didn't specifically ask in terms of the
26  plans getting out, his work plans, the owner of
27  Big Ed's Furniture seems to indicate that Mr.

57

1    Glasgow would be employed in sales and delivery

2    and I'm not sure if that is going to mean that

3    Mr. Glasgow at age 64 with medical issues that

4    he's got is going to be out in a truck

5    delivering heavy furniture.  So I don't know if

6    that is truly a practical plan for him at this

7    stage in his life.  But all things considered

8    and when we get down to the remorse issue, when

9    Mr. Glasgow was asked he felt about the crime I

10   heard him talk about his family, I heard him

11   talk about the victim's family, and maybe I

12   missed it but I didn't hear him specifically

13   talk about how he feels for Mr. Collins loosing

14   his life.  He talked about Mr. Collins family

15   and Mr. Glasgow's family but I didn't hear what

16   sounded to my like a true indication of remorse

17   for Mr. Collins loosing his life and I don't

18   know if there is still animosity there.  So my

19   concern is that even though Mr. Glasgow is 64,

20   is no doubt is a much perhaps living a gentler

21   or less aggressive lifestyle behind bars but if

22   he is to get out, if he was to be given a date

23   and to go back out.  I know he has taken anger

24   management classes while he has been in but when

25   he was out last time with four prior felony

26   convictions he didn't hesitate to arm himself

27   and I truly do not feel from what I have heard

58

1   today that Mr. Glasgow has reassured anyone that

2   if he is released he is not going to fall back

3   into patterns that maybe have gotten him to

4   where he is today.  And I think that until such

5   time as he truly looks inward and is perhaps

6   more forthright  and comes to terms and gains

7   insight, true insight into how this crime took

8   place.  What he really did that there is not

9   indication that under certain circumstances he

10  wouldn't act like this again.  And I think that

11  he still has work to do and in that regard  and

12  I would submit on those comments I ask that he

13  be found not suitable.  Thank you.

14          PRESIDING COMMISSIONER ST. JULIEN:  Thank

15  you.  And Mr. Rico we did find the crime scene

16  photographs.  They were in a folder under some

17  other things.  Did you hear me?

18          DEPUTY DISTRICT ATTORNEY RICO:  Yes I did

19  but I talked enough so thank you.

20          PRESIDING COMMISSIONER ST. JULIEN:  Mr.

21  Hall closing statement.

22          ATTORNEY HALL:  Yes, thank you.  I think

23  that the Deputy District Attorney's statement

24  amounts to really an attempt to retry the case.

25  That was the implication of the questioning of

26  Mr. Glasgow.  Perhaps that was not his intent

27  but it amounts to that.  I think the real issue

59

1    is whether or not Mr. Glasgow would pose an

2    unreasonable risk upon society should he be

3    paroled.   And I think the conclusion has to be

4    that he would not pose such a risk.   Here is a

5    person who is been working on him self, working

6    through heroine addiction, working through the

7    fact that having killed someone and taking

8    responsibility for it.   And he has done that.

9    And I think that he has done that sufficiently

10   that the psychologist who evaluated him through

11   out his incarceration has mapped his progress in

12   that regard and we could go back to the

13   evaluation that was done by Doctor Kidd back in

14   1992.   Doctor Kidd points out that Mr. Glasgow

15   violence potential outside the controlled

16   setting in the past appeared less than average

17   then at present has decreased.   Then we come to

18   earlier in 1989 Doctor Martin stated that less

19   controlled setting such as a return to the

20   community the inmate will likely continue the

21   present gains if he does not return to his

22   addiction.   In 2000 Doctor Reed wrote that if

23   released to the community his violence potential

24   is considered to be no more than the average

25   citizen in the community.   And the Commissioner

26   has put on the record already the present

27   psychological assessment essentially that Mr.

60

1    Glasgow would pose no more risk than the average
2    citizen in the community if he was to be
3    paroled.  The statements made by Patricia Watts
4    should be taken with a grain of salt when her
5    entire testimony in fact.  I mean here is a
6    person convicted of a felony of perjury.  I know
7    the Deputy District Attorney asks questions as
8    to the specific comments or statements made by
9    Ms. Watts for which he was convicted of perjury.
10   We don't know that, if not presented to the
11   board any transcript of what was said by her,
12   what the court deemed to have been perjury
13   (indiscernible).  Mr. Glasgow does not know
14   exactly what lies she told when she testified
15   but in fact he testified to how the crime
16   occurred and she testified and between the three
17   individuals, Mr. Collins, Ms. Watts, and Mr.
18   Glasgow, she and Mr. Glasgow were the only
19   remaining witnesses.  Any statements that she
20   made as to how the instances occurred, how the
21   murder occurred should be taken with a grain of
22   salt.  Certainly Mr. Glasgow has been
23   forthright, he has been convicted of this crime
24   and really has no reason to lie about what
25   happened.  The statement by the Agent Powers
26   describing Mr. Glasgow's domineer stating that
27   he show no sign of remorse, that was at the time

61

1  of the crime.  I don't know if Agent Powers has
2  seen any of the psychological evaluations.  I
3  don't know if she has seen or spoken to anyone
4  since this crime occurred in 1980 and so to base
5  a conclusion on what she perceived Mr. Glasgow
6  to be demonstrating back in March of 1980
7  certainly would be unfair to Mr. Glasgow but
8  than unfair it's just unreliable and it's not a
9  reflection of who Mr. Glasgow is today.  So I
10  think that comment, any comment regarding Mr.
11  Glasgow's perceived lack of remorse should be
12  discounted and not observed at all.  Instead the
13  various evaluators that assessed Mr. Glasgow has
14  pointed out that he has shown remorse through
15  out the time that he has been incarcerated and
16  again he has demonstrated that the various
17  petitions submitted on his behalf as his
18  expressed remorse of Mr. Collins death and the
19  harm to the families.  It is true that he does
20  mention his family and I think we should keep in
21  mind that this is a family that two families are
22  intertwined both are Ms. Watts was his niece
23  since she is now deceased.  Certainly there
24  would be remorse on both sides and these family
25  members have, some family members have forgiven
26  Mr. Glasgow and are urging his release on
27  parole.  Again the evaluators have expressed

62

1    that Mr. Glasgow has demonstrated that he has

2    gained insight into what he has done.  Certainly

3    being incarcerated for so long without any kind

4    of violation for drugs, or controlled substances

5    of any kind clearly demonstrates that in fact

6    that he has kicked the habit, that he has been

7    fighting the heroine addiction that he has been

8    fighting at a time of the crime.  And I think

9    that he has realistic parole plans.  He's got

10   employment offers as well as marketable skills

11   and commitment to a residence with his wife.

12   Given Mr. Glasgow's medical condition I think it

13   is very unlikely that he would be at risk of

14   committing any kind of violence or

15   (indiscernible) against anyone in the community.

16   And then when you add his age of 64 to that it

17   certainly would minimize any potential what so

18   ever he would commit any kind of aggression or

19   violence against anyone.  He has family support,

20   various family members who will again on his

21   behalf written parole as well as other community

22   members and I believe it amounts to some 60

23   individuals who voice there support as members

24   of the community supporting Mr. Glasgow's

25   release on parole.  I think overall given Mr.

26   Glasgow's following of the rules with in the

27   institution, having rehabilitated him self,

63

1    having kicked the heroine addiction, and having

2    sincere and competent plans for the future we

3    believe at this time he is suitable for parole

4    and we urge this panel to so decide and grant

5    Mr. Glasgow parole.  Thank you.

6         PRESIDING COMMISSIONER ST. JULIEN:  Okay,

7    thank you.  Actually I have an unusual - Mr.

8    Rico I have a question for you before we go on.

9    Was Mr. Duhart convicted of anything?  I know

10   that he was --

11        DEPUTY DISTRICT ATTORNEY RICO:  I have a

12   note here that at the jury trial December 19th,

13   1980 he was found not guilty.  I don't have --

14   The trial prosecutor is here but I don't have a

15   note about that aspect of it.  I don't know if

16   you wish to -

17        MS. NEDDE:  As I recall he was acquitted

18   of everything.  There was no evidence that he

19   participated in the shooting or anything else.

20   My argument to the jury of course was that he

21   was an accomplice that having more than one

22   person there, that increased the victim's

23   danger.

24        PRESIDING COMMISSIONER ST. JULIEN:  Okay

25   thank you.  Mr. Glasgow would you like to give a

26   statement as to your parole suitability?

27        INMATE GLASGOW:  Well at this point in my

64

1    life.

2         DEPUTY COMMISSIONER WOLK:  Why don't you

3    go ahead and start over again.

4         INMATE GLASGOW:  What I am doing now for

5    my life I am planning on doin the rest of my

6    life.  I don't plan on doin any thing backward

7    and doin what I used to do.  I learned my lesson

8    and I live my self in life and all I can do is

9    continue to do the right things.  I know

10   (indiscernible).  I am not on trial anymore but

11   I (indiscernible).  I won't disappoint anyone.

12   Please let me (indiscernible).  I love my family

13   and I want to be with them.  If there is

14   anything more I can do (indiscernible).

15        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

16   Is there anything else that you would like to

17   say Sir?

18        INMATE GLASGOW:  Just that I extend my

19   remorse to the Collins family and I put it on

20   paper but I pray for his soul.  I pray

21   (indiscernible) taking his life (indiscernible).

22        PRESIDING COMMISSIONER ST. JULIEN:  Okay,

23   thank you Sir.  We will now recess for

24   deliberations.

25                  R E C E S S

26                   --oOo--

27

65

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3        DEPUTY COMMISSIONER WOLK:  We're back on

4    record.

5        PRESIDING COMMISSIONER ST. JULIEN:  All

6    parties have returned to the room for the

7    hearing of Brice Glasgow.  Mr. Glasgow we are

8    going to deny your parole, we are going to deny

9    your parole for a year.  The main reason, the

10   commitment crime.  It just doesn't, we just

11   can't reconcile the facts of the crime with your

12   accounts, we can't say, we don't who's right and

13   who's wrong and who is telling the truth and who

14   isn't.  But as long as there are lingering

15   doubts we just can't do it.  We have reviewed

16   all the information received from the public and

17   relied on the following circumstances in

18   concluding that the inmate is not suitable for

19   parole and would pose and unreasonable risk of

20   danger to society or a threat to public safety

21   if released from prison.  The commitment offense

22   was carried out in an especially cruel and

23   callous manner in that the inmate shot and

24   killed Mr. Ralph Collins and there were three

25   bullet wounds to the back and two to the back of

26   the head and also a shot into Patricia Watts who

27   BRICE GLASGOW C-26529  DECISION PAGE 1  11/2/05

66

1   was the inmates niece and she was shot once in

2   the back.  Multiple victims were attacked in the

3   same incident and one was killed and one was

4   injured and the motive for the crime was

5   explicable or very trivial in relation to the

6   offense and on the one hand we have as a result

7   of and altercation and (indiscernible) and on

8   the other hand we have that there was

9   intentional motives behind the shooting.  So it

10  is hard for us to draw a conclusion here and we

11  would suggest that you really, really think

12  about this and try to go back and research your

13  memory as much as you can and perhaps even write

14  something down.  Make a statement as to the

15  events of that night or that morning in its

16  entirety and what you did afterwards because the

17  fact that you left, you basically left Mr.

18  Collins.  I don't know if you knew he was dead

19  or (indiscernible) So I think all of those

20  things (indiscernible).  In terms of your

21  previous record, you do have an escalated

22  pattern of criminal conduct and violence and a

23  history of unstable relationships with others

24  and you have failed previous rounds of probation

25  and parole and can't (indiscernible) want you to

26  avoid future criminalities and that

27  BRICE GLASGOW C-26529  DECISION PAGE 2  11/2/05

67

1    (indiscernible). The probation and parole stems

2    from approximately 82 arrests and the arrests

3    were for various crimes but they include

4    battery, illegal weapon, burglary, conspiracy

5    and forgery.  And I also note that you have

6    failed to profit from societies previous

7    attempts to correct your criminality and these

8    include CYA commitment, (indiscernible), being

9    on parole and probation, (indiscernible).  In

10   terms of your programming you have done very

11   well.  And as my colleague previously noted you

12   have numerous laudatory chronos and you have

13   done exceptionally well while you have been

14   here.  Your last 115 was in 1999 and you have

15   only had 3 total since you have been here and

16   that is indeed a very good record.  We also note

17   that your psychological report dated December

18   1st, 2004 authored by Doctor Reed is favorable

19   and that he states that you need no more risk of

20   violence that the average citizen however I also

21   do note on that psychological report that Doctor

22   Reed really didn't delve into your prior

23   criminal history and the heroine use and as it

24   relates to the crime and perhaps if you had some

25   more discussions with a therapist or a

26   psychologist you to maybe could reconcile some

27   BRICE GLASGOW C-26529  DECISION PAGE 3  11/2/05

68

1    of the issued that we are so concerned about.

2    In terms of your parole plans you do have viable

3    residential plans in the County of

4    (indiscernible) as well as in Stockton area and

5    you do have acceptable employment plans and that

6    you have two job offers and you do have a

7    marketable skill.  And we note that in response

8    to 3042 notices for opposition of parole

9    suitability we have that opposition

10   (indiscernible) by the District Attorney of

11   Santa Clara as well as the Palo Alto police

12   department and I am referring to the letter that

13   was in the file.  And we made the following

14   findings that the prisoner needs therapy in

15   order to face (indiscernible) cope with stress

16   in a nondestructive manner.  Until progress is

17   made we maintain that you may be unpredictable

18   and a threat to others.  However we would like

19   to commend you for participating in anger

20   management, the PIA textiles for over 20 years,

21   project impact, and disciplinary free since 1999

22   as well as your exceptional record in receiving

23   over approximately 50 laudatory chronos.

24   However the positive aspects of you behavior do

25   not out weigh the factors of unsuitability that

26   were mentioned and we are hopeful that in one

27   BRICE GLASGOW C-26529   DECISION PAGE 4  11/2/05

69

1    year that you read through all your prior

2    transcripts, this one included, all your

3    transcripts and really try to connect the pieces

4    of this puzzle for the next panel.  I would

5    really encourage you to do that.  And therefore

6    I want to prepare your observation and

7    evaluation is required before the board should

8    find that you are suitable for parole.

9    Commissioner Wolk?

10         DEPUTY COMMISSIONER WOLK:   That's

11   everything.

12         PRESIDING COMMISSIONER ST. JULIEN:   And

13   we will recess and it's ten minutes to eleven.

14                    --oOo--

15

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

                                   MAR  2 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   BRICE GLASGOW C-26529 DECISION PAGE 5   11/2/05

70

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 69, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF BRICE

GLASGOW,  CDC NO. C-26529, ON NOVEMBER 2, 2005, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated NOVEMBER 20, 2005, at Sacramento,

California.


_____
SUE GERDES
TRANSCRIBER
PETERS SHORTHAND REPORTING

EXHIBIT "B"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
FEBRUARY 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 3, 2002

Inmate Brice Glasgow, CDC# C-26529, was seen for a
psychological evaluation for the Board of Prison Terms by
Joe Reed, Ph.D., Staff Psychologist at the Correctional
Training Facility (CTF), on 05/01/00 for the April 2000
Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

BZ/gmj

D:  09/03/02
T:  09/03/02

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JANUARY 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 29, 2001

Inmate Brice Glasgow, CDC# C-26529, was seen for a mental health evaluation for the Board of Prison Terms by J. Reed, Ph.D., Staff Psychologist at CTF, on 05/01/00 for the April 2000 Lifer Calendar.

According to the agreement that CDC psychologists made with the Board of Prison Terms, once a mental health evaluation is completed in the new format, revised in August 1998, a new evaluation is not necessary each time the inmate appears before the Board of Prison Terms.

Therefore, a mental health evaluation was not conducted at this time.

JEFF HOWLIN, Ed.D.
Senior Supervising Staff Psychologist (A)
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JH/gmj

D:   10/29/01
T:   10/29/01

GLASGOW        C-26529        CTF-CENTRAL        10/29/01        gmj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
APRIL 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 1, 2000

This is a psychological evaluation for the Board of Prison Terms for inmate Brice Glasgow, CDC# C-26529.  This report is based upon a personal clinical interview of the inmate, conducted on 05/01/00, as well as a review of his Central file and unit health record.  This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

I.   IDENTIFYING INFORMATION:

Inmate Glasgow is a 59-year-old, divorced, African-American male.  His date of birth is 04/23/41.  His stated religious affiliation is Protestant.  No obvious unusual physical characteristics were observed and he denied ever having used any nicknames or aliases.

II.  DEVELOPMENTAL HISTORY:

He had no significant developmental history.  He had no history of physical or sexual abuse as either a perpetrator or a victim.

III. EDUCATIONAL HISTORY:

Inmate Glasgow attended public school and completed the tenth grade.  He said he received his GED in 1990 at CTF.  He has no college credits.  His records indicate a 1986, measured grade point level of 6.9 TABE.  He has no history of special education or academic or behavioral problems in school.  He has no current involvement or interest in educational activities.

IV.  FAMILY HISTORY:

Inmate Glasgow said that there is no significant history of crime or drug abuse in his family.  He generally described his current relationships with his family members as supportive and that there is no history of abuse.

GLASGOW     C-26529        CTF-CENTRAL        05/04/00      gmj

GLASGOW, BRICE
CDC NUMBER: C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Glasgow is a heterosexual male. He denied any
history of sexual aggression or high-risk sexual
behavior.

VI.   MARITAL HISTORY:

Inmate Glasgow stated that he has been married one
time. His marriage began in 1980 and ended in 1984 due
to incarceration-related problems. He generally
described his current relationship with his ex-wife as
supportive with no history of abuse. He acknowledged
having one daughter who is now 21 years of age from his
marriage. He generally described his current
relationship with his daughter as supportive and that
there is no history of abuse.

VII.   MILITARY HISTORY:

The records indicate that this inmate has no military
history.

VIII.   EMPLOYMENT AND INCOME HISTORY:

Inmate Glasgow reported that his preincarceration work
history includes working five years in construction and
one year training as a barber. During his
incarceration, he worked from 1985 until 1994 in PIA in
fabric cutting and sewing. In 1994, he became
certified in vocational print shop. From 1996 until
the current date, he has worked in PIA in fabric
cutting and sewing.

IX.   SUBSTANCE ABUSE HISTORY:

Prior to his incarceration, inmate Glasgow acknowledged
having abused heroin. He further stated that he has
been abstinent for over 24 years. He reported that he
has attended Alcoholics Anonymous and Narcotics
Anonymous regularly from 1990 until the current date.
This inmate does appear to have a drug abuse problem.

X.   PSYCHIATRIC AND MEDICAL HISTORY:

This inmate has recent psychiatric diagnoses of Heroin
Dependence, in institutional remission, and Antisocial

GLASGOW     C-26529     CTF-CENTRAL     05/04/00     gmj

GLASGOW, BRICE
CDC NUMBER:  C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

Personality Disorder, improved.  He stated that in 1975
he attended a methadone treatment program, and after
completing the program remaining abstinent from heroin
for four to five years just prior to his current
incarceration.  He has no history of serious accident,
including head injury.  He has no history of suicidal
behavior, or a history of seizure or other neurological
conditions.  This inmate does have hypertension and is
currently receiving medication for this condition.

XI.   <u>PLANS IF GRANTED RELEASE</u>:

If granted parole, this inmate plans to live in Santa
Clara County with his brother, who has agreed to this
arrangement.  His financial and vocational plans
include using his savings and working in the
construction area in a job offered by his brother.
This inmate's prognosis for community living appears to
be good.

<u>CLINICAL ASSESSMENT</u>

XII.  <u>CURRENT MENTAL STATUS/TREATMENT NEEDS</u>:

During the clinical interview, inmate Glasgow was alert
and oriented to person, place and time.  He was well
dressed and groomed.  His speech was articulate and
contextually meaningful.  His mood and affect were
within normal limits and his behavior was appropriate
to the setting.  No evidence of a mood or thought
disorder was demonstrated.  His estimated level of
intellectual functioning was approximately within the
average range.

<u>CURRENT DIAGNOSTIC IMPRESSIONS</u>:

AXIS I:    Heroin Dependence, in sustained full
           remission.
AXIS II:   No Contributory Personality Disorder.
AXIS III:  Hypertension.

In addition to attending his Alcoholics Anonymous and
Narcotics Anonymous meetings, inmate Glasgow has
attended a number of other self-help programs.  In
1991, he complete the Life Skills group with Dr.
Bakeman at CTF.  In 1993, he completed one on one

GLASGOW      C-26529      CTF-CENTRAL      05/04/00      gmj

GLASGOW, BRICE
CDC NUMBER:  C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


counseling with Dr. Bakeman.  In 1995, he completed the
Science of Mind Foundation course, and from 1996 until
1997, he attended the Milatti Islamic Program for
Addiction Recovery.

XIII. REVIEW OF LIFE CRIME:

Inmate Glasgow said that he killed the victim with the
victim's own gun, purely in self-defense.  He said that
he had previously been attacked by the victim and some
of the victim's friends.  At the time of the instant
offense, the inmate recalled that he was surprised and
attacked by the victim at the home of the inmate's
niece.  He further noted that he was very afraid of the
victim because of beatings suffered by him from the
victim on the two previous occasions.  Inmate Glasgow
did acknowledge the damage done to the victim and to
his niece, who was also injured during the instant
offense.  He did note that he has sent support money to
his now-deceased niece's children.  This inmate did
appear to have good insight into the causative factors
related to the instant offense.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  His violence potential within a controlled setting
    is considered to be below average to significantly
    below average relative to this Level II inmate
    population.  This conclusion is based upon several
    factors.

    On the one hand, inmate Glasgow had a juvenile
    criminal history involving numerous arrests, and he
    was committed to CYA on two occasions, once for
    Battery and Carrying a Concealed Weapon and once
    for Assault with a Deadly Weapon (a knife).  His
    adult criminal history includes over 50 arrests
    with two convictions, one for Burglary and one for
    Shoplifting.  He has three CDC-115 disciplinaries,
    the last received in 1999 for have gambling
    paraphernalia (gambling chips).  He obtained
    two disciplinaries in 1993 for refusing a urine
    sample;  these disciplinaries were received one day
    apart.  He has also received four CDC-128s, the
    last received in 1999.

GLASGOW, BRICE
CDC NUMBER:   C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

On the other hand, however, he has never received a disciplinary for violent behavior during his 20 years of incarceration within CDC.  He has also received only three significant disciplinaries (as noted above) during this period.  He has no history of gang affiliation.  No significant psychopathy was observed.  He has also completed a number of self-help programs satisfactorily and continues to attend Alcoholics Anonymous programming.  Additionally, he developed job skills, including vocational print shop and fabric cutting.

Therefore, in light of these factors, his violence potential is considered to be below average to significantly below average relative to this Level II inmate population.

B.   If released to the community, his violence potential is considered to be no more than the average citizen in the community.

C.   Heroin abuse is a risk factor which may be a precursor to violence for this individual.

XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.   This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards.

B.   This inmate does not have a mental disorder which would necessitate treatment either during his incarceration period or following upon parole.

C.   This inmate does appear to have a heroin abuse problem and continued attendance at Alcoholics Anonymous or Narcotics Anonymous is suggested both during his incarceration and as a contingency for parole.

JOE REED, Ph.D., J.D.
Staff Psychologist
Correctional Training Facility, Soledad

GLASGOW, BRICE
CDC NUMBER:  C-26529
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


*for* ~~*signature*~~

STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JR/gmj

D:   03/03/00
T:   03/04/00

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
FEBRUARY 1997 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 7, 1996

This is either the fifth or the sixth psychological evaluation for the Board of Prison Terms on inmate Brice Glasgow. This report is the product of a personal interview, conducted on 11/07/96, as well as a review of his Central file and his unit health record. This interview was a single contact with this inmate for the sole purpose of preparing this report.

Inmate Glasgow was convicted of a 1980 murder. He continues to report that he did not know that the victim was in the apartment that he visited on that particular night. He also continues to state that the victim was shot in self-defense. Asked for his thoughts and feelings regarding this crime, he stated that he now knows that other people were hurt by this crime; in particular, his and the victim's family. He said if he had to do it all over again, he would not be involved with drugs.

Regarding CDC-115 violations, his most recent violation was on 06/14/93 for disobeying a direct order to submit to a urine sample.

Regarding drugs and alcohol, he admits to a heroin problem in the past. He is currently participating in a recovery group in this institution. He has participated in one-on-one BPT therapy with Dr. Bruce Bakeman and also participated in Dr. Bakeman's "Life Skills" group in the past. Educationally, he completed his GED during his incarceration. Vocationally, he has experience in the print shop, at one point being in the lead position in that vocation. This inmate stated he gets regular visits from family members, including his brother, mother and fiancee. His plans, if paroled, include getting married to his fiancee and finding work either in the printing or construction fields.

MENTAL STATUS EXAMINATION: Inmate Glasgow is a 55-year-old, black male of average to large build who appears his stated age. His dress and grooming were appropriate. He was calm, alert and cooperative during the interview. His speech, affect and flow of thought were all normal. His intellectual functioning was estimated to be within the average range.

GLASGOW
C-26529
Page Two


DIAGNOSTIC IMPRESSIONS:

AXIS I:    Heroin dependence, in institutional remission.
AXIS II:   Antisocial personality disorder, improved.
AXIS III:  High blood pressure.

CONCLUSIONS AND RECOMMENDATIONS:

1) This inmate is competent and responsible for his behavior.
He has the capacity to abide by institutional standards and he
has generally done so during his incarceration.

2) Regarding his violence potential, due to his maturity and
sobriety, his violence potential is estimated to be somewhat
below average relative to this inmate population.

3) Conditions of parole should include no alcohol nor illicit
drugs and mandatory drug monitoring.

4) This inmate has no psychiatric condition that would suggest
the need for any kind of mental health treatment at this time.


STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
SEPTEMBER 1993 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 17, 1993

This is the fourth psychiatric evaluation for the Board of Prison Terms on inmate Glasgow. This report is the product of a personal interview, as well as a review of his Central file and medical record.

He had no CDC 115s for a long period, but there is currently a CDC 115 pending from June 15, 1993, when he disobeyed an order to submit a urine sample for testing.

His crime consisted of the 1980 shooting of a man. He expressed regret for that incident. He has attained his GED educationally. Vocationally, he is now president of the print shop where he works. His future plans include moving to Santa Clara County to live and work in printing.

MENTAL STATUS EXAMINATION: Inmate Glasgow is a well developed, well nourished, muscular man who appeared to be his stated age of 52. He was appropriately dressed and groomed, and seemed to be relaxed and cooperative during the interview. His speech was of normal intensity, rate, inflection and quantity. His affect was normal and seemed appropriate to the content of his thought. His flow of thought was normal with no hallucinations nor delusions noted. He seemed to be fully oriented with normal intellectual functioning. His attention and concentration were good. His insight and judgment appear to be improving over that at the time of the shooting.

PSYCHIATRIC DIAGNOSIS: (DSM-III-R)

AXIS I:    304.00 - Heroin dependence, in institutional remission.
AXIS II:   301.70 - Antisocial personality disorder, improved.
AXIS III:  High blood pressure.
AXIS IV:   Psychosocial stress - two (incarceration).
AXIS V:    Global assessment of functioning:  current 90, past year 90.

PSYCHIATRIC CONCLUSIONS: His diagnosed psychopathology appears to be indirectly related to his offense. It was a contributing factor in the way he thought and acted at that time, but it did not specifically determine

GLASGOW          C-26529          CTF-CENTRAL          07/12/93          gj

GLASGOW
C-26529
Page 2

his actions.  He does not have a psychiatric condition which would benefit from mental health treatment following his release.  He does appear to be showing improvement in his behavior, and if released, he should be able to maintain these gains, especially provided he avoids illicit drugs.

SUGGESTED ACTIONS:  If he is to be continued in his present program, he should be encouraged to continue his attendance of Alcoholics Anonymous and to continue his vocational training in the printing trade.  If he is considered for parole, his level of dangerousness should be no more than for the average inmate.  Conditions for parole should include no alcohol nor illicit drugs.

RECOMMENDATION TO CLASSIFICATION COMMITTEE:  Until released, he should:
1)  Continue to attend Alcoholics Anonymous.  2)  Continue his vocational training in the printing trade.

*Bruce Bakeman Ph.D.*

BRUCE M. BAKEMAN, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

GLASGOW              C-26529          CTF-CENTRAL        07/12/93              gj

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
JULY 1992 ISL CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 4, 1992

This is the third psychological evaluation for the Board of Prison Terms on inmate Brice Glasgow. He was seen for a 30 minute interview, including a review of his Central file and medical record, for the purpose of this evaluation.

His last psychiatric evaluation for the Board of Prison Terms in 1989 by Dr. Clyde Martin was positive. Despite a long criminal history, this inmate has been estimated to be below average in violence potential. He completed Dr. Bakeman's "Lifeskills" group in January of 1991. He is currently working in the print shop and is attending Alcoholics Anonymous meetings. He has not received any CDC 115s.

In describing his offense, he states that it was self-defense, and that the victim had severely beaten the inmate a year prior to the Life crime.

MENTAL STATUS EXAMINATION: This is a well developed, well nourished male who appears to be his stated age. He was neatly dressed and well groomed. He was relaxed and cooperative. His speech was normal. His affect was normal and appropriate. He denies any symptoms of depression, suicidal ideation, hallucinations, delusions or thought disorder. He was oriented and is not having any difficulty with his memory. His intellectual functioning is estimated to be in the average range. His attention and concentration are good. His insight and self-understanding are good. He appears to have a clear understanding of the causative factors related to his offense. His emotional stability is currently much improved. He appears to be sincere about his rehabilitation. His judgment for hypothetical situations indicates that his problem solving ability is good. He shows an ability to cooperate with authority during an emergency situation and has a prosocial orientation. His solutions for moral dilemmas indicate an above average ability to understand the rights and responsibilities of himself and others.

GLASGOW          C-26529          CTF-CENTRAL          06/06/92          gj

GLASGOW
C-26529
Page   2

PSYCHIATRIC DIAGNOSIS:

AXIS I:     304.00 - Heroin dependence, in institutional remission.
AXIS II:    301.70 - Antisocial personality disorder, improved.
AXIS III:   High blood pressure, per inmate.
AXIS IV:    Two - mild.
AXIS V:     GAF is currently 90, and GAF for the past year has been 90.

PSYCHIATRIC CONCLUSIONS:  There is no significant relationship between the above diagnosed psychopathology and the offense.  During observation in the institution, he has psychiatrically improved moderately due to the effects of maturity and enforced sobriety.  In a less controlled setting, such as a return to the community, this inmate is considered likely to hold his present gains if he continues to abstain from drugs.  His violence potential outside of a controlled setting in the past is considered to have been less than average, and at present is decreased.  Conditions of parole should include drug monitoring, attendance at Narcotics Anonymous meetings or other similar rehabilitation program, and close supervision.  If he is not paroled or released, he should continue with his present rehabilitation program as continued benefit is likely.

RONALD KITT, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

GLASGOW          C-26529          CTF-CENTRAL          06/06/92          gj

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
JULY 1989 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
APRIL 3, 1989

This is the second psychiatric evaluation for the Board of Prison Terms on Mr. Glasgow and is based on a 30-minute interview and a review of the Central file. The inmate had heroin addiction and was receiving methadone on the outside. A previous psychiatric report indicated heroin addiction and antisocial personality.

MENTAL STATUS EXAMINATION: The patient is a well developed, well nourished, muscular individual who appears his stated age. He was neatly dressed and well groomed. He was mildly tense. He was cooperative. His speech was of normal intensity, rate and inflection and he was spontaneous. His affect was normal. His thought content was appropriate to affect. His flow of thought was normal. He denies depressive or suicidal ideation. He has normal associations of thought. He is oriented as to time, place and person. His memory is intact. His intellectual functioning was not estimated. His attention and concentration were good. He has some insight and fair judgment at this point. He is currently remaining disciplinary-free and has a good work history. He seems to understand the causative factors of his crime, has some good self-understanding, positive attitudes for change, and good social identification. His sincerity for rehabilitation seems to be good.

PSYCHIATRIC CONCLUSIONS: The diagnosed psychopathology is only indirectly related to the crime. It predisposed to it, but did not determine it. Psychiatrically, he has improved moderately while in the institution. In a less controlled setting, such as a return to the community, the inmate is likely to continue the present gains if he does not return to his addiction. If not paroled, it is recommended that he be continued in his present rehabilitation program. If paroled, his potential for violence is probably less than that of the average inmate unless he returns to his addiction, at which time it would be greater. Any conditions for parole should include drug and alcohol counseling and testing, and close supervision. I have no other recommendations.

CLYDE V. MARTIN, M.D., F.A.P.A.
Staff Psychiatrist
Correctional Training Facility, Soledad

GLASGOW        C-26529        CTF-CENTRAL        04/10/89        gj

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
JULY 1986 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 9, 1986

This is the first psychiatric report to the Board of Prison Terms for this 45 year old black male serving a sentence for Murder First from Santa Clara County.

This report is based upon a review of the inmate's Central File and an interview of half an hour. The subject was born in Prescott, Arizona and moved with his family to California at age 3. He dropped out of school in the 11th grade and has been a construction laborer since that time, working sporadically. From his early 20's until the age of 36 he was a heroin addict. He stopped by himself when he "grew up". He had four felony convictions prior to the instant offense but no prior prison sentences (for theft, burglary, NSF). He is reluctant to discuss the details of the instant offense as he has it on appeal since his niece, one of the victims, was convicted of perjury for her testimony in his trial. The subject is married and has a nine year old child. He is currently employed in textiles at CTF and is housed at CTF-Central. He has mild hypertension which is controlled with Aldomet and Dyazine. He sustained head injuries during assaults connected with the instant offense and had three convulsive seizures later and glaucoma, traumatic type, which has improved. He has no CDC-115's since incarceration and no significant problems during incarceration.

MENTAL STATUS EXAMINATION: Is unremarkable. He is in good contact and fully oriented, without thought or mood disorder. Intellect is average. Memory is grossly normal and there are no overt signs of organicity. Insight and judgement are intact. He does not appear to have antisocial attitudes at the present time.

PSYCHIATRIC DIAGNOSIS:   Axis I:   Heroin Dependence, by history.
                         Axis II:  Antisocial Personality Disorder, Improved.

PSYCHIATRIC RECOMMENDATION: I can make no observations about the instant offense as the subject has it in appeal. He has a long history of criminal behavior, primarily associated with his drug dependence of many years. There is little evidence or prior violent behavior. He appears to have matured and "grown up", as he puts it, since incarceration. His disciplinary record supports this hypothesis. He does not appear to be in need of psychiatric treatment or vocational training.

PHILIP S. HICKS, M.D.
Staff Psychiatrist

GLASGOW          C-26529          CTF-CENTRAL          5/9/86          da

# EXHIBIT 11

# ORIGINAL

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

FILED

Court of Appeal - Sixth App. Dist.

JAN 2 5 2007

MICHAEL J. YERLY, Clerk

By _____

DEPUTY

In re BRICE GLASGOW,

on Habeas Corpus.

H030793
(Santa Clara County
 Super. Ct. No. 75071)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

Dated    JAN 2 5 2007    _P. Bamattre Manoukian_ Acting P.J.

# EXHIBIT 12

# S150130

## IN THE SUPREME COURT OF THE

## STATE OF CALIFORNIA

In re

BRICE GLASGOW　　　　　,

On Habeas Corpus.

_____/

Sixth Appellate District
Court of Appeal,

Case No. H030793

(Santa Clara County
Superior Court No. 75071.)

SUPREME COURT
FILED

FEB 1 3 2007

Frederick K. Ohlrich Clerk

~~DEPUTY~~

## PETITION FOR REVIEW

Brice Glasgow
C-26529
CORRECTIONAL TRAINING FACILITY
P. O. Box 689
Soledad, CA 93960-0689

1    IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

2

3    In re:                                    **S150130**

     Brice Glasgow        )        No._____
4
                          )
         Petitioner,      )
5                         )        Court of Appeal No. H030793
     On Habeas Corpus)
6

7

8                        PETITION FOR REVIEW

9    TO THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE, AND TO THE
     HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF
10   CALIFORNIA:

11    Petitioner Brice glasgow hereby petitions this Court for review

12   following the decision of the Court of Appeal Sixth Appellant

13   District, filed January 25, 2007 denying the Petition for Writ of

14   Habeas Courpus. A copy of the decision is attached hereto as

15   Exhibit "A".

16                        QUESTION PRESENTED

17   1. Does the Board decision violate Petitioner's right to due process

18   because the reasons are not supported by the Board, and effectively

19   resentence Petitioner.

20   2.   Does the Board's decision violate Petitioner's due process

21   because there is no evidence that indicates Petitioner's release

22   unreasonable endangers public safety?

23   3.   Does the Board violate Petitioner's due process when the

24   Superior Court does not show Relevant and Reliable Evidence that

25   Petitioner is a current threat to public safety

26   //                        RECEIVED

27   //                        FEB 8 - 2007

28   //                    CLERK SUPREME COURT

1   <u>NECESSITY OF REVIEW</u>

2   A grant of review and resolution of these issues by this Court are

3   necessary to secure uniformity of decision and to settle important

4   questions of law.   The need for uniformity of decision is

5   demonstrated by a comparison for this case with the factually

6   similar in In re Ramirez (2002) 94 Cal. App. 4th 549 and Biggs v.

7   Terhune (9th Cir. 2003) 334 F. 3d 910, which both resulted in court

8   findings opposite to what the Court decisions in Petitioner's case.

9   Petitioner submits that viewing these cases together demonstrates a

10  lack of uniformity in application of the due process/equal

11  protection standard of the 5th & 14th amendment of the U.S.

12  Constitution.   The decision by the court of appeal in this case

13  conflicts with other cases concerning crimes of murder and the due

14  process standard set out by the Ninth Circuit Court of Appeals in

15  Biggs v. Terhune (2003) 334 F.3d 910.   This case also provides the

16  Court with an opportunity to decide if by denying parole to 98% of

17  appearing prisoners, the Board is following the mandate of

18  penal code section 3041 (a) that parole "shall normally" be

19  granted, as this court mandated in In re Rosenkrantz, supra, at

20  683, or does the Board's repeated denials of parole to 98% of

21  appearing inmates reflect their factual bias against parole. And

22  does the Executive Branch, past and present Governors refusal to

23  adhere to the mandate that parole "shall normally" be granted

24  futher reflect an illegal policy in violation of the mandate of

25  penal code section 3041 (a)?

26  In summary, Petitioner respectfully submits that in the instant

27  matter, there is not "some evidence" having an "indicia of

28  reliability" to support each of the Board's findings required by

1  the United States Constitution, Fifth and Fourteenth Amendments,

2  the California Constitution, Article I section 15, and Biggs v.

3  Terhune supra, (9th Cir 2003) 334 F. 3d 910.

4  ARGUMENT

5  On November 2, 2005,    Petitioner appeared before the Board of

6  Prison Terms and was again found unsuitable for parole after

7  serving more than 18 actual years , without the benefit of good

8  time credits, based on unchanging factors, i.e., the circumstances

9  of the offense, prior history. Petitioner received a 1 year denial.

10  On September 13, 2006, the Los Angeles Superior Court denied

11  Petitioner's petition for the issuance of a writ of habeas corpus.

12  (See Exhibit "B", attached hereto) Petitioner then filed a petition

13  for writ of habeas corpus in the Sixth Appellant District. On

14  January 25, 2007, that Court denied the Petition. (See Exhibit "A",

15  attached hereto). On Feburary 6, 2007, under the Mailbox Rule,

16  Petitioner delivered to prison officials, the instant petition for

17  review. The petition for review is timely.

18  The Board's Decision To Deny Parole Was Not Supported By Evidence
   Having An "Indicia Of Reliability" That Petitioner Is Currently

19  An Unreasonable Risk or Threat To Society.

20  In Bigg. v. Terhune, supra, at p. 914 the Ninth Circuit Court of

21  Appeals held that "[b]ecause the California parole scheme [Penal

22  Code § 3041 (b))] vests in every inmate a  constitutionally

23  protected liberty interest protested by the procedural safeguards

24  of the Due Process Clause, 'some evidence' having an 'indicia of

25  reliability' must underly every Board decision." The Biggs Court

26  then proceeded to establish a Federal standard for the California

27  Board of Prison Terms to follow when assessing the facts before it

28  during a parole consideration hearing. Biggs 334 F. 3d at 919

1  concludes that although a commitment offense can provide some
2  evidence to justify the initial denial of a parole date, subsequent
3  denials in the face of exemplary behavior and overwhelming evidence
4  of rehabilitation raises serious questions involving Petitioner's
5  liberty interest in parole.  Petitioner submits the Board's
6  refusals to grant a parole date and repeated failure to provide
7  post-commitment support for its decisions have violated
8  petitioner's liberty interest and due process rights.  And the time
9  already served is in gross excess of the established guidelines
10 [Matrix, 15, CCR § 2403 (c)], for Petitioner's commitment offense,
11 and for the Board to continue to incarcerate Petitioner is a clear
12 violation of his Federal Due Process Rights.
13 Petitioner submits the mandatory language of P.C. § 3041 (b)
14 imposes an affirmative obligation by the Board to grant parole,
15 which presumption that parole release will be granted if certain
16 conditions are met. McQuillion v. Duncan (9th Cir. 2002) 306 F. 3d
17 895, 901-902; Biggs v. Terhune (9th Cir. 2003) 334 F 3d 910.
18 Petitioner submits he has met those conditions.
19 Petitioner respectfully submits that in accordance with the
20 recently announced Federal standard, this Court should grant review
21 to come into compliance with Federal law.
22 The Board of Parole Hearing Has An Anti-Parole Policy Or Policy
23 Of Demonstrating Systematic Bias, Or Policy Of Underinclusion In
   Their Decision Making By Denying Grants To Parole To 98% Of
24 Appearing Inmates. To The "Shall Normally" Grant Parole As
   Mandated By The Legislature When It Enacted Penal Code Section
   3041 (a).
25
26 Petitioner respectfully submits that a review of the available
27 state government statistical date, which can be provided if
28 requested, will demonstrate the Boards, past and present, denied

1   parole to 99% to prisoners in violation of penal code section 3041

2   (a), as this court mandated in In re Rosenkrantz, supra, 29 Cal.

3   4th at 6893, in violation of the recently announced Federal

4   standard set out by the Ninth Circuit Court of Appeals in Biggs v.

5   Terhune, supra, at 916-917.

6     In this case, Petitioner submits the Board affected its desired

7   result by "simply identifying 'some evidence' from the record to

8   support [the] desired result," ignoring the principles outlined in

9   In re Ramirez, supra, at P. 536-564 and 571, and Biggs supra, at

10   pp. 916-917.  These facts do not and can not demonstrate that

11   Petitioner is <u>currently</u> an unreasonable threat to public safety if

12   released.  The hearing was a sham and a farce.

13     Petitioner submits he did not receive a fair parole hearing

14   because the hearing results reflect the Board's systematic bias

15   against granting parole.  The hearing was adjudicated in pro

16   forma, violating Petitioner's state and federal due process rights,

17   depriving petitioner of his federally protected liberty interest of

18   due process and equal protection under the fifth and fourteenth

19   amendments of the U.S. Constitutions and similar provisions under

20   the California Constitution and equal protection, to be released on

21   parole.

22                    CONCLUSION

23    For the above reasons, Petitioner respectfully submits this court

24   grant review, to insure uniformity of decision making as mandated

25   in In re Ramirez, supra, and this court in In re Rosenkrantz,

26   supra, and the Ninth Circuit Court of Appeals standard set out in

27   Biggs v. Terhune supra.

28   Date: __2/6/07__ .

                               Respectfully Submitted;

                               *Mr. Brice Glasgow*

                               Brice Glasgow

# EXHIBIT   "A"



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT



Court of Appeal - Sixth App. Dist.

**FILED**

JAN 2 5 2007

MICHAEL J. YERLY, Clerk

By _____

DEPUTY

In re BRICE GLASGOW,

    on Habeas Corpus.

H030793
(Santa Clara County
Super. Ct. No. 75071)

BY THE COURT:

    The petition for writ of habeas corpus is denied.

    (Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

Dated    JAN 2 5 2007        BAMATTRE-MANOUKIAN, J.    Acting P.J.

# EXHIBIT "B"

1

2

3

**FILED**

4

SEP 1 3 2006

5

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara

6

BY _____ DEPUTY

7

8                 SUPERIOR COURT OF CALIFORNIA

9                    COUNTY OF SANTA CLARA

10

11

12   In re                          )    No.: 75071
                                     )
13       BRICE GLASGOW,              )
                                     )    ORDER
14   On Habeas Corpus                )
                                     )
15

16

17        Pursuant to *In re Dannenberg* (2005) 34 Cal.4th 1061 parole can

18   be denied if any one of several broadly interpreted, and extremely

19   deferentially reviewed, unsuitability factors are present.  In this

20   case "multiple victims were attacked, injured or killed."  The

21   habeas petition is DENIED.

22

23   DATED:    **13 Sep** , 2006

24                                    PAUL BERNAL
                                      JUDGE OF THE SUPERIOR COURT

25

26   cc:  Petitioner
          Attorney General
27        Research(A)
          CJIC

28

1

| IN THE SUPERIOR COURT OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA CLARA | **F I L E D**<br>SEP 1 3 2006<br>KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of CA County of Santa Clara<br>BY _____ DEPUTY |
|---|---|
| Plaintiff/Petitioner<br>Brice Glasgow | |
| In re: People vs. Glasgow | |
| **PROOF OF SERVICE OF: Order in re: Habeas Corpus** | Case Number:<br>**75071** |

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this cause and that a true copy of this document was mailed first class postage fully prepaid in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on SEP 1 3 2006 . I declare under penalty of perjury that the foregoing is true and correct.

DATED:  SEP 1 3 2006

Kiri Torre, Chief Executive Officer

BY:  Catherine Guerra, Deputy Clerk

| Brice Glasgow<br>#C-26529<br>P.O. Box 689<br>Soledad, CA 93960-0689 | Research Attorney Criminal Division<br>190 W. Hedding Street<br>San Jose, CA 95110<br>*Placed in Research Attorney pick up box at HOJ |
|---|---|
| | Office of the District Attorney<br>70 West Hedding Street<br>San Jose, CA 95110<br>*Placed in District Attorney pick up box at HOJ |
| | CJIC |
| | |

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _Brice Glasgow_____, declare:

I am over 18 years of age and I am party to this action. I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California. My prison address is:

_Brice Glasgow_, CDCR #: _C-26529_
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _____
SOLEDAD, CA 93960-0689.

On _February 6, 2007_____, I served the attached:

_____ Petition for Review _____
_____

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined. The envelope was addressed as follows:

Supreme Court of California
350 McAllister St.
San Francisco, Ca 94102

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on _2/6/07_____.

_Mr. Brice Glasgow_____
Declarant



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT



Court of Appeal - Sixth App. Dist.

**FILED**

JAN 2 5 2007

MICHAEL J. YERLY, Clerk

By _____
                    DEPUTY

In re BRICE GLASGOW,

on Habeas Corpus.

H030793
(Santa Clara County
Super. Ct. No. 75071)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,
participated in this decision.)

Dated    **JAN 2 5 2007**    _____    **BAMATTRE-MANOUKIAN, J.**    _____    Acting P.J.

# EXHIBIT 13

# CALIFORNIA APPELLATE COURTS

## Case Information



**Supreme Court**

Change court ▾

Court data last updated: 10/04/2007 09:53 AM

Supreme
Court

Welcome

Search

E-mail

Calendar

Help

Opinions

C|C
home

**Case Summary**   **Docket**   **Briefs**
**Disposition**   **Parties and Attorneys**   **Lower Court**

## Case Summary

| | |
|---|---|
| **Supreme Court Case:** | S150130 |
| **Court of Appeal Case(s):** | Sixth Appellate District<br>H030793 |
| **Case Caption:** | GLASGOW (BRICE) ON H.C. |
| **Case Category:** | Review - Habeas (criminal) |
| **Start Date:** | 02/08/2007 |
| **Case Status:** | closed |
| **Issues:** | none |
| **Disposition Date:** | 04/25/2007 |
| **Case Citation:** | none |

## Cross Referenced Cases

No Cross Referenced Cases Found

**Click here** to request automatic e-mail notifications about this case.

© 2007 Judicial Council of California