IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRICE GLASGOW, | No. C 07-1851 CW (PR) |
|     Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
|   v. | |
| BEN CURRY, Warden, | |
|     Respondent. | |

On April 3, 2007, Petitioner Brice Glasgow, a state prisoner incarcerated at the Correctional Training Facility at Soledad, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging as a violation of his constitutional rights the denial of parole by the California Board of Parole Hearings (Board).[1]  On October 23, 2007, Respondent Warden Ben Curry filed an answer.  Petitioner timely filed a traverse. Having considered all of the papers filed by the parties, the Court DENIES the petition.

BACKGROUND

On March 1, 1980, Petitioner knocked on the door of his niece Patricia Watts' home at five in the morning.  (Resp't Ex. 3, Jan.

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings.  Cal. Penal Code § 5075(a).

1  29, 1981 Report of Adult Probation Officer at 2.)  She refused to
2  let him in then, but allowed him to enter her home later in the
3  morning when he returned.  (Id.)  Petitioner sat in Watts' living
4  room for ten minutes and played with her daughter.  (Id.)  There
5  was a knock at the door and Petitioner allowed Edmund Duhart to
6  enter.  (Id.)  Petitioner then walked towards the hallway with a
7  gun in his hand.  (Id.)  Watts ran to the bedroom and attempted to
8  wake her boyfriend Ralph Collins.  (Id.)  Petitioner entered the
9  bedroom and a struggle ensued between him and Collins.  (Id.)
10 Petitioner shot Collins several times and also shot and injured
11 Watts in the back as she attempted to protect Collins.  (Id. at 1-
12 2.)  Petitioner apparently called to Duhart and asked him to
13 remove Watts from Collins.  (Id.)  After the shooting, Petitioner
14 and Duhart left the apartment.  (Id.)  Collins died of gunshot
15 wounds to the head, chest and abdomen; two of the gunshot wounds
16 entered his body through his upper back.  (Id. at 3.)  Petitioner
17 was arrested on the same day, March 1, 1980, by the Palo Alto
18 Police Department.  (Id. at 1.)
19      On December 19, 1980, a jury found Petitioner guilty of first
20 degree murder and assault with a deadly weapon.  Petitioner was
21 sentenced to a term of twenty-five years to life plus five years.
22 (Pet'r Ex. A, Nov. 2, 2005 Transcript of Parole Hearing at 1.)
23      Petitioner has an extensive record of over eighty-two
24 arrests, including burglaries, forgery, carrying concealed weapons
25 and battery.  (Id. at 18.)  Some of these arrests resulted in
26 convictions, including four felony convictions for possession of a
27 completed check, conspiracy and burglary.  (Resp't Ex. 3 at 1.)
28

2

**United States District Court**
For the Northern District of California

1   Several convictions occurred while Petitioner was on probation for
2   a previous crime.  (Resp't Ex. 5, Feb. 2003 Life Prisoner
3   Evaluation Report at 4-7.)  Petitioner was addicted to heroin for
4   over twenty-three years.  (Pet'r Ex. A at 43.)
5       Petitioner was born in 1942 and was sixty-three years old at
6   the time of the 2005 parole hearing, which was his fourth parole
7   hearing.  (Resp't Ex. 6, California Department of Justice Bureau
8   of Identification Report at 1; Resp't Ex. 8, Aug. 18, 2006
9   Petition for Writ of Habeas Corpus in Superior Court at 7.)  The
10  Palo Alto Police Department recommended against his release due to
11  the gravity of the crime.  (Pet'r Ex. A at 31.)  The District
12  Attorney of Santa Clara County also recommended against his
13  release.  (Id. at 58.)
14      At the hearing, the Board considered the following evidence.
15  Petitioner attended Narcotics Anonymous (NA) meetings in prison
16  for many years.  (Id. at 34.)  Several years ago, Petitioner
17  married a woman he knew before he was incarcerated and plans to
18  live with her if released on parole.  (Id. at 23.)  Petitioner has
19  offers of employment and a sponsor for his participation in NA
20  meetings.  (Id. at 23-24.)  Approximately fifty people signed a
21  petition advocating for his release on parole.  (Id. at 25.)  His
22  family members stated they would welcome him back home.  (Id. at
23  29.)
24      Petitioner worked successfully in several vocations during
25  his time in prison.  (Id. at 33.)  He passed a General Educational
26  Development test, thus earning the equivalent of a high school
27  diploma.  (Id. at 34.)  Petitioner is a volunteer in the academic
28  department distance learning program and participates in the

3

prison's life skills program.  (Id.)  He took numerous life skills classes, including anger management.  (Id.)  The Presiding Commissioner on the Board noted that Petitioner had "more laudatory chronos in [his] file than [she] had ever seen before." (Id.)  Petitioner also has a good disciplinary record in prison. (Id. at 67.)

Petitioner's psychological report states that, if released to the community, his "violence potential is considered to be no more than that of the average citizen in the community."  (Id. at 37.) The report also states that Petitioner has been abstinent from heroin for over twenty-three years and notes his regular attendance at NA meetings.  (Id.)

At his parole hearing, Petitioner said the following about his current feelings about the crime:  "I feel like I am responsible for it and I [am] sorry it had to happen.  It affected me and it affected my family and it affected his family.  And I know that they suffer from it and so have I.  If I could redo it again I would do it much different."  (Id. at 17.)  Petitioner testified that he had written letters of remorse to the families of the victims.  (Id. at 24.)  Petitioner stated that he has changed since the time of the crime and has accepted God in his life.  (Id. at 21.)

When asked how many times he shot Collins, Petitioner said, "I don't know nothin about nothin."  (Id. at 15.)  He claimed that he did not remember how Watts was shot.  (Id.)  When asked how he would redo things now, Petitioner stated, "I would take the chance of turning myself over to the care of God and I wouldn't leave the

4

scene like I did." (<u>Id.</u> at 17.)

Petitioner told his version of the commitment offense at the parole hearing. Petitioner contended that he went to the bathroom and when he came out Collins was there with something in his hand Petitioner thought was a gun and he shot Collins out of fear. (<u>Id.</u> at 13-15.) Petitioner had claimed until 2000 that the murder weapon was the victim's gun; he only recently admitted that he brought the gun into the house. (<u>Id.</u> at 55.)

After deliberation, the Board concluded that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released. (<u>Id.</u> at 65.) The Board issued a one year denial of parole. (<u>Id.</u> at 68-69.) The Board stated that the main reason for its denial was the commitment crime. (<u>Id.</u> at 65.) In support of its decision, the Board cited the "cruel and callous" manner in which Petitioner killed Collins, that multiple victims were attacked and that the motive for the crime was "very trivial" in relation to the offense. (<u>Id.</u> at 65-66.)

The Board was also concerned with the discrepancy between the Petitioner's account of the crime and the surviving victim's version which led to a first degree murder conviction. (<u>Id.</u>) Citing Petitioner's eighty-two arrests, the Board stated Petitioner had an "escalated pattern of criminal conduct and violence," and had "failed previous rounds of probation and parole." (<u>Id.</u> at 66.) The Board expressed concern that Petitioner would revert back to his previous criminal behavior. (<u>Id.</u>)

The Board commended Petitioner on his good prison record, his

1 participation in numerous programs, his plans for release and his
2 favorable psychological report. (Id. at 67-68.)  However, the
3 Board suggested that Petitioner spend more time with a therapist
4 to discuss his prior criminal history and heroin use and how it
5 related to his crime. (Id.)

6     Petitioner filed a petition for a writ of habeas corpus in
7 the Santa Clara County Superior Court challenging the Board's
8 decision.  On September 13, 2006, the superior court, in a one
9 paragraph opinion, denied the petition based on the fact that
10 "multiple victims were attacked, injured or killed." (Resp't Ex.
11 9, Sept. 13, 2006 Santa Clara County Superior Court Order at 1.)
12 Petitioner filed habeas petitions in the California court of
13 appeal and the California Supreme Court, both of which were
14 summarily denied. (Resp't Ex. 11, Jan. 25, 2007 California Court
15 of Appeal Order at 1; Resp't Ex. 12, Feb. 13, 2007 California
16 Supreme Court Order at 1.)

17 <center>STANDARD OF REVIEW</center>

18     Under the Antiterrorism and Effective Death Penalty Act of
19 1996 (AEDPA), a district court may not grant habeas relief unless
20 the state court's adjudication of the claim: "(1) resulted in a
21 decision that was contrary to, or involved an unreasonable
22 application of, clearly established Federal law, as determined by
23 the Supreme Court of the United States; or (2) resulted in a
24 decision that was based on an unreasonable determination of the
25 facts in light of the evidence presented in the State court
26 proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S.
27 362, 412 (2000).  The first prong applies both to questions of law
28 and to mixed questions of law and fact, Williams, 529 U.S. at 407-

<center>6</center>

09, while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. See id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340. A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. Id. Although only Supreme Court law is binding on the States, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

7

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In the present case, the only state court to address the merits of Petitioner's claim is the Santa Clara superior court.

## DISCUSSION

Petitioner asserts that California Penal Code § 3041(b) imposes an affirmative obligation to grant parole which creates a legally cognizable liberty interest. Petitioner argues that his due process rights were violated by the Board's decision to deny him parole because that decision was not supported by "some evidence" in that he is not currently a threat to the public safety.

The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)).[2]

---

[2] Respondent argues that, under AEDPA, the "some evidence" standard of Hill does not apply to parole suitability hearings because the United States Supreme Court has not applied it in that context. Respondent claims that the due process protections to which California prisoners are entitled by clearly established Supreme Court authority are limited to an opportunity to be heard and a statement of reasons for denial. This position, however, has

8

This standard is met if there was "some evidence" from which the conclusion of the administrative tribunal could be deduced. Hill, 472 U.S. at 455. An examination of the entire record is not required nor is an independent weighing of the evidence. Id. The relevant question is whether there is any evidence in the record that could support the conclusion reached by the administrative board. Id.

When assessing whether a state parole board's unsuitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant State. Sass, 461 F.3d at 1128. Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle. Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." Cal. Penal Code § 3041(b).

The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the parole authority is required to consider. Cal. Code Regs. tit. 15, § 2402(b). These include "[a]ll relevant, reliable information

---

been rejected by the Ninth Circuit.

available," such as:

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. § 2402(c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id.

Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. Id.

Circumstances tending to support a finding of suitability for

10

parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. Id. § 2402(d).

Petitioner argues that, under the reasoning of Biggs v. Terhune, 334 F.3d 910, 915-16 (9th Cir. 2003), in denying parole the Board improperly relied on static factors to find that he was a threat to public safety.

In Biggs, the Ninth Circuit found that parole denial based solely on the gravity of the commitment offense can initially satisfy due process requirements, using the "some evidence" standard. However, in dicta, the Biggs court stated that courts may also consider the parole board's decision-making process over time: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor . . . runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17.

The Ninth Circuit's opinion in Irons v. Carey sheds further light on whether reliance on an immutable factor such as the commitment offense violates due process. 505 F.3d 846, 850 (9th Cir. 2007). In Irons, the District Court for the Eastern District

11

1  of California granted a habeas petition challenging the parole
2  board's fifth denial of parole where the petitioner had served
3  sixteen years of a seventeen years to life sentence for second
4  degree murder with a two-year enhancement for use of a firearm,
5  and where all factors indicated suitability for parole.  358 F.
6  Supp. 2d 936, 947 (E.D. Cal. 2005).  The Ninth Circuit reversed.
7  505 F.3d 846 (9th Cir. 2007).  The Ninth Circuit limited its
8  holding to inmates deemed unsuitable prior to the expiration of
9  their minimum sentences and left the door open for inmates deemed
10 unsuitable after the expiration of their minimum sentences.  Id.
11 at 854.  The Ninth Circuit stated:

> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.  Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.  Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

22 Id. at 853-54.  The court recognized that at some point after an
23 inmate has served his minimum sentence, the probative value of his
24 commitment offense as an indicator of an unreasonable risk of
25 danger to society recedes below the "some evidence" required by
26 due process to support a denial of parole.  Id.
27       Like the petitioner in Irons, Petitioner has not served his
28 minimum sentence.  Petitioner was sentenced to twenty-five years

12

to life plus five years, a total minimum sentence of thirty years. He had completed only twenty-five of his thirty year minimum sentence at the time of the 2005 parole hearing. Petitioner's due process rights were not violated when the Board deemed him unsuitable for parole before his minimum sentence had been served.

Further, the Board relied on more than the single "unchanging factor" described in Biggs in denying Petitioner parole. Although the "cruel" nature of Petitioner's commitment offense weighed heavily in the Board's determination, especially the attack on multiple victims, the Board was also significantly influenced by Petitioner's extensive criminal history and his previous failures on probation and parole. (Pet'r Ex. A at 65-67.) The Board was concerned with Petitioner's attitude towards the crime and the discrepancy between his version of the crime and the evidence that led a jury to convict him of first degree murder. The Board suggested that he "really, really think" about the crime, and spend more time with his therapist to address his past criminal history and heroin use as it related to the crime. (Id. at 65-67.) Thus, the Board relied on factors other than the commitment offense for some evidence that Petitioner was unsuitable for parole.

The Ninth Circuit's evolving guidance in Biggs, Sass and Irons suggests that the Board can continue to evaluate static factors, including the nature of the commitment offense and pre-conviction criminality, as "some evidence" in deciding whether to grant parole. The weight to be attributed to those immutable events, however, should decrease as a predictor of future dangerousness as the years pass and the prisoner demonstrates

13

favorable behavior.  See Biggs, 334 F.3d at 916-17; Irons, 505 F.3d at 853-54.  Should Petitioner follow the Board's advice by expressing insight into and remorse for his crimes, talking with a therapist about the impact his past criminal history and heroin addiction had on his behavior and maintaining a positive disciplinary record, continued parole denials based on Petitioner's commitment offense and past criminal record alone could eventually give rise to a due process violation after he completes serving his minimum sentence of thirty years.  See Biggs, 334 F.3d at 916-17.  However, at this time the state court's decision affirming the Board's denial of parole was not contrary to or an unreasonable application of Supreme Court authority or an unreasonable application of the facts in light of the evidence in the record.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 10/17/08

_____
CLAUDIA WILKEN
United States District Judge

<div style="text-align:center">

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

</div>

| | |
|---|---|
| GLASGOW et al, | Case Number: CV07-01851 CW |
| Plaintiff, | **CERTIFICATE OF SERVICE** |
| v. | |
| CURRY et al, | |
| Defendant. | |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 17, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Brice  Glasgow
CTF-Soledad
Corr Training Facility
P.O. Box 689
YW-131L
Soledad,  CA 93960-0689

Scott Colin Mather
CA State Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco,  CA 94102-7004

Dated: October 17, 2008

    Richard W. Wieking, Clerk
    By: Sheilah Cahill, Deputy Clerk

**United States District Court**
For the Northern District of California